**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| DELTA AIR LINES, INC., et al., | ) | Case No. 05-17923 (ASH) |
| | ) | Jointly Administered |
| Debtors. | ) | |

_____

| | | |
|---|---|---|
| KENTON COUNTY BONDHOLDERS | ) | |
| COMMITTEE, | ) | 07 Civ. 3968 (JGK) |
| Appellants. | ) | |
| v. | ) | |
| | ) | |
| DELTA AIR LINES, INC., et al., | ) | |
| Appellees. | ) | |

_____

**OPPOSITION BRIEF OF APPELLEE KENTON COUNTY AIRPORT BOARD**
**IN SUPPORT OF THE BANKRUPTCY COURT'S**
**ORDER APPROVING THE SETTLEMENT AGREEMENT**


EDWARDS ANGELL PALMER & DODGE, LLP
750 Lexington Avenue
New York, New York 10022
Telephone:  (302) 425-7103
Facsimile:   (302) 777-7263
Selinda A. Melnik (SM 1614)
                - and -
ZIEGLER & SCHNEIDER, P.S.C.
541 Buttermilk Pike, Suite 500
P.O. Box 175710
Covington, Kentucky 41017-5710
Telephone:  (859) 426-1300
Facsimile:   (859) 426-1350
Matthew C. Smith (*admitted pro hac vice*)

Attorneys for Appellee
The Kenton County Airport Board

# TABLE OF CONTENTS

Preliminary Statement ........................................................................................................... 1

Argument ............................................................................................................................... 2

I.     NEITHER KCAB NOR ITS ASSETS ARE LIABLE FOR THE 1992 BONDS ................ 2

II.    APPELLANTS HAVE NO RIGHT TO RELET PROCEEDS ............................................ 4

III.   KENTUCKY LAW OBLIGATES KCAB TO CHARGE REASONABLE RATES
       UNRELATED TO THE PRINCIPAL AND INTEREST REMAINING ON THE
       1992 BONDS ....................................................................................................................... 6

       A.    Appellants' construction of KRS 103.260(2) would lead to an absurd result ........... 11

       B.    Appellants' construction of KRS 103.260(2) violates other Kentucky law .............. 13

       C.    Appellants' construction of KRS 103.260(2) violates Federal laws........................... 14

       D.    Appellants' construction of KRS 103.260(2) violates the U.S. Bankruptcy Code..... 15

IV.    THE RELEASE GRANTED KCAB IS SUSTANABLE AND NECESSARY ................. 16

V.     CONCLUSION................................................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*Daviess County v. Snyder*, 556 S.W.2d 688 (Ky. 1977) ......................................................8

*In re Drexel Burnham Lambert Group*,
    130 B.R. 910, 928 (S.D.N.Y. 1991), *aff'd*, 960 F.2d 285 (2nd Cir. 1992) ............17

*Evansville- Vandenburg Airport Authority Dist. v. Delta Air Lines, et al.*,
    405 U.S. 707 (1972) ...............................................................................................14

*Manies v. Croan*, 977 S.W. 2d 22 (Ky. App. 1998) ...........................................................8

*In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005) ................................17

*Northwest Airlines v. County of Kent*, 510 U.S. 355, 366 (1994) .....................................14

*Popplewell's Alligator Dock No, 1, Inc. vs Kentucky Revenue Cabinet*
    133 S.W. 3d 456 (Ky. 2004) ...................................................................................8

*Renaker v. Commonwealth of Kentucky*, 889 S.W. 2d 819, 820 (Ky. App. 1994) ............12

*Stoltz v. Brattleboro Housing Authority*, 315 F.3d 80 (2d Cir. 2002) ...............................16

## STATUTES

11 U.S.C. §362 ....................................................................................................................16

11 U.S.C. §362(a)(6) ...........................................................................................................15

11 U.S.C. §525(a) ................................................................................................................16

11 U.S.C. §365 ....................................................................................................................16

11 U.S.C. §365(g)(1) ...........................................................................................................15

49 U.S.C. §40116 ................................................................................................................14

49 U.S.C.S. § 47101 *et seq.* ................................................................................................15

49 U.S.C. §47107 ................................................................................................................15

KRS 103.200 to 103.285 ............................................................................................8, 9, 10, 11

KRS 103.210 ..........................................................................................................................9

KRS 103.250 ......................................................................................................................9, 10

KRS 103.251 ......................................................................................................................9, 10

KRS 103.260 ................................................................................................................. *passim*

KRS 183.133 ............................................................................................................7, 13, 14

The Kenton County Airport Board ("**KCAB**"), a public body corporate and politic duly organized and validly existing under the laws of the Commonwealth of Kentucky and the operator of the Cincinnati/Northern Kentucky International Airport (the "**Airport**") hereby respectfully submits its Brief in Opposition to the Opening Brief of Appellants ("**App. Brief**"). In doing so, KCAB will not burden the Court's time by reiterating herein all of the reasons this Appeal[1] should be dismissed which are more than adequately set forth in the Opposition Briefs of Appellees Delta Air Lines, Inc. ("Delta") and UMB Bank, N.A. ("UMB"). Nor will KCAB restate all of the false assertions of fact contained within the Appellants' Opening Brief that were noted by Delta and UMB in their Opposition Briefs.[2] Rather, KCAB hereby adopts, joins in and incorporates these by reference and respectfully submits to the Court the following additional support respecting certain discrete matters related specifically to KCAB.

