# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____
)
In re:                                  )
                                        )
DELTA AIR LINES, INC., *et al.*,        )
                                        )        1:07-CV-3968  (JGK)
        Debtors.                        )
                                        )
_____)
                                        )
KENTON COUNTY BONDHOLDERS               )        On Appeal From:
COMMITTEE,                              )
                                        )        United States Bankruptcy Court
        Appellants,                     )        Southern District of New York
                                        )        Chap. 11 Case No. 05-17923 (ash)
v.                                      )        (Jointly Administered)
                                        )
DELTA AIR LINES, INC., KENTON           )
COUNTY AIRPORT BOARD, and               )
UMB BANK, N.A., AS SUCCESSOR            )
INDENTURE TRUSTEE,                      )
                                        )
        Appellees.                      )
_____)

## OPPOSITION BRIEF OF APPELLEE UMB BANK, N.A., AS SUCCESSOR INDENTURE TRUSTEE

MINTZ, LEVIN, COHN, FERRIS,
 GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Telephone:  (617) 542-6000
Facsimile:  (617) 542-2241
William W. Kannel (WK - 5285)
Dominic J. Picca (DP – 2376)
Matthew C. Hurley (MH - 5258)
Ian A. Hammel (IH - 8267)

*Attorneys for UMB Bank, N.A.,
 as Successor Indenture Trustee*

Dated: June 22, 2007

## **TABLE OF CONTENTS**

Introduction ........................................................................................................1

Statement of Issues Presented on Appeal ...............................................3

Standard of Appellate Review ................................................................3

Statement of the Case ........................................................................4

Argument ..........................................................................................12

    I.  The Appellants' appeal is constitutionally and equitably moot ........12

    II.  The Bankruptcy Court properly found that it had jurisdiction to approve releases that were integral to the Settlement Agreement 20

    III.  The Settlement Order did not violate the Appellants' due process rights ............................................................................................23

    IV.  The Bankruptcy Court correctly found that the Trustee had the authority to seek court approval for a Settlement Agreement binding on all Bondholders. ...................................................26

    V.  The Bankruptcy Court correctly held that it had the authority to approve a settlement without 100% bondholder consent .................30

    VI.  The Bankruptcy Court also had the authority to approve releases as part of the Settlement. ......................................................31

Conclusion.........................................................................................37

# TABLE OF AUTHORITIES

## Cases

*ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*,
    361 B.R. 337 (S.D.N.Y. 2007)……….…………………………………………………… 27

*Ad Hoc Adelphia Trade Claims Comm. v. Adelphia Commc'ns Corp.*
    *(In re Adelphia Commc'ns Corp.)*, 2006 WL 3826700 (2d Cir. 2006)…………...……….. 15

*Adams v. Cowen*, 177 U.S. 471 (1900)  ……………………………………………......... 36

*Adelphia Business Solutions, Inc. v. Abnos*, 482 F.3d 602 (2d Cir. 2007)……...…………….. 23

*Allstate Ins. Co. v. Hughes*, 174 B.R. 884 (S.D.N.Y. 1994)  ……………………………12, 13

*Association for Retarded Citizens of Connecticut, Inc. v. Thorne*, 30 F.3d 367 (2d Cir. 1994)…….33

*Baker v. Dale*, 123 F.Supp. 364 (W.D. Mo. 1954)………………………………………… 27

*Beal Sav. Bank v. Sommer*, 865 N.E. 2d 1210 (N.Y. 2007)……………………………29, 30

*Boddie v. Connecticut*, 401 U.S. 371 (1971)………………………………………………… 24

*Carey v. Brown*, 92 U.S. 171 (1875)………………………………………………….. 27

*Celotex Corp. v. Edwards*, 514 U.S. 300 (1995)……………………………………………20, 21

*Codman v. Dumaine*, 144 N.E. 408 (Mass. 1924)………………………………………… 27

*Cruz v. One Source Facility Servs.*, 2005 WL 2923517 (S.D.N.Y. Nov. 4, 2005)………...……… 32

*Downey v. Clauder*, 811 F. Supp. 338 (S.D. Ohio 1992)………..……………………………… 15

*Evans v. Tucker*, 135 So. 305 (Fla. 1931)…..…………………………………………….. 27

*Farnham v. City of Lincoln*, 106 N.W. 666 (Neb. 1906)…..……………………………………… 27

*Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746 (5th Cir. 1995)……………………………..15 - 16

*Forden v. Bristol Myers Squibb*, 63 Fed. Appx. 14 (2d Cir 2003)………..…………………….. 32

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)("Chateaugay II")*, 10 F.3d 944
    (2d Cir. 1993)……………………………………………………………….. 13, 15

*Hilal v. Williams*, 2006 WL 2331053 (S.D. Tex. 2006)……………………………………… 15

*Hutchings v. Lousiville Trust Co.*, 276 S.W. 2d 461 (Ky. Ct. App. 1955)………………………… 36

*In re Armstrong*, 99 Fed. Appx. 210, 2004 WL 1173142 (10th Cir. 2004)…………………………23

*In re Ashford Hotels, Ltd.*, 235 B.R. 734 (S.D.N.Y. 1999)…………………………………… 3

*In re Board of Directors of Multicanal S.A.*, 307 B.R. 384 (Bankr. S.D.N.Y. 2004)…………. 31

*In re Board of Directors of Telecom Argentina S.A.*, 2005 WL 3098934 (S.D.N.Y. 2005)………. 31

*In re Centerre Trust Co. v. Jackson Saw Mill Co.*, 736 S.W.2d 486 (Mo. App. E.D. 1987)……… 31

*In re Cuyahoga Equip. Corp.*, 980 F.2d 110 (2d Cir. 1992)…………………………………….. 21

*In re Drexel Burnham Lambert Group, Inc.*, 995 F.2d 1138 (2d Cir. 1993)………………….. 24

*In re Enron Corp.* 326 B.R. 497 (S.D.N.Y. 2005)……………………………………………….. 12

*In re Frost Bros., Inc.*, 1992 U.S. Dist. LEXIS 18301, No. 91 Civ. 5244 (PNL)
    (S.D.N.Y. Dec. 2, 1992)……………………………………………………………………… 25

*In re General Development Corp.*, 165 B.R. 685 (S.D. Fla. 1994)…………………………… 23

*In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007)…………………………………… 3

*In re Loews Cineplex Entertainment Corp.*, 286 B.R. 239 (S.D.N.Y. 2002)………………… 3

*In Re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005)……………..……......... passum

*In re Opti-Gage, Inc.*, 128 B.R. 189 (Bankr. S.D. Ohio 1991)………..……………………… 22

*In re Purofied Down Prods. Corp.*, 150 B.R. 519 (S.D.N.Y. 1993)………………………… 25

*In re Quality Spice Corp.*, 107 B.R. 843 (D.N.J. 1989)………………………………………… 15

*In re Revere Copper and Brass, Inc.*, 78 B.R. 17 (S.D.N.Y. 1987)……..……………………… 12

*In re Smart World Tech., LLC*, 423 F.3d 166 (2d Cir. 2005)………..……………………….... 27

*In re T.R. Acquisition Corp.*, 309 B.R. 830 (S.D.N.Y. 2003)………………………………… 23

*In re Texaco, Inc.*, 92 B.R. 38 (S.D.N.Y. 1988)……..………………………………………… 12

*In re The Lionel Corporation*, 29 F.3d 88 (2d Cir. 1994)…..…………………………………… 23

*In re Warner Communications Sec. Litig.*, 798 F.2d 35 (2d Cir. 1986)…..…………………… 15

*In re Worldcom Inc. Securities Litigation*, 293 B.R. 308 (S.D.N.Y. 2003)…..……………… 21

*In the Matter of Camarda*, 133 A.D. 2d 114 (App. Div. N.Y. 1987)………………………… 15

*Ingram v. Lewis*, 37 F.2d 259 (10th Cir. 1930)……………………………………………… 35

*Kassover v. Gibson*, 2003 WL 21222341 (2d Cir. 2003)……………………………………12, 14

*Kelton Corp. v. County of Worcester,* 688 N.E.2d 941 (Mass. 1997)……………………………… 27

*Kemper Investors Life Ins. Co. v. Las Colinas Corp.*, Case No. 88C 9152 (N.D. Ill. 1989)………. 27

*Lewis v. Continental Bank Corp.*, 494 U.S. 472 (1990)……………..……………………………….. 12

*Lower Colorado River Auth. v. Chemical Bank and Trust Co.*, 185 S.W.2d 461
    (Tex. Ct. Civ. App 1945); aff'd 190 S.W.2d 48 (Tex. 1945)……………………………… 27

*LTV Corp. v. Aetna Cas. & Sur. Co. (In re Chateaugay Corp.)*, 167 B.R. 776 (S.D.N.Y. 1994) 15, 16

*MBank Dallas v. LaBarge, Inc.*, Case No. 86C 9583 (N.D. Ill. 1987)……………………………27, 29

*Nellis v. Shugrue*, 165 B.R. 115 (S.D.N.Y. 1994)……………..…………………………………  25

*Nemsa Establishment, S.A. v. Viral Testing Systems Corp.*, No. 95 Civ. 0277, 1995 WL 489711
    (S.D.N.Y. Aug. 15, 1995)……………………………………………………………… 25

*Newhouse v. First Nation Bank of Chicago*, 13 F.2d 887 aff'd 17 F.2d 228 (7th Cir. 1927)……… 27

*Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984)……………..………………………………..  21

*Pegram v. Herdrich*, 530 U.S. 211 (2000)………………………………………………………… 36

*Shaw v. Little Rock and Fort Smith Ry. Co.*, 100 U.S. 605 (1880)……………………………... 27

## **Other Authorities:**

Fed. R. Bankr. P. 8013………………………………………………………………………..   3

15 U.S.C. § 77…………………………………………………………………….............. 28, 29

S. Rep. No. 248, 76th Cong. 1st Sess 28 (1939)………………………………………………   28

H. Rep. No. 1016, 76th Cong. 1st Sess 56 (1939)……………………………………………   29

**INTRODUCTION**

Appellee UMB Bank, N.A., as successor indenture trustee ("UMB" or the "Trustee") for the $419,000,000 Kenton County Airport Board Special Facilities Revenue Bonds, 1992 Series A (Delta Air Lines, Inc. Project) and the $19,000,000 Kenton County Airport Board Special Facilities Revenue Bonds, 1992 Series B (Delta Air Lines, Inc. Project) (collectively, the "Bonds" and the holders of such Bonds, the "Bondholders") respectfully submits this Appeal Brief in response to the Opening Brief of the Appellants (the "Appellants").

