**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| DELTA AIR LINES, INC., <u>et al.</u>, | ) Case No. 05-17923 (ASH) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |
| KENTON COUNTY BONDHOLDERS | ) |
| COMMITTEE | ) |
| | ) 07 Civ. 3968 (JGK) |
| Appellants. | ) |
| | ) |
| v. | ) |
| | ) |
| DELTA AIR LINES, INC., <u>et al.</u>, | ) |
| | ) |
| Appellees. | ) |
| | ) |

**BRIEF OF APPELLEE DELTA AIR LINES, INC. IN SUPPORT OF THE**
**BANKRUPTCY COURT'S APRIL 24, 2007 ORDER APPROVING THE**
**SETTLEMENT AGREEMENT**

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 450-6539
Marshall S. Huebner (MH 7800)
Timothy Graulich (TG 0046)
James I. McClammy (JM 5592)
Andrew Dean (AD 4312)

Attorneys for Appellee Delta Air
Lines, Inc.

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES .................................................................................................iii

PRELIMINARY STATEMENT...........................................................................................1

STATEMENT OF ISSUES PRESENTED ON APPEAL ................................................3

UNDISPUTED FACTS AND PROCEDURAL HISTORY...........................................3

    A.    The Rejection, Lengthy Negotiation and Interim Agreements .................................3

    B.    The Parties Enter into the Settlement Agreement ....................................................4

    C.    All Parties Were Provided Ample Notice of the Settlement Agreement ..................5

    D.    The Bankruptcy Court Overrules the Appellants' Objections ..................................6

    E.    The Plan and the Settlement Agreement Are Consummated....................................8

APPLICABLE STANDARD..................................................................................................8

ARGUMENT .............................................................................................................................9

    I.    The Appeal Must Be Dismissed As Moot.........................................................9

        A.    Effective Relief Cannot Be Fashioned and Any Order in Favor of Appellants Would Require Unraveling Numerous, Intricate, Integrated Transactions ..................................................................................................... 11

        B.    Even if Possible, Implementation of the Relief Sought Would be Inequitable and Most of the Adversely Affected Parties Are Not Before the Court .................................................................................... 16

        C.    The Appellants' Unsuccessful Stay Attempts Do Not Change the Equation ..................................................................................... 18

    II.    Because the Trustee Had Authority to Act on Behalf of All Bondholders, Appellants' Attacks on the Settlement Agreement Must Fail................................. 20

        A.    Post-Default, the Indenture Permits the Trustee to Settle and Bind All Bondholders ................................................................................... 20

i

B.     The Bankruptcy Court Can Bind All Bondholders ....................................... 23

C.     The Settlement Agreement Is Incorporated into the Plan, and Was Overwhelmingly Accepted........................................................................... 25

III.    The Appellants' So-Called "Constitutional" Arguments Rehash Arguments Already Rejected ..................................................................................................... 27

A.     The Narrowly-Tailored, Consensual Releases Are Appropriate and Properly Preclude Appellants from Collaterally Attacking the Settlement Agreement .................................................................................. 28

1.    The Releases in the Settlement Agreement Do Not Implicate *Metromedia* ......................................................................................... 30

2.    The Injunction Was Narrowly Tailored To Enforce the Consensual Releases .......................................................................... 31

3.    The Bankruptcy Court Had Jurisdiction Under 28 U.S.C. § 157 and § 1334(b) of the Bankruptcy Code to Approve the Settlement Agreement .......................................................................... 32

B.     The Appellants Have No Right to Enforce the Reletting Provision ............ 36

IV.    The Procedural Arguments Raised by Appellants Are Without Merit ................... 38

CONCLUSION……………………………………………………………………………………..40

# TABLE OF AUTHORITIES

### CASES

PAGE

*In re 1515 Broadway Assocs., L.P.*,
   153 B.R. 400 (S.D.N.Y. 1993) ............................................................................. 13

*8300 Newburgh Rd. P'ship v. Time Constr. (In re Time Constr.)*,
   43 F.3d 1041 (6th Cir. 1995) ............................................................................... 35

*Ad Hoc Adelphia Trade Claims Comm. v. Adelphia Commun'cns Corp.*
   (*In re Adelphia Commun'cns Corp.*), Nos. 06-1417 BK LEAD,
   06-1738-BK XAP, 2006 WL 3826700 (2d Cir. Dec. 26, 2006)………………………14

*Allstate Ins. Co. v. Hughes*,
   174 B.R. 884 (S.D.N.Y. 1994) ......................................................................... 9,10

*Bartel v. Bar Harbor Airways, Inc.*,
   196 B.R. 268 (S.D.N.Y. 1996) ........................................................................ 11,13

*Beal Savings Bank v. Sommer*,
   8 N.Y.3d 318, No. 26, 2007 N.Y. LEXIS 267 (N.Y. Mar. 22, 2007) ...................... 22

*In re Bd. of Dirs. of Multicanal S.A.*,
   307 B.R. 384 (Bankr. S.D.N.Y. 2004) .................................................................. 23

*In re Bd. of Dirs. of Telecom Argentina, S.A.*,
   Case No. 06 CIV 2352, 2006 WL 3378687 (S.D.N.Y. Nov. 20, 2006).................... 23

*Carey v. Brown*,
   92 U.S. 171, 23 L. Ed. 469 (1875) ...................................................................... 24

*Carroll v. Rafael Galleries, Inc. (In re Altman)*,
   254 B.R. 509 (D. Conn. 2000) ............................................................................. 39

*In re Carter*,
   100 B.R. 123 (D. Me. 1989).................................................................................. 10

*Celotex Corp. v. Edwards*,
   514 U.S. 300, 115 S. Ct. 1493, 131 L. Ed. 2d 403 (1995) ...................................... 34

*Chateaugay Corp. v. LTV Steel Co. (In re Chateaugay Corp.)*,
   10 F.3d 944 (2d Cir. 1993)................................................................................. 9,10

*Church of Scientology of Cal. v. United States*,
   506 U.S. 9 (1992) ............................................................................................................ 9

*Citibank, N.A. v. Vebeliunas*,
   332 F.3d 85 (2d Cir. 2003) ............................................................................................. 8

*In re Cuyahoga Equip. Corp.*,
   980 F.2d 110 (2d Cir. 1992) .................................................................................... 34,35

*In re Drexel Burnham Lambert Group*,
   130 B.R. 910 (S.D.N.Y. 1991), *aff'd*, 960 F.2d 285 (2d Cir. 1992) .................... 31,32

*In re Enron Corp., et al.*,
   326 B.R. 497 (S.D.N.Y. 2005) ...................................................................................... 16

*Feld v. Zale Corporation (In re Zale Corporation)*,
   62 F.3d 746 (5th Cir. 1995) ..................................................................................... 13,35

*First Nat'l Bank of Louisville v. Continental Illinois Nat'l Bank & Trust Co.*,
   933 F.2d 466 (7th Cir. 1991) ........................................................................................ 22

*Friedman v. Chesapeake & Ohio Ry. Co.*,
   261 F. Supp. 728 (S.D.N.Y. 1966), *aff'd* 395 F.2d 663 (2d Cir. 1968) .................... 23

*In re Frost Bros., Inc.*,
   No. 91-Civ.-5244, 1992 U.S. Dist. LEXIS 18301 (S.D.N.Y. Nov. 30, 1992) ........... 9

*In re Gaston & Snow*,
   Nos. 93 Civ 8517, 93 Civ. 8628, 1996 U.S. Dist. LEXIS 17774
   (S.D.N.Y., Nov. 25, 1996) ............................................................................................ 11

*Gulino v. N.Y. State Educ. Dep't*,
   460 F.3d 361 (2d Cir. 2006) ............................................................................. 24, 27, 38

*Har-Ken Oil Co. v. Progas, Inc.*,
   NO. 91-CA-2964-MR, 1993 Ky. App. LEXIS 84 (Ky. Ct. App. July 2, 1993) ........ 37

*In re Indian Palms Assocs., Ltd.*,
   61 F.3d 197 (3rd Cir. 1995) ......................................................................................... 24

*In re Ionosphere Clubs, Inc.*,
   184 B.R. 648 (S.D.N.Y. 1995) ..................................................................................... 13

*In re Iridium Operating*,
    478 F.3d 452 (2d Cir. 2007) .................................................................................... 8

*Kassover v. Gibson*,
    No. 02 Civ. 7978, 2003 U.S. Dist. LEXIS 8765 (S.D.N.Y. May 27, 2003), *aff'd*
    98 F. App'x 30 (2d Cir. 2004).......................................................................... 10,11

*Kemper Investors Life Ins. Co. v. Las Colinas Corp.*,
    Case No. 88 C 9152 (N.D. Ill. 1989) ..................................................................... 24

*LTV Corp. v. Aetna Casualty & Sur. Co. (In re Chateaugay Corp.)*,
    167 B.R. 776 (S.D.N.Y. 1994) .............................................................................. 13

*Louisville & Nashville R.R. Co. v. Dry Branch Coal Co.*,
    65 S.W.2d 1008 (Ky. 1933) .................................................................................. 37

*Louisville Gas & Electric Co. v. Continental Field Sys.*,
    CIV.A. NO. 3:01 CV 387-H, 2005 U.S. Dist. LEXIS 7634 (W.D. Ky. Mar. 17, 2005) ......... 37

*MBank Dallas, N.A. v. Continental Ins. Co.*,
    Case No. 86 C 9583 (N.D. Ill. 1987) ..................................................................... 24

*In re Metromedia Fiber Network, Inc.*,
    416 F.3d 136 (2d Cir. 2005) .........................................................................*passim*

*Mills v. Green*,
    159 U.S. 651 (1895) .............................................................................................. 9

*In re New York, N. H. & H. R. Co.*,
    632 F.2d 955 (2d Cir. 1980) ................................................................................. 28

*New York City Dep't of Finance v. 1515 Broadway Assoc., L.P.*
*(In re 1515 Broadway Assocs., L.P.)*,
    153 B.R. 400 (S.D.N.Y. 1993) .............................................................................. 16

*Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v.*
*Official Comm. of LTV Steel Co. (In re Chateaugay Corp.)*,
    988 F.2d 322 (2d Cir. 1993)................................................................................ 9,12

*Pacor, Inc. v. Higgins*,
    743 F.2d 984 (3d Cir. 1984).................................................................................. 34

*Palmer v. Bankers' Trust Co.*,
    12 F.2d 747 (8th Cir. 1926)................................................................................... 24

*In re Pan Am Corp.*,
   No. 98 Civ. 7838, 1999 U.S. Dist. LEXIS 14612 (S.D.N.Y. Sept. 22, 1999) ........................ 10

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
   390 U.S. 414 (1968) ............................................................................................................... 28

*In re Public Service Co. of New Hampshire*,
   963 F.2d 469 (1st Cir. 1992) ................................................................................................... 16

*In re Purofied Down Prods. Corp.*,
   150 B.R. 519 (S.D.N.Y. 1993) .................................................................................................. 8

*Quirke v. St. Louis-San Francisco Ry. Co.*,
   277 F.2d 705 (8th Cir. 1960) ................................................................................................... 23

*Redmond v. Commerce Trust Co.*,
   144 F.2d 140 (8th Cir. 1944) ................................................................................................... 24

*In re Revere Copper and Brass, Inc.*,
   78 B.R. 17 (S.D.N.Y. 1987) ................................................................................................ 10,18

*In re Roberts Farms, Inc.*,
   652 F.2d 793 (9th Cir. 1981) ................................................................................................... 13

*Rosen v. Siegel*,
   106 F.3d 28 (2d Cir. 1997) ...................................................................................................... 32

*Ross v. City of Fort Wayne*,
   63 F. 466 (7th Cir. 1894) ......................................................................................................... 24

