UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | On Appeal From: |
| DELTA AIR LINES, INC., *et. al.*, | United States Bankruptcy Court<br>Southern District of New York<br>Chap. 11 Case No. 05-17923 (ASH) |
| Debtors. | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| KENTON COUNTY BONDHOLDERS<br>COMMITTEE, | |
| Appellants, | **1:07-CV-3968 (JGK)** |
| DELTA AIR LINES, INC., KENTON<br>COUNTY AIRPORT BOARD, and<br>UMB BANK, N.A., AS SUCCESSOR<br>INDENTURE TRUSTEE, | |
| Appellees. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**BRIEF OF AMICUS CURIAE AMERICAN BANKERS
ASSOCIATION IN SUPPORT OF APPELLEE
UMB BANK, N.A. AS SUCCESSOR INDENTURE TRUSTEE**

BRYAN CAVE, LLP
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 541-2000
Facsimile: (212) 541-4630

*Attorneys for American Bankers Association*

## TABLE OF CONTENTS

**Page**

INTEREST OF THE AMICUS CURIAE ...................................................... 1

ARGUMENT ............................................................................................... 4

I.  The Trustee had the Authority to Negotiate and Consummate the Settlement ................................................................................ 5

    A.  The Trustee has the Power under the Indenture to Commence Proceedings and Compromise Claims ................. 5

    B.  The Indenture Provision Relied upon by the Minority Bondholders Does Not Require 100% Bondholder Approval ..................................................................................... 6

II. Allowing a Group of Minority Bondholders to Displace What the Bankruptcy Court Has Concluded is a Fair and Reasonable Settlement Will Have Negative Consequences for the Banking Industry ........................................................................ 10

CONCLUSION ......................................................................................... 14

# TABLE OF AUTHORITIES

## CASES

*In re Board of Directors Of Multicanal, S.A.* No. 04-10280 (ALG) 307 B.R. 384 (Bankr. S.D.N.Y. Mar. 12, 2004) .................................. 7

*In re Board of Dirtectors Of Telecom Argentia, S.A.*, No. 05-17811 (BRL) 2005 WL 3098934 (S.D.N.Y. Nov. 18, 2005) .......................... 7

*In re Hass*, 273 B.R. 45 (Bankr. S.D.N.Y. 2002) ...................................... 11

## DOCKETED CASES

*Kemper Investors Life Insurance Co. v. Las Colinas Corp.*, Case No. 88 C 9152 (N.D. Ill. docketed June 29, 1989) ........................ 5, 7, 8

*MBank Dallas v. LaBarge, Inc.*, Case No. 86 C 9583 (N.D. Ill. filed Dec. 29, 1986) ................................................................. 4-5, 7, 8

## STATUTES

15 U.S.C. § 77 aaa .......................................................................................... 6

15 U.S.C. § 77 ppp .......................................................................................... 6

## MISCELLANEOUS

Hearing on H.R. 10292 Before the Subcomm. of the Comm. on Interstate and Foreign Commerce, 75th Cong., 3 (1938) (Statement of William O. Douglas, Chairman, Securities Exchange Commission) ........................................................................ 6

Thompson Financial National Trustee Rankings for 2005, *The Bond Buyer*, July 17, 2006 ................................................................. 9

The American Bankers Association ("ABA") submits this brief as *amicus curiae* in support of the position of Appellee, UMB Bank, N.A. as Successor Bond Trustee (the "Trustee" or "UMB").

## INTEREST OF THE *AMICUS CURIAE*

The ABA is the largest national trade association of the banking industry in the country. It represents banks and holding companies of all sizes in each of the fifty states and the District of Columbia, including community, regional, and money center banks. The ABA also represents savings associations, trust companies, and savings banks. The Association frequently appears in litigation, either as a party or *amicus curiae*, to protect and promote the interests of the banking industry and its members.