## Preliminary Statement

*Ab initio*, it cannot be sufficiently stressed that Appellants here appeal from an Order of the Bankruptcy Court approving a **settlement.** Appellants continue to refuse to acknowledge the role of the Bankruptcy Court in approving a settlement. Appellants claim as error that the Bankruptcy Court refused to adjudicate any of the underlying claims before ruling on the settlement. However, the Bankruptcy Court, in determining whether to approve the Settlement Agreement, was not required to conduct a mini-trial on the merits of the underlying litigation. Rather, the Bankruptcy Court's role was merely to canvas the issues to determine whether the settlement is fair and reasonable. After reviewing the extensive record in the case, including the

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in Delta's Opposition Brief.

[2] However, it should be noted that the Appellants also misrepresent to the Court numerous other "facts" which are untrue including, among others, that KCAB was a party to the Guaranty *(App. Brief, at p. 5)*, that KCAB joined the Trustee's Objection to Delta's Motion to Reject *(App. Brief, at p. 6)*, that the debt in issue is KCAB's debt *(App. Brief, at p. 8)*, and that the Settlement Agreement provided that KCAB was to be the recipient of the $260 million allowed claim and $85 million Delta Note *(App. Brief, at pp. 8-9)*.

parties' position on each of the relevant issues, and after conducting a three hour hearing on the matter, the Bankruptcy Court in fact determined that the settlement was fair and reasonable.

Despite this fact, Appellants continue to assert reversible error claiming that the Settlement Order extinguished "KCAB's liability" for the 1992 Bonds, eliminated valuable relet proceeds, violated Kentucky law, and that the releases provided were improper.  However, as clearly established in the case below:  (i) KCAB is not liable for the 1992 Bonds; (ii) Appellants are not entitled to receive any relet proceeds from the Terminal 3 Facilities at the Airport; (iii) Kentucky law does not require KCAB to assess post-rejection rental fees for the Terminal 3 Facilities in an amount sufficient to pay the 1992 Bonds; and (iv) the releases granted under the Settlement Agreement are consensual, typical, narrowly tailored to the Settlement Agreement, fully sustainable, absolutely necessary for any settlement between the parties, and wholly incapable of excision from the Settlement Agreement.  *See, generally, pleadings, Orders and transcripts in case below.*

## ARGUMENT

## I.    <u>NEITHER KCAB NOR ITS ASSETS ARE LIABLE FOR THE 1992 BONDS</u>

Appellants continue to misrepresent to this Court (as they did to the Court below) that KCAB is liable for the 1992 Bonds.  However, not once throughout these lengthy proceedings have Appellants cited to any provision of any operative document that in any way provides, or even suggests or implies, that KCAB is a debtor or co-obligor for the 1992 Bonds or that its assets may serve as a source of payment of the Bonds.  Appellants have not done so because they **can not**.

None of the underlying 1992 Bond documents in any way suggest or imply that KCAB is or could be liable for the payment of the 1992 Bonds.  Quite the contrary, every relevant document in this matter emphatically makes clear the very opposite:

- *Facilities Agreement* - Section 6.15 of the Facilities Agreement is styled "No Liability of [KCAB]" and expressly provides that the 1992 Bonds are "payable solely and only out of the rental payments" by Delta under the Facilities Agreement and that "no holder of any [1992 Bonds] shall have the right to compel ....[KCAB] to pay principle of, premium, if any, or interest on or purchase price of the [1992 Bonds] and the [1992 Bonds] shall not constitute a general indebtedness of [KCAB]."  [*Exhibit D[3]*]

- *Trust Indenture* - Section 7.01 of the Trust Indenture makes clear that the 1992 Bonds are payable solely from the facility rent paid by Delta under the Facilities Agreement and provided that the 1992 Bonds "shall not constitute a debt, liability or obligation or pledge of the faith and credit of [KCAB]."  Section 2.05 of the Trust Indenture further provides that "No holder or holders of the [1992 Bonds] shall ever have the right ...to enforce payment thereof [the 1992 Bonds] against any property [including the Terminal 3 Facilities] of [KCAB]; nor shall such [1992 Bonds] constitute a charge, lien or encumbrance, legal or equitable, upon any property of [KCAB]."   [*Exhibit A*]

- *The 1992 Bond* - The form of the 1992 Bond specimens states in bold capital letters on page 2 of the 1992 Bonds that "THE BONDS AND THE INTEREST THEREON...SHALL NOT BE DEEMED TO CONSTITUTE AN INDEBTEDNESS OR GENERAL OBLIGATION OF [KCAB]...NOR SHALL [KCAB]...BE OBGLIATED TO PAY THE PRINCIPAL OF THE [1992 BONDS], THE INTEREST THEREON OR OTHER COSTS INCIDENT THERETO..."  [*Exhibit* A, *at Exhibit A thereto*]

- *Official Statement* - The Official Statement distributed in connection with marketing the 1992 Bonds clearly disclosed that "[t]he [1992 Bonds] shall not be deemed to constitute a debt, liability or obligation of [KCAB]....or a pledge of the faith and credit of [KCAB]...or any political subdivision thereof." *Official Statement at p. 13*. [*Exhibit NN*]

As Judge Hardin noted after a review of the above provisions and other extensive documentary evidence in this case, the "Bondholders and the Bond Trustee have **no claim**