This appeal should be dismissed and the Bankruptcy Court order should be affirmed in its entirety because this appeal is constitutionally and equitably moot and because the Bankruptcy Court acted properly in approving the Settlement Agreement.

This appeal is constitutionally and equitably moot because the Settlement Agreement at issue has been fully implemented and cannot be undone. As part of the parties' Settlement, Delta has already distributed over 5.8 million shares of its stock as well as the Delta Notes to hundreds – if not thousands – of participants in the public securities markets, where such securities can be freely sold to third parties not before the Court. It would be impossible to put the parties back in the situation that existed prior to entry of the Settlement Order. And even if effective relief were somehow possible, it would be inequitable to the Trustee, Delta, KCAB and the Bondholders, as well as to third parties, to unravel a Settlement Agreement upon which all parties have relied.

Even if the Court were to reach the merits of this appeal, the Court should affirm the Bankruptcy Court's decision for a number of reasons. First, the Bankruptcy Court clearly had subject matter jurisdiction to enter the Settlement Order, including the

provision concerning the releases.  The Settlement Agreement had a significant impact on Delta's operations at its second-largest hub and therefore had a sufficient effect on Delta's estate for jurisdictional purposes.  And the releases given in connection with the Settlement were an integral, non-severable part of the Settlement Agreement.  Without the finality afforded by the releases, the Settlement Agreement would not have happened.

Second, the Settlement Order did not infringe the Appellants' due process rights. The Appellants had more than ample notice of the Settlement Motion and opportunity to object to it, which they did.  Contrary to the suggestion of the Appellants, the Bankruptcy Court was not required to conduct a mini-trial on every claim resolved by the Settlement Agreement.

Third, the Bankruptcy Court correctly held that the Trustee had the authority to seek bankruptcy court approval for a settlement that would bind all Bondholders and the Trustee did not impermissibly impair the Appellants' rights by doing so.

Finally, the Bankruptcy Court appropriately held that it had the authority to approve the Settlement Agreement over the objections of a small minority of Bondholders.  The unprecedented relief sought by the Appellants – a finding that the unanimous written consent of each and every holder of widely-held public securities is required to approve a settlement in bankruptcy court – would not only create a logistical nightmare, but would also create a classic "holdout" problem, thereby making settlement of bondholder claims in bankruptcy virtually impossible.

The Bankruptcy Court's decision should be affirmed in its entirety.

STATEMENT OF ISSUES PRESENTED ON APPEAL[1]

1.      Whether changed circumstances since the entry of the Settlement Order, including the distribution of over 5.8 million shares of Delta stock and the issuance of the publicly-tradable Delta Notes to participants in the public securities markets, renders this appeal constitutionally and/or equitably moot.

2.      Whether the Bankruptcy Court properly found that it had subject matter jurisdiction to approve the Settlement Agreement.

3.      Whether the Bankruptcy Court correctly held that the Trustee had the authority to seek court approval for a Settlement Agreement binding on all Bondholders.

4.      Whether the Bankruptcy Court correctly held that it had the authority to approve a settlement over the objections of a small minority of bondholders.

STANDARD OF APPELLATE REVIEW

A bankruptcy court's findings of fact are reviewed for clear error and its conclusions of law are reviewed *de novo*. FED. R. BANKR. P. 8013. A reviewing court should not overturn an order approving a settlement unless it is manifestly erroneous and a clear abuse of discretion. *In re Iridium Operating LLC,* 478 F.3d 452, 461 (2d Cir. 2007); *In re Loews Cineplex Entertainment Corp.*, 286 B.R. 239, 247 (S.D.N.Y. 2002) (finding plan appeal moot; observing that "[w]here, as here, a bankruptcy court's decision to approve a settlement is challenged, a reviewing court will not overturn the decision unless it is manifestly erroneous and a clear abuse of discretion") (internal quotations and citations omitted); *In re Ashford Hotels, Ltd*., 235 B.R. 734, 739 (S.D.N.Y. 1999) (dismissing appeal from settlement order, citing same standard of review, and observing

_____

[1]      The Trustee agrees with Appellants' Statement of Basis for Appellate Jurisdiction.

that "a bankruptcy court's approval of [a] settlement should be reviewed 'extremely deferentially'").

**STATEMENT OF THE CASE**

**A.     The CVG Transaction: the Facilities Agreement, the Indenture and the Guaranty.**

On February 1, 1992, Delta, the Kenton County Airport Board ("KCAB") and the Trustee entered into a series of related agreements involving the construction of a new terminal and associated facilities (the "facilities" or "CVG facilities") at the Cincinnati/Northern Kentucky International Airport (the "Airport" or "CVG").  The Airport is Delta's second-largest hub.  The three most relevant agreements for purposes of this appeal are the Facilities Agreement, the Indenture and the Guaranty.

The Facilities Agreement was an agreement between Delta and KCAB that governed Delta's use and occupancy of the facilities at the Airport.[2]  Among other things, the Facilities Agreement required Delta to make biannual payments equal to amounts due on the Bonds, the proceeds of which were used to construct the facilities.  KCAB assigned to the Trustee certain of its rights under the Facilities Agreement, including the right to receive the biannual payments from Delta.  *See* Facilities Agreement § 4.04.  In addition, the Facilities Agreement expressly provides that Delta "agrees, for the benefit of the Owners from time to time of the 1992 Series A and B Bonds, to do and perform all acts and things contemplated in the Indenture to be done or performed by it."  *See* Facilities Agreement § 6.04.

---

[2]     A copy of the Facilities Agreement is Exhibit D of the "Appendix to Brief of Appellant" (the "Appendix").  To the extent the Appellees are citing materials not in the Appendix, the three Appellees - Delta, the Trustee and KCAB - have attached these materials to the Declaration of James I. McClammy dated June 22, 2007 (the "McClammy Decl."), submitted with Delta's brief.

The Bonds that were paid pursuant to the Facilities Agreement were issued under a Trust Indenture (the "Indenture") dated February 1, 1992 between KCAB (as the issuer) and Star Bank, N.A., the predecessor-in-interest to UMB.[3]  Delta also entered into a Guaranty with the Trustee dated February 1, 1992, in which Delta, among other things, guaranteed to pay to the Trustee all rental payments under the Facilities Agreement that were required for the full and prompt payment of the principal and interest on the Bonds.[4]

**B.    Delta announces its intention to reject the Facilities Agreement.**

On September 14, 2005 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  In late 2005, Delta informed KCAB and the Trustee that it intended to reject certain agreements at the Airport, including the Facilities Agreement.

Between late 2005, when Delta announced its intention to reject the Facilities Agreement, and February 22, 2007, when the parties announced the principal terms of the Settlement in open court, the parties engaged in long and contentious negotiations and legal battles over their respective rights under the CVG transaction.  Among the issues that were hotly contested by the parties both in court and across the negotiating table were: (i) Delta's ability to reject the Facilities Agreement; (ii) Delta's liability on the Guaranty; (iii) whether the Facilities Agreement was a true lease or a financing; and (iv) the Trustee's entitlement to reletting proceeds.[5]  Based on the arguments it asserted in the

---

[3]        *See* Appendix, Ex. A (the Indenture).

[4]        *See* Appendix, Ex. B (the Guaranty).

[5]        The Trustee's, KCAB's and Delta's legal positions on these issues are set forth not only in pleadings with respect to Delta's motion to reject the Facilities Agreement (*see, e.g.* Appendix, Ex. H and J) but also in the briefs filed by the parties in support of the Settlement.  *See* Trustee's brief in support of the Settlement Agreement (the "UMB 9019 Brief"), at 33-41, (Appendix, Ex. HH); Delta's reply brief in

litigation and during negotiations with Delta and KCAB, the Trustee also argued that it was entitled to a full claim of approximately $417 million, while Delta argued that its only obligation with respect to the Bonds was pursuant to the soon-to-be-rejected Facilities Agreement, and that the Trustee had only a single capped claim of between $75.5 million and $127.5 million. *See* Delta 9019 Reply at 4 (Appendix, Ex. X), UMB 9019 Brief at 35-37 (Appendix, Ex. HH)**.**

**C.    The parties sought court approval of the Settlement Agreement.**

After more than a year of complex, arms-length negotiations, Delta, KCAB and the Trustee (upon the direction of the majority of Bondholders) reached an agreement in principal on a global settlement.  Less than three days later, they announced this Settlement in open court.  *See* Appendix, Ex. Q.  Subject to approval by the Bankruptcy Court, and on notice to all parties, including all Bondholders, the Settlement would resolve all issues between the parties, including all issues arising from the Bonds and Delta's rejection of the Facilities Agreement. *See* Appendix*,* Ex. P (the Settlement Agreement).  Under the proposed Settlement the Bondholders were to receive, among other consideration, an allowed pre-petition claim of $260,000,000 and a Note of $85,000,000, less certain forbearance payments made through the closing date (the "Delta Notes").  *Id.*, §§ 3.02(c), (d).  As part of the consideration in the Settlement Agreement, Delta, KCAB, the Trustee and the Bondholders agreed to release any claims or rights that each had against the others with respect to the CVG transaction.  *Id.,* § 3.02(f).