*Schallitz v. Starrett Corp.*,
   82 N.Y.S.2d 89 (Sup. Ct. 1948) .............................................................................................. 23

*Sexton v. Taylor County*,
   692 S.W.2d 808 (Ky. Ct. App. 1985) ...................................................................................... 37

*Shaw v. Railroad Co.*,
   100 U.S. 605, 25 L. Ed. 757 (1880) ........................................................................................ 23

*Six West Retail Acquisition, Inc. v. Loews Cineplex Entm't Corp.*,
   286 B.R. 239 (S.D.N.Y. 2002) ................................................................................................ 10

*In re Specialty Equip. Cos.*,

3 F.3d 1043 (7th Cir. 1993) .................................................................................. 16

*Sure-Snap Corp. v. State Street Bank & Trust Co.*,
    948 F.2d 869 (2d Cir. 1991) ........................................................................ 25

*In re Texaco, Inc.*,
    92 B.R. 38 (S.D.N.Y. 1988) ..................................................................... 9,15

*Trust Corp. v. Patterson (In re Copper King Inn, Inc.)*,
    918 F.2d 1404 (9th Cir. 1990) ..................................................................... 38

*In re UNR Indus.*,
    20 F.3d 766 (7th Cir. 1994) ........................................................................ 18

*UPIC & Co. v. Kinder-Care Learning Ctrs.*,
    793 F. Supp. 448 (S.D.N.Y. 1992) ............................................................. 23

*United States v. Allstate Ins. Co.*,
    754 F.2d 662 (6th Cir. 1985) ...................................................................... 37

*In re Warner Communications Sec. Litig.*,
    798 F.2d 35, 37 (2d Cir. 1986)……………………………………………..14

*In re WorldCom, Inc. Securities Litigation*,
    293 B.R. 308 (S.D.N.Y. 2003) ................................................................... 34

### STATUTES & RULES

28 U.S.C. § 157 ............................................................................................ 32

28 U.S.C. § 157(b)(2)(B) ............................................................................. 33

28 U.S.C. § 157(b)(2)(M) ............................................................................ 33

28 U.S.C. § 1334(b) ............................................................................ 32,33,34

49 U.S.C. § 47107(a) .................................................................................... 23

Bankr. Code § 365(a) ................................................................................... 22

Bankr. Code § 365(g) ......................................................................... 7, 22, 34

Bankr. Code § 502(b)(6) ............................................................................ 7,22

Bankr. Code § 1141(a) ...................................................................................... 25

Fed. R. Bankr. R. 2019 ................................................................................ 16, 17

Fed. R. Bankr. P. 7001 ................................................................................ 38, 39

Fed. R. Bankr. P. 7001(7) .................................................................................. 39

Fed. R. Bankr. P. 9019 ........................................................................................ 8

Ky. Rev. Stat. § 103.260(2) ............................................................................... 22

Sec. 316(b) of the TIA ....................................................................................... 23

### OTHER AUTHORITIES

76 Am. Jur. 2d Trusts § 566 (1975) ................................................................. 24

Yahoo Finance, www.finance.yahoo.com/q/hp?s =dal (last visited June 22, 2007) ..................... 8

**Preliminary Statement**

This appeal concerns a settlement (the "**Settlement Agreement**" or "**Settlement**") [Exh. P][1] between Delta Air Lines, Inc. ("**Delta**"), the Kenton County Airport Board ("**KCAB**"), and UMB Bank, N.A., as trustee (the "**Trustee**"), acting at the written direction of a majority of holders of the 1992 Kenton County Series A and Series B Bonds (the "**Bonds**" and the holders thereof, the "**Bondholders**"). The Settlement, which obviated further protracted litigation about Delta's occupancy of certain facilities at the Cincinnati-Northern Kentucky International Airport (the "**Airport**"), Delta's second largest hub, was approved by Bankruptcy Court order dated April 24, 2007 (the "**B.C. Order**" or "**Settlement Order**") [Exh. C] and opinion dated April 25, 2007 (the "**B.C. Opinion**") [Exh. AA]. Hoping to profit from their recent speculation in the Bonds, Appellants – a mere seven of the many hundreds of bondholders – seek to expose (a) Delta, KCAB and the Bondholders to substantial litigation and great uncertainty with respect to the Airport and (b) the remaining hundreds of Bondholders, the vast majority of whom (97.3% in amount) endorsed the Settlement, to disgorgement, and a very lengthy delay and serious risk of substantial reduction in any recoveries.

This appeal must be dismissed because it is moot. No effective relief could be granted, and even if it could, it would be inequitable under these facts. On May 3, the many transactions contemplated by the unstayed Settlement closed. Numerous contracts terminated, others were entered into, hundreds of millions of dollars of pre-petition bonds were cancelled, and hundreds of public Bondholders (whose identities are not even known to the parties) received over 5.8

---

[1] All exhibits designated by letter refer to the exhibits contained in Appellants' Appendix. All exhibits designated by number refer to the exhibits attached to the Declaration of James I McClammy dated June 22, 2007.

million shares of freely tradeable Delta common stock and a $65.875 million note ("**Delta Notes**" or "**Notes**").  Since then, it is surely the case that many of these unrestricted shares and Notes have been sold to innocent and unrelated third parties.  The substantial consideration paid by Delta to Bondholders under the Settlement Agreement could never be recovered.  Nor can or should the releases, known by all to lie at the very heart of the integrated Settlement, be excised on appeal.

Even were it not moot, the appeal, which recycles arguments the Bankruptcy Court (and this Court) rejected, is also without merit.  The findings below – that the Appellants were bound to the Settlement by the terms of the Bond Indenture ("**Indenture**"), by the overwhelming plan vote, and by the finding that the Settlement was fair and reasonable to all Bondholders (a finding Appellants did not contest) – defeat their individuated complaints at every turn.

But their individual arguments each also fall on its own accord, for other reasons as well. Appellants argue that the narrowly-tailored releases that effectuate the Settlement violate their "constitutional rights to due process."  This constitutional argument is a new argument improperly raised for the first time on appeal.  Additionally, the substantive points (that the releases are impermissible "anti-suit injunctions," that they violate *Mertomedia*, etc.) on which it is based demonstrate that the Appellants are trying to pour old wine into a new bottle.  Those arguments were previously rejected by the Bankruptcy Court (and as to probability of success this Court) for good reason.

Appellants next argue that they have unlawfully been deprived of an alleged "right" to relet proceeds (under a document to which they are not even party).  They err.  Under the relevant documents, they have <u>no</u> right to any relet.  Moreover, the issue of entitlement to relet

proceeds was addressed in negotiations, and the consideration paid reflects substantial

compensation for, *inter alia*, the release of any claims to any relet proceeds. There was also

substantial uncontroverted evidence below that no relet proceeds from other parties were

available that could have provided value anywhere near the Settlement. Moreover, the

Bondholders clearly accepted this – as evidenced by the overwhelming votes in favor of the Plan

and their treatment under the Settlement.

## Statement of Issues Presented on Appeal[2]

1.      Whether the closing with respect to the Settlement Agreement, including the

distribution of over 5.8 million shares of Delta stock and $65.875 million in Delta Notes to

participants in the public securities markets, including the Appellants, renders the appeal moot.

2.      Whether the Bankruptcy Court correctly found that it had subject matter

jurisdiction to approve the Settlement Agreement.

3.      Whether the Bankruptcy Court correctly found that the Settlement Agreement

binds all Bondholders.

4.      Whether the Bankruptcy Court correctly found that it had the authority to approve

the Settlement over the objections of seven bondholders (out of many hundreds).

## Undisputed Facts and Procedural History

**A.      The Rejection, Lengthy Negotiation and Interim Agreements**

In late 2005, Delta informed KCAB and the Trustee that it planned to reject the Lease

Agreement dated February 1, 1992 (the "**Facilities Agreement**") [Exh. D] and related

agreements. Negotiations began, with notice of the negotiations and an invitation to join them

---

[2] Delta agrees with Appellants' Statement of Basis for Appellate Jurisdiction.

provided by the Trustee to all Bondholders.  On April 28, 2006, Delta filed a Motion (Docket No. 2477) (the "**Rejection Motion**") [Exh. J] to reject the Facilities Agreement and related agreements.  Various interim agreements were reached during the ongoing negotiations[3] and, on February 19, 2007, the parties reached an agreement in principle on a global settlement.

**B.    The Parties Enter into the Settlement Agreement**

As the Bankruptcy Court found, the negotiations leading to the Settlement Agreement were long and contentious, with the Trustee represented by "experienced bankruptcy counsel, experienced FAA counsel, experienced Kentucky law counsel and an experienced airline industry consultant."  B.C. Op. at 6.  Pursuant to the Settlement Agreement ultimately reached:

- the Rejected Agreements and the Guaranty [Exh. B] were rejected and terminated as of the Closing Date, the Bonds were cancelled, and the Indenture remained in effect solely as set forth in the Settlement Agreement;

- Delta and KCAB entered into a new lease agreement (the "**New Lease**") and a variety of other agreements;

- Delta issued the Notes to the Trustee (for the benefit of all Bondholders), the original principal amount of which was $65,875,000;

- the Trustee received (for the benefit of all Bondholders) a $260,000,000 unsecured claim (the "**Bankruptcy Claim**");

- Delta, KCAB, the Trustee, and the Bondholders released all claims against each other with respect to the Bonds, the Bond facilities and related agreements, and the negotiation of or entry into the Settlement; and

- Delta amended and assumed the Airport Use Agreement.

---

[3] On July 17, 2006, for example, the parties entered into a forbearance agreement (as amended, the "**Forbearance Agreement**") [Exh. L], pursuant to which, *inter alia*, (i) in lieu of making a payment in the full amount then due, Delta made a payment to the Trustee of $9,000,000 for use of the 1992 Bond Facilities from January 1, 2006 to August 31, 2006; (ii) each month thereafter, Delta paid $1,125,000, (iii) Delta's payments under the Agreement would be credited against any obligation to pay further facilities rent; and (iv) each party would forbear from exercising any rights or remedies available to them with respect to any failure by Delta to make payments due under the Facilities Agreement.  The Forbearance Period was ultimately extended to the Closing Date.

As evidenced by the terms of the Settlement Agreement, the parties bargained for finality and certainty.  Delta achieved cost reductions for continued use of facilities at the Airport, its second largest hub, and avoided further litigation.  The Bondholders got eminently fair and very substantial liquefiable value up front in the form of unrestricted securities.  As this Court noted, "the Trustee and the majority of Bondholders who supported the settlement an[d] have argued without substantial contradiction that the settlement provides fair and reasonable consideration." District Court Stay Hearing Transcript, May 2, 2007 ("**D.C. Tr.**" and oral opinion therein, "**D.C. Op.**") at 86-7 [Exh. 1].  KCAB got a new lease, with attendant obligations, with its anchor tenant.

## C.     All Parties Were Provided Ample Notice of the Settlement Agreement

As the Bankruptcy Court found, the Bondholders were amply notified of the Settlement Agreement prior to voting on the Plan.  B.C. Op. at 6.  During the negotiations – which all Bondholders were repeatedly invited to join – the Trustee issued 16 notices (the "**Notices**") to the Bondholders that, *inter alia*, it was (i) negotiating a settlement and (ii) entering into interim agreements that compromised the payment of interest when due.  *See* Notices [Exh. 2].  For 15 months, no party alleged that the Trustee lacked authority on these matters – and Delta paid over $30 million pursuant to various agreements (some of which were approved by the Bankruptcy Court with no objections by any party).

On February 7, 2007, the Bankruptcy Court approved Delta's disclosure statement (the "**Disclosure Statement**"), which stated, *inter alia*,[4] that as to airport revenue bond transactions:

---

[4] Pages 56 and 57 of the Disclosure Statement also described the history of negotiations between the Trustee and Delta and alerted readers to the fact that a tentative "agreement in principle" had been reached between the parties but that negotiations to finalize this agreement had stalled as of February 7, 2007.