The ABA and its members have a direct interest in the outcome of this litigation. ABA members provide more than 99 percent of corporate trust services in the U.S.[1] Trust indentures are important mechanisms for servicing corporate and municipal debt and banks play an essential role in the process that brings financings to the public market. Given the long-standing preeminence of New York as a world financial center, many of the

---

[1] Thompson Financial National Trustee Rankings for 2005, *The Bond Buyer*, July 17, 2006.

domestic indenture agreements entered into by ABA members fall within the jurisdiction of the state and federal courts in New York.

The ABA respectfully urges this Court to affirm the Decision of the United States Bankruptcy Court for the Southern District of New York (Hon. Adlai Hardin, U.S.B.C.), which rejected the claim asserted by the Ad Hoc Committee of Bondholders (the "Minority Bondholders") that the indenture (the "Indenture") dated February 1, 1992 and entered into by Kenton County Airport Board ("KCAB") as issuer and Star Bank, N.A., predecessor-in-interest to UMB, required 100% Bondholder approval of the settlement (the "Settlement") reached with Delta Air Lines, Inc. ("Delta"). The ABA respectfully submits that the Bankruptcy Court Decision correctly interprets the Indenture, and that the Decision is based upon sound and well established legal precedent. Specifically, the Bankruptcy Court properly determined that subject to a direction by a majority of the Bondholders, the Trustee had the right to act on behalf of all of the Bondholders to conduct appropriate proceedings, including the negotiation of the Settlement, in response to the default by Delta. The Bankruptcy Court also correctly concluded that because the proposed Settlement was determined by the Court to be fair and reasonable, and was overwhelmingly supported by

Bondholders, the Trustee had the authority to consummate the Settlement and enter into Releases as part of that Settlement.

If the Bankruptcy Court Decision is not affirmed, the Minority Bondholders – who represent approximately 10% of all of the Bondholders – would be permitted to defeat a Settlement that the Bankruptcy Court determined was fair and reasonable. As a consequence, the Trustee would be forced to continue to litigate this matter without end or achievable purpose. As determined by the Bankruptcy Court, there is no assurance that a better resolution could be reached, and, indeed to the contrary, as set forth in the Decision, there is a demonstrated and palpable risk that the Bondholders would lose the value of the Settlement. In addition to blocking a judicially approved Settlement that the vast majority of the Bondholders support, the ABA respectfully submits that the position advocated by the Minority Bondholders, if adopted by this Court, also would have industry-wide consequences and implications beyond this particular proceeding.

First, it would create the opportunity for future minority bondholders to block a settlement that has been judicially determined to be fair and reasonable and which a significant majority of bondholders support. Second, empowering minority holders to block a Settlement would accord those holders special privileges and create a natural incentive for minority

holders to hold out even in situations where the vast majority of holders have supported the Settlement and the Settlement has undergone independent judicial scrutiny. Third, it would impose upon trustees the practically impossible mandate of requiring 100% bondholder approval for the compromise and settlement of bankruptcy claims and thereby create the risk, such as the risk present here, that the holders will lose a fair and reasonable settlement and be left without any prospect for a comparable resolution. Fourth, it would force the Trustee to litigate matters until conclusion without regard to the risk that a decision not to settle will yield a diminished recovery or eliminate recovery altogether. Each of these consequences would have a chilling effect on the willingness of banks to offer these services and ultimately hinder the ability of businesses to raise capital.

## ARGUMENT

The Court is poised to decide an issue of significant importance to many of the ABA's members: whether the settlement of a claim in bankruptcy which was negotiated at the direction of a majority of holders, judicially determined to be fair and reasonable, and approved by a majority of holders, may only be consummated by the Trustee upon unanimous 100% bondholder approval. For the reasons set forth below, the ABA respectfully urges this Court to affirm the Bankruptcy Court Decision.