---

[3] Lettered Exhibits are set forth in the Appendix to Appellants' Brief.  Numbered Exhibits are set forth in the Declaration of James I. McClammy in Support of Delta's Opposition Brief.

against KCAB, the issuer of the Bonds, which are expressly made **non-recourse** under the Indenture." *Exhibit C at p. 4 (Settlement Order)(emphasis added).*

## II.    <u>APPELLANTS HAVE NO RIGHT TO RELET PROCEEDS</u>

Appellants seek reversal of the Settlement Order, *inter alia,* because they claim that the Settlement Agreement it approves requires them to relinquish "valuable" relet proceeds to which they erroneously contend they are entitled because KCAB had a duty to relet the Terminal 3 Facilities for the benefit of Appellants until the 1992 Bonds were fully defeased. *App. Brief, p. 16*. However, KCAB does not have, and never has had, **any** duty to relet the Terminal 3 Facilities for the benefit of Appellants – at all, let alone until the 1992 Bonds are fully defeased.

The only obligation of KCAB to relet the Terminal 3 Facilities is an obligation to **Delta** contained in Section 8.07(c) of the Facilities Agreement, which provides that, upon Delta's default of the Facilities Agreement, KCAB is required to use its "best efforts" to relet the Terminal 3 Facilities and to credit rentals derived from such relet to mitigate rentals payable by Delta **under the Facilities Agreement**.  The sole purpose of this relet provision is to protect Delta by requiring KCAB to seek to mitigate any post-default rent payment obligation of **Delta** under the Facilities Agreement.

The Facilities Agreement is an agreement between KCAB and Delta – **not** Appellants. The duty to relet contained within the Facilities Agreement is a duty owed by KCAB to Delta - **not** to Appellants.  KCAB's duty to relet under Section 8.07(c) of the Facilities Agreement expressly was **not** pledged nor assigned to the Bondholders or Bond Trustee.  In fact, the Trust Indenture was carefully drafted to expressly **exclude** KCAB's Section 8.07 duty to relet from the bundle of rights under the Facilities Agreement that were assigned by KCAB through the Trust

4

Indenture. Indeed, KCAB's duty to relet under Section 8.07 of the Facilities Agreement expressly is one of the "Unassigned Rights" under the Trust Indenture. *See Exhibit A, Trust Indenture §1.01.* Unassigned Rights do not serve as a source for the repayment of the 1992 Bonds. *Exhibit D, Facilities Agreement, § 4.04.*

As they must, Appellants acknowledge that KCAB's duty to relet under Section 8.07 of the Facilities Agreement was an Unassigned Right. *App. Brief, p.16.* If KCAB's duty to relet was intended to benefit the Bond Trustee, and by extension Appellants, Section 8.07 of the Facilities Agreement and the Trust Indenture would have expressly so provided, would not have been silent on the issue, and the Section 8.07 duty would not have been purposely included among the "Unassigned Rights" under the Trust Indenture.

Upon rejection of the Facilities Agreement, Delta no longer *has* an ongoing liability for rental payments thereunder. Absent such liability, KCAB owes no continuing duty to relet pursuant to Section 8.07 of the Facilities Agreement to mitigate it. Accordingly, Appellants have no entitlement to any rental payments received for use of the Terminal 3 Facilities following rejection of the Facilities Agreement.

It is also worth noting that, as Delta points out in its Opposition Brief, even if Appellants were entitled to the proceeds of any post-rejection relet of the Terminal 3 Facilities – which they are not - the value realistically attainable thereby would be far less than that received by the Bondholders under the Settlement Agreement. Some of realities of the negative economic viability of the relet provision include the fact that:

- The Facilities Agreement expires on December 31, 2015, absent Delta's affirmative exercise of renewal options. *Exhibit D, §4.02.* Therefore, at best, the relet provision could not conceivably extend beyond the next eight years.

5

- The relet provision does not require KCAB to give any preference to the Terminal 3 Facilities over any other available facilities at the Airport. As Robert Holscher, CEO of KCAB, stated in his deposition testimony, Terminal One at the Airport currently is unoccupied and has nine available gates that are not being used. *Exhibit 11, at 6* ("we have an older terminal that has nine gates that's sitting empty"). Mr. Holscher further testified that over 60 carriers had been contacted and not one wanted to operate out of the Airport. *Exhibit 11, at 62*. Finally, Mr. Holscher testified that even if KCAB could attract other airlines, it would be more feasible and economical for them to locate somewhere other than in the Terminal 3 Facilities. *Exhibit 11, at 198-200*.

- A piecemeal reletting of various gates within the Terminal 3 Facilities would never generate sufficient proceeds to pay the 1992 Bonds. A portion of the 1992 Bond proceeds were used to: (i) reconfigure the roadway in front of the Terminal 3 Facilities to accommodate the new terminal; (ii) demolish the prior terminal building; (iii) build a temporary baggage system; and (iv) construct improvements to a fuel farm. *Exhibit 11, at 149-152*.

- The relet provision is not without cost. Pursuant to the Trust Indenture, KCAB is not required to undertake any act under the Facilities Agreement or the Trust Indenture related to the 1992 Bonds unless KCAB is indemnified and receives payment for all of its costs, expenses and attorney fees. *Exhibit A, §§7.01 and 7.10*.