---

support of the Settlement Agreement  (the "Delta 9019 Reply"), at 35-54, (Appendix, Ex. X); and KCAB's brief in support of the Settlement Agreement (the "KCAB 9109 Brief"), at 8-24, (Appendix, Ex. LL).

The parties then labored mightily to quickly complete the definitive settlement documentation.  On March 8, 2007, Delta, KCAB and the Trustee executed the Settlement Agreement and Delta filed its motion to approve the Settlement (the "Settlement Motion") with the Bankruptcy Court.  *See* Appendix, Ex. U.  A hearing was set on the Settlement Agreement for April 19, 2007 – more than forty days later. *Id*.  The Settlement Agreement was expressly conditioned on Bankruptcy Court approval.  *See* Settlement Agreement § 3.01.  In fact, the Settlement Agreement by its very terms, and as noticed to all Bondholders, was expressly conditioned on a court order finding, *inter alia*, that the Settlement was fair and reasonable to and in the best interest of all of the parties, including the Bondholders, and that in entering into the Settlement Agreement, the parties and those Bondholders directing the Trustee to enter into the agreement had exercised their rights and powers and used the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances.  *See* Settlement Agreement § 4.02(l).  In other words, the Trustee (upon the direction of the majority of Bondholders) did not unilaterally enter into the Settlement Agreement outside of the bankruptcy process.  The Trustee sought court approval of the Settlement and would consummate the Settlement only if the court found the Settlement to be fair and reasonable to all Bondholders. [6]

---

[6]    The proposed Settlement Order submitted with the Settlement Motion (which was ultimately issued by the Bankruptcy Court) expressly provides that the terms of the Settlement are incorporated in and made part of Delta's Plan of Reorganization.  *See* Appendix, Ex. C (the Settlement Order), ¶ 3.  The Bankruptcy Court approved the Plan on April 25, 2007.  The Bondholders voted overwhelmingly in favor of the Plan, both in terms of dollar amount (97.35%) and number (89.19%).  *See* McClammy Decl., Ex. 4 (tabulating votes on Plan by holders of the Bonds).

Not only did the Bondholders have the benefit of plan voting because the Settlement was expressly incorporated into the plan, they also had the benefit of a special court hearing devoted to the fairness and reasonableness of the Settlement.

**D.    The extensive notice procedures employed by the Trustee and the parties with respect to Delta's bankruptcy and the Settlement.**

Throughout Delta's bankruptcy and with respect to the Settlement itself, the Trustee went to great lengths to ensure that all Bondholders had appropriate notice of Delta's bankruptcy proceeding and of the Settlement. This included providing Bondholders throughout the bankruptcy case with 16 bondholder notices (the "Bondholder Notices") notifying the Bondholders of material events.[7] *See* McClammy Decl., Ex. 2. Among other things, the Bondholder Notices publicized Delta's threat to reject the Facilities Agreement and the ongoing negotiations concerning the potential settlement with Delta and KCAB and invited Bondholders to join an Unofficial Bondholders Committee that was established to assist in the process.[8] One of the notices (dated February 23, 2007) advised Bondholders of the principal terms of the proposed Settlement that had been announced in open court the day before. Another notice (dated March 9, 2007, the day after the definitive settlement documentation had been filed for court approval) provided a detailed description of the Settlement and access to the settlement documents and advised the Bondholders that the Settlement would be incorporated into Delta's plan of reorganization. *See* McClammy Decl., Ex. 2.

The Trustee also established a website solely dedicated to the interests of the 1992 Bondholders (www.kentoncountybondholders.com). The website allowed Bondholders access to important information concerning the bankruptcy proceedings, including copies of all Bondholder notices and relevant pleadings filed by Delta or the Indenture Trustee.

---

[7]    The Trustee also posted the bondholder notices on Bloomberg and provided them to the Depositary Trust Company ("DTC") for distribution to the beneficial holders of the Bonds.

[8]    Certain Bondholders expressed a reluctance to join given that, as a member of the Bondholders' Committee, material non-public information would be made available, which may have restricted such Bondholders from trading with respect to the Bonds or potentially other Delta securities.

*See* Opening Brief at 7 (acknowledging website). Information concerning the Settlement was also (i) sent directly to the 1992 Bondholders through Delta's balloting agent; (ii) made available on Delta's website; (iii) published in the Wall Street Journal National Edition and Cincinnati Enquirer; (iv) provided to four Nationally Recognized Municipal Securities Information Repositories; and (v) set forth in an 8K filed by Delta on March 8, 2007 with the Securities and Exchange Commission.[9] *See* McClammy Decl., Ex. 3, 6, 9 and 10.

The Bankruptcy Court found that the Appellants were fully informed of the Settlement. This finding cannot be disputed. In fact, the Appellants formed their committee on February 23, 2007 – the day after the Settlement was announced in court and weeks before the motion to approve the Settlement was even filed. On March 6, 2007, the Appellants sent correspondence to the Trustee, Delta, and KCAB objecting to the proposed Settlement, and then they proceeded to file not one, but two, separate objections to the Settlement – the first one on March 13, 2007 (only three business days after the Settlement was filed with court) and the second one on April 13, 2007. *See* Appendix, Ex. T, V and W. The Appellants undertook extensive discovery of Delta, the Trustee and KCAB, including wide-ranging document requests, interrogatories and full-day depositions of representatives of Delta, the Trustee and KCAB.

---

[9]    For a fuller discussion of the notice process that the Trustee employed throughout the bankruptcy case and that the parties employed with respect to the Settlement, *see* UMB 9019 Brief at pp. 4-8 (Appendix, Ex. HH).

**E.    The Bankruptcy Court rejected the Appellants' opposition to the Settlement Motion and denied their Motion to Stay Pending Appeal.**

The only objection to the Settlement Motion was filed by the Appellants – five (now seven) holders of the Bonds whose holdings collectively constitute roughly 10% of the Bonds.  In neither the Preliminary Objection filed on March 13, 2007, nor in the Supplemental Objection dated April 13, 2007 (which the Appellants filed after a period of extensive discovery) did the Appellants assert that the Settlement was unfair or unreasonable from the perspective of Delta *or even the Bondholders*. *See* Appendix, Ex. V and W.

The Bankruptcy Court held a hearing on the Settlement Motion and the Appellants' objection on April 19, 2007.  *See* McClammy Decl., Ex. 7.  In an order dated April 24, 2007 (the "Settlement Order"), the Bankruptcy Court (J. Hardin) granted the Debtors' Settlement Motion and approved the Settlement. *See* Appendix, Ex. C.  In a lengthy written decision issued the following day (the "Decision"), the Bankruptcy Court noted that there is an "aura of unreality that pervades the [Appellants'] arguments."  *See* Decision, (Appendix, Ex. AA) at 4.  The Bankruptcy Court further noted that "the putative entitlement which the Objection seeks to vindicate – preservation of the Indenture and the Bondholders' right to 100% payment thereunder – is sheer fantasy in the context of this case under the Bankruptcy Code." *Id.* at 5.[10]

On April 26, 2007, the Appellants orally moved before the Bankruptcy Court for a stay of enforcement of the Settlement Order. *See* McClammy Decl., Ex. 16.  After a hearing, the Bankruptcy Court denied that motion.  *Id.*  On April 27, 2007, the Appellants

---

[10]    The Bankruptcy Court also noted that the Appellants never argued that the Settlement was not reasonable or beneficial from the perspective of the Bondholders.  *See* Decision at 3.

filed an emergency motion to stay the Settlement Order pending appeal with this Court, which denied the Appellants' motion following a hearing on May 2, 2007. *See* McClammy Decl., Ex. 1.

**F.     The Settlement Agreement has been fully implemented.**

On April 30, 2007, Delta's Plan of Reorganization (the "Plan") went effective and Delta emerged from bankruptcy as a reorganized entity, thereby concluding one of the largest Chapter 11 cases in U.S. history.  In accordance with long-announced plans, Delta distributed billions of dollars in its securities to holders of allowed unsecured claims on May 3, 2007, which was the Initial Distribution Date under the Plan.[11]  Hundreds of millions of dollars in Delta securities have been traded on the market since the Initial Distribution Date.  In connection with the Settlement Agreement alone, Delta distributed over 5.8 million shares of its stock as well as the freely-tradable Delta Notes.[12]

In addition to setting forth the consideration described above, the Settlement Agreement also provided that certain agreements – including the Facilities Agreement – would be terminated as of the Closing Date of the Settlement Agreement (*i.e.*, May 3, 2007).  The Settlement Agreement also provided that Delta and KCAB would enter into a new lease agreement and other related agreements regarding the CVG facilities, such as a new Maintenance and Operations Services Agreement.  The new agreements are now in effect.