> [Delta] may elect to enter into and seek Bankruptcy Court approval of a settlement agreement resolving and/or restructuring its obligations related to such [bonds]. If such a settlement is reached and approved by the Bankruptcy Court, the treatment of the parties to such settlement and the holders of the [bonds] subject to a settle[ment] shall receive payments in accordance with the terms and conditions of such settlement.

Disc. Stmt, § 4.2(o)(1)(iii) [Exh. 12].  At the February 22, 2007 omnibus hearing (attended in person by two of the Appellants), Delta announced that it had reached agreement with KCAB and the Trustee.  [Exh. Q].  The next day, the Trustee sent a notice to all Bondholders about the proposed settlement, including the principal terms thereof.  *See* Notice dated Feb. 23, 2007 [Exh. R]; B.C. Op. at 7.  On the same day, the Appellants retained counsel to oppose the Settlement Agreement.  On March 8, 2007, Delta filed a Form 8-K [Exh. 3], outlining the terms of the Settlement Agreement and a motion seeking its approval (the "**Settlement Motion**") [Exh. U].  The objection deadline was set for April 12, 2007, almost five weeks later, and a hearing was held on April 19, 2007, more than forty days after the filing.  On March 9, 2007, the Trustee sent a notice to all Bondholders summarizing the terms of the proposed settlement and attaching the Settlement Agreement and Motion.  Notices [Exh. 2 at UMB 1202-1255].[5]  The voting deadline for the Plan was not until April 9, 2007.

**D.    The Bankruptcy Court Overrules the Appellants' Objections**

On March 13, 2007, Appellants filed a preliminary objection ("**Preliminary Objection"**) [Exh. V] and served on the Debtors, the Trustee, and KCAB demands for written discovery and depositions.  The parties produced thousands of pages of documents to Appellants, and

---

[5] In addition, on March 12 & 13, 2007, actual and publication notice of the Settlement Motion was provided to Bondholders.  *See* Supplemental Affidavit of Service of Financial Balloting Group LLC, filed March 20, 2007 [Docket No. 5318] [Exh. 10].  On March 14, 2007, publication notice of the Settlement Agreement was provided in *The Wall Street Journal – National Edition* and *Cincinnati Enquirer*.  [Exh. 6]; B.C. Op. at 7.

Appellants deposed witnesses for Delta, the Trustee, and KCAB.  Remarkably, in their supplemental objection filed on April 13, 2007 (the "**Supplemental Objection**") [Exh. W], Appellants did not cite a single document that had not previously been publicly filed.

An extensive hearing (the "**Settlement Hearing**") was held on April 19.  In its order and opinion issued on April 24 and 25, 2007, respectively, the Bankruptcy Court approved the Settlement Agreement, finding, i*nter alia,* that it was "clearly in the best interests of both Delta and the Bondholders."  B.C. Op. at 9 [Exh. A].   The Court also opined that:

- "[W]hat is surprising is that the Objectors did not make any argument that the Settlement is not reasonable or beneficial from the perspective of the Bondholders, even after the Court noted the point at the oral argument."  B.C. Op. at 3.

- "The Settlement reflects the preference of the great majority of Bondholders for payment of the Section 365(g) claim in a form which can be monetized immediately, in lieu of 'rent' payments stretched out over fifteen years."  B.C. Op. at 17-18.

- The rent paid by Delta under the rejected lease was substantially higher than the market value for the facilities, B.C. Op. at 8, and therefore that the Bondholders could not have received anything close to a 100% recovery.[6]

On April 26, the Bankruptcy Court denied an 'emergency stay motion.'  [Exh. Z, EE].

On May 2, 2007, this Court heard the stay motion and denied such motion.  [Exh. 1].

---

[6] Appellants' "summary of the Opinion" misrepresents it in several respects, including:

- The Bankruptcy Court did not determine (as alleged) that it had "jurisdiction and power to cancel $417 million *of KCAB's debt*." Appellants' Brief ("**App. Br.**") at 11 (emphasis added).  Indeed, the Appellants continually misrepresent that the debt at issue was KCAB's debt.  As the Bankruptcy Court and this Court have repeatedly recognized, the debt is non-recourse to KCAB.  B.C. Op. at 4; D.C. Tr. at 89.

- It is not the case that the Bankruptcy Court found that "the Settlement was in the best interests of the Bondholders based solely upon the direction of the Consenting Bondholders and the plan vote for which there was no evidence in the record." App. Br. at 11.  In fact, the Bankruptcy Court took numerous factors into account in so determining, including Delta's right to reject its Lease, B.C. Op. at 9-10, the likely applicability of the section 502(b)(6) cap on any damage claim, B.C. Op. at 10, the fact that Kentucky law does not require payment of full debt service on the Bonds after rejection, B.C. Op. at 16, that unsecured creditors will not receive a 100% recovery in the bankruptcy context, B.C. Op. at 4, and the uncontested evidence about the lack of any other prospective tenants, B.C. Op. at 8.

E.    **The Plan and the Settlement Agreement Are Consummated**

On April 25, 2007, the Bankruptcy Court confirmed Delta's plan of reorganization (the "**Plan**"), which had an effective date of April 30, 2007 (the "**Effective Date**").  On May 3, 2007, initial distributions of shares of reorganized Delta's stock were made on allowed claims.

May 3 was also the "Closing Date" for the Settlement, which was fully implemented in accordance with its terms.  Williams Aff. ¶ 4.  Delta issued the Notes in an aggregate amount of $65,875,000, and made an initial distribution of 5,848,221 shares of stock to hundreds, if not thousands, of Bondholders with respect to the $260 million Bankruptcy Claim.  *Id*.  Both the Notes and the shares were and are freely tradeable.  *Id.* ¶ 5.  Thus, recipient Bondholders were immediately able to sell the consideration received pursuant to the Settlement Agreement. Between May 3, 2007 and June 21, 2007, over 135 million shares of Delta common stock traded hands, with share prices ranging from a low of 18.02 to a high of 21.95 (a difference of over 21%).  Yahoo Finance, www.finance.yahoo.com/q/hp?s =dal (last visited June 22, 2007) [Exh. 5].  Price fluctuations have been substantial.  *Id.*

### APPLICABLE STANDARD

A bankruptcy court's findings of fact are reviewed for clear error; its conclusions of law *de novo*.  *Citibank, N.A. v. Vebeliunas*, 332 F.3d 85, 90 (2d Cir. 2003).  A bankruptcy court's finding pursuant to Bankruptcy Rule 9019 that a settlement is reasonable is reviewed for abuse of discretion.  *In re Iridium Operating*, 478 F.3d 452, 461 n.13 (2d Cir. 2007); *In re Purofied Down Prods. Corp.*, 150 B.R. 519 (S.D.N.Y. 1993) (decision to approve settlement must be "manifestly erroneous" and an abuse of discretion).  A reviewing court can find abuse of discretion where "no 'reasonable man could agree with the decision'" to approve the settlement.

8

*In re Frost Bros., Inc.*, No. 91-Civ.-5244, 1992 U.S. Dist. LEXIS 18301, at *13 (S.D.N.Y. Nov. 30, 1992) (quoting *In re Carter*, 100 B.R. 123, 126 (D. Me. 1989)).

## ARGUMENT

## I.    The Appeal Must Be Dismissed As Moot

The mootness doctrine is premised on the "fundamental jurisdictional tenet that Federal courts are empowered to hear only live cases and controversies."  *In re Texaco, Inc.*, 92 B.R. 38, 45 (S.D.N.Y. 1988).  Article III of the Constitution requires that "[when] an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)).  Additionally, even when a bankruptcy appeal is not constitutionally moot, "'an appeal should . . . be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.'"  *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005) *(quoting Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. Official Comm. of LTV Steel Co. (In re Chateaugay Corp.)*, 988 F.2d 322, 325 (2d Cir. 1993) ("*Chateaugay I*")).

"The Second Circuit has indicated that it is appropriate to scrutinize appeals for mootness in two situations:  when an unstayed order has resulted in a comprehensive change in circumstances, and when a reorganization is substantially consummated." *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) (internal citations and quotations omitted); *see also Chateaugay I*, 988 F.2d at 325; *Chateaugay Corp. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 952-53 (2d Cir. 1993) ("*Chateaugay II*").  Both are true here, and there is a

presumption (in either event) that the appeal should be dismissed as moot. *See Kassover v. Gibson*, No. 02 Civ. 7978, 2003 U.S. Dist. LEXIS 8765, *4 (S.D.N.Y. May 27, 2003), *aff'd* 98 F. App'x 30 (2d Cir. 2004) (unpublished opinion); *Six West Retail Acquisition, Inc. v. Loews Cineplex Entm't Corp.*, 286 B.R. 239, 245 (S.D.N.Y. 2002); *Allstate Ins.*, 174 B.R. at 889.

To overcome this presumption of mootness, Appellants must demonstrate:

(i) the court can still order some effective relief;

(ii) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity;

(iii) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation in the Bankruptcy Court;

(iv) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and

(v) the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.

*Kassover*, 2003 U.S. Dist. LEXIS 8765, at *4 (citing *Chateaugay II*, 10 F.3d 944, 952-53 (2d Cir. 1993). All five of these factors must be met or the appeal is moot.[7] *Chateaugay I*, 10 F.3d

---

[7] Appellants wrongly assert that "where… the order on appeal is not a confirmation order, there is no presumption of equitable mootness that exists with respect to an order confirming a plan that has been substantially consummated." Ap. Br. at 37 (citing *Allstate*, 174 B.R. 884). *Allstate* says absolutely nothing about whether there is a presumption of mootness with respect to appeals of orders other than confirmation orders; it states only that it did not rely on the five-factor test of *Chateaugay II*. *Allstate,* 174 B.R. at 889. Later decisions in the Southern District have made it clear that the *Chateaugay II* test is equally applicable to appeals from orders other than confirmation orders that have been substantially implemented. *See, e.g., Kassover*, 2003 U.S. Dist. LEXIS 8765 (applying *Chateaugay II* test to appeal of order approving settlement agreement and stock purchase agreement); *In re Pan Am Corp.*, No. 98 Civ. 7838, 1999 U.S. Dist. LEXIS 14612 (S.D.N.Y. Sept. 22, 1999) (applying *Chateaugay II* test to appeal of order approving stipulation concerning claims).

Further, the rule is particularly appropriate here, as the Settlement Agreement resolved complex issues between a debtor and major creditors, and provided for distributions far in excess of the amounts distributed under many plans that are the subject of appeals determined to be moot. *See, e.g. In re Revere Copper and Brass, Inc.*, 78 B.R. 17 (S.D.N.Y. 1987) (finding appeal of confirmation order moot after plan providing for approximately (…continued)

at 952-53; *Kassover*, 2003 U.S. Dist. LEXIS 8765, at *4-5; *Bartel v. Bar Harbor Airways, Inc.*, 196 B.R. 268, 272 (S.D.N.Y. 1996) (Koeltl, J.).  Appellants fail to meet this stringent 5-part test, and thus their appeal must be dismissed as moot.

**A.    Effective Relief Cannot Be Fashioned and Any Order in Favor of Appellants Would Require Unraveling Numerous, Intricate, Integrated Transactions**

Appellants state that "[n]othing in a vacatur of the Settlement Order in and of itself would require that Appellees unwind all aspects of the consummated transactions"; Appellees would "simply . . . have to make choices [that] may be difficult."  App. Br. at 38.  This is profoundly untrue.  Delta paid out hundreds of millions of dollars to hundreds of Bondholders for <u>this</u> settlement, including the finality and certainty it provides.  If the benefits of this bargain are taken away, all the consideration Delta paid must be returned (which is of course utterly impossible), leaving all parties to litigate their rights and remedies.  Under the Settlement Agreement's terms, any modification of the Settlement Order gives each party the right to terminate, rendering the settlement "null and void" and returning the parties to their pre-settlement positions.  Settlement Agreement, § 4.05 [Exh. P].[8]  Moreover, without valid court approval, Delta cannot be a party to the Settlement.