I.   **The Trustee had the Authority to Negotiate and Consummate the Settlement**

   A.   **The Trustee has the Power under the Indenture to Commence Proceedings and Compromise Claims**

Upon an Event of Default, an Indenture Trustee has the power to "enforce all rights of the owners of the Bonds . . . and to bring suit upon the Agreement, the Bonds. . . ." Indenture at §9.02. It is undisputed that several defaults existed under the Indenture: (1) Delta's failure to make payments (Indenture at §9.01(b)); and, (2) Delta's default under the Facilities Agreement (Indenture at §9.01(c)). The Bankruptcy Court properly concluded that upon default, the "Trustee alone has the power and authority to commence remedial procedures on behalf of all Bondholders." Decision at 14.

The ability to litigate is necessarily accompanied by the ability to compromise. As held by the Bankruptcy Court, "implicit in the authority to commence proceeding to remedy defaults is the power to negotiate and agree upon settlement." *Id.* In addition to the Bankruptcy Court, other courts have consistently held that an indenture trustee has both the power to sue and the power to compromise. *See, e.g., MBank Dallas v. LaBarge, Inc.,* Case No. 86 C 9583 at 17 (N.D. Ill. filed Dec. 29, 1986) ("[a]fter default . . .

the Trustee may litigate all claims relating to the recovery of [that] property and may settle or compromise such claims.") (citations omitted); *see also Kemper Investors Life Ins. Co. v. Las Colinas Corp.*, Case No. 88 C 9152 (N.D. Ill. docketed June 29, 1989), at 19.

### B. The Indenture Provision Relied upon by the Minority Bondholders Does Not Require 100% Bondholder Approval

The Minority Bondholders argue that §9.06 of the Indenture, which is entitled "No Impairment of Right to Enforce Payment" prohibits the Trustee from compromising their right to be paid in full without their consent. That Section, which is generally referred to as a non-impairment clause, provides:

> Notwithstanding any other provision in this Trust indenture, the right of any Owner to receive payment of the principal of or purchase price of and any interest in and any premium on his Bond, on or after the respective due dates expressed therein, or to institute suit for the enforcement of such payment on or after such respective date, shall not be impaired or affected without the consent of such Owner.

As set forth in the Decision, Delta is the source of payment of the Bonds. And, as noted by the Bankruptcy Court, notwithstanding the language of §9.06, the rights of the Bondholders were impaired because of the bankruptcy filing.

The Legislative History to the Trust Indenture Act of 1939, 15 U.S.C. §§ 77 aaa *et seq.* (the "TIA") from which this language is derived[2/], as well as testimony provided during Congressional hearings held by then Securities Exchange Commission Chairman, William O. Douglas, make clear that non-impairment clauses were to be included in indentures to prevent abusive tactics by insiders to renegotiate an issuer's obligations to the obvious detriment of the remaining non-insider investors. According to Chairman Douglas, the impairment of a bondholder's right to be paid could take place only with the unanimous consent of the holders *or* within the framework of regulatory or judicial control.[3/] Plainly, the language of §9.06 was not intended to preclude the Trustee from compromising a bankruptcy claim when such compromise has been subject to judicial scrutiny — and additionally approved and directed by a majority of holders.

In addition to the Bankruptcy Court, other courts have also correctly determined that the non-impairment language in § 9.06 does not require unanimous consent of 100% of all bondholders before a bankruptcy court settlement may be voted upon and consummated by the trustee. *In re Board*

---

[2/] Although the TIA is not applicable in the municipal bond context, the language of Section 9.06 mirrors the statutory provision of 15 U.S.C. §§ 77ppp.

[3/] Hearing on H.R. 10292 Before the Subcomm. of the Comm. on Interstate and Foreign Commerce, 75th Cong., 3 (1938) (Statement of William O. Douglas, Chairman, Securities Exchange Commission).

*of Dirs. Of Telecom Argentia, S.A.*, No. 05-17811 (BRL) 2005 WL 3098934 (S.D.N.Y. Nov. 18, 2005); *In re Board of Dirs. Of Multicanal, S.A.* 307 B.R. 384 (Bankr. S.D.N.Y. 2004) In *Kemper Investors Life Ins. v. Las Calinas*, and *Mbank Dallas v. LaBarge*, both courts approved the settlements in each proceeding and expressly found that the settlements did not violate bondholder rights under non-impairment clauses.