The value received by Appellants under the Settlement Agreement is a far better recovery than that attainable solely through receipt of relet proceeds from the Terminal Facilities post-rejection. Further, the Delta Note and Delta Claim constitute a fixed and secure revenue stream for Appellants. Any conceivable relet would be sporadic, variable and subject to abatement as with any commercial lease.

## III. KENTUCKY LAW OBLIGATES KCAB TO CHARGE REASONABLE RENT UNRELATED TO THE PRINCIPAL AND INTEREST REMAINING ON THE 1992 BONDS.

Appellants incorrectly assert that Kentucky law requires that any new agreement entered into after rejection of the Facilities Agreement for use of the Terminal 3 Facilities must provide for a rental rate sufficient to pay the outstanding principal and interest on the 1992 Bonds due

after rejection. *App. Brief,* pp. 31-32. To the *contrary*, Kentucky law obligates KCAB to charge a <u>reasonable</u> rental rate for such use <u>unrelated</u> to the principal and interest remaining due on the 1992 Bonds following rejection of the Facilities Agreement. *See KRS 183.133.*

By their erroneous assertion, Appellants contort Kentucky law in a bold attempt to convince the Court that repayment of the 1992 Bonds effectively is secured by a security interest in the Terminal 3 Facilities and its rent proceeds – where no such security interest has been granted or created or otherwise exists either in fact or by operation of any law.

Appellants bottom their assertion <u>solely</u> on *sub*section (2) of KRS 103.260. However, to Appellants' detriment, KRS 103.260 provides <u>in full</u>, as follows [emphasis added]:

**KRS 103.260. Application of revenue - Charges for use.**

**(1) <u>At or before the issuance of bonds</u>** the city legislative body or the fiscal court of the county, [includes airport boards] as the case may be, shall, by ordinance or resolution, set aside and pledge the income and revenue of the industrial building [includes airport facilities] into a separate and special fund to be used and applied in payment of the cost thereof and in the maintenance, operation and depreciation thereof. The ordinance or resolution shall definitely fix and determine the amount of revenue necessary to be set apart and applied to the payment of principal and interest of the bonds, and the proportion (if any) of the balance of the income and revenue to be set aside as a proper and adequate depreciation account, and the remaining proportion of such balance shall be set aside for the reasonable and proper operation and maintenance of the industrial building.

**(2)** The rents to be charged for the use of the building shall be fixed and revised from time to time so as to be sufficient to provide for payment of interest upon all bonds and to create a sinking fund to pay the principal thereof when due, and to provide for the operation and maintenance of the building and an adequate depreciation account, if any depreciation account has been established.

In advancing their argument, Appellants attempt to have subsection (2) stand independent from subsection (1).  However, subsection (2) must be interpreted in harmony with subsection (1) and in concert with the statutory scheme of KRS 103.200 to 103.285.[4]

The introductory language of subsection (1) of KRS 103.260 clearly sets the context of the statute.  The statute applies "[**A]t or before the issuance of bonds**".  Subsection (1) and subsection (2) operate in tandem to provide the rate setting methodology to be utilized in connection with issuing the bonds.

KCAB did in fact comply with its obligations under KRS 103.260.  Prior to issuing the 1992 Bonds, KCAB required Delta to enter into the Facilities Agreement.  The Facilities Agreement provides for a rental that is not fixed, but varies, from time to time, to pay the principal and interest on the 1992 Bonds.  *Exhibit D, at §4.03*.

Appellants ignore the context of the statute and misinterpret KRS 103.260(2) to apply in the case of a default by the original obligor, Delta.  By their construction of KRS 103.260(2), Appellants assert that upon a default by Delta of the pre-petition Facilities Agreement KCAB is required under any *new* lease for the Terminal 3 Facilities to set a rental rate that is sufficient to pay the principal and interest on the 1992 Bonds for the benefit of Appellants.  In doing so, Appellants assert that KRS 103.260(2) provides a security interest in the Terminal 3 Facilities entitling them to receive under any new lease for the Terminal 3 Facilities the same rental payments they were entitled to receive under the rejected pre-petition Facilities Agreement.

---

[4] It is a basic cannon of construction that interrelated sections enacted as part of a single integrated statute must be construed in harmony with each other. *Daviess County v. Snyder,* 556 S.W.2d 688 (Ky. 1977).  Kentucky courts construe statutes within their context and strive to give consistent meaning to related statutory provisions. *Manies v. Croan*, 977 S.W. 2d 22 (Ky. App. 1998).  One of the fundamental maxims of statutory construction is that an act is to be read as a whole; that is, any language in the act is to be read in light of the whole act, not just a portion of it.  The point of this maxim is that the whole act provides the context into which to place any language found in the act. *Popplewell's Alligator Dock No, 1, Inc. vs Kentucky Revenue Cabinet* 133 S.W. 3d 456 (Ky. 2004).

KRS 103.260 clearly does not provide a secured interest in the event of default by the obligor of the 1992 Bonds. Appellants fail to cite any case law or legislative history in support of such position. Nowhere in KRS 103.260 does it mention a security interest nor does that portion of the statute purport to apply in the event of default by the obligor of the 1992 Bonds.