---

[11]     *See* McClammy Decl., Ex. 12, 13 (excerpts from Delta's Plan and Disclosure Statement describing the stock and other property Delta distributed under the Plan).

[12]     The Appellants are simply wrong when they continue to assert that the settlement consideration flowed to KCAB.  See Opening Brief at 8, Settlement Agreement § 3.02(c) and (d).

**ARGUMENT**

**I.     The Appellants' appeal is constitutionally and equitably moot.**

The Bankruptcy Court's decision should be affirmed because this appeal is both constitutionally and equitably moot.  The constitutional mootness doctrine arises from Article III of the U.S. Constitution, which requires that courts hear only actual cases and controversies.  If a court cannot fashion effective relief in a particular action, then that action does not present a "live" controversy and should be dismissed as moot.  *See, e.g., Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477-78 (1990); *In re Enron Corp.* 326 B.R. 497, 502 (S.D.N.Y. 2005) (finding plan appeal moot under equitable principles); *In re Texaco, Inc.*, 92 B.R. 38, 45 (S.D.N.Y. 1988) (finding plan appeal moot).

The related doctrine of equitable mootness requires the dismissal of an appeal when, even though effective relief could be fashioned, such relief would be inequitable. *See Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994).  "The mootness doctrine is especially relevant in bankruptcy proceedings, where public policy favors that, in the absence of a stay, court-approved reorganizations go forward."  *Id.*, *citing In re Revere Copper and Brass, Inc.*, 78 B.R. 17, 21 (S.D.N.Y. 1987).  Indeed, there exists a strong presumption that an appeal of an unstayed order in a bankruptcy proceeding is moot where, as here, the settlement has been fully implemented.  *In re Enron Corp.,* 326 B.R. at 502; *Kassover v. Gibson*, 2003 WL 21222341 (2d Cir. 2003) (dismissing appeal from settlement order, observing that an appeal is presumed moot when there is "such a comprehensive change in circumstances…[that] it is inequitable to hear the merits…").

Constitutional and equitable considerations dictate that substantial consummation will not moot an appeal if *all* of the following circumstances exist: (1) the court can still

12

order some effective relief; (2) such relief will not affect the re-emergence of the debtor

as a revitalized corporate entity; (3) such relief will not unravel intricate transactions so

as to "knock the props out" from under every transaction that has taken place and create

an unmanageable, uncontrollable situation for the Bankruptcy Court; (4) the parties who

would be adversely affected by the modification have notice of the appeal and an

opportunity to participate in the proceedings; and (5) the appellant pursued with diligence

all available remedies to obtain a stay of execution of the objectionable order.  *See*

*Allstate*, 174 B.R. at 889, *citing In re Chateaugay Corp.*, 10 F.3d 944, 952-53 (2d Cir.

1993).  This appeal should be dismissed as moot because the Appellants have failed to

establish these required factors.

> **A.      The court cannot order effective relief.**

> > **1.      The relief sought by the Appellants would require the unwinding of the Settlement Agreement, which is impossible.**

The Appellants appear to concede that the Court cannot unravel the entire

Settlement Agreement, which has now been fully implemented and has resulted in the

distribution of over 5.8 million shares of Delta stock on the open market, the distribution

of the Delta Notes, and the implementation of several new agreements governing Delta's

use of CVG.  Recognizing the impossibility of completely unwinding the Settlement

Agreement, the Appellants now claim that the Bankruptcy Court can fashion effective

relief simply by retracting its approval of the Settlement Agreement and by nullifying the

releases exchanged by the parties, thereby paving the way for the Appellants to assert

claims for damages against some or all of the Appellees.  Opening Brief at 37.[13]

---

[13]      Under the scenario envisioned by the Appellants, they would apparently retain their share of the proceeds of the Settlement Agreement while seeking an additional recovery from the Appellees.

But the newly-minted relief requested by the Appellants is not even remotely possible. Delta, KCAB, and the Trustee expressly agreed that the Settlement Agreement was conditioned on both bankruptcy court approval *and* the exchange of releases. *See* Settlement Agreement § 3.01. As this Court noted at the hearing on the motion to stay, those provisions are essential, non-severable aspects of the parties' transaction. *See* McClammy Decl., Ex. 1 at 88. Indeed, those provisions go to the very heart of the Settlement Agreement, the purpose of which was to resolve, *once and for all*, the claims arising from the CVG transaction. The parties could not and would not have entered into the Settlement Agreement if the parties and the Settlement Agreement itself were subject to ongoing collateral attack. *See* Decision (Appendix, Ex. AA) at 18-19 ("... [T]he only claims being released by any party are from those necessary to effect the Settlement and preclude further litigation with respect to issues resolved and foreclosed by the Settlement").

Although the Appellants portray the relief they seek as a limited remedy that would simply leave the Appellees with a series of choices, the truth of the matter is that granting the Appellants the relief they seek would completely eviscerate the Settlement Agreement and would require nothing less than its complete unwinding, thereby requiring every Bondholder to disgorge its settlement consideration. But that is simply impossible now that over 5.8 million shares of Delta stock and the Delta Notes have been distributed on the open market, where Delta's securities have been actively traded over the past two months. Given that the circumstances of this case have changed dramatically since the Initial Distribution Date, the court would be unable to order effective relief even if the Appellants were somehow able to prevail on appeal. *Kassover*

14

*v. Gibson*, 2003 WL 21222341 (2d Cir. 2002) (finding appeal of settlement order moot);

*Hilal v. Williams*, 2006 WL 2331053 (S.D. Tex. 2006) (same); *In re Quality Spice Corp.*,

107 B.R. 843 (D.N.J. 1989) (same).

> 2.    **The court can only approve or disapprove the Settlement placed before it.**

Granting the Appellants the relief they are seeking would in fact be no different

than modifying the terms of the Settlement, and doing so would not only be logistically

impossible at this point, but it would also violate the settled law that a court can only

approve or disapprove a settlement as placed before it.  *See, e.g., Ad Hoc Adelphia Trade*

*Claims Comm. v. Adelphia Commun'cns Corp.* (*In re Adelphia Commun'cns Corp.*),

2006 WL 3826700, at \*1 (2d Cir. 2006); *In re Warner Communications Sec. Litig.*, 798

F.2d 35, 37 (2d Cir. 1986) ("it is not a district judge's job to dictate the terms at a class

settlement, he should approve or disapprove a proposed agreement as it is placed before

him and should not take it upon himself to modify its terms"); *see also In the Matter of*

*Camarda*, 133 A.D. 2d 114 (App. Div. N.Y. 1987) (settlement terms cannot be modified

by the court); *Downey v. Clauder,* 811 F. Supp. 338, 339 (S.D. Ohio 1992) ("this court

may not modify settlement terms or in any manner re-write agreements reached by the

parties").

> 3.    **The Appellants' reliance on the *Chateaugay* cases and *Zale* is misplaced.**

The cases relied upon by the Appellants for the proposition that the Court can

fashion effective relief do not support their position.[14]  The *Chateaugay* case discussed by

---

[14]    *See* Opening Brief at 38, *citing Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)("Chateaugay II")*, 10 F.3d 944 (2d Cir. 1993) and *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746 (5th Cir. 1995). The Appellants cite *Chateaugay II*, but then discuss a different *Chateaugay* case –*LTV Corp. v. Aetna Cas. & Sur. Co. (In re Chateaugay Corp.)*, 167 B.R. 776 (S.D.N.Y. 1994), which is

the Appellants is inapposite. *See LTV Corp. v. Aetna Cas. & Sur. Co. (In re Chateaugay Corp.)*, 167 B.R. 776 (S.D.N.Y. 1994). In that case, a workers' compensation surety (Aetna) appealed from a bankruptcy court order that approved a settlement involving the debtors and another surety. In finding that Aetna's appeal was not moot, the court noted that if the settlement was reversed on appeal, the debtors would simply have to return approximately $6 million "the majority or entirety of which Debtors presumably could recover by commencing an action" against a single third party. *Id.* at 779. In this case, the Appellants are not asking Delta to return funds that Delta could then recover. Rather, the Appellants are seeking to unravel an extremely important settlement involving hundreds – if not thousands – of Bondholders, public securities, and Delta's Cincinnati hub – a settlement that has already been fully consummated.

The other case relied upon by the Appellants – *Feld v. Zale Corp. (In re Zale Corp.),* 62 F.3d 746 (5th Cir. 1995) – does not even discuss the mootness doctrine. In any event, *Zale* is distinguishable. In *Zale*, the Fifth Circuit held that the bankruptcy court did not have jurisdiction over third-party tort claims that impacted the debtor's estate only through indemnification provisions found only in the very settlement agreement at issue. *Id.* at 756. As a result, the court could fashion effective relief by vacating the bankruptcy court's order approving the settlement without impacting the debtor's already-consummated plan of reorganization. *Id.* By contrast, the litigation claims at issue here arose from a completely-integrated, 15-year-old transaction between Delta, KCAB and

---

addressed below. Opening Brief at 38. *Chateaugay II* is also distinguishable. Unlike the appellants in *Chateaugay II*, the Appellants do not seek to recoup funds erroneously distributed to or that had re-vested in parties currently before the court. *Chateaugay II*, 10 F.3d at 953, 961. Instead, they apparently want to increase their recovery by pursuing already-released litigation claims against some or all of the Appellees. And even if the Appellants were seeking to recoup proceeds distributed as part of the Settlement, those funds do not reside with the debtor and other parties before the court, as in *Chateaugay II*. Rather, the settlement proceeds have been widely distributed to participants in the public markets.

the Trustee involving Delta's second-largest hub.  Unlike in *Zale*, vacating the Settlement

Order here would have an immediate and adverse effect on an extremely important asset

of the debtor's estate.