_____

(continued…)

$300,000,000 in total claims had been substantially consummated); *In re Gaston & Snow*, Nos. 93 Civ. 8517, 93 Civ. 8628, 1996 U.S. Dist. LEXIS 17774 (S.D.N.Y., Nov. 25, 1996) (determining that plan under which distributions aggregating approximately $14.5 million had been made was substantially consummated and that appeal therefrom was moot).

[8] Additionally, the Settlement Agreement makes it clear that all provisions of the agreement are "essential, non-severable terms" such that no one element can be modified without undoing the entire deal.  Settlement Agreement, § 3.01.  As discussed below, contrary to Appellants' assertion, therefore, equitable relief could not be awarded by severing the release provisions contained in the Settlement Agreement. Moreover, Delta, as debtor, needed Court authority to enter into the Settlement Agreement and the other agreements contemplated therein.  If the Settlement Order is reversed on appeal, such authority would be retracted *ab initio*.

But a return to the past is utterly impossible, for virtually all actions contemplated by the Settlement Agreement have long since been irrevocably completed:  (i) the Facilities Agreement and related agreements have been rejected and terminated; (ii) the Bonds have been cancelled and the Indenture has been modified to be of no force and effect except for certain mechanical and administrative provisions; (iii) Delta and KCAB have entered into the New Lease, the New M&O Agreement and the Bulk Storage Facilities Lease, Williams Aff. ¶ 4, (iv) the Guaranty and Tax Certificate have been discharged and terminated, (v) Delta has amended and assumed the Airport Use Agreement, and (vi) $65,875,000 of Delta Notes and 5,848,221 shares of Delta common stock (both freely tradeable) were distributed to hundreds of individual Bondholders in early May.

It is simply not possible, nor would it be equitable, to undo this reality.[9]  The distributions pursuant to the Settlement Agreement were made through financial intermediaries, and the actual identities of the Bondholders are not even known.  Williams. Aff. ¶ 6.  Additionally, it is likely that many of the Bondholders have long since sold to third parties some or all of the unrestricted Delta Notes and shares they received.  The legal and administrative burdens associated with even tracing, let alone reversing, these distributions and potentially thousands of market transactions are insurmountable.  To unravel the multiple intricate transactions that have transpired pursuant to the Settlement Agreement would "knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the

---

[9] To the extent that it is no longer possible to grant effective relief, this appeal must be dismissed on constitutional as well as on equitable grounds.  *See Chateaugay I*, 988 F.2d at 325-36.  As "case law evidences that constitutional and equitable considerations of the mootness doctrine are often intertwined," *Allstate*, 174 B.R. at 888, this Brief does not distinguish between the two closely-related doctrines.  A further discussion of these issues can be found in the Trustee's brief in opposition.

Bankruptcy Court." *In re Metromedia*, 416 F.3d at 144 (quoting *In re Roberts Farms, Inc.*, 652

F.2d 793, 797 (9th Cir. 1981)).  In this circuit, this is exactly when mootness is implicated.

For this reason, courts invariably find that once distributions have been made, it is

impossible to grant effective relief.  In *Bartel*, 196 B.R. at 273, this Court found that an

employee's appeal of a confirmation order was moot because "assets ha[d] been liquidated,

millions of dollars in distributions ha[d] already been made, and these assets and distributions

[could not] be recouped."  *See also In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 652 (S.D.N.Y.

1995) (Koeltl, J.) ("[T]ens of thousands of creditors have received millions of dollars under the

Plan.  These assets and distributions cannot be recouped."); *In re 1515 Broadway Assocs., L.P.*,

153 B.R. 400, 406 (S.D.N.Y. 1993).

Appellants' reliance on *LTV Corp. v. Aetna Casualty & Sur. Co. (In re Chateaugay

Corp.)*, 167 B.R. 776 (S.D.N.Y. 1994) ("*Chateaugay III*")[10] is misplaced.  The *Chateaugay III*

court held that an appeal was not moot where the payments at issue had been made to the debtors

and were easily reversible.  That situation is completely different from the case at bar, where

hundreds of millions of dollars of freely tradeable securities have been distributed to hundreds of

Bondholders, and numerous contracts and leases have been terminated and new agreements

executed in reliance upon the settlement.  Unlike in *Chateaugay III*, it is impossible to

unscramble the eggs here.[11]

---

[10] Though Appellants cite to Chateaugay II, it is clear from context they meant Chateaugay III.

[11] The comparison Appellants draw to *Feld v. Zale Corporation (In re Zale Corporation)*, 62 F.3d 746 (5th
Cir. 1995) is similarly unavailing.  Equitable mootness was never even raised in *Zale*.  Even had the issue been
raised, the case still would be inapposite for there was no evidence the settlement had been implemented.

Appellants argue that their appeal is not moot because relief can be granted by eliminating the release provisions on appeal. *See* App. Br. at 37-39. This claim is without merit, as the release provisions are integral to – and cannot be separated from – the comprehensive compromise. *See* Settlement Agreement § 3.01 ("Except as the Parties may otherwise agree, all provisions of this Agreement are essential, non-severable terms of this Agreement….") and § 3.02(c), n.1 ("The Delta Note and the payments of amounts under Section 3.02(c)(iii) of this Agreement are provided in consideration of [, among other things,] … (ii) the release of all claims with respect to Delta's post-rejection occupancy of the 1992 Bond Facilities, including any purported rights to receive relet proceeds."). And the Second Circuit has held that courts may only approve or disapprove (and may not modify) settlements placed before them. *See, e.g., Ad Hoc Adelphia Trade Claims Comm. v. Adelphia Commun'cns Corp.* (*In re Adelphia Commun'cns Corp.*), Nos. 06-1417 BK LEAD, 06-1738-BK XAP, 2006 WL 3826700, at *1 (2d Cir. Dec. 26, 2006); *In re Warner Communications Sec. Litig.*, 798 F.2d 35, 37 (2d Cir. 1986) ("it is not a district judge's job to dictate the terms at a class settlement, he should approve or disapprove a proposed agreement as it is placed before him and should not take it upon himself to modify its terms").

Moreover, the integral role of the releases has been (a) confirmed by this Court and (b) conceded by counsel for Appellants during the stay hearing before this Court:

> THE COURT: How can you extract the releases from the entire text of the settlement? The settlement agreement on its face says that no portion is severable, that it is an integrated document, and it's fairly clear from the structure of the settlement that that's true.
>
> MR. SHORE: I agree.

14

THE COURT:  KCAB is not going to enter into the modification of its agreements without a release.

MR. SHORE:  That's right.

D.C. Tr. at 23:11-23:19.

To strip an essential, core element from this complex, integrated, multi-party settlement would be inequitable and unprecedented.  None of the three parties would have agreed to the transaction absent releases and finality, which were part of what Delta paid hundreds of millions to purchase, and why KCAB allowed years of rent payments to go to the Bondholders, not to itself.

Furthermore, Appellants' very request was recently rejected by the Second Circuit in *In re Metromedia*, 416 F.3d 136 (2d Cir. 2005).  In *Metromedia,* which is closely on point, the appellants asserted that the plan releases improperly shielded certain non-debtors from suit. Exactly as here, appellants argued that the court could provide effective relief without "unraveling" the transaction by simply carving out the appellants' claims from the releases.  *Id*. at 145.  In deeming the appeal equitably moot, the court refused to void the releases on equitable grounds, noting that "the bargain struck by the debtor and the released parties might have been different without the releases."  *Id*.  Here, it is indisputable that the bargain struck with KCAB and the Trustee would have been radically different without the releases – in fact, there would have been no bargain at all.  *See, e.g.,* Settlement Agreement § 3.02(c), n.1.

Similarly, in *In re Texaco*, 92 B.R. 38, appellants argued that releases in a consummated plan could be severed and reversed.  *Id.* at 40.  The court disagreed, finding the appeal moot, that the releases were part of an "integrated settlement" and that "it was simply untenable to suggest that [it] could excise the [releases] without affecting the settlement and, *ipso facto*, the now-

15

confirmed and consummated reorganization." *Id.* at 46, 50 (internal quotations omitted).  The

rescission of the releases, the Court stated, would "undermine the entire reorganization, creating .

. . a nightmarish situation for the bankruptcy court on remand." *Id.; see also In re Specialty*

*Equip. Cos.*, 3 F.3d 1043, 1049 (7th Cir. 1993) (refusing to nullify non-debtor releases in

confirmed plan because it would "amount to imposing a different plan of reorganization on the

parties."); *In re Enron Corp., et al.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (finding appeal of

exculpation provision in consummated plan moot because removing exculpation provision would

"unravel the entire fabric" of the plan and be "inequitable to all those who participated in good

faith to bring it to fruition").

**B.      Even If Possible, Implementation of the Relief Sought Would be Inequitable and Most of the Adversely Affected Parties Are Not Before the Court**

As the Second Circuit has ruled, appeals should be dismissed as moot "when, even

though effective relief could conceivably be fashioned, implementation of that relief would be

inequitable." *In re Metromedia*, 416 F.3d at 143; *In re Public Service Co. of New Hampshire*,

963 F.2d 469, 471-72 (1st Cir. 1992); *New York City Dep't of Finance v. 1515 Broadway Assoc.,*

*L.P. (In re 1515 Broadway Assocs., L.P.)*, 153 B.R. 400, 405 (S.D.N.Y. 1993).  The equities here

strongly favor the Appellees.  The Appellants are a group of only seven out of many hundred

Bondholders, and more than 90% of the Appellants' holdings were purchased <u>after</u> bankruptcy

and after negotiations with respect to the Settlement Agreement had been publicly announced.

Indeed, some were purchased even after the Settlement was announced.  See Rule 2019

Statement (May 4, 2007) [Exh. 16].  At bottom, they are professional speculators, hoping to blow

up a carefully-negotiated deal, supported by the overwhelming majority of Bondholders, to

extract additional hold-up value for themselves from the settling parties.  As this Court noted:

> [T]he equities tip decidedly against the appellants in view of the fact, apparent from their April 25 statement pursuant to Bankruptcy Rule 2019, that the overwhelming number of the appellants' bonds were bought after Delta entered into bankruptcy proceedings.  Thus the appellants bought the bonds while they knew the income stream to pay the bonds was imperiled, and they continued to hold the bonds without objection while they were aware that the Trustee was engaged in settlement discussions.  D.C. Op. 92:24-93:7.

Moreover, Appellants' assertion that Delta is the only party that "loses" if the Settlement Order is vacated is fiction.  App. Br. at 39, 40.  If the Settlement Order is modified or vacated, all parties must somehow be returned to the *status quo ante* and face significant harm.  At the request of seven bondholders, hundreds of others would have to disgorge hundreds of millions of dollars of consideration (though this is impossible), and instead extensively litigate various claims.[12]  Nor are these hundreds of potentially adversely affected parties before this Court – another one of the necessary factors Appellants fail to meet.  Any recovery to them would be delayed considerably, and would almost surely ultimately amount to substantially less than under the Settlement Agreement.[13]  Many hundreds of Bondholders of course agree with this assessment, as they voted overwhelmingly in both dollar amount (97.35%) and number (89.19%) to accept the Plan into which the Settlement was expressly incorporated.  Moreover, both this Court and the Bankruptcy Court pointedly noted that the Appellants have never challenged that the Bondholders got a good deal under the Settlement Agreement.  *See infra* at 7; D.C. Tr. at 34-36.