> The holders of the Notes have not been deprived of their right to sue for payment of principal and interest within the meaning of Section 316(b) of the Trust Indenture Act, 15 U.S.C. §§ 77ppp. This lawsuit is a suit, brought by Kemper on behalf of the Class of the Noteholders, for enforcement of the right to receive payment of principal and interest on the Notes pursuant to Section 316(b) of the Trust Indenture Act, 15 U.S.C. § 77ppp. The Proposed Settlement will constitute the best available payment of such principal and interest, and the Court has subjected the Proposed Settlement to judicial scrutiny. Individual lawsuits by Noteholders at this time would circumvent the best interest of all of the Noteholders and interfere with the rights of all the holders and would lead to a race to judgment and quite possibly, to a reduced recovery for all Noteholders. Therefore, the Proposed Settlement does not violate or conflict with Section 316(b) of the Trust Indenture Act, 15 U.S.C. §§ 77ppp.

*Kemper Investors* at pp. 19-20; *see also MBank* at pp. 19-20.

In addition to the fact §9.06 does not apply in the context of this bankruptcy proceeding, the suggestion that it would apply cannot be

reconciled with a number of other indenture provisions. For example, §9.05 of the Indenture expressly limits the right of any bondholder to file a litigation, action or proceeding to enforce the terms of the bonds unless and until a majority of bondholders has requested the Trustee to undertake certain actions, and the Trustee has refused to do so. Any action taken to enforce the holders' rights under the Indenture is undertaken by the trustee in its name for the "equal and ratable benefits of the holders." Indenture §9.07. These sections make clear that, in the event of a default, such as a bankruptcy filing, the Trustee alone has the power and authority to take action on behalf of the holders, subject to the written direction of a majority of the Bondholders.

In this action, a majority of holders directed the Trustee with respect to the Settlement. Thus, although the Minority Bondholders assert that they will not consent to the Settlement and therefore the Settlement cannot be consummated, they are prohibited by the Indenture from undertaking any separate or independent action because the Trustee was directed by a majority of Bondholders to pursue the Settlement. The Direction by the majority of the Bondholders to pursue the Settlement precludes a contrary direction to continue the litigation or to pursue other remedies.

## II. Allowing a Group of Minority Bondholders to Displace What the Bankruptcy Court Has Concluded is a Fair and Reasonable Settlement Will Have Negative Consequences for the Banking Industry

As detailed in the Bankruptcy Court Decision, the Trustee was given a direction by 60% of the Bondholders to pursue the Settlement. Once the definitive terms of the Settlement were reached, those terms were placed on the record in open court and were also included in Bondholder Notices. The Settlement was expressly conditioned upon Bankruptcy Court approval, Plan confirmation and the occurrence of the Effective Date of the Plan. The Notice further specified that the Settlement would be incorporated into the Plan, it informed Bondholders about the Plan and it also detailed the steps and procedures to follow for objecting to the Settlement. As a result, in addition to the Plan process, the Bondholders were accorded a separate hearing devoted exclusively to the consideration of the Settlement. Finally, the Settlement was expressly conditioned upon the Court assessing the fairness and reasonableness of the Settlement – even absent any objection by the Bondholders. At the conclusion of this process, the Bankruptcy Court determined that the proposed Settlement with Delta was fair and reasonable.

As set forth in the Bankruptcy Court's opinion, the Bondholders "voted overwhelmingly both in dollar amount (97.35%) and number (89.19%) to accept the Plan. . . . Bondholders voting on the Plan obviously

have no interest under the Plan other than what is provided under the Settlement. Thus the actual vote reflects the Bondholders' overwhelming support for the Settlement." Decision at 11. In reaching that conclusion, the Bankruptcy Court also noted that the Minority Bondholders conceded that the terms of the Settlement were beneficial to the Bondholders.