In fact, there *is* no case law nor any legislative history in support of Appellants' position. Upon review of the statutory scheme of KRS 103.200 to 103.285, it is clear that a security interest in the event of a default is not addressed under KRS 103.260(2), but only under KRS 103.250 (a Mortgage Lien) and KRS 103.251 (a Mortgage Deed of Trust).[5]

---

[5] **103.250. Lien of bondholders on building - Receiver on default.**

**(1)** A statutory mortgage lien shall exist upon the industrial building [includes airport facilities] so acquired in favor of the holders of the bonds and coupons. The industrial building so acquired shall remain subject to the statutory mortgage lien until the payment in full of the principal of the bonds, and all interest due thereon. Said statutory mortgage lien shall be effective from and after the recording of a lease of the property, which has been acquired by the issuer of the bonds, to the lessee corporation, and said lien shall attach to all of the property described in said lease, including machinery, equipment and appurtenances described therein in either general or specific terms. No filing or recording or notice of said lien on property held or thereafter acquired by the issuer from the proceeds of the bonds shall be required under the Uniform Commercial Code.

**(2)** If there is any default in the payment of principal or interest of any bond, any court having jurisdiction of the action may appoint a receiver to administer the industrial building on behalf of the city or county [includes airport boards], as the case may be, with power to charge and collect rents sufficient to provide for the payment of any bonds or obligations outstanding against the building, and for the payment of operating expenses, and to apply the income and revenue in conformity with KRS 103.200 to 103.280 and the ordinance referred to in KRS 103.210.

**KRS 103.251. Mortgage deed of trust by issuer of bonds.**

Notwithstanding the provisions of KRS 103.250, it may be provided in the proceedings authorizing bonds issued under the terms of KRS 103.200 to 103.285, inclusive, that the issuer, in connection with the issuance of its bonds, execute a mortgage deed of trust in favor of the trustee on the project acquired or constructed through the application of the proceeds of the bonds, providing that in the event of default by the issuer in the payment of interest on or principal of its bonds, or in the event of default of any other covenant contained in such mortgage deed of trust, the trustee, upon behalf of the bondholders, may institute and carry through foreclosure proceedings in which the property secured by the mortgage deed of trust may be sold, the proceeds of such sale to be applied to the payment of the bonds and any interest or premium due thereon, and to the costs of the proceedings. In connection with such plan of financing, such provisions may be inserted in the bonds themselves and in the mortgage deed of trust as may be necessary to protect the bondholders and to make such bonds salable with the lowest net interest cost to the issuer. If the issuer declares its intent by ordinance or resolution to follow the provisions of this section the statutory mortgage lien provided in KRS 103.250 shall not

9

These two later provisions are the only provisions within the relevant statute that provide for a security interest and a remedy in the event of a default of bonds issued under KRS 103.200 to 103.285. However, neither of these provisions apply with respect to the Facilities Agreement, the Trust Indenture and the 1992 Bonds.

KRS 103.250 (Mortgage Lien) creates a mortgage lien and provides for a lien to attach to a bond financed facility so that upon default any future rentals from the facility will be applied to payment of the bonds issued pursuant to the statute. KRS 103.251 (Mortgage Deed of Trust) provides that the issuer *may* provide for a Mortgage Deed of Trust in favor of the indenture trustee, permitting the trustee for the bondholders to institute and carry through foreclosure proceedings, with the proceeds of the sale to be applied to the payment of the bonds.

However, KCAB did not grant the Bond Trustee a Mortgage Deed of Trust. Accordingly, KRS 103.251 does not apply in this case.

Moreover, the Bond Trustee expressly <u>waived</u> its right to a mortgage lien under KRS 103.250. The Trust Indenture expressly provides at §2.05 that <u>"[T]he statutory mortgage lien provided for by KRS 103.250(1) is hereby waived by the Issuer and the Trustee and shall not be applicable to the Project Facilities or constitute security for the payment of the 1992 Series A or B bonds</u>." *Exhibit A.*

Appellants cannot strain a reading of KRS 103.260(2) to create a security interest in the Terminal 3 Facilities that they do not have. In essence, by their construction of KRS 103.260(2), they argue that the Terminal 3 Facilities are held hostage into perpetuity until the 1992 Bonds are

---

attach and all other provisions of <u>KRS 103.200</u> to <u>103.285</u>, inclusive, which are necessarily inconsistent with the mortgage deed of trust shall be inapplicable to the extent of such necessary inconsistency.

paid in full. This is true even though the Bond Trustee has no security interest in the Terminal 3 Facilities and expressly waived its right to any security interest therein.

The Official Statement distributed in connection with marketing the 1992 Bonds expressly provides that:

> The Trust Indenture and the Lease provide that the Bonds <u>are not secured</u> by any lien or other security interest, express or statutory, upon the facilities to be financed by the application of the proceeds of the [1992 Bonds]. In that regard, [KCAB] and the Trustee in the Trust Indenture, and [KCAB] and [Delta] in the [Facilities Agreement], have expressly waived, to the extent permitted by law, the application of any statutory mortgage lien otherwise provided by the provision of Section 103.200 to 103.285, inclusive of the Kentucky Revised Statues, as amended.

*Exhibit NN, p. 34 (emphasis added).* Thus, it is clear that when the 1992 Bonds were issued, marketed and sold it was understood that in the event of a bankruptcy filing by Delta and rejection of the Lease that there was no security interest in the Terminal 3 Facilities, but merely the right to present a claim for rejection damages occasioned by the rejection of the Lease or a claim for breach of the Delta Guaranty - nothing more.