In sum, even if the Appellants were somehow to succeed on the merits of their

appeal, the court would be unable to order effective relief, and therefore this appeal

should be dismissed as moot.  Although the Appellants have attempted to disguise the

true nature of the relief they seek, the fact remains that removing court approval and the

releases from the Settlement Agreement would require the Settlement Agreement to be

completely unwound, and that is simply not feasible.

     **B.**     **The relief requested by the Appellants would unravel a settlement that is extremely important to Delta.**

The Appellants argue that "whether or not the Settlement Order is affirmed or

vacated will not affect the success of the Delta's Plan or require this Court to modify any

provision of Delta's Plan."  Opening Brief at 39.  While it is true that the leases at the

Airport and the Settlement are not the "crown jewels" of an airline with over $20 billion

in assets, it is also true that a settlement involving over $200 million in consideration and

Delta's ongoing operations at its Cincinnati hub is important to Delta.  Overturning the

Settlement Agreement would certainly have an adverse impact on Delta and would

negatively impact the success of its restructuring.

     **C.**     **The relief requested by the Appellants will "knock the props out from under" the deal struck by Delta, KCAB, and the Trustee and will create an unmanageable situation for the Bankruptcy Court.**

Even if it were *possible* to order effective relief – which it is not – reversal of the

Settlement Order would be highly inequitable to the Appellees and would create an

unmanageable situation for the Bankruptcy Court.  Delta, KCAB and the Trustee entered

into a Settlement Agreement that was expressly conditioned upon the approval of the Bankruptcy Court and that included releases preventing the very type of collateral attack that the Appellants seek to wage. Vacating the Settlement Order would materially alter the deal struck by the parties by eliminating essential, bargained-for aspects of the parties' deal. *See In Re Metromedia Fiber Network, Inc.* 416 F.3d 136, 145 (2d Cir. 2005) (finding that appeal was moot where the bargain struck by the debtor and the released parties might have been different without the releases at issue). As a result, the parties would be back to square one: a Settlement Agreement that all parties agreed was fair and reasonable – and that the overwhelming majority of Bondholders approved – would be null and void, and the parties would be forced to resume litigation of claims that they previously agreed to resolve. Moreover, it is unclear how the parties would proceed once back at "square one." According to the Appellants' view of the world, the Bonds could never be restructured without written consent from *all* Bondholders, and the parties would be forced to litigate all issues to conclusion.

At that point, all options would be back on the table: Delta could continue to press its motion to reject the Facilities Agreement and could argue that the Bondholders' claim is far below what has already been distributed to them under the Settlement Agreement. Delta could further assert that hundreds of Bondholders – many of whom may have sold Delta securities to third parties in the weeks since the Initial Distribution Date – must return their settlement proceeds, thereby creating a chaotic, unmanageable situation for the Bankruptcy Court. Given that the closing of the Settlement Agreement and the distribution of Delta securities on the Initial Distribution Date have already occurred, it would be highly unfair to the Trustee, KCAB and Delta for the court to unwind the

18

Settlement Agreement, even if that were theoretically possible, which it is not. *See Metromedia*, 416 F.3d at 145 (finding that appeal was moot where "none of the completed transactions can be undone without violence to the overall arrangements").

**D.    The relief requested by the Appellants would adversely affect not only Delta, KCAB and the Trustee, but also third parties who are not before the Court.**

The Appellants seem to acknowledge that disgorgement of settlement proceeds is impossible, and therefore suggest that reorganized Delta alone may have to absorb the loss associated with alleged overpayments to the Bondholders.  Opening Brief at 39.  But that argument ignores the fact that Delta is a publicly-traded company.  Innocent third parties who currently hold Delta securities would see the value of their holdings diminished through no fault of their own.  Furthermore, the scenario envisioned by the Appellants would also cast a cloud of uncertainty over Delta's future at CVG – which is an extremely important part of the local economy and where Delta represents 90% of the traffic – thereby adversely impacting residents of the Cincinnati/Northern Kentucky area and the traveling public.

**E.    The Appellees did not rush to close on the Settlement Agreement in order to moot this appeal.**

The Appellants argue that their appeal is not moot because they did everything they could "to stop the transactions contemplated in the Settlement Agreement from taking place," whereas the Appellees "have done everything in their power to moot Appellants' rights, ultimately electing to close the Settlement in the face of this appeal in the apparent hope of creating the very 'changed circumstances' that Appellees will urge requires a dismissal."  Opening Brief at 36.  But the Appellants' diligence in pursuing a stay of proceedings is just one of the five factors that they must establish to overcome the

presumption of mootness.  Standing alone, their unsuccessful efforts to stay the

Settlement Order pending appeal cannot carry the day for them.

In any event, the Appellants' argument regarding the Appellees' conduct

mischaracterizes the facts.  The Appellees did not rush to close on the Settlement

Agreement in the hope of creating changed circumstances that would render this appeal

moot.  Instead, the Appellees followed through on their long-announced plans to close on

this deal on Delta's Initial Distribution Date so that the Bondholders would receive their

stock at the same time as Delta's other creditors, which, as this Court noted, was a

significant part of the Bondholders' bargained-for consideration under the Settlement

Agreement.  *See* McClammy Decl., Ex. 1, at pages 86-87.

## II.    The Bankruptcy Court properly found that it had jurisdiction to approve releases that were integral to the Settlement Agreement.

Even if the Court were to reach the merits of this appeal, the Court should affirm

the Bankruptcy Court, which properly rejected the Appellants' opposition to the

Settlement Order.  As a threshold matter, the Appellants contend that the Bankruptcy

Court lacked subject matter jurisdiction to enter the Settlement Order.  This argument is

completely without merit, as the Bankruptcy Court correctly found.

### A.    The Settlement Agreement and Settlement Order have a significant impact on Delta's estate.

As the Supreme Court has stated, a bankruptcy court has jurisdiction where an

"outcome [of the proceeding] could alter the debtor's rights, liabilities, options or

freedom of action (either positively or negatively) and which in any way impacts upon

the handling and administration of the bankrupt estate."  *Celotex Corp. v. Edwards*, 514

U.S. 300, 308 n.6 (1995).  The Supreme Court expressly recognized that "the proceeding

need not necessarily be against the debtor or against the debtor's property" for the

bankruptcy court to have jurisdiction. *Id.* Rather, as courts have uniformly recognized, if

claims or litigation involving non-debtors "could conceivably have any effect on the

estate being administered in bankruptcy," then the bankruptcy court will have jurisdiction

over the proceedings.[15]

There is absolutely no doubt that the resolution of the claims between KCAB,

Delta and the Trustee regarding Delta's second-largest hub have a "conceivable effect"

upon Delta. Indeed, at the hearing in the Bankruptcy Court, counsel for the Appellants

essentially conceded that subject matter jurisdiction exists here. *See* McClammy Decl.,

Ex. 7 at pages 17-18. Counsel had no choice but to make this admission given the

realities of the CVG transaction and its significant impact on Delta. After all, Delta was

liable on the Bonds and it alone occupies the CVG facilities. By entering into the

Settlement Agreement, Delta resolved the claims arising from the CVG transaction,

substantially reduced its costs at CVG, and achieved a large measure of certainty

regarding one of its largest airport operations. Under these circumstances, it cannot be

seriously disputed that the Settlement Agreement had a significant impact on Delta's

estate.

**B.     The releases were an essential, non-severable aspect of the Settlement Agreement.**

On appeal, the Appellants now argue that one portion of the Settlement

Agreement – the release section – does not have the necessary impact on Delta to justify

---

[15]        *See In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992); *see also In re Worldcom Inc. Securities Litigation*, 293 B.R. 308, 318 (S.D.N.Y. 2003) ("thus, in this circuit, as elsewhere, whether an action has 'any conceivable effect' on the bankruptcy estate determines whether a federal court has 'related to' jurisdiction over the matter"); *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984).

the exercise of subject matter jurisdiction.  Opening Brief at 27.  But once again, the Appellants ignore the integrated nature of this transaction and the fact that without the releases, the parties would not have entered into the Settlement Agreement.  *See* Settlement Agreement § 3.01.  The simple truth is that the releases cannot be viewed in isolation.  They were an essential and material part of a transaction that unquestionably had a significant impact on Delta's estate.

Indeed, Delta, KCAB, and the Trustee have been parties to the "inextricably intertwined" CVG transaction since its inception, and it is perfectly appropriate that the Bankruptcy Court exercised subject matter jurisdiction over all aspects of the parties' Settlement – including the releases.[16]  *See* Decision at 16.  The parties did not create "jurisdiction by agreement" by shoehorning third-party releases bearing no relation to a debtor's estate into a bankruptcy court settlement, as the Appellants suggest.  To the contrary, the parties to the 15-year-old CVG transaction agreed to resolve their differences arising from that transaction and, not surprisingly, agreed to exchange releases to effectuate their Settlement.