---

[12] Of course, it would be impossible to disgorge the shares and Notes distributed to Bondholders for the reasons stated herein, and thus the result would be grossly inequitable to Delta – which would be left to litigate from square one having already paid hundreds of millions pursuant to the Settlement Agreement.

[13] Without the Settlement Agreement, the Bondholders faced receiving, as their *total* recovery, a single claim capped by section 502(b)(6) of the Bankruptcy Code in the amount of either (approximately) $75.5 million or $127.5 million.  Under the Settlement Agreement, however, they received a claim of $260 million, cash or notes with a present value of about $65 million, and up to $2 million in legal fees.

*In re Revere Copper and Brass, Inc.*, 78 B.R. 17 (S.D.N.Y. 1987), addressed a very similar issue. Certain holders of industrial revenue bonds appealed an order confirming a plan of reorganization that had been consummated. *Id*. at 20. In finding the appeal moot, the court noted that the relief requested – directing the debtors to make changes to the bondholders' plan distributions – would improperly impact the rights of the other bondholders who had voted (by a margin of 95%) to accept the treatment provided for under the plan. *Id*. at 22. The court thus found that the requested relief would lead to a "harmful and prejudicial effect on creditors not party to the appeal" and impact "the activities of the debtor in its reorganized form." *Id.*[14]

**C.    The Appellants' Unsuccessful Stay Attempts Do Not Change the Equation**

Both this Court and the Bankruptcy Court ruled that Appellants did not meet the requirements for a stay – including probability of success on the merits. This leaves Appellants in the same position as if they had never sought a stay at all. As Judge Easterbrook has stated:

> UNR's employees sought a stay at every opportunity; by doing so, they insist, they preserved their entitlement to full appellate review . . . [but a] stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization. And it is the reliance interests engendered by the plan, coupled with the difficulty of reversing the critical transactions, that counsels against attempts to unwind things on appeal.

*In re UNR Indus.*, 20 F.3d 766, 769-70 (7th Cir. 1994).

Moreover, Appellants' assertion that the Appellees have nefariously done "everything in their power to moot Appellants' rights" is untrue. App. Br. at 36. Appellants ignore the provisions of the Settlement Agreement that required that the Bondholders receive their

---

[14] Overturning the Settlement Order would also be inequitable to the tens of thousands of other creditors of the Debtors. Among other things, it would subject Delta to risk of instability at its second largest hub, which would also negatively impact KCAB and the traveling public.

distributions on the Bankruptcy Claim on the Plan's initial distribution date. *See* Settlement Agreement Art. 2 (def. "Closing Date"), § 3.02(d); Art. 5. Under the Settlement Agreement, the closing had *always* been keyed to the Plan's initial distribution date. The Bondholders understandably insisted on receiving their initial distributions of common stock and the Notes at the same time as all other Delta creditors to avoid both recovery delays and substantial market risk. *See* Settlement Agreement § 3.02(d). This proved prophetic. As described above, over 135 million shares of Delta common stock traded hands between May 3, 2007 and June 21, 2007, during which time share prices fluctuated substantially. As this Court noted:

> a stay would deprive the Bondholders of a substantial benefit of the settlement that would allow them to receive a substantial distribution of securities from Delta on … the same date that other creditors would receive distributions under Delta's approved reorganization plan. And . . . to avoid future market risk, Delta and the other parties opposing this motion have argued compellingly that the value of these securities could decrease after the bulk of the distributions to other creditors take place and, therefore, that the Bondholders could lose a substantial portion of their bargained for value under the settlement agreement.

D.C. Tr. at 86:20-87:06.

At bottom, equitable mootness is about whether it is possible to "unscramble the eggs" and fairly grant effective relief once a court-approved transaction has been substantially implemented. Appellants expressly conceded this when seeking a stay before this Court, stating with respect to *Metromedia*, that "once the transaction closed, that is, there was a reliance upon the existence of the releases and the transaction closed, under the analysis it would have been equitably moot the next day because there was reliance upon that." D.C. Tr. at 20:6-20:10. We agree. Here, many different eggs have been scrambled (including by hundreds of individual bondholders), and no effective, fair or equitable remedy exists. Nor are all potentially affected parties before the Court.

19

II.     **Because the Trustee Had Authority to Act on Behalf of All Bondholders, Appellants' Attacks on the Settlement Agreement Must Fail**

Nearly all of the Appellants' substantive arguments echo the same central claim unsuccessfully pressed below – that Appellants cannot be bound to the Settlement Agreement or to the releases contained in Section 3.02(f) thereof. This claim, which Appellants now couch in "constitutional" terms, continues to ignore that there are no fewer than **3** independent sources of authority by which all Bondholders (including the Appellants) were properly bound to the Settlement Agreement. First, the Indenture unequivocally gave the Trustee the power to conduct and settle remedial proceedings on behalf of all Bondholders once a default had occurred. As this Court stated, "[t]he Trustee was authorized to settle claims by the majority of the Bondholders pursuant to the Indenture." D.C. Op. at 90-91. Second, judicial approval of the Settlement upon finding that it was fair and reasonable and in the best interest of all Bondholders – a factual finding never challenged by the Appellants below – makes the settlement binding upon all Bondholders. Third, the Settlement Agreement was approved as part of the Plan, which was overwhelmingly accepted by 97.35% (in dollar amount) and 89.19% (in number) of all voting Bondholders. Because, *inter alia*, these 3 sources of authority bind the Appellants to the Settlement, all their arguments fail.

A.     **Post-Default, the Indenture Permits the Trustee to Settle and Bind All Bondholders**

The Indenture expressly provides that the Trustee – when directed in writing by the majority of Bondholders – has the **exclusive** right to conduct (and therefore settle) remedial proceedings once a default has occurred. In particular, Section 9.04 [Exh. A], **which expressly overrides all other provisions of the Indenture,** directs the Trustee to exercise and direct remedies at the direction of a majority of Bondholders once there has been an event of default:

20

> **Anything in this Indenture to the contrary notwithstanding**, the Owners of a majority in principal amount of the Bonds then Outstanding hereunder shall have the right, by an instrument in writing executed and delivered to the Trustee, to direct the time, method and place of conducting all remedial proceedings available to the Trustee under this Indenture or exercising any trust or power conferred on the Trustee by this Indenture. (emphasis added).

The Appellants argue that the Settlement Agreement violates the "absolute" right of each Bondholder to receive payment of principal and interest when due, citing Section 9.06 (and refer to Sections 12.03, 12.06, and 12.07) of the Indenture. But, as found by the Bankruptcy Court, these provisions are either "irrelevant" or "moot." B.C. Op. at 12, 15 [Exh. AA]. Instead, the Bankruptcy Court found that Sections 9.01, 9.02, 9.04, 9.05 and 9.07 "individually and collectively, make absolutely clear that, when there is a default by the issuer, the Bond Trustee alone has the power and authority to commence remedial procedures on behalf of all Bondholders." B.C. Op. at 14.

Here, there were various defaults, including a failure to pay interest when due and multiple defaults under the Facilities Agreement. Moreover, as laid out at length below and as the Bankruptcy Court ruled: (i) it is black-letter law (and beyond cavil) that the power to conduct remedial proceedings includes the power to settle them, *see* B.C. Op. at 14 (collecting authority), (ii) Section 9.05 of the Indenture (which explicitly limits the ability of individual Bondholders to initiate any action to enforce the Bonds without a majority instruction) further confirms the lack of merit to the Appellants' contentions and (iii) it is Delta's chapter 11 filing and statutory

rejection power – not the Settlement or any voluntary actions by KCAB or the Trustee – that have "impaired" these non-recourse bonds, *see* B.C. Op. at 12.[15]

In addition, as courts have made clear in analogous contexts, minority dissenting lenders cannot use apparent unanimous-consent provisions that pertain to amendment, modification, or waiver to give themselves "veto rights" over post-default settlements supported by the requisite majority lenders. *See Beal Savings Bank v. Sommer*, 8 N.Y.3d 318, No. 26, 2007 N.Y. LEXIS 267, at *22 (N.Y. Mar. 22, 2007) ("[t]he [unanimity] provisions concerning amendment, modification and waiver of . . . agreements [did] not preclude the Administrative Agent and 95.5% of the Lenders from" reaching a post-default settlement binding upon all lenders); *see also First Nat'l Bank of Louisville v. Continental Illinois Nat'l Bank & Trust Co.*, 933 F.2d 466, 470 (7th Cir. 1991) (argument that a provision providing for extension of time only by unanimous agreement blocked the majority from reaching a settlement agreement post-default was "an interpretation of the agreement that not only lacks textual support, but also arms one bank to take advantage of the forbearance of others").[16]

---

[15] As Judge Hardin found: "What is ignored is the fact that this is a bankruptcy case, and whether the Settlement is approved by this Court or not, the Bondholders including the Objectors are not going to receive 100% of the amount to which they were entitled under the Indenture. . . . Delta has the extraordinary power under Section 365(a) of the Bankruptcy Code to reject the Lease, leaving KCAB, and thus the Bond Trustee, and thus the Bondholders, with an unsecured, pre-petition claim for damages under Section 365(g), which [] may be capped under Section 502(b)(6). Whether capped or not under Section 502(b)(6), it is a practical certainty that the Bondholders will receive less than their contractual entitlement under the Indenture. The only question is how much less, and that was precisely the subject of the negotiations leading to the Settlement." B.C. Op. at 4.

[16] Appellants also attempt to resurrect an earlier argument based on Kentucky Revised Statute § 103.260(2) that KCAB is not allowed to enter into **any** new lease – whether for all or a small fraction of the premises, whether for 1 year or 20, whether with reorganized Delta or a two-plane airline – unless it pays full debt service on the Bonds (on principal of over $413 million). App. Br. at 31; Prelim. Obj. at 9-10 [Exh. V]. This unprecedented and contortionist "interpretation" of state law – which Appellants fail to note was explicitly rejected by the Bankruptcy Court, B.C. Op. at 16 – has never been accepted by any court, and would violate directly governing federal law, *see, e.g.*, 49 U.S.C. §47107(a); FAA Grant Assurance 22(e). A more in-depth discussion of this issue can be found in KCAB's brief in opposition and Delta's Reply to Appellants' objection to the Settlement Motion [Exh. X].

Appellants also ignore Section 10.10, another critical provision of the Indenture:

> The Trustee may construe any of the provisions of this Indenture insofar as they may appear to be ambiguous or inconsistent with any other provision hereof, and any construction of any such provisions hereof by the Trustee in good faith shall be binding upon the Owners.

Thus, even were this Court to conclude that there is some ambiguity in the many Indenture provisions addressed by the Bankruptcy Court, the Indenture expressly delegates to the Trustee the exclusive right to resolve **all** ambiguities and inconsistencies – with such good faith resolution "binding on the owners" – *i.e.*, all Bondholders.[17]

## B.    The Bankruptcy Court Can Bind All Bondholders

As the Bankruptcy Court also determined, the Settlement Agreement, entered into by the Trustee at the direction of the majority of Bondholders, properly bound all Bondholders upon court approval.  The Trustee is entitled, with proper direction from the controlling holders, to enter into compromises and settlements on behalf of the Bondholders.  *Shaw v. Railroad Co.*, 100 U.S. 605, 611, 25 L. Ed. 757 (1880);  *Friedman v. Chesapeake & Ohio Ry. Co.*, 261 F. Supp. 728 (S.D.N.Y. 1966), aff'd 395 F.2d 663 (2d Cir. 1968); *Quirke v. St. Louis-San Francisco Ry. Co.*, 277 F.2d 705 (8th Cir. 1960); *Schallitz v. Starrett Corp.*, 82 N.Y.S.2d 89 (Sup. Ct. 1948).