The ABA respectfully submits that permitting a group of Minority Bondholders to block a judicially approved Settlement voted for by an overwhelming majority of Bondholders will create a series of issues that will severely and negatively impact the banking industry and the capital markets by deterring banks from offering their services.

A bankruptcy proceeding necessarily involves the balancing of individual rights against the rights of a group as well as the balancing of the rights of the creditors against the rights of the debtor. As was the case in this proceeding, a judge considers and analyzes a proposed compromise and the bondholder objections asserted to that compromise. The purpose of doing so is to ensure the fairness and reasonableness of a proposed bondholder settlement. After balancing the interests of all the parties, evaluating the merits of a specific settlement, and hearing the objections to the proposed compromise, a court can determine whether the settlement is fair and reasonable. To require unanimous bondholder consent in a bankruptcy after

a finding of fairness and reasonableness would elevate the rights of the minority holders above the rights of other creditors. It would also constrict the ability of the bankruptcy court to finally resolve competing interests among the creditors and the debtor and to conclude the bankruptcy proceeding. Such a result undermines the purpose of the Bankruptcy Code and would constitute a drain on judicial resources. *In re Hass,* 273 B.R 45 (Bankr. S.D.N.Y. 2002). Nor is such a result contemplated by §9.06 of the Indenture or its statutory cousin, the TIA.

Requiring unanimous bondholder consent in a bankruptcy will also result in according minority holders special privileges. It incentivizes minority holders to refuse to participate in a settlement in order to negotiate for a better deal. However, such "hostage taking" does not ensure a better result but instead risks failure of the settlement for all bondholders and the potential unraveling of any chance for compromise. As noted by the Bankruptcy Court in its Decision, absent approval of the Settlement, the Bondholders would have faced a significantly diminished recovery. The only means to ensure that a settlement may be consummated is to ensure that a majority supported, judicially approved, and properly noticed Settlement will bind the minority. To do otherwise will create incentives and avenues of opportunity for minority holders to withhold their consent.

In addition, if such a settlement is conditioned upon unanimous bondholder consent, and such consent is not obtained, the trustee will be forced to litigate bondholder claims in a manner that is divorced from the reality of litigation—the likelihood of success must always be balanced against the cost of attaining that success and the ability to actually recover on behalf of the holders. Requiring unanimous bondholder consent would leave the trustee with no option but to litigate, notwithstanding the fact that such a course of action could lead to either a substantially diminished recovery or no recovery at all. This is plainly contrary to the trustee's rights and its duties to all bondholders.

Finally, excising the releases from the Settlement thwarts the entire settlement process. Without releases, a settlement could be collaterally attacked forever. The very point of a release is to prevent future litigation that has been resolved by settlement. Indeed, without releases there is no prospect of a settlement. The ultimate effect of eliminating the releases from a settlement would be to preclude the trustees from compromising any claim. If the trustee is not able to deliver releases, no party will be willing to settle with the trustee. In such a scenario, the trustee will have no option but to litigate until the bitter end – notwithstanding the fact this would threaten the viability of any recovery for the holders. Additionally, without the

trustee's ability to be provided a release, and faced with the prospect of being subject to collateral attack for a settlement, no trustee would enter into a settlement.

The trustee's ability to stand behind the releases is a necessary and critical aspect of any settlement. Without the ability to stand behind the releases it would be virtually impossible for a trustee to consummate any settlement--even one that has been approved by a court and is supported by an overwhelming majority of bondholders.

## CONCLUSION

The ABA respectfully requests that the Court affirm the Decision of the Bankruptcy Court and dismiss the Appeal of the Minority Bondholders.

                Respectfully submitted,

                BRYAN CAVE, LLP

                By: /s/ Dennis Fleischmann
                     Dennis Fleischmann (5663)
                     Christine B. Cesare (1967)
                     1290 Avenue of the Americas
                     New York, NY 10104
                     Telephone: (212) 541-2000
                     Facsimile: (212) 541-4630

                *Attorneys for American Bankers Association*

Dated: June 22, 2007