A. **Appellants' construction of KRS 103.260(2) would lead to an absurd result.**

Appellants' position is that under KRS 103.260(2) KCAB is prohibited from entering into any new lease for the Terminal 3 Facilities unless the new lease provides a rental structure sufficient to repay the remaining principal and interest due on the 1992 Bonds. This is their position unrelated to whether Delta is or is not the new tenant under a new lease. They interpret this statute to apply any time a lease is entered into for the Terminal 3 Facilities until the 1992 Bonds are fully paid. Therefore, if Delta determines to leave the Cincinnati market, Appellants' construction of the statute would require KCAB to set a rental structure for any new lease with any new tenant in the future at a rate sufficient to pay for the principal and interest remaining due

11

on the 1992 Bonds unrelated to the fair value for the tenant's use of the Terminal 3 Facilities and the realities of supply and demand for space.

This construction of the statute would create an untenable situation for KCAB.  Prior to the Closing of the Settlement Agreement, more than $400 million remained outstanding in principal on the 1992 Bonds.  Delta's rental payments under the Facilities Agreement were essentially interest payments of approximately $30 million per year. These interest only payments substantially exceed the fair value for use of the Terminal 3 Facilities.  Even in the unlikely event that KCAB could find a tenant willing to pay these interest payments bearing no relationship to the fair value for use of the Terminal 3 Facilities, the principal on the 1992 Bonds would still remain, creating a situation in which KCAB could never be free from the 1992 Bonds because the rental generated from the Terminal 3 Facilities would never be sufficient to pay for the principal due on the Bonds.

In addition, under Appellants' construction of the statute, if, after rejection, a new tenant merely desired, for example, use of only four (4) gates and two (2) ticket counters for a term of one (1) year, the tenant would be required to pay a rental rate sufficient to pay for the principal and interest on the 1992 Bonds unrelated to a reasonable rent for the tenant's desired facilities.

Appellants' construction of KRS 103.260(2) would lead to an absurd and unreasonable result, in violation of Kentucky law.  _Renaker v. Commonwealth of Kentucky_, 889 S.W. 2d 819, 820 (Ky. App. 1994)(Kentucky law must not be construed in manner to bring about absurd or unreasonable result).

The illogical result of this argument is precisely the reason why the 1992 Bonds were special purpose bonds, not general obligations of KCAB, and precisely the reason why KCAB

did not provide a mortgage lien or a mortgage deed of trust in connection with the 1992 Bond issue.

**B. Appellants' construction of KRS 103.260(2) violates other Kentucky law**

KCAB is a public body organized as an Airport Board under the provisions of Chapter 183 of the Kentucky Revised Statues.  KRS 183.133 sets forth the duties and powers of KCAB. KRS 183.133(1) provides that the "purpose of the Board shall be to establish, maintain, operate and expand necessary, desirable or appropriate airport and air navigation facilities."  In connection with operating the Airport, KRS 183.133 prescribes the fees to be charged by KCAB to an aeronautical tenant, such as Delta.  KRS 183.133(2) provides in full as follows:

> **(2)**  The board shall establish and fix reasonable rates, charges and fees for the use of the landing area, ramps and other common aviation facilities.  In fixing such rates, charges or fees the board may take into consideration, among other factors, the total capital investment by the board or other local or state governmental authority, the revenue needed properly to maintain such facilities, the revenue needed properly to expand the airport and its facilities, the portion of the facilities utilized by the licensee or contracting party and its customers and the volume and type of business conducted.  Any party aggrieved by the rates, charges or fees may appeal from the action of the board to the Circuit Court of the county within which the board operates, within ninety (90) days from the date that the board finally publishes such rates, charges or fees and gives notice of same to the contracting party or licensee.  The Circuit Court may hear evidence and determine whether or not the rates, charges or fees are, or are not, reasonable in amount. Appeal from the judgment of the circuit court may be prosecuted as any other civil appeal.

KRS 183.133 requires KCAB's rental rates to be reasonable.  The rental structure under the Facilities Agreement set the rental at an amount sufficient to pay for the 1992 Bonds unrelated to a reasonable rent for Delta's use of the Terminal 3 Facilities.   Delta can always agree, as in the Facilities Agreement, to pay a rental amount that exceeds the reasonable value for use of the Terminal 3 Facilities.  However, in the present case, Delta has rejected its obligations under the Facilities Agreement for the reason that the rental thereunder exceeds a

13

reasonable rental rate. Absent Delta's agreement under the Facilities Agreement, KCAB is obligated under KRS 183.133 to charge only a reasonable rental rate for use of the Terminal 3 Facilities. To the extent Appellants interpret KRS 103.260(2) to provide otherwise, such interpretation is in conflict with this specific legislative mandate on KCAB to fix reasonable rental charges.