Finally, the Appellants overlook the consideration that Delta will receive in connection with the releases.  Pursuant to Section 6.08 of the Facilities Agreement, Delta agreed to indemnify both KCAB and the Bond Trustee for any actions brought against them by third parties.  *See* Facilities Agreement § 6.08.  Pursuant to the Settlement, both the Trustee and KCAB agreed to forgo these claims.  Given the consideration provided

---

[16]     *See* Decision at 16; *see, e.g., Nemsa Establishment, S.A. v. Viral Testing Systems Corp.*, No. 95 Civ. 0277, 1995 WL 489711 (S.D.N.Y. Aug. 15, 1995) (finding that "related to" jurisdiction was appropriate where the debtor and the non-debtor were intertwined); *In re Opti-Gage, Inc.,* 128 B.R. 189, 195-196 (Bankr. S.D. Ohio 1991) (observing that "proceedings are related to bankruptcy cases not only where the outcome of the proceeding may conceivably have an effect upon the estate being administered, but also where the parties are sufficiently intertwined with the debtor").

by both the Trustee and KCAB – as well as the importance of the Settlement to Delta in the context of resolving issues relating to its CVG hub – the releases clearly have an impact on the debtor's estate.

### III. The Settlement Order did not violate the Appellants' due process rights.

#### A. The Court should not even consider the Appellants' due process argument, which they have raised for the first time on appeal.

For the first time on appeal, the Appellants claim that the Settlement Order violated their due process rights by resolving certain claims – such as the reletting claim – without notice and the opportunity to be heard. Opening Brief at 13, 17-18. The Court should not even consider this argument, which the Appellants never raised before the Bankruptcy Court. *See Adelphia Business Solutions, Inc. v. Abnos,* 482 F.3d 602, 607 (2d Cir. 2007) (refusing to consider new argument raised on appeal, observing that "[i]n general, a federal appellate court refrains from passing on issues not raised below"); *In re The Lionel Corporation*, 29 F.3d 88 (2d Cir. 1994) (refusing to consider new argument). "[T]he general rule is that an appellate court will not consider an issue not passed upon below unless failure to entertain the issue will result in a manifest injustice." *In re T.R. Acquisition Corp.*, 309 B.R. 830, 841 (S.D.N.Y. 2003) (refusing to consider new arguments).

#### B. Appellants' due process argument is without merit.

Even if the Court considers the Appellants' due process claims, they have no merit. Due process requires appropriate notice and an opportunity to be heard. *See, e.g., In re Armstrong*, 99 Fed. Appx. 210, 2004 WL 1173142 (10th Cir. 2004) (bankruptcy court approval of settlement did not violate due process rights); *In re General Development Corp.*, 165 B.R. 685 (S.D. Fla. 1994) (rejecting procedural due process

claims in appeal of settlement order); *see also In re Drexel Burnham Lambert Group, Inc.*, 995 F.2d 1138, 1144 (2d Cir. 1993) (rejecting appellants' claims that notice requirements of due process were not satisfied in connection with settlement; "notice is adequate so long as it is reasonably calculated to apprise the parties of the terms of a proposed settlement and the options available in connection with the judicial proceedings"). Due process did not require – as the Appellants suggest – a full trial on the merits of the issues resolved by the Settlement. *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971) (observing that "[d]ue process does not, of course, require that the defendant in every civil case actually have a hearing on the merits").

The Appellants clearly had adequate notice and an opportunity to be heard. The notice procedures employed by the Trustee throughout the case were extensive. The notice procedures employed by the Trustee and the rest of the parties with respect to the Settlement were equally extensive. The Appellants were well aware of the Settlement almost two full months before the hearing in the Bankruptcy Court and were able to engage in extensive discovery in connection with their opposition. Despite full engagement in the process, the Appellants failed to object to the fairness and reasonableness of any portion of the Settlement – let alone the Trustee's prudence and due process, which are issues they now raise for the first time on appeal.

### C. The Appellants misconstrue the nature of the settlement approval process in bankruptcy court.

The Appellants' due process argument also misconstrues the nature of the settlement approval process in bankruptcy court. In determining whether a settlement should be approved, the bankruptcy court is not required to conduct a "mini-trial" on the merits of the underlying litigation, but instead must "canvass the issues and see whether

the settlement 'falls below the lowest point in the range of reasonableness.'" *See In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522-23 (S.D.N.Y. 1993); *In re Frost Bros.*, Inc., 1992 U.S. Dist. LEXIS 18301 at *16, No. 91 Civ. 5244 (PNL) (S.D.N.Y. Dec. 2, 1992). This standard "reflect[s] the considered judgment that little would be saved by the settlement process if bankruptcy courts could approve settlements only after an exhaustive investigation and determination of the underlying claims." *In re Purofied Down Prods. Corp.*, 150 B.R. at 522-23. This standard also reflects the long-standing principle that settlements are "favored and, in fact, encouraged" in bankruptcy. *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).

The Bankruptcy Court correctly applied this standard in finding that the Settlement Agreement was fair and reasonable to all parties, including the Bondholders. Decision at 10. In reaching that decision, the Bankruptcy Court appropriately canvassed the legal issues that were "hotly contested in the Settlement negotiations and resolved by the Settlement Agreement," including the issue of "[w]hether the Indenture Trustee had a claim to 're-let proceeds' to the extent that the Facilities Agreement was rejected." *Id.* at 7.[17] After considering all of these issues, the Bankruptcy Court found that the Settlement Agreement appeared favorable for the Bondholders because, among other reasons, the Bondholders could have received "an unsecured, pre-petition claim which could not approach their entitlement under the Indenture" in the likely event that the Bankruptcy Court granted Delta's motion to reject the Facilities Agreement. Decision at 10. The truth of the matter is that the Trustee was able to negotiate a very favorable settlement for

---

[17]    The Bankruptcy Court noted that the Trustee was represented by "a team of professionals to provide guidance and advice concerning the myriad of legal, regulatory and economic issues faced during this chapter 11 case," including "experienced bankruptcy counsel, experienced FAA counsel, experienced Kentucky law counsel and an experienced airline industry consultant." Decision at 6.

the Bondholders by "hotly contesting" the issues that the Appellants claim were given short shrift in the settlement process.

By appropriately applying the correct standard, the Bankruptcy Court did not deprive the Appellants of their due process rights. The Appellants had more than adequate notice concerning the Settlement proposed by the Trustee and ample opportunity to object to it. In fact, the Appellants even took discovery on the issues involved in the Settlement, including the reletting claim, and thereafter decided not to pursue a claim that the Settlement was unfair or unreasonable – either from the perspective of Delta or the Bondholders. The Appellants should not be heard to complain that this process deprived them of their constitutional rights.[18]

IV.    **The Bankruptcy Court correctly found that the Trustee had the authority to seek court approval for a Settlement Agreement binding on all Bondholders.**

   A.    **The right to settle is implicit in the Trustee's right to pursue all available remedies upon default.**

The Appellants continue to argue that the Trustee lacked the authority to pursue court approval for the Settlement without the *unanimous* written consent of the many hundreds of Bondholders – a position that, if adopted, would allow a single bondholder to block a settlement approved by every other bondholder. But as the Bankruptcy Court held, numerous provisions of the Indenture – including Sections 9.01, 9.02, 9.04, 9.05 and 9.07 – make clear that upon default, "the Trustee alone has the power and authority to commence remedial procedures on behalf of all Bondholders." *See* Decision at 14. "Implicit in the authority to commence proceedings to remedy defaults is the power to

_____

[18]    The Appellants also claim that the Bankruptcy Court infringed their due process rights by preventing them from pressing claims against the Trustee and other parties in connection with the Settlement Agreement. Opening Brief at 18. But these "due process" claims are really just a repackaging

negotiate and agree upon settlements." *Id.*  If that were not the case, the Trustee would

be compelled to litigate all disputes to the bitter end, even if that was not in the best

interest of the Bondholders.  *See* Decision at 5.

    The Bankruptcy Court's decision should be affirmed because the Indenture gives

the Trustee the power to "enforce all rights of the Owners of the Bonds . . . and to bring

suit upon the Agreement [and] the Bonds . . ."  *See* Appendix, Ex. A (the Indenture), §

9.02.  Delta was in default under the Indenture, and therefore the Trustee clearly had the

authority to file suit and otherwise pursue all available remedies upon default.  *Id*.  And it

is well-settled that the power to compromise is a necessary component of the power to

litigate.  *See, e.g., ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia*

*Commc'ns Corp.)*, 361 B.R. 337, 355 (S.D.N.Y. 2007) (noting that it is "beyond cavil

that [the authority to litigate] includes the authority to settle").[19]  Indeed, courts have

universally held that an indenture trustee has both the power to sue *and* the power to

compromise.[20]

_____

of the Appellants' familiar arguments about the Bankruptcy Court's jurisdiction and authority to enter the
Settlement Order.  Those arguments are addressed in Section II, *supra* and Section IV, *infra*.