---

[17] While the Trust Indenture Act of 1939 (the "**TIA**") does not apply here (because the Bonds were issued by a governmental entity), it is cited by Appellants.  However, the TIA actually strongly supports Delta's position.  Section 316(b) of the TIA was not intended to impair the ability of the judiciary to restructure debt.  Quite the contrary.  As shown in the very cases cited by Appellants, it was intended to curb the ability of parties to **escape** judicial scrutiny; **debt restructurings undertaken in chapter 11 are wholly exempt from 316(b)**.  *See, e.g., In re Bd. of Dirs. of Telecom Argentina, S.A.*, Case No. 06 CIV 2352, 2006 WL 3378687, at *6 (S.D.N.Y. Nov. 20, 2006) ("the TIA cannot prevent the reorganization of a debtor under U.S. bankruptcy laws"); *UPIC & Co. v. Kinder-Care Learning Ctrs.*, 793 F. Supp. 448, 452-453 (S.D.N.Y. 1992) (SEC's intent was to bring contractual recapitalizations under Bankruptcy Court jurisdiction); *In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384, 388 (Bankr. S.D.N.Y. 2004) ("the rights of holders to principal and interest on bonds issued under a TIA-qualified indenture can be impaired by bankruptcy proceedings").

Here, the Bankruptcy Court's findings that (i) the Settlement Agreement was a fair and reasonable result and in the best interest of all Bondholders and (ii) the Trustee acted prudently – findings never challenged below – make the settlement binding upon all holders.[18]  *Carey v. Brown*, 92 U.S. 171, 23 L. Ed. 469 (1875);  *Ross v. City of Fort Wayne*, 63 F. 466, 470 (7th Cir. 1894).  The law is well-settled:  where a "compromise is made [conditioned on] proper court approval, the trustee may safely do so and such is binding upon the beneficiaries."  *Redmond v. Commerce Trust Co.*, 144 F.2d 140, 155 (8th Cir. 1944) (citations omitted); *Palmer v. Bankers' Trust Co.*, 12 F.2d 747, 754 (8th Cir. 1926) ("A court of equity . . . will not lend its aid to a scheme by a minority bondholder of holding up a fair reorganization plan, solely as a means for obtaining greater value or more favorable terms for his bonds than are to be given by the plan to the great majority of the bondholders.").  *See also Kemper Investors Life Ins. Co. v. Las Colinas Corp.,* Case No. 88 C 9152, at 19-20 (N.D. Ill. 1989) [Exh. 15] (approving settlement binding upon all holders)*; MBank Dallas, N.A. v. Continental Ins. Co.,* Case No. 86 C 9583, at 19-20 (N.D. Ill. 1987) [Exh. 15] (same)*.*

---

[18] For the first time on appeal, Appellants argue that the Trustee was not prudent in "agreeing to the Settlement."  App. Br. at 15.  However, the proposed order filed with the Settlement Motion on March 8 sought a finding that the parties – including the Trustee – acted prudently.  Order ¶ 11 and Proposed Order at ¶ 10 ("The Settlement Agreement is fair and reasonable to, and is in the best interest of, Delta and its creditors, KCAB, the Bond Trustee, and the 1992 Bondholders, and, in entering into the Settlement Agreement, Delta, KCAB, and the Bond Trustee, and those 1992 Bondholders irrevocably directing the Bond Trustee to enter into the Settlement Agreement have exercised their rights and powers, and used the same degree of skill in their exercise, as a prudent person would exercise or use under the circumstances.") [Exh. U].  During the entire Rule 9019 proceeding, including its two objections to the Settlement Motion, Appellants did not contest whether the Trustee had acted prudently.  *See Gulino*, 460 F.3d at 380 n.22.  Indeed, because the record reflected that the Trustee acted prudently (without refutation), and that the Settlement Agreement was fair and reasonable (without refutation), *see infra* at 7, the Bankruptcy Court found that the Trustee acted prudently.

**C.     The Settlement Was Incorporated into the Plan, and Overwhelmingly Accepted**

There is yet another independent source of authority to bind all Bondholders, for, as even the Appellants conceded, the Settlement Agreement can be approved as part of a plan of reorganization.  Prelim. Obj at ¶ 31 [Exh. V] (counsel for Appellants arguing that they should have been "allowed to vote upon the Proposed Settlement as part of the Plan"); *see also* Supp. Obj. at 6-7 n. 5 [Exh. W] (appearing to concede the Settlement Agreement can be approved if creditors approve the Plan).  And it was.  As found by the Bankruptcy Court and amply supported by the record, the Settlement Agreement was, in fact, incorporated into the Plan and voted on.  B.C. Op. at 10-11, 18-19; B.C. Order at ¶ 3 ("The terms of the Settlement Agreement [] are incorporated into the Plan . . . .").

It is clearly set forth in both the Settlement Agreement and the Settlement Motion that the Settlement Agreement is incorporated into the Plan, and can only be consummated if the Plan is as well.  *See* Settlement Motion ¶ 13; Settlement Agreement § 4.04; B.C. Op. 10-11, 18-19. Upon confirmation, the terms of the Plan, including the Settlement Agreement, bind all parties. *See* Bankruptcy Code § 1141(a); *see also Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991).

Critically, voting **Bondholders voted overwhelmingly in both dollar amount (97.35%) and number (89.19%) to accept the Plan.**[19]  And in doing so, as the Bankruptcy Court

---

[19] Even if all nonconforming ballots were counted (in violation of the governing order), 84.61% in amount and 88.83% in number of voting Bondholders voted in favor.  *See* Exhibit E of the *Certification of Jane Sullivan of Financial Balloting Group LLC with Respect to the Tabulation of Votes on the Debtors' Joint Plan of Reorganization* (the "**Vote Certification**") [Exh. 4], filed with the Bankruptcy Court on April 18, 2007.

(…continued)

25

expressly found, they were voting on their treatment under the Settlement Agreement after full

and proper notice:

> The Settlement Agreement expressly provides that the terms of the Settlement (which was fully and timely disclosed to all creditors including Bondholders) are incorporated in and made part of Delta's Plan of Reorganization and subject to creditor approval of the Plan.  The Bondholders have voted overwhelmingly both in dollar amount (97.35%) and number (89.19%) to accept the Plan. . . . **Bondholders voting on the Plan obviously have no interest under the Plan other than what is provided under the Settlement.  Thus, the actual vote reflects the Bondholders' overwhelming support for the Settlement**."  B.C. Op. at 10-11 (emphasis added).  *See also id.* at 18-19.[20]

---

(continued...)

It should be noted that, from time to time during these proceedings, the Appellants have made passing suggestions that the Vote Certification – one of the most crucial documents in the procedural history of any bankruptcy case – is somehow not admissible.  They are wrong for a host of reasons: (i) a document filed in a bankruptcy case becomes part of the record on appeal, *see In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 203-05 (3rd Cir. 1995); (ii) at the Confirmation Hearing, the Vote Certification was submitted into evidence with Appellants' consent, and Appellants declined to cross-examine Ms. Sullivan, *see* Confirmation Hr'g Tr. at 22:5-22:14 [Exh. 14]; and (iii) the record at the Confirmation Hearing (including the uncontested Vote Certification) were consolidated <u>by motion of the Appellants</u> with the record of the Settlement Hearing, *see* Confirmation Hr'g Tr. at 63-66.

[20] And the Court's findings were supported by an extensive and uncontradicted factual record.  The section of the Disclosure Statement addressing airport revenue bond facilities expressly stated that the Debtors:

> may elect to enter into and seek Bankruptcy Court approval of a settlement agreement resolving and/or restructuring its obligations related to such [bonds].  If such a settlement is reached and approved by the Bankruptcy Court, the treatment of the parties to such settlement agreement and the holders of the [bonds] subject to a settle[ment] … shall receive payments in accordance with the terms and conditions of such settlement agreement.

Discl. Stmt. § 4.2(o)(1)(iii) [Exh. 12].  And this is exactly what happened.  Moreover, all Bondholders had notice of the Settlement many weeks before the plan's voting and objection deadline:

- The announcement at the February 22, 2007 hearing **was 6 weeks before the voting deadline and at least 9 days before Bondholders even received beneficial ballots.**

- On February 23, 2007, the Bond Trustee posted notice of the Settlement Agreement and its key terms on its web site.  *See* Notices [Exh. 2 at UMB 1196-1201].

- The finalized Settlement Agreement, motion and other documents, were, among other things, publicly filed on March 8, 2007 and disclosed to the general public in Delta's SEC filings on Form 8-K.  This was more than more than **4 weeks** before the voting deadline.

- Notices of the Settlement Agreement were also sent to all Bondholders on or around March 13, 2007, nearly **3 weeks** before the voting deadline.

This eviscerates any lingering claims of the Appellants with respect to this Court's authority to bind them to all of the terms of the Settlement (including the releases).[21]

### III.    The Appellants' So-Called "Constitutional" Arguments Rehash Arguments Already Rejected

After repeatedly failing to convince the Bankruptcy Court (and this Court) that their arguments have merit, Appellants have recast their prior arguments into "constitutional" ones. The gravamen of these new "constitutional" arguments is that the Bankruptcy Court (i) violated the "due process" rights of the Appellants when it approved the narrowly tailored release provisions contained in the Settlement Agreement and (ii) wrongfully deprived the Appellants of their alleged "right" to relet proceeds under the Facilities Agreement.  App. Br. at 14-30.  Of course, as discussed above, all of these arguments conveniently ignore the fatal fact that there was ample authority to bind all Bondholders (including the Appellants) to all of the terms of the Settlement Agreement, including the releases, and that it was uncontested below and found that (i) the Bondholders received fair and reasonable consideration in exchange for any rights they may have foregone and (ii) the Trustee acted prudently.  Moreover, because the Appellants never raised these "constitutional" arguments in the proceedings below, this Court should not entertain them.  *See, e.g.*, *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 380 n.22 (2d Cir. 2006) (observing the well-established general rule that "courts do not consider arguments raised for the

---

[21] Moreover, a number of findings in the Bankruptcy Court's order confirming the Plan (the "**Confirmation Order**") [Exh. 8], which Appellants have agreed – with one narrow exception related to the exculpation of the Trustee under the Plan and Confirmation Order – is now a final order, yet further belie any argument that Appellants are not bound by the Settlement Agreement.  These findings include:  (i) "Votes on the Plan were solicited after disclosure of 'adequate information'" and were tabulated fairly and in good faith, Confirmation Order ¶ 7; (ii) "all holders of Claims who voted to accept the Plan . . . are deemed to have accepted the Plan as modified", by among other things, the Settlement Agreement, *id.* ¶ 10; and (iii) notice of the confirmation was appropriate and satisfactory, *id.* ¶ 49.

first time on appeal") (citation omitted).  However, even ignoring these many flaws and taking

the Appellants' new arguments on the merits, they do not withstand scrutiny.

**A.      The Narrowly-Tailored, Consensual Releases Are Appropriate and Properly
         Preclude Appellants from Collaterally Attacking the Settlement Agreement**

The limited release provisions of the Settlement Agreement provide as follows:

> *Releases.* Effective as of the Closing, each of Delta, KCAB, the Bond
> Trustee, and each 1992 Bondholder shall . . . be deemed . . . to have
> forever released, discharged, waived and abandoned any and all claims . . .
> against one or the other, or their respective properties or assets, arising
> from, in any way based upon or in any way related to the following: the
> negotiation of or entry into this Agreement and/or the Implementing
> Agreements; the 1992 Bond Agreements; the 1992 Bond Facilities; any
> payments received from Delta under the 1992 Bond Agreements prior to
> the Bankruptcy; and/or the Forbearance Agreement, but excluding any
> claims brought under or to enforce the terms of this Agreement, the New
> Lease, the New Indenture, the Delta Note, the other Implementing
> Agreements or any indemnification claim of the Bond Trustee.