## C. Appellants' construction of KRS 103.260(2) violates Federal laws

Under the Anti-Head Tax Act ("the Act"), KCAB may only charge reasonable rental charges.[6] In _Northwest Airlines v. County of Kent_, 510 U.S. 355, 366 (1994), the United States Supreme Court held that the Act requires all rental charges to be reasonable. The Supreme Court noted that the Act did not set standards for assessing reasonableness. Lacking guidance, the Court stated it was compelled to give effect to the statute's use of "reasonable" rental charges. _Id._ at 367. The Supreme Court adopted its prior test of reasonableness used in _Evansville-Vandenburg Airport Authority Dist. v. Delta Air Lines, et al_., 405 U.S. 707 (1972) . Under the _Evansville_ standard, a fee is reasonable if, (1) it is based on some fair approximation of use of the facilities, (2) it is not excessive in relation to the benefits conferred; and (3) it does not discriminate against interstate commerce. _Id._ It is clear under the _Evansville_ standard for reasonableness that KCAB could not require a rental rate for use of the Terminal 3 Facilities

---

[6] 49 U.S.C. §40116, the Anti-Head Tax Act, provides under subsection (e) as follows:

(e) Other allowable taxes and charges. Except as provided in subsection (d) of this section, a State or political subdivision of a State may levy or collect –

(1) taxes (except those taxes enumerated in subsection (b) of this section, including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services; and

(2) reasonable rental charges, landing fees, and other service charges from aircraft operators for using airport facilities of an airport owned or operated by that State or subdivision.

based on what is required to pay the interest and principal on the 1992 Bonds. The rental rate would have to be based on a fair value for use of the Terminal 3 Facilities. To the extent that Appellants interpret KRS 103.260(2) to provide for an alternative result, it is conflict with federal law.

In addition, the Airport Airway Improvement Act of 1982, requires KCAB to charge a rental rate under a new lease that is reasonable and nondiscriminatory.[7] Under Appellants' interpretation of KRS 103.260(2), KCAB would be required to charge any new tenant in the Terminal 3 Facilities a rental rate sufficient to pay the interest and principal on the 1992 Bond unrelated to the fair value for the tenant's use of the Terminal 3 Facilities. Such a requirement under state law would be in conflict with the Airport Airway Improvement Act of 1982.

## D. **Appellants' construction of KRS 103.260(2) violates the U.S. Bankruptcy Code.**

A lease rejected in bankruptcy is treated as if the debtor breached the lease immediately prior to the petition date, creating a pre-petition obligation of the debtor. 11 USC §365(g)(1). The filing of a bankruptcy petition automatically stays "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. §362(a)(6). Accordingly, if, after Delta's rejection of the Facilities Agreement under

---

[7] As a condition to receiving federal funds under the Airport and Airways Improvement Act, KCAB is required to provide written assurances to the Secretary of Transportation, among which are the following:

    (a)  General written assurances. The Secretary of Transportation may approve a project grant application under this subchapter [49 USCS Section 47101 et seq.] for an airport development project only if the Secretary receives written assurances, satisfactory to the Secretary, that--

        (1) the airport will be available for public use on reasonable conditions and without unjust discrimination;

        (2) air carriers making similar use of the airport will be subject to substantially comparable charges --

            (A) for facilities directly and substantially related to providing air transportation; and

            (B) regulations and conditions, except for differences based on reasonable classifications, such as between (i)  tenants and nontenants; and (ii) signatory and nonsignatory carriers. 49 USC §47107(a)

Bankruptcy Code section 365, KCAB conditioned a new lease to Delta for the Terminal 3 Facilities upon Delta's payment of the principal and interest payments remaining due under the Facilities Agreement, KCAB would be a violation of Section 362 of the Bankruptcy Code.

Moreover, 11 U.S.C. §525(a)[8] requires KCAB to allow Delta to remain in possession after rejection and prohibits KCAB from conditioning Delta's right to remain in possession upon payment of its prepetition obligations under the Facilities Agreement including remaining principal and interest due on the Bonds. *See Stoltz v. Brattleboro Housing Authority*, 315 F.3d 80 (2d Cir. 2002)*("Stoltz")*. Appellants' interpretation of KRS 103.260(2) would require KCAB, a governmental unit, to condition a new lease to Delta upon Delta's payment of the principal and interest on the Bonds remaining due under the Facilities Agreement which, upon rejection, would be a pre-petition obligation of Delta, all in violation of Bankruptcy Code section 525(a) and the Second Circuit's determination in *Stoltz*.

## IV.    THE RELEASE GRANTED KCAB IS SUSTAINABLE AND NECESSARY

The very limited, narrow, consensual release granted to KCAB by Section 3.02 of the Settlement Agreement is a typical and critical component of the fair and reasonable settlement reached by the parties. The release does nothing more than effectuate the terms of the Settlement Agreement. Without the release, Appellants would receive all of the benefits of the Settlement Agreement, including the substantial consideration afforded by KCAB, and thereafter could bring suit against KCAB for the very claims that have been settled by approval of the Bankruptcy Court. Despite the fact that KCAB has no liability on the 1992 Bonds or to

---

[8] Frequently referred to as the "anti-discrimination" provision of the Bankruptcy Code, section 525(a) provides in pertinent part that "a governmental unit may not deny, revoke, suspend, or refuse to renew a license…or other similar grant [or]….discriminate with respect to such a grant against…a person that is or has been a debtor under this title…solely because such bankrupt or debtor is or has been a debtor under this title…or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act."

Appellants, absent the release, KCAB unjustifiably could be forced to incur substantial expense to defeat or settle any vexatious collateral attack.

KCAB cannot be placed in the position of settling on its rights and responsibilities on the one hand, and on the other hand being exposed to further litigation by Appellants. Moreover, without the releases, the parties themselves would be free to continue to pursue the same claims against each other. The releases are necessary in order to have any settlement at all.