[19]    *See In re Smart World Tech., LLC*, 423 F.3d 166, 174-75 (2d Cir. 2005) (power to sue conferred
by bankruptcy code "presumably includes the derivative power to settle suits"); *Kelton Corp. v. County of
Worcester*, 688 N.E.2d 941, 944 (Mass. 1997) (the power of a municipal government to compromise
disputed claims is necessarily incident to the power to sue); *Evans v. Tucker*, 135 So. 305, 309 (Fla. 1931)
(citing "general rule" that the right to compromise is an incident to the power to sue and collect); *Codman
v. Dumaine*, 144 N.E. 408, 411 (Mass. 1924) (the power to sue and be sued carried with it as a necessary
incident the power to compromise); *Farnham v. City of Lincoln*, 106 N.W. 666, 667 (Neb. 1906) ("the
power to compromise grows out of, and is incident to, the power to sue and be sued")

[20]    *See, e.g., MBank Dallas v. LaBarge, Inc.*, Case No. 86C 9583 (N.D. Ill. 1987) at p.17, ¶ E
(McClammy Decl., Ex. 15) ("[a]fter default, the Trustee may litigate all claims relating to the recovery of
that property and may settle or compromise such claims" *citing Carey v. Brown*, 92 U.S. 171, 173 (1875);
*Shaw v. Little Rock and Fort Smith Ry. Co.*, 100 U.S. 605 (1880); *Newhouse v. First Nation Bank of
Chicago*, 13 F.2d 887 *aff'd* 17 F.2d 228 (7th Cir. 1927); *Baker v. Dale*, 123 F.Supp. 364 (W.D. Mo. 1954);
*Lower Colorado River Auth. v. Chemical Bank and Trust Co.*, 185 S.W.2d 461 (Tex. Ct. Civ. App 1945);
*aff'd* 190 S.W.2d 48 (Tex. 1945); s*ee also Kemper Investors Life Ins. Co. v. Las Colinas Corp.*, Case No.
88C 9152 (N.D. Ill. 1989) at p.18, ¶ E (McClammy Decl., Ex. 15) ("[t]he Class Representative, Kemper,

**B.     The Appellants' "non-impairment" argument is without merit.**

In arguing that 100% of Bondholders must approve a settlement – even a judicially-scrutinized settlement in a bankruptcy court setting – for it to be binding, the Appellants primarily rely on Section 9.06 of the Indenture.  Opening Brief at 31.  But as the Bankruptcy Court correctly found, that provision is meaningless in the context of a default situation *in bankruptcy*.  The Settlement Agreement does not run afoul of Section 9.06 because the Settlement does not impair the *right* to enforce payment on the Bonds. *Id*.  Like the rights of the other creditors in this bankruptcy, the rights of the Bondholders were already impaired, whether they consented or not, and courts have routinely held that in such a default scenario, "non-impairment" clauses such as Section 9.06 are no longer relevant.

For instance, in both *Kemper* and *MBank*, the courts found that settlements with less than 100% consent were consistent with the terms of the underlying Trust Indenture.[21]  Notwithstanding the lack of consent of all holders, both the *Kemper* and

---

has at all times acted properly and appropriately and in the best interest of all Class members in negotiating and seeking approval of this Proposed Settlement").

[21]     In both cases, the Courts expressly dealt with the Federal Trust Indenture Act (15 U.S.C. §§ 77 aaa et seq. -- the "TIA") which provides:

> Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal or an interest on such indenture security on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any payment on or after such respective dates shall not be impaired or affected without the consent of such holder…

15 U.S.C. §§ 77ppp.  Although the TIA is not applicable in the municipal bond context, *see* 15 U.S.C. § 77ddd and 15 U.S.C. § 77c, Section 9.06 of the Trust Indenture is the mirror image of 15 U.S.C. §§77ppp. The Legislative History of the TIA recognizes that even restrictions like those contained in Section 9.06 permit a court to approve a settlement when the settlement is vetted in a judicial proceeding.  *See* S. Rep. No. 248, 76th Sess. 26 (1939) ("[e]vasion of judicial scrutiny of the fairness of debt readjustment plans is [intended to be] prevented by [Section 316(b)'s] prohibition"); H.R. Rep. No. 1016, 76th Cong., 1st Sess. 56 (same).

*MBank* courts approved the respective settlements and expressly found that the

settlements did not violate the rights of holders under the "non-impairment clause":

> The holders of the Notes have not been deprived of their right to sue for payment of principal and interest within the meaning of Section 316(b) of the Trust Indenture Act, 15 U.S.C. §§ 77ppp. . . . The Proposed Settlement will constitute the best available payment of such principal and interest, and the Court has subjected the proposed Settlement to judicial scrutiny.  Individual lawsuits by Noteholders at this time would circumvent the best interest of all the Noteholders and interfere with the rights of all the holders and would lead to a race to judgment and quite possibly, to a reduced recovery for all Noteholders. Therefore, the Proposed Settlement does not violate or conflict with Section 316(b) of the Trust Indenture Act, 15 U.S.C. §§ 77ppp.

*Kemper Investors* at pp.19-20, ¶ L; *see also MBank* at pp.19-20, ¶ N.  Both courts

expressly found that the proposed settlements – which were both subject to judicial

scrutiny – constituted the best available recovery.

The Court of Appeals of New York recently addressed a similar situation.  *See*

*Beal Sav. Bank v. Sommer*, 865 N.E. 2d 1210 (N.Y. 2007).  In *Beal*, one lender in a

syndicated loan arrangement sought to sue a borrower directly, contrary to the decisions

of the other 95 percent of the lenders to forbear from taking action and to otherwise

settle.  Just as the Appellants have argued here, the dissenting lender argued that the

agreement underlying the loan documents prohibited an amendment, modification or

waiver of rights which would release the borrower of its obligations without the consent

of all lenders.  But the Court of Appeals distinguished this "non-impairment" provision in

the context of a default situation:

> Rather, the issue concerns a default and, under the Credit Agreement, even if the Settlement has a "similar effect" to a release, the supermajority of Lenders exercised their

29

> rights by restructuring the debt of a financially troubled
> Borrower (citations omitted)… Thus, the provision
> concerning amendment, modification and waiver of the
> agreements do not preclude the Administrative Agent and
> 95.5% of the Lenders from attempting to recover on as
> much of the Trust's obligation as they could.

*Beal Sav. Bank v. Somme*r, 865 N.E. 2d 1210 (N.Y. 2007).

These principles apply with equal force in this case. As the Bankruptcy Court correctly found, the Appellants' non-impairment arguments ignore the reality of the bankruptcy context. Rather than running afoul of the Indenture, the Trustee did exactly what the Indenture requires: as directed by a majority of Bondholders, it prevented any further impairment of the Bondholders' claims by seeking court approval of a Settlement Agreement that everyone agreed was fair and reasonable.[22]

## V.    The Bankruptcy Court correctly held that it had the authority to approve a settlement without 100% bondholder consent.

It is well accepted that an open and fair process in which a settlement undergoes judicial scrutiny can bind all bondholders. To conclude otherwise would allow a single bondholder to hold hostage – or collaterally attack in the future – even a judicially-scrutinized, reasonable settlement supported by every other bondholder. Not surprisingly, both bankruptcy and non-bankruptcy courts have rejected that absurd result and have routinely approved settlements involving bondholder/debenture claims

---

[22]    In addition, the Appellants' arguments under the Indenture ignore Section 9.05 of the Indenture, which essentially provides that no individual Bondholder may commence a separate action to recover under the Bonds unless and until a majority of the Bondholders direct the Trustee to pursue an action and the Trustee refuses. *See* Indenture § 9.05. Here, a majority of Bondholders directed the Trustee to enter into the Settlement, and an overwhelming majority of the Bondholders supported the Settlement Agreement, which, by its terms, is a direction to the Trustee not to pursue further litigation. The Appellants also ignore Section 10.10, which gives the Trustee the authority to harmonize any seemingly ambiguous or inconsistent provisions of the Indenture as the Trustee, acting in good faith, deems appropriate. *Id*. at 16. The Trustee appropriately used its discretion to seek court approval for the Settlement, an act with which the overwhelming majority of Bondholders agreed.

notwithstanding the "non-impairment" clauses of the underlying trust indenture. *See In re Board of Dirs. of Telecom Argentina S.A.*, 2005 WL 3098934, at *2 (S.D.N.Y. Nov. 18, 2005) (observing that noteholders' rights can be affected in a U.S. bankruptcy case); *In re Board of Directors of Multicanal S.A.,* 307 B.R. 384, 388 (Bankr. S.D.N.Y. 2004); *In re Centerre Trust Co. v. Jackson Saw Mill Co*., 736 S.W.2d 486, 495-497 (Mo. App. E.D. 1987) (authorizing settlement that compromised payment on bonds despite Trust Indenture provisions that barred amendments to principal and interest obligations).

The Appellants attempt to distinguish this situation from the long line of cases in which courts have restructured debt over the objections of a minority of bondholders by arguing that the Bankruptcy Court was "not free to declare, in essence, that the Bondholder's right to repayment was against Delta." Opening Brief at 34. But that argument ignores the economic realities of conduit financings such as the one involved here, in which Delta was obligated to make the payments on the Bonds. Although the Appellants claim that the Bankruptcy Court's actions were unprecedented, the reverse is actually true: to deprive a Bankruptcy Court of the authority to approve settlements without 100% bondholder consent would be unprecedented and would make bondholder settlements in bankruptcy virtually impossible.

**VI.    The Bankruptcy Court also had the authority to approve releases as part of the Settlement.**

**A.    Since the Court had the authority to bind all Bondholders, it also had the authority to approve narrowly-tailored releases, which were a necessary and integral part of the Settlement Agreement.**

The Appellants allege that the Bankruptcy Court exceeded its authority by approving third party releases in violation of *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005). Opening Brief at 29. But *Metromedia* does not apply to the

facts of this case.  In contrast to the very general and broad third party plan releases

binding all creditors that were the subject of the decision in *Metromedia*, the settlement

release approved by the Bankruptcy Court here "is extremely narrow in scope, does not

release claims against third parties, and releases only those claims amongst the Releasing

Parties, as defined, which are necessary to prevent further litigation with respect to the

claims covered and resolved by the Settlement Agreement."  *Id*.  The Settlement

Agreement expressly provides that any claims unrelated to the Settlement will be

maintained and otherwise preserved.  *See, e.g.,* Settlement Agreement § 4.02(o)

(Appendix, Ex. P).  Simply stated, the settlement releases in question here are unlike the

sweeping, blanket, non-consensual plan releases by all creditors that were at issue in

*Metromedia*.