This Court correctly characterized the releases in the Settlement Agreement as being "narrowly

drawn and are necessary to prevent relitigation of precisely the claims that were negotiated and

resolved by the Settlement Agreement."  D.C. Op. at 90:18-90:20.

As the Supreme Court itself has said:  "Compromises are a normal part of the process of

reorganization.  In administering reorganization proceedings in an economical and practical

manner it will often be wise to arrange the settlement of claims as to which there are substantial

and reasonable doubts."  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson*, 390 U.S. 414 (1968); *see also In re New York, N. H. & H. R. Co.*, 632 F.2d 955, 959

(2d Cir. 1980) (courts generally favor compromises in bankruptcy) (citations omitted).  These

release provisions are necessary to effectuate the Settlement.  Without them, the Appellants (or

other parties) could collaterally attack the Settlement Agreement and the Bankruptcy Court's

approval order by later bringing suit against Delta, KCAB or the Trustee and "re-litigating" the very same issues resolved by the court-approved Settlement Agreement.  Indeed, Appellants' list of "legally protectable rights," App. Br. at 14, is a veritable roadmap for just such an impermissible collateral attack.  It also highlights the important role that the tailored releases play in preserving the integrity of the Settlement Agreement and the findings of the Bankruptcy Court.[22]  Without them, the Settlement Agreement is effectively a nullity.

As below, Appellants again mischaracterize the releases, variously describing them as (i) "non-debtor releases" that violate *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005), *see* App. Br. at 18-19; 28-30, (ii) an "anti-suit injunction" entered "without factual findings to support it," *see* App. Br. at 21-22, or (iii) non-debtor discharges that are beyond the subject-matter jurisdiction of the Bankruptcy Court, *see* App. Br. at 24-28.  All of these characterizations (each of which has already been rejected) ignore the critical fact that the releases contained in the Settlement Agreement are actually <u>consensual</u> releases entered into by the Trustee as the authorized representative of <u>all</u> Bondholders.  Even leaving this aside, however (which is a complete answer on the topic), each of the Appellants' allegations fails.[23]

---

[22] These releases are also particularly appropriate in light of the underlying relationship between the parties. First, the releases are an important part of the consideration that KCAB and the Trustee − both of whom have given up whatever indemnification rights they may have had under Section 6.08 of the Facilities Agreement (among many other things) − are receiving under the Settlement Agreement.  Second, without the releases, any post-confirmation lawsuit brought against KCAB might well ultimately be largely paid for by Delta, because virtually 100% of the Airport's costs are borne by its resident airlines, and Delta and its affiliates currently account for more than **90%** of the Airport's traffic.

[23] As the Trustee demonstrates in its brief, it was also entirely appropriate that future claims against it for breaches of fiduciary duty be included within the scope of the releases.  The Settlement was found to be fair to all Bondholders and the Trustee and others have acted prudently.  Moreover, among other things, as noted above, the Trustee would argue it was protected by an indemnification provision in Section 6.08 of the Facilities Agreement.

### 1.     The Releases in the Settlement Agreement Do Not Implicate *Metromedia*

Appellants argue that the releases implicate *In re Metromedia Fiber Network, Inc.*  But as

the Bankruptcy Court found:

> The release provision, Section 3.02(f) of the Settlement Agreement, is binding upon only
> Delta, KCAB, the Bond Trustee and the Bondholders. The release is extremely narrow in
> scope, does not release claims against third parties, and releases only those claims
> amongst the Releasing Parties, as defined, which are necessary to prevent further
> litigation with respect to the claims covered and resolved by the Settlement Agreement.
> The release does not implicate any of the concerns expressed by the Second Circuit in *In
> re Metromedia Fiber Network, Inc*.
>
> All the parties to the release, including Delta and the Bondholders, have received
> substantial consideration from each other, and the only claims being released by any
> party are from those necessary to effect the Settlement and preclude further litigation
> with respect to issues resolved and foreclosed by the Settlement.

B.C. Op. at 18-19 (citations omitted).  And as this Court noted:

> The appellants' reliance on *In re Metromedia Fiber Network, Inc.* is misplaced.  Unlike
> the releases in *Metromedia*, the releases of claims against KCAB, Delta, and the Trustee
> at issue here are narrowly drawn and are necessary to prevent re-litigation of precisely the
> claims that were negotiated and resolved by the Settlement Agreement.  It is furthermore
> clear that the releases at issue comprise valuable consideration for KCAB and the Trustee
> in return for their agreement to give up indemnification rights against Delta and therefore
> the releases.  Therefore, the releases are of the kind that *Metromedia* would consider as
> acceptable.  Moreover, the releases are part of the Settlement Agreement that was entered
> into by the Trustee on behalf of the Bondholders.  The Trustee was authorized to settle
> claims by the majority of the Bondholders pursuant to the terms of the Indenture.
> Therefore, the releases were consensual releases which were recognized as authorized in
> *Metromedia*.

D.C. Op. at 90:14-91:6 (citations omitted).

The releases at bar are narrow, consensual releases by only certain parties on only a

specific subject matter made in the context of a litigation settlement – wholly unlike the releases

in *Metromedia*, which were blanket, non-consensual releases by all creditors in a plan of

reorganization.  *See Metromedia*, 416 F.3d at 142 (releases as to non-debtors are permissible if

30

the affected creditors consent). Moreover, even were *Metromedia* implicated, the instant

releases satisfy its dictates. The Settlement, and its releases, "played an important part in the

debtor's reorganization plan." 416 B.R. at 141 (quoting *In re Drexel Burnham Lambert Group*,

960 F.2d 285, 293 (2d Cir. 1992)) . Cincinnati is Delta's second largest hub, and, without the

releases, there is no Settlement or assurance of an acceptable new lease. Moreover, as required

by *Metromedia* (*id.* at 142), the Debtors have "received substantial consideration" for the

releases (including that KCAB has agreed to allow all its facilities rent for the next 15 years to be

prepaid to the Bondholders – with not a penny to KCAB), and Delta would be exposed to

indemnification and other claims by both KCAB and the Trustee without them. Finally, quite

unlike *Metromedia*, the releases are narrow and exist only to further the Settlement's terms and

protect the court order approving it. *Contra. id.* at 143 (expressing concern at the breadth of the

involuntary third-party plan releases).

### 2.  The Injunction Was Narrowly Tailored To Enforce the Consensual Releases

Equally inapposite is the claim that the "Bankruptcy Court failed to make the necessary

findings to support the anti-suit injunction." App. Br. at 21. First of all, this argument

completely misses the point. The only "injunction" was the decretal language in the Approval

Order that effectuated the consensual releases in the Settlement Agreement, that were agreed to

by the Trustee as the authorized representative of all Bondholders (including the Appellants).

This "injunction" (to the extent it is one) was also entered (i) pursuant to extensive notice

procedures, (ii) after discovery by the Appellants and (iii) after a hearing before the Bankruptcy

Court at which the Appellants fully participated – and at which the Court expressly found the

Settlement fair to Bondholders. Indeed, the Court made numerous supporting factual findings

about the Settlement and the settling parties, which Appellants did not contest below and now ignore on appeal.  Appellants' misleading citation to *Rosen v. Siegel*, 106 F.3d 28 (2d Cir. 1997) – in which the Second Circuit remanded a broad injunction issued on an *ex parte* basis – is wildly inapposite.

Equally unavailing is Appellants' attempt to distinguish *In re Drexel Burnham Lambert Group*, 130 B.R. 910, 928 (S.D.N.Y. 1991), *aff'd*, 960 F.2d 285, 289-90 (2d Cir. 1992), which held that where, as here, a settlement is a "necessary . . . step toward confirmation," that "eliminates one of the most significant hurdles standing in the way of resolution of these Chapter 11 cases" *id.* at 926–27, courts may enforce a settlement through injunctions against future claims.[24]  Appellants improperly attempt to narrow *Drexel* to a nullity.[25]  Moreover, *Drexel* is not even implicated here because the authorized agent of all Bondholders (including the Appellants) consented to the Settlement Agreement and the releases.

### 3. The Bankruptcy Court Had Jurisdiction Under 28 U.S.C. § 157 and § 1334(b) of the Bankruptcy Code to Approve the Settlement Agreement

As this Court noted at the stay hearing, Appellants conceded below that the Bankruptcy Court had subject-matter jurisdiction to grant the relief sought in the Settlement Motion.[26]  D.C.

---

[24] *Drexel* was repeatedly cited approvingly by the Second Circuit in *Metromedia*.  *See* 416 F.3d at 141-143.

[25] According to Appellants, *Drexel* is somehow inapposite because, among other things, it (i) was approved after extensive notice and a hearing, (ii) resolved the claims of a large class of litigants, (iii) involved complex litigation issues, (iv) was negotiated by experienced counsel and (v) was approved after extensive discovery had occurred.  *See* App. Br. at 21-22.  As the procedural history described above illustrates, each of these factors is present here.

[26] *See* D.C. Tr. at 26 (Court: "Your colleague appeared to say no problem with respect to jurisdiction.  Of course you have the jurisdiction, the power to order the settlement agreement, and moved on."); Settlement Hr'g Tr. at 17-18 [Exh. 7] (colloquy between the Bankruptcy Court and counsel for the Appellants, in which, *inter alia*, counsel conceded that "we agree Your Honor, under 28 U.S.C. 1334(b) and 157, would have subject matter jurisdiction to rule on a 9019 motion such as this and to entertain it").

Op. at 26.  This Court also rejected the jurisdiction argument as to probability of success, and the Bankruptcy Court found it "frivolous."  D.C. Op. at 88-90; B.C. Op. at 15.

As was extensively addressed below (and as is entirely typical in municipal finance), the Bonds were non-recourse to KCAB.  *See* Settlement Hr'g Tr. at 60:03-61:06.  As the Bankruptcy Court specifically found as a matter of fact (in a section entitled "Basic Facts Ignored by the Objectors"), the "Bondholders and the Trustee have no claim against KCAB, the issuer of the Bonds, which are expressly made non-recourse under the Indenture.  The sole source of funding for the Bonds is the stream of rental payments under the Lease running from 1992 through 2022."  B.C. Op. at 4.[27]  Accordingly, the Settlement Motion addressed matters at the core of the Bankruptcy Court's jurisdiction.  Moreover, it is completely disingenuous for the Appellants to claim reversible error because the Bankruptcy Court (purportedly) ruled that it had "the jurisdiction and power to cancel $417 million *of KCAB's Debt* . . ."  App. Br. at 11 (emphasis added).  For, as Appellants well know, there of course is no $417 million KCAB debt.

The Bankruptcy Court unquestionably had "related to" jurisdiction, which covers "all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).  The Supreme Court has held that for section 1334(b) jurisdiction to lie, the proceeding must be one in which "the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."  *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6, 115 S. Ct. 1493, 131 L. Ed. 2d 403 (1995).  The bankruptcy court's "related to"

---

[27] See also Delta Reply to Settlement Objection at 37 [Exh. X]; KCAB Reply to Settlement Objection at 8-9 [Exh. LL]; B.C. Op. at 4.

jurisdiction is very broad, and "encompass[es] 'more than simply proceedings involving the property of the debtor or the estate.'" *In re WorldCom, Inc. Securities Litigation*, 293 B.R. 308, 317 (S.D.N.Y. 2003) (quoting *Celotex*, 514 U.S. at 308).

In keeping with this expansive grant of jurisdiction, the test in this Circuit regarding jurisdiction over litigation (and settlements thereof) involving non-debtors is "whether its outcome might have any 'conceivable effect' on the bankrupt estate. If that question is answered affirmatively, the litigation falls within the 'related to' jurisdiction of the bankruptcy court." *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992); *see also Pacor, Inc. v. Higgins*, 743 F.2d 984, 994-95 (3d Cir. 1984). The Settlement Agreement addressed matters with far more than a "conceivable effect" on the Debtors (indeed, it has a material effect) and, as a result, fell squarely within "related to" bankruptcy jurisdiction.