The narrow releases are used merely to implement the terms of the Settlement Agreement, a kind of release routinely approved. *See, e.g., In re Drexel Burnham Lambert Group,* 130 B.R. 910, 928 (S.D.N.Y. 1991), *aff'd*, 960 F.2d 285 (2nd Cir. 1992). As is typical in any settlement, the parties have agreed to exchange mutual releases for finality. They are consensual releases.

Appellants attempt to convert these narrowly tailored consensual releases to blanket third party plan releases under *Metromedia*. *In re Metromedia Fiber Network, Inc*. 416 F.3d 136 (2d Cir. 2005). These narrowly tailored releases are necessary for any settlement and they do not fall within the ambit of *Metromedia*. If they did, all releases would suddenly be subject to the scrutiny of *Metromedia*. It should, however, be noted that even if these releases were subject to the standards set forth in Metromedia, they would satisfy the standard.

First, there is no doubt that the releases are a critical and integral part of the settlement. The Settlement Agreement is conditioned upon the releases and does not work without the releases. *Exhibit P, at §3.01*.

Second, there is a direct monetary impact on Delta. Appellants misrepresent that "there is <u>no</u> conceivable prospective effect on the Debtors' estate insofar as claims against KCAB...and there is no basis in the record for contending that Delta will have any direct or indirect

17

responsibility for any judgment suffered by...KCAB." *App. Brief, p. 27.*  To the contrary, any liability of KCAB directly affects Delta.   In addition to the indemnification provided by section 6.08 of the Facilities Agreement, Delta is a signatory to KCAB's Airport Use Agreement dated November 15, 1971 between KCAB and Delta, as amended (the "Airport Use Agreement"). The Airport Use Agreement permits KCAB to establish a landing fee sufficient to pay KCAB's anticipated annual expenses and provides formulae for establishing the landing fee to be paid by Delta and other signatory airlines operating at the Airport towards that end.  If the landing fee that is established does not produce sufficient income to allow KCAB to meet its budget for the year, Delta and the other signatory airlines are liable for the deficiency at the end of the year.

As Delta accounts for more than 90% of the flights at the Airport, Delta ends up paying approximately 90% of all expenses incurred each year by KCAB to operate the Airport.  If KCAB is not released and in fact is subjected to suits by dissident Bondholders, Delta effectively will be responsible for paying 90% of the costs and expenses KCAB is forced to incur as a consequence of any such lawsuits.

Third, KCAB has provided substantial financial consideration to the Settlement Agreement. The benefits that the Settlement Agreement affords Delta and its creditors, including the 1992 Bondholders, flow in pertinent part from the substantial consideration that KCAB is providing as part of the settlement.

KCAB at an economic cost is putting aside its positions on issues central to the dispute over what the Bondholders are and are not entitled to upon Delta's rejection of the Facilities Agreement.  Despite KCAB's position that the 1992 Bondholders are not entitled to any relet proceeds from the Terminal 3 Facilities and that any such relet proceeds would belong exclusively to KCAB, by the Settlement Agreement, KCAB agrees to lease the Terminal 3

18

Facilities to Delta pursuant to the New Facility Lease to the benefit of the Bondholders. The New Facility Lease is a fifteen (15) year lease that provides for Delta's continued use and occupancy of the Terminal 3 Facilities. It does not, however, provide for any facility rent payments to be made *to KCAB*. Rather, the New Lease provides for Delta to make the payments under the Settlement Agreement, *inter alia,* in lieu of paying facility rent to KCAB.

The Settlement Agreement would not be possible if KCAB did not agree to allow Delta's payments to the Bondholders to serve in lieu of facility rent payable to KCAB. This is a particularly key component of the Settlement Agreement. Without KCAB's concession and consent, the Bondholders would not be receiving the Settlement Agreement proceeds nor other substantial consideration provided by Delta to the Bondholders under the Settlement Agreement. [For additional consideration provided by KCAB, *See KCAB's Reply Brief to the Bankruptcy Court. Exhibit LL*].

Further, the release does not seek to discharge co-debtor liability for a debt owed by Delta. As discussed *supra*, KCAB is not liable for payment of the 1992 Bonds. Nor is any property of KCAB subject to payment of the 1992 Bonds.

The releases are consensual, typical and a necessary part of any settlement agreement. They are appropriate and sustainable in all respects. Without the releases, including the release of any claims arising from KCAB's negotiation and entry into the Settlement Agreement, a settlement is not possible.

19

## V.  CONCLUSION

For all of the above-stated reasons and those set forth in the Opposition Briefs of

Appellees Delta and UMB, KCAB respectfully requests that the Court deny and dismiss

Appellants' appeal on all grounds.

Dated: June 22, 2007
       New York, New York

                                EDWARDS ANGELL PALMER & DODGE, LLP
                                750 Lexington Avenue
                                New York, New York 10022
                                Telephone:  (302) 425-7103
                                Facsimile:  (302) 777-7263
                                By:  _/s/  *Selinda A. Melnik*_____
                                      Selinda A. Melnik (SM 1614)

                                            - and -

                                ZIEGLER & SCHNEIDER, P.S.C.
                                541 Buttermilk Pike, Suite 500
                                P.O. Box 175710
                                Covington, Kentucky 41017-5710
                                Telephone:  (859) 426-1300
                                Facsimile:  (859) 426-1350
                                Matthew C. Smith (*admitted pro hac vice*)

                                Attorneys for Appellee
                                The Kenton County Airport Board