Indeed, the releases at issue here were a critical component of the parties'

compromise, as this Court correctly noted at the hearing on the motion to stay.  *See*

McClammy Decl., Ex. 1 at 91 ("[T]he release of claims against KCAB, Delta, and the

Trustee at issue here are narrowly drawn and are necessary to prevent relitigation of

precisely the claims that were negotiated and resolved by the Settlement Agreement.");

*see also* Settlement Agreement § 3.01.  Absent the releases, there would have been no

deal, which is not surprising, given that the settlement of any litigation routinely

encompasses releases to be exchanged between the litigating parties.[23]

---

[23]     *See, e.g.*, *Forden v. Bristol Myers Squibb*, 63 Fed. Appx. 14, 16 (2d Cir. 2003) (affirming district
court's ruling that, since there "had been no agreement on a material term - - i.e. the release - - no
enforceable settlement had been reached"); *Cruz  v. One Source Facility Servs.*, 2005 WL 2923517, at *3
(S.D.N.Y. Nov. 4, 2005) ("settlement agreement is not complete where the parties cannot finalize general
release language").  The Appellants also appear to make the argument that while perhaps the releases are
permissible to the extent they relate to the claims underlying the Settlement, the Appellants should be able
to sue parties for entering into the Settlement.  But that argument ignores the fact that all Bondholders
could be bound to a settlement that the Bankruptcy Court found to be fair and reasonable.  Moreover, why

## B.    *Metromedia* does not apply to consensual releases.

*Metromedia* expressly found that "nondebtor releases may also be tolerated if the affected creditors consent." *Metromedia*, 416 F.3d at 142.  As discussed above, the Indenture provided the Trustee with the authority to seek court approval for a settlement agreement that would bind all Bondholders.  Thus, an authorized representative of the Bondholders was a party to the Settlement Agreement and negotiated a deal that all parties agreed was fair and reasonable.  Because the Bankruptcy Court appropriately approved the Settlement Agreement and found that it was binding on all Bondholders, *Metromedia* does not apply. [24]

## C.    Delta received substantial consideration in connection with the releases.

Even if *Metromedia* did apply to this case, the facts of this matter would satisfy the *Metromedia* standard.  *Metromedia* held that nondebtor releases are appropriate when the estate receives substantial consideration and the enjoined claims would indirectly impact the debtor's reorganization "by way of indemnity or contribution." *Id.*  The releases at issue here satisfy that test.  Pursuant to Section 6.08 of the Facilities Agreement, Delta agreed to indemnify both KCAB and the Bond Trustee for any actions

---

would parties ever enter into settlements if they could be collaterally attacked for doing so?  And what better evidence is there for the necessity of such releases than the Appellants' behavior in this case.

[24]    The Appellants also argue that the Settlement Order amounts to an improper anti-suit injunction.  Opening Brief at 21-22.  This argument fails for two primary reasons.  First, the "injunction" at issue here is a release of claims.  While it is true that a release effectively prohibits future litigation over claims encompassed by the release, the Bankruptcy Court absolutely had the authority to approve the Settlement Order with the releases, for all of the reasons discussed herein.  Second, even the case cited by the Appellants holds that consent decrees may been enforceable against non-parties if "the interests of nonparties have been adequately represented by parties to the consent decree." Opening Brief at 22, n.9, citing *Association for Retarded Citizens of Connecticut, Inc. v. Thorne*, 30 F.3d 367, 372 (2d Cir. 1994).  For the reasons discussed above, the Trustee had the authority to propose a Settlement Agreement that, if approved by the Bankruptcy Court, would bind all Bondholders.  And the Appellants never contested the reasonableness of the Settlement Agreement and therefore cannot claim that the Trustee did not adequately represent their interests.

brought against them by third parties. *See* Facilities Agreement § 6.08. In connection

with the releases contained in the Settlement Agreement, both the Trustee and KCAB

agreed to forgo those claims. Given the consideration provided by both the Trustee and

KCAB – as well as the importance of the Settlement to Delta in the context of resolving

issues relating to its Cincinnati hub – the releases are permissible under the *Metromedia*

standard. *Metromedia*, 416 F.3d at 141 ("a court may enjoin a creditor from suing a third

party, provided the injunction plays an important part in the debtor's reorganization

plan.").[25]

> **D.    The Trustee did not engage in self-dealing.**

Having failed to establish any credible - much less compelling - arguments to

excise the release terms of the Settlement, the Appellants make yet another argument they

never raised below: They now contend that the Bankruptcy Court erred by failing to

view the Trustee's release with skepticism and heightened judicial scrutiny.[26] Opening

Brief at 22-23. However, the cases relied upon by the Appellants all involve allegations

of self-dealing. And it cannot be seriously claimed that the Trustee received any kind of

benefit, economic or otherwise, beyond the peace of mind that any released party gets

from knowing that all claims associated with a transaction have been extinguished. In

---

[25]    The Appellants argue that the releases could not have played an important part in Delta's reorganization plan because Delta admitted that the Facilities Agreement and the Settlement were not the "crown jewels" of an airline with over $20 billion in assets. Opening Brief at 29-30. But the standard under *Metromedia* is "important," not "crown jewels," *see Metromedia*, 416 F.3d at 141, and it is beyond dispute that the Settlement Agreement was an important aspect of Delta's Plan. Even the quote from Delta upon which the Appellants frequently rely underscores the importance of CVG to Delta's operations. Opening Brief at 29 (Delta noted that "the Airport is an important part of [its] overall flight network").

[26]    Of course, it was the Trustee's intention that the entire Settlement be given judicial scrutiny, which is why the Settlement was brought to the Bankruptcy Court for approval, after notice to all parties.

addition, the Bankruptcy Court explicitly found, on notice to all parties and after a lengthy hearing, that the Settlement was fair and reasonable to all parties.

The cases relied upon by the Appellants do not apply here. For example, in one of the cases cited by the Appellants, a trust beneficiary sued for an accounting in a case that reflected significant self-dealing and duress by two trustees. *Ingram v. Lewis*, 37 F.2d 259 (10th Cir. 1930). In that case, the plaintiff/beneficiary owned oil-producing land. Two individuals began advising the plaintiff while he was still a minor, and informed him that "they were engaged in protecting the plaintiff from crooks." *Id.* at 260. The two individuals convinced the plaintiff to appoint them as executors under his will and to convey his properties to them in trust for a period of years. *Id.* The trustees in fact depleted trust assets, and caused the trust to purchase mortgages from another trust managed by one of the trustees. After a falling out between the plaintiff and trustees, the plaintiff/beneficiary commenced suit against the trustees for a breach of the trust documents. The trustees informed the plaintiff/beneficiary they would not release trust assets unless the plaintiff agreed to dismiss the lawsuit with prejudice and grant a release. *Id.* at 261-262. Reviewing a lower court decision that enforced the release by barring plaintiff's subsequent suit against the trustees, the Tenth Circuit found that the lower court failed to view the release with skepticism and heightened scrutiny. *Id.* at 265.

Nothing even approaching that set of facts is present here. The Trustee does not stand to profit in any way from the Settlement Agreement, and the releases only stand to protect the Trustee from frivolous litigation involving the very claims already resolved by the Settlement Agreement. The Bankruptcy Court correctly found that the Settlement was in the best interests of all parties, including all Bondholders, and the Appellants

never even argued that the Settlement was unfair or unreasonable. The Trustee did not

have any adverse interest, and did not engage in self-dealing. Rather, the Trustee

explicitly sought court approval for a Settlement that the Bankruptcy Court found was

fair and reasonable to all parties.[27]

---

[27]     The other cases cited by the Appellants for this proposition are equally unavailing. In *Adams v. Cowen,* 177 U.S. 471 (1900), parties disputed administrators' interpretation of a will. The court suggested in the decision that the administrators could have protected themselves by asking the court to interpret the provision. Here, the Trustee brought the settlement to the Bankruptcy Court for approval. *Pegram v. Herdrich*, 530 U.S. 211 (2000) is an ERISA case stemming from a medical malpractice claim. *Hutchings v. Lousiville Trust Co.*, 276 S.W. 2d 461 (Ky. Ct. App. 1955) imposed trustee liability only after a corporate trustee improvidently invested trust assets in the trustee's own securities.

CONCLUSION

The Appellants' appeal should be dismissed because it is constitutionally and equitably moot.  Even if the Court were to reach the merits of this appeal, it should affirm the decision of the Bankruptcy Court, which acted properly in approving the Settlement Agreement.

Dated: June 22, 2007                    Respectfully submitted,


                                        **/s/ William W. Kannel**
                                        William W. Kannel (WK - 5285)
                                        Dominic J. Picca (DP – 2376)
                                        Matthew C. Hurley (MH - 5258)
                                        Ian A. Hammel (IH - 8267)
                                        MINTZ, LEVIN, COHN, FERRIS,
                                         GLOVSKY AND POPEO, P.C.
                                        One Financial Center
                                        Boston, MA 02110
                                        Tel: (617) 542-6000

                                        *Attorneys for UMB Bank, N.A. as*
                                        *Successor Indenture Trustee*


4066829