The Bankruptcy Court ruled that "there can be no question that this Court has jurisdiction with regard to the Settlement in its entirety under both the 'arising under title 11' and the 'arising in or related to cases under title 11' clauses of 28 U.S.C. § 1334(b)" and that any argument to the contrary was "frivolous." B.C. Op. at 15-16.[28] And as this Court noted: "The Bankruptcy Court plainly had jurisdiction under Section 1334(b) to approve the settlement binding nondebtors because the settlement had more than a 'conceivable effect' on the bankruptcy estate, as required

---

[28] Judge Hardin found that "[b]oth KCAB and the Bond Trustee are direct creditors of Delta, KCAB based on the Lease and the Bond Trustee based on Delta's February 1, 1992 Guaranty of the Lease, which is the only source of funding of KCAB's obligation to the Bond Trustee under the Indenture. All of these agreements – the Lease, the Indenture, and the Guaranty – are inextricably related to each other. KCAB's Section 365(g) claim against Delta for rejection of the Lease and the Bond Trustee's claim against Delta under the Guaranty cannot be resolved without a corresponding resolution of the KCAB-Bond Trustee relationship under the Indenture." *Id.* at 15-16. This Court articulated a similar view. D.C. Op. at 88-90.

in this circuit; it in fact had a very clear effect on Delta's obligations."  D.C. Op. at 89 (citations omitted).

Nor is subject matter jurisdiction defeated because claims between non-debtors are addressed.  In *Cuyahoga*, for example, the proposed settlement addressed disputes between third parties regarding the allocation of a bankruptcy claim as between themselves.  The Second Circuit, noting that a proceeding is "related to" a bankruptcy if its "outcome might have any 'conceivable effect' on the bankrupt estate," expressly found that the bankruptcy court had jurisdiction to approve the settlement with respect to claims asserted by third parties.[29]  *In re Cuyahoga Equipment Corp.*, 980 F.2d at 114; *see also 8300 Newburgh Rd. P'ship v. Time Constr. (In re Time Constr.)*, 43 F.3d 1041, 1045 (6th Cir. 1995) (third-party action "related" because outcome would impact value of estate).  *Inter alia*, the Settlement was indispensible for a new lease at Delta's second biggest hub airport – critical to the Debtors' estates.

Appellants' assertion that Appellees "misled" this Court by noting that claims against KCAB, the Trustee or consenting Bondholders could impact Delta is rather shocking.  App. Br. at 27.  First, the releases are an essential part of the Settlement Agreement – without them, there is no Settlement, and without the Settlement, Debtors' estates are clearly and materially impacted.  *See infra* at 13-14.  Second, the Trustee and KCAB, if found liable, would certainly assert indemnification claims against Delta under Section 6.08 of the Facilities Agreement.

---

[29]  *Feld v. Zale Corporation (In re Zale Corporation)*, 62 F.3d 746 (5th Cir. 1995) is unavailing.  It held that jurisdiction did not lie for third-party tort claims that impacted a debtor's estate only through indemnification provisions found only in the very settlement at issue.  In *Zale*, there was no other or prior obligation of the debtor to the released party.  Here, unlike *Zale*, the relevant indemnification provisions and other avenues to possible debtor liability pre-date and are wholly independent of the Settlement.

There is no exclusion for "acts undertaken by the Trustee."[30]  Finally, as yet again ignored by the Appellants, the Airport is a "residual" airport – meaning that all expenses of the Airport (and KCAB) are passed on to tenants.  Thus, any KCAB liability might very well ultimately be borne principally by Delta, which accounts for 90% of the traffic at the Airport – yet another reason why jurisdiction lies and the releases were critical and appropriate.  Settlement Hearing Tr. at 22.

## B.     The Appellants Have No Right to Enforce the Reletting Provision

The next so-called "constitutional problem" asserted is that the Bankruptcy Court "refused to adjudicate" but nevertheless "dismiss[ed] with prejudice" certain causes of action that Appellants aspire to assert; namely an alleged "right" to relet proceeds under the Facilities Agreement.  App. Br. at 14-18.  In addition to the obvious and complete reply that these are precisely the claims that were settled by Appellants' agent for reasonable consideration, and did not have to be adjudicated, Appellants are wrong in several respects.[31]  Most notably, under the plain terms of the relevant documents, they have <u>no</u> right to enforce any right to receive relet proceeds.[32]  The Trustee is not a party to the Facilities Agreement, nor to Section 8.07(c) (the

---

[30] Section 6.08 states:  "[Delta] will pay, and will protect, indemnify and save [KCAB] and the Trustee (including all officers and employees of the Issuer and the Trustee) harmless from and against any and all fines, penalties, liabilities, losses, damages, costs and expenses[], causes of action, suits, claims, demands and judgments of whatsoever kind and nature . . .."

[31] Indeed, even Appellants acknowledge and do not challenge the Bankruptcy Court's finding that the "'relet proceeds' question" was "not only a legal but factual issue of significance to the economic negotiations." App. Br. at 17 n. 8.

[32] In addition, as the Bankruptcy Court correctly found, there were no other tenants willing to pay (collectively or individually) a rental amount for the Terminal Facilities that would result in a better recovery for the Bondholders than the Settlement.  B.C. Op. at 8.  For example, Robert Holscher, CEO of KCAB, testified that after Delta filed for bankruptcy, KCAB met 60 times with various airlines – not one of which wanted to operate out of the Airport.  In addition, Mr. Holscher testified that, in his experience, no airline would seek to make the Airport a hub because of its very low origin and destination market (at approximately 20%-30%) compared to an ideal hub (at approximately 50%).  Holscher Tr. at 63 [Exh. 11] ("What carriers look for when they come in to hub a city is they want a 50 percent origin and destination number…."); 73; 206-207 ("I can just tell you my background in business does not dictate that anybody would come into a market this small and put a major hub into it.").  He also testified (…continued)

36

"**Reletting Provision**") thereof – the provision requiring KCAB to use "best efforts" to relet the Terminal Facilities to mitigate *Delta's* damages resulting from a breach of the agreement.

Nor are the Trustee or Bondholders third-party beneficiaries of the Reletting Provision. To assert third-party beneficiary status under Kentucky law, they must show that the reletting provision "was intended for [their] benefit in the sense that it embraces the claim asserted." *United States v. Allstate Ins. Co.*, 754 F.2d 662, 665 (6th Cir. 1985) (quoting *Louisville & Nashville R.R. Co. v. Dry Branch Coal Co.*, 65 S.W.2d 1008, 1011 (Ky. 1933)). Furthermore, a third party may only enforce a contract "made for its 'actual and direct' benefit." *See Louisville Gas & Electric Co. v. Continental Field Sys.*, CIV.A. NO. 3:01 CV 387-H, 2005 U.S. Dist. LEXIS 7634, at *21-22 (W.D. Ky. Mar. 17, 2005) (quoting *Sexton v. Taylor County*, 692 S.W.2d 808, 810 (Ky. Ct. App. 1985); *Har-Ken Oil Co. v. Progas, Inc.*, NO. 91-CA-2964-MR, 1993 Ky. App. LEXIS 84, at *18-19 (Ky. Ct. App. July 2, 1993).

Here, the plain text of the agreements shows that Reletting Provision was not intended for their actual and direct benefit. Section 4.04 of the Facilities Agreement states that "[a]s security for the payment of the [Bonds], [KCAB] will assign to the [Bond] Trustee [KCAB's] rights under this Agreement, including the rights to receive payments hereunder and the Reserved Rights but exclusive of the Unassigned Rights." *See* Facilities Agreement § 4.04 [Exh. D]. The defined term "Unassigned Rights," includes, *inter alia*, the Reletting Provision of Section 8.07 of the Facilities Agreement. *See* Indenture § 1.01 [Exh. A]. Because the Reletting Provision was explicitly *excluded* from the basket of rights assigned to the Trustee, the Trustee cannot be a

(continued…)

that even if KCAB could attract other airline tenants, it would only be feasible and economical to place them in other terminals, with no connection to the Bonds. Holscher Tr. at 198-199.

third-party beneficiary of it.[33]  The sole purpose of the Reletting Provision – which was not

pledged or assigned to the Bondholders – is to protect <u>Delta</u> by requiring KCAB to mitigate

<u>Delta's</u> damages.[34]

## IV.    The Procedural Arguments Raised by Appellants Are Without Merit

Finally, Appellants make a passing suggestion of procedural impropriety, suggesting that

the releases are inappropriate because they were not the result of an adversary proceeding

invoked pursuant to Bankruptcy Rule 7001.  *See* App. Br. at 19-20.

Appellants failed to raise these arguments below and they should be deemed waived.

*See, e.g., Gulino*, 460 F.3d at 380 n.22.  But even had they not waived this argument, Appellants

could not prevail.  While Rule 7001 is a procedural mechanic pursuant to which a debtor may

seek (among many other things) an injunction, *see* Fed. R. Bankr. P. 7001(7), it is also widely

recognized that an adversary proceeding is not indispensable so long as the objector was given

sufficient notice and opportunity to present its position to the bankruptcy court.  *See Carroll v.

Rafael Galleries, Inc. (In re Altman)*, 254 B.R. 509, 512 (D. Conn. 2000) ("courts have excused

the lack of a formal adversarial proceeding to resolve disputed matters . . . with respect to entities

who were parties to the proceedings and thus had notice, participated in the hearings and

---

[33] Moreover, the Indenture repeatedly makes clear that the Bonds are non-recourse to KCAB or its property, and that the Bonds are payable only from the "Trust Estate," which is expressly defined to *exclude* the Unassigned Rights.  *See* Indenture § 2.05 ("The Bonds shall not be payable from or charged upon any funds other than the Trust Estate pledged to the payment thereof, nor shall [KCAB] be subject to any pecuniary liability thereon."); *id.* at § 1.01 (definition of "Trust Estate" "shall mean all right, title and interest of [KCAB] in and to the Agreement (except for Unassigned Rights)…").

[34] The Reletting Provision requires KCAB to "credit" the reletting proceeds to Delta's ongoing liability for payments under the Facilities Agreement, and says nothing about turning over such proceeds to the Trustee or applying them in accordance with the Indenture.  Even were Appellants correct that they had some cognizable right to relet proceeds, the Trustee had the power under the Indenture to compromise such claims and no relet deal better than the Settlement existed.

otherwise had effective opportunity to be heard"); *see also*, *e.g.*, *Trust Corp. v. Patterson (In re Copper King Inn, Inc.)*, 918 F.2d 1404, 1407 (9th Cir. 1990) (holding that a party had waived its right to an adversary proceeding because an "extensive hearing and subsequent briefing" gave the party "ample time to air its position").

Here, the approval motion was filed with 40 days notice (a period longer than any period prescribed under Bankruptcy Rule 7001). In addition to filing a preliminary objection on March 13, 2007 and a supplemental objection on April 13, 2007, Appellants conducted three depositions, received thousands of pages of documents in discovery and participated fully in an almost three-hour hearing. There can be no serious question that the Appellants had far more than an ample opportunity to "air their position."

## CONCLUSION

WHEREFORE, Delta respectfully requests the Court affirm the Bankruptcy

Court's Settlement Order and order any further relief as is just and proper.

Dated:   June 22, 2007
         New York, New York


                            By:   /s/ Marshall S. Huebner
                                  Marshall S. Huebner (MH 7800)
                                  Timothy Graulich (TG 0046)
                                  James I. McClammy (JM 5592)
                                  Andrew Dean (AD 4312)

                            DAVIS POLK & WARDWELL
                            450 Lexington Avenue
                            New York, New York 10017
                            Telephone: (212) 450-4000
                            Facsimile: (212) 450-6539

                            Attorneys for Appellee Delta Air Lines,
                            Inc.