752ndeln.txt

1

752ndeln                    Argument

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    IN RE DELTA AIR LINES INC. et
      al.,
 4                                        Chapter 11
      Debtors.
 5
      ------------------------------x
 6
      KENTON COUNTY BONDHOLDERS
 7    COMMITTEE,

 8               Appellant,          New York, N.Y.

 9          v.                       M-47 (JGK)

10    DELTA AIR LINES, INC. et al.,

11               Appellees.

12    ------------------------------x

13                                   May 2, 2007
                                     4:15 p.m.
14    Before:

15                    HON. JOHN G. KOELTL,

16                                   District Judge

17                    APPEARANCES

18
      WHITE & CASE
19         Attorneys for Appellant
      BY:  J. CHRISTOPHER SHORE
20         THOMAS E. LAURIA
           JOHN K. CUNNINGHAM
21
      DAVIS POLK & WARDWELL
22         Attorneys for Appellees
      BY:  MARSHALL HUEBNER (Via Telephone)
23         ANDREW B. DEAN
           TIMOTHY GRAULICH
24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

2

752ndeln                    Argument

752ndeln.txt

1                         APPEARANCES (Continued)

2    MINTZ LEVEN COHN FERRIS GLOVSKY & POPEO
          Attorneys for UMB Bank
3    BY:  DOMINIC J. PICCA
          WILLIAM W. KANNEL
4         MATTHEW HURLEY

5    EDWARDS ANGELL PALMER & DODGE
          Attorneys for Kenton County Airport Board
6    BY:  SELINDA A. MELNICK
               - and -
7    ZIEGLER & SMITH
          Attorneys for Kenton County Airport Board
8    BY:  WILL ZIEGLER (Via Telephone)
          DEBRA PLEATMAN (Via Telephone)
9         STEVEN MARTIN (Via Telephone)
          MATT SMITH (Via Telephone)
10

11   AKIN GUMP STRAUSS HAUER & FELD
          Attorneys for Post Effective Date Committee
     BY:  DAVID H. BOTTER
12        ABID QURESHI

13

14

15

16

17

18

19

20

21

22

23

24

25


                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

♀                                                          3

     752ndeln                      Argument


1         (Case called)

2         MR. PICCA:  Your Honor, I am here to move for the pro

3    hac vice admission of my partners Bill Kannel and Matt Hurley.
                              Page 2

752ndeln.txt

4          THE COURT:  Who have already appeared?

5          MR. PICCA:  They have appeared.

6          THE COURT:  I mean they just appeared for the Court.

7          MR. PICCA:  Yes.

8          THE COURT:  That is fine.

9          MR. PICCA:  Thank you, your Honor.

10         THE COURT:  No objections, right?

11         COUNSEL:  No, your Honor.

12         THE COURT:  The application is granted.

13         Welcome to the bar of the court for purposes of this

14         MS. MELNICK:  Your Honor, I do not know whether they

15    will actually appearing, the folks out in Kentucky at Zeigler &

16    Schneider, but if I could also move their admission pro hac

17    vice, I would be grateful.

18         THE COURT:  Sure.  No objection, right?

19         COUNSEL:  No, your Honor.

20         THE COURT:  The attorneys in Kentucky are admitted pro

21    hac vice for purposes of this case.

22         OK.  I have a couple of initial matters.  This matter

23    came to me on an emergency basis for initially an order to show

24    cause for an expedited appeal and then an order to show cause

25    for a stay.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀
                                                         4

752ndeln                     Argument


1          I have spoken to the attorneys on the phone twice as

2    far as I can recall on matters of scheduling and conflict

3    issues.  I wanted to cover those issues, because this is the

4    first time I have all of you here and a court reporter.

5          The first issue that I raised with you was, there was

                              Page 3

752ndeln.txt
```
 6   a service list initially that was given to me that had

 7   Debevoise & Plimpton as receiving papers in the case.  I am a

 8   former partner at Debevoise, left it over 12 years ago, but I

 9   disqualify myself in Debevoise cases.

10          The lawyers assured me that Debevoise was not involved

11   in these matters; Debevoise has appeared in other matters

12   relating to the Delta bankruptcy; there is no statutory

13   conflict, nothing about the fact that Debevoise would appear in

14   other matters relating to the bankruptcy would affect anything

15   that I did.

16          The parties said that there was no problem, no one saw

17   it as a conflict, and I said all right, I was prepared to

18   accept that.  Let me raise it again at the outset to assure

19   myself on the record that that is not an issue for any of the

20   parties.

21          Is that right?

22          MR. SHORE:  No, your Honor.

23          THE COURT:  It is not?

24          MR. SHORE:  Correct.  There is no issue.

25          MR. HUEBNER:  Your Honor, on behalf of Delta I can
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

5

752ndeln                    Argument

```
 1   again confirm for the record on the transcript that Debevoise

 2   is merely one of Delta's many law firms and has no connection

 3   at all to this matter and has not been giving advice on it or

 4   handling it.  Davis Polk has been handling this, the only law

 5   firm that appears on the pleadings either below or before this

 6   court.

 7          MR. KANNEL:  Your Honor, on behalf of UMB Bank, NA, we

 8   have no issue.
```
Page 4

752ndeln.txt

9          MR. BOTTER:  On behalf of the Post Effective Date
10    Committee, we have no issue.
11          MS. MELNICK:  On behalf of the Kenton County Airport
12    Board, we have no issue as well.
13          THE COURT:  Yesterday, the 7.1 statements came in, and
14    the one issue raised with the 7.1 statements was the Post
15    Effective Date Committee had as a member Coca-Cola.  I promptly
16    scheduled a telephone call with the lawyers to raise the fact
17    that I held stock in Coke.
18          The parties said, oh, that wasn't a problem.  It
19    wasn't an issue because Coke was simply a member of the
20    committee.  They weren't directly involved in the issues on
21    this appeal, and, as an added layer of assurance to me, Coke
22    would recuse itself from any deliberations with respect to this
23    appeal.  No one had a problem with my being on the case and the
24    lawyers said after all I had spent substantial time on the case
25    before the 7.1 statement came in.

♀

                                                                    6
752ndeln                    Argument

1          After I spoke to the parties, even after the
2     assurances that the parties gave me, after further research on
3     my own, I concluded that Coke's presence on the creditor's
4     committee was a source of a potential disqualification, so
5     because I had spent substantial time, substantial judicial time
6     on the matter, I disposed of any interest in Coke in order to
7     avoid any possible conflict or the appearance of any conflict.
8          I wanted to report that to you and to assure myself
9     that that was satisfactory with everyone and that no one saw
10    this current situation as any reason for any disqualification.

752ndeln.txt

11          MR. HUEBNER:  Your Honor, from Delta Airlines

12    perspective, we were, as I said yesterday, quite comfortable

13    even before the decision was offered in acceptance to recuse

14    Coke from this and certainly are doubly and triply and

15    quadruply, your Honor --

16          THE COURT:  I can't hear you.

17          MR. HUEBNER:  Coke is a very small vendor to Delta we

18    do not believe there would have been any material impact, so we

19    are very comfortable.

20          THE COURT:  OK.  Mr. Shore?

21          MR. SHORE:  We thank you for your efforts, your Honor,

22    and we have no objection.

23          THE COURT:  OK.

24          MS. MELNICK:  No objection on behalf of Kenton County

25    Airport Board.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              7
      752ndeln                    Argument

1           MR. KANNEL:  No objection to behalf of UMB Bank.  I do

2     want to mention we are having some trouble in the back rows

3     here hearing Mr. Huebner.

4           THE COURT:  Yes.  Mr. Huebner, please keep your voice

5     up when you talk.  I'll try to turn up the sound here also.

6           MR. HUEBNER:  Thank you, your Honor.  I will do my

7     best.

8           MR. BOTTER:  Your Honor, also on behalf of Post

9     Effective Date Committee, Coke did agree to the recusal, but

10    obviously this takes care of that issue.

11          Thank you, your Honor.

12          THE COURT:  OK.

13          There are actually two orders to show cause that are

                              Page 6

752ndeln.txt

14    pending.  One was for the expedited appeal.

15            The papers indicated that the parties had actually

16    agreed to a briefing schedule to have it completely briefed I

17    think within a month.  But we can put over for a moment, more

18    than a moment, the order to show cause for an expedited appeal

19    and deal with the issue of the stay.

20            Plainly, I will authorize an expedited appeal.  If the

21    parties have agreed to what the schedule for the expedited

22    appeal is, that's fine.  I will just have to work out the date

23    with you for the hearing on the appeal.

24            MR. HUEBNER:  Your Honor, from Delta's perspective,

25    just so the record is clear, we actually do not believe that

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

♀                                                              8

752ndeln                        Argument

1    the appeal satisfies the standards for expedition.  But since

2    there was no reason not to be professionally courteous, and the

3    exchange of e-mails understanding that we have been courteous

4    without it being used against us and that nobody would argue

5    that we agreed there was an urgency, we were very happy to

6    agree to a reasonable briefing schedule, as were the other

7    parties.

8            THE COURT:  That is fine.  I don't think anyone is

9    conceding anything by agreeing to an expedited appeal, which

10   leads us then to the order to show cause for a stay.

11           I have read the papers and I am prepared to listen to

12   argument.

13           MR. SHORE:  Thank you, your Honor.

14           Chris Shore from the law firm of White & Case for the

15   Ad Hoc Committee of Kenton County bondholders, each of the

                            Page 7

752ndeln.txt
16  members being an individual appellant.  I have three

17  preliminary matters.

18          First, I think that on behalf of everybody I would

19  like to thank the Court for making time on a very short

20  schedule to hear us.  We believe this is a serious matter, and

21  we appreciate the efforts of the Court and the staff in

22  adjusting your schedules to take it up.

23          Second, it is unclear how much time your Honor has

24  this afternoon.  I think you will find that, if given free

25  rein, you will hear a lot from the talkers.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              9
        752ndeln                    Argument

1           THE COURT:  Let me ask a question.  Whether I grant or

2   deny a stay, is that immediately appealable?

3           MR. SHORE:  The denial of the stay would be, your

4   Honor.  I believe a grant would, too.

5           THE COURT:  So whether I grant or deny the stay, the

6   parties would want me to do that as swiftly as possible so that

7   if you wanted to, you could take it up to the Court of Appeals

8   before the closing, which I understand is about 10:30 tomorrow

9   morning?

10          MR. SHORE:  Yes, your Honor.

11          THE COURT:  OK.  So, in response to the question about

12  how long the arguments are, you can gauge your time

13  accordingly.

14          MR. SHORE:  Thank you, your Honor.

15          The third preliminary is we do have an objection that

16  we haven't been able to resolve with respect to one of the

17  exhibits that's been submitted, which was a document that

18  wasn't before the bankruptcy court below.

                            Page 8

752ndeln.txt

19    We had offered to let your Honor take judicial notice
20    of it as a filing in the case, but it goes to this issue of
21    what the votes were and how they were tabulated.  It is an
22    affidavit submitted by somebody who isn't here.  But, as I
23    understand it, at least the airport will not concede -- or, I'm
24    sorry, the indentured trustee will not concede that it doesn't
25    come in for all purposes.  I can raise it when we get to it in

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                              10
     752ndeln                    Argument

1     the argument.
2             THE COURT:  OK.
3             MR. SHORE:  That is an issue.
4             In going forward today, and mindful of your Honor's
5     admonition, I would skip a discussion of any of the procedural
6     factors, the four Hirschfeld, factors whether the Court and how
7     the court balances it and what the standard of review is here,
8     and really focus on five issues that I think are critical to
9     the determination.
10            One, what the indenture says.  Before this hearing is
11    over, I believe the Court has to understand what our
12    interpretation of the indenture is and what the bankruptcy
13    court's ruling below does in our view to the rights that are
14    afforded to my clients under the indenture;
15            Second, I would like to discuss the jurisdiction and
16    the power of the bankruptcy court to do what it did in the
17    settlement order;
18            Third, I would like to discuss who these bondholders
19    are and what is motivating them here.  I think a good deal has
20    been said, some of it not particularly nice, in the opposition
                             Page 9

752ndeln.txt

21    papers, and a lot of motives have been attributed that I would

22    like to address, because I think there is some misperception;

23         Four, to answer the question why can't we just let the

24    transaction close and address this on the expedited appeal,

25    obviously we recognize the reluctance of any Court to step in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

752ndeln                    Argument

1    the middle of a very large commercial transaction;

2         Five, why we believe that a delayed closing isn't the

3    immense harm that the objectors say it is.  That will require

4    us I think to go through the settlement agreement as we go

5    forward.

6         THE COURT:  By the way, another preliminary matter I

7    should point out is that I actually received all of the

8    opposition papers myself yesterday morning from all of your

9    various messengers and/or lawyers, but there is nothing about

10    that that affects anything that I do.

11         Go ahead.

12         MR. SHORE:  I think, in order to follow along, if your

13    Honor has the declaration of, Iliana Cruz, which we submitted,

14    which has all the exhibits and the declaration of Mr. Dean,

15    which has additional exhibits?

16         THE COURT:  Yes.

17         MR. SHORE:  It may help to follow along, because I

18    would like to start with the indenture.

19         THE COURT:  I have the indenture.  You submitted it as

20    a separate document.  That's Exhibit M.

21         MR. SHORE:  If you have that, and follow along, that

22    would be useful.  I actually have just excerpts of it for

23    people that don't want to follow along in the bigger book, but

Page 10

752ndeln.txt

24    you having it separate I think it will work fine.

25          I think if we boil it all down, there are not many


                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

♀                                                              12

752ndeln                      Argument

1     provisions of the indenture that are at issue.  I think we

2     start on page 85 of the indenture, which is Section 9.02,

3     Remedies, which is in Article IX, entitled "Defaults and

4     Remedies."

5          We start with the beginning language of 9.02 on page

6     85:  "In addition to the rights conferred or obligations

7     imposed upon the trustee under Section 9.01 to accelerate the

8     principal of the Bonds, upon the occurrence and continuance of

9     any Event of Default, then and in each and every such case, the

10    Trustee in its discretion may and upon the written request of

11    the owners of the majority in principal amount of the Bonds

12    then outstanding and receipt of indemnity to its satisfaction,

13    shall in its own name and as the trustee of an express trust:"

14         And then we go down to the two factors which have been

15    implicated here:

16         "(c) bring suit upon the Agreement, the Bonds or any

17    Credit Facility; or

18         "(d) by action or suit in equity enjoin any acts or

19    things which may be unlawful or in violation of the rights of

20    the owners of the bonds."

21         That's the provision that the objecting parties and

22    the Court below rely upon to say that the trustee has the right

23    to start the proceedings.

24         Then we turn to 9.04, which is the provision they cite

25    for keeping us, or for arguing that they have the right to

                            Page 11

752ndeln.txt

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

13

752ndeln                    Argument

1    settle on any terms, and it begins:

2            "Anything in this Indenture to the contrary

3    notwithstanding, the Owners of the majority in principal amount

4    of the bonds then outstanding hereunder shall have the right,

5    by an instrument in writing executed and delivered to the

6    Trustee, to direct the time, method, and place of conducting

7    all remedial proceedings available to the Trustee under this

8    indenture or exercising any trust or power conferred on the

9    Trustee by this Indenture."

10           That's the provision they say that once the trustee

11   has started the suit, a majority of the bonds can direct that

12   that suit be settled on any terms that the trustee deems

13   appropriate.

14           Then you turn to 9.06.

15           I will skip by 9.05, if I need to address it later,

16   this concept that both the trustee and the issuer, here the

17   airport, are immune from any suit even if they breach the

18   indenture, and go to 9.06, which is following the two

19   provisions that say that the trustee can start a suit and the

20   majority can direct that trustee in that suit:

21           "Notwithstanding any other provision in this

22   Indenture, the right of any owner to receive payment of the

23   principal of or purchase price of and interest in any premium

24   on his Bond on or after the respective due dates expressed

25   therein, or to institute suit for the enforcement of any such

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

14

752ndeln.txt
752ndeln                        Argument

1   payment on or after such respective date shall not be impaired
2   or affected without the consent of the Owners."
3          Those are what we call the 916(b) rights afforded by
4   the Trust Indenture Act.
5          That is to avoid the situation where a majority whose
6   interests are not known as to why they want to reach a deal
7   with the issuer can't reach a deal which interferes with the
8   right of principal to receive principal and interest.
9          THE COURT:  There is no question on the papers that
10  the Trust Indenture Act doesn't apply.
11         MR. SHORE:  The Trust Indenture Act does not apply.
12         Then if we turn to page 104 of the indenture, because
13  we are not just talking about a settlement of the amount owing
14  under the indenture with a cancellation of the indenture, which
15  is what the settlement order provides, but a termination of the
16  lease and the relet of the lease or the relet of the premises
17  under a new lease under which we have a rental stream and the
18  cancellation of guarantee which Delta provided.
19         Section 12.01 talks about how you go about modifying
20  those things.  It is on page 104.
21         It says:
22         "Neither this Indenture nor the agreement" -- the
23  agreement being defined as the lease -- "shall be modified or
24  amended in any respect subsequent to the date of the issuance
25  of any series of bonds hereunder except as provided in and in

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                         15
752ndeln                        Argument

1   accordance with and subject to the provisions of this Article."
                             Page 13

752ndeln.txt

2          If you can't do it in article 12, you can't do it.

3          We go to 12.03 which is on page 105.

4          12.03(a), which talks about other than a nonmaterial

5     modification to the indenture, "The owners of not less than a

6     majority in aggregate outstanding principal amount of the bonds

7     shall" --

8               THE COURT:  12.03 relates to a supplemental indenture?

9               MR. SHORE:  Yes.

10              THE COURT:  This is not a supplemental indenture.

11              MR. SHORE:  It is not a supplemental indenture, but

12    even if they wanted to do it by establishing an indenture with

13    the very terms they are talking about, which is the acceptance

14    of an unsecured claim in the amount of $260 million, the

15    provision of a note, that is, if they put that in an indenture,

16    that is subject to 12.03(a), and the carryover on 106 beginning

17    at, "Provided, however, that, unless approved in writing by the

18    Owners of all the Bonds, nothing herein contained shall permit,

19    or be construed as permitting (i) a change in the times,

20    amounts, or currency of payment of the principal of or interest

21    or any premium on any bond changing the terms of the purchase

22    of Series of Bonds pursuant to Section 2.02."

23              THE COURT:  OK.

24              MR. SHORE:  With an elision, "or a reduction in the

25    principal amount or redemption price of any Bond or a change in

16

752ndeln                    Argument

1     principal amount or redemption price of any bond, or a change

2     in the method of determining the rate of interest thereon."

3          They cannot enter into an indenture which provides

4     this or change the terms of the indenture in those romanettes

752ndeln.txt

5   without consent of all the bondholders.

6          If you go down to Section C on page 106:

7          "Within two years after the date of the giving of such

8   notice," which is that we are going to enter into, a

9   supplemental indenture -- "the Issuer and the Trustee may enter

10  into such supplemental indenture in substantially the form

11  described in such notice, but only if there shall have first

12  been delivered to the Trustee (i) the required consents in

13  writing of the Owners of the Bonds."

14         If you are going to change principal and interest, you

15  have to get consent of all the owners of the bonds.

16         12.06 deals with the guarantee.  Again the settlement

17  agreement provides and the settlement order ratifies a breach

18  of the guarantee, that is, an agreed-upon breach between the

19  indentured trustee and the debtor.

20         The issuer, and this is 12.06, the second paragraph,

21  "The Issuer shall not enter into and the Trustee shall not

22  consent to --

23         THE COURT:  But the bankruptcy court plainly had the

24  power to change the guarantee given its jurisdiction over

25  Delta.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                        17
752ndeln                    Argument


1          MR. SHORE:  It had the power to allow the rejection of

2   the guarantee.

3          THE COURT:  All right.

4          MR. SHORE:  But the issue is here with respect to the

5   settlement of that by the indentured trustee and the issuer.

6   It is more tied than the issue of resolving disputes under the

                              Page 15

752ndeln.txt

7  indenture, to which the debtor is not a party.  But nonetheless

8  the acceptance of that deal requires, again, written consent of

9  the owners of all bonds then outstanding.  You cannot change

10  the obligations of the company under the agreement relating to

11  the payments of the principal in premium, if any, and interest

12  on the bonds.  Again, you can't do it without consent.

13           The same with respect to the guarantee, which is the

14  last paragraph in Section 12.06 on 108.

15           I don't think there's any dispute here that the

16  language in this indenture is traditional corporate --

17           THE COURT:  There is also no dispute, is there, that

18  the bankruptcy court had the power to change the guarantee

19  despite what was written in the indenture?

20           MR. SHORE:  He has the power to change the guarantee.

21  He doesn't have the power to release the indentured trustee and

22  the issuer for any actions on their part which led to that

23  result.

24           THE COURT:  OK.  Go ahead.

25           MR. SHORE:  So in order to harmonize these

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              18

752ndeln                    Argument

1  provisions --

2           THE COURT:  You're really arguing on this appeal not

3  the powers of the bankruptcy Court over Delta and the debts and

4  obligations of Delta, but rather over the scope of the release

5  or the existence of the release to the Kent County Airport

6  Board and the trustee.

7           MR. SHORE:  Yes.  And the interpretation of the

8  indentures, which is purported to be an order binding upon us,

9  which says that our minority holder rights are moot in the

                            Page 16

752ndeln.txt

10  event of a default.  I don't think that there's any textual

11  support in the indenture for a reading which says in a default

12  setting we recognize the right to insist upon principal and

13  interest but that right goes away when there is a default.

14      THE COURT:  Just so that I'm clear, on this appeal,

15  you're really seeking rights against the trustee and KCAB?

16      MR. SHORE:  Yes.  If they don't have the authority to

17  enter into the transaction, Delta doesn't have the authority to

18  enter into the transaction with them.

19      THE COURT:  With respect to rights against and the

20  scope or validity of releases against the trustee and the KCAB,

21  you contend that that's not an issue that would be mooted even

22  if the closing goes forward tomorrow, because your basic

23  contention is that there was no jurisdiction by the bankruptcy

24  court to grant those nondebtor releases to the nondebtors,

25  right?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                        19
752ndeln                    Argument

1       MR. SHORE:  Well, I think that that is correct.  But

2   there are also alternate permutations of rulings which would

3   lead to a substantial risk of mootness.

4           For example, if your Honor found that there was

5   related-to jurisdiction but nonetheless found that the

6   bankruptcy court was without power to grant releases or make

7   declarations under a contract which was not properly before it,

8   then in that event, in that ruling you still have to deal with

9   the issue of mootness.

10          This is exactly what happened in Metromedia.  The

11  Second Circuit took up the issue of the releases in a plan,

752ndeln.txt

12    made a finding that the bankruptcy court acted outside its
13    powers, its statutory powers and nonetheless found that the
14    appeal was equitably moot because the third parties had closed
15    or consummated the plan with the debtors and had relied upon
16    the existence of releases.
17          We have tried everything we can to get ourselves
18    outside of Metromedia by putting the indentured trustee and the
19    airport on notice, by bringing an application for a stay.  But
20    if this transaction closes and your Honor finds that they never
21    should have gotten the releases and nonetheless finds that it's
22    equitably moot, we are irreparably harmed.
23          In addition, the issue of being able to proceed
24    against the airport and the indentured trustee --
25          THE COURT:  But Metromedia was a case in which there

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

♀

                                                              20
752ndeln                    Argument

1    was to effort to seek a stay or an expedited appeal, and the
2    Second Circuit took all of that into account in determining
3    equitable mootness.
4          MR. SHORE:  But I think the issue that the Second
5    Circuit was raising there, I don't think it was whether it took
6    place a year later or six months later.  Once the transaction
7    closed, that is, there was a reliance upon the existence of the
8    releases and the transaction closed, under the analysis it
9    would have been equitably moot the next day because there was
10   the reliance upon that.
11         THE COURT:  Why did they go through all of the
12   analysis about what the appellants had failed to do?
13         MR. SHORE:  I think that is an outgrowth to some
14   extent of the Chateaugay opinion, what you need to do to

752ndeln.txt

15    establish the absence or the presence of equitable mootness in

16    constitutional mootness.  And they listed off a series of

17    factors, including that the third party was put on notice that

18    its claims were subject to reversal and any release it got in

19    that context was subject to reversal or vacatur at a later

20    date.

21         But I think if you look at the analysis, it was the

22    fact that a closing took place, that is, the plan was

23    consummated.  These creditors, in reliance upon their releases,

24    voted in a certain respect in connection with that plan, and,

25    according to the analysis, might not have done that if they had

♀

1    been told that they weren't getting releases.

2         But focusing only on the airport and the trustee

3    ignores the fact that Delta is a party to this.  I will come

4    back to it a little bit later in talking about what we want

5    here, why we're fighting, but the ability to sue an indentured

6    trustee in a drawn-out proceeding to recover for a failure to

7    follow a reasonable person standard or a prudent person

8    standard is a very different animal than Delta being put to the

9    issue, are you going to assume this lease and pay all the

10   bondholders in full or are you going to reject this lease and

11   get rid of your Cincinnati hub?

12        That's a different issue.  To allow the appeal as

13   against Delta to become equitably moot by allowing these

14   transactions to occur, allowing the legal relationships of the

15   parties to be changed, leases to be cancelled, new leases to be

16   signed, the reletting of the airport, it is going to be, and I

752ndeln.txt

17  don't think anybody has argued that it is clear, and we've

18  never argued that it is clear that our appeal as against Delta

19  isn't subject to a significant claim of equitable mootness.

20      We don't want to sue the trustee.  What we want here

21  is on behalf of all bondholders for these leases to be assumed

22  or the lease to be assumed and all payments under the bonds to

23  be made.  But I will, I think, try to come back to that later.

24      THE COURT:  You've convinced me, by the way.  How long

25  with respect to time, by the way?  How long do you want for the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                    22

752ndeln                    Argument

1  argument?

2      MR. SHORE:  I would think another half hour, your

3  Honor.

4      THE COURT:  You have gone for about 20 minutes.  Why

5  don't we say another 20 minutes, so 20 minutes after 5:00.

6      OK.  Thank you.

7      MR. SHORE:  Rather than address their cases, which

8  they try to allay the court's concerns, if there are any, that

9  this happens all the time, I think if you look at those cases

10  closely, there has never been a Court that found that 316(b)

11  rights become moot in a default setting.  I think the cases are

12  the opposite.  Nor will you find a case in which someone solved

13  a minority bondholder problem by barring someone else's

14  bankruptcy and getting basically a no-action antisuit

15  injunction which barred anybody from challenging the indentured

16  trustee's actions or the issuers.

17      Two issues with respect to my second point, which is

18  jurisdiction, because this is not just an interpretation issue.

19      There are questions with respect to jurisdiction and

Page 20

752ndeln.txt

20    there are questions with respect to statutory power.  They are
21    separate.  The question with respect to jurisdiction is this.
22    You need to parse it by the action of the Court.  The mere fact
23    that you invoke related-to jurisdiction doesn't let the Court
24    do everything with respect to a party.  What are the releases?
25    How are the releases related to the bankruptcy?  How is the

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
♀
                                                              23
    752ndeln                    Argument

1    injunction related to the bankruptcy?  And how does the
2    declaration that what the trustee did here is appropriate
3    related to Delta's bankruptcy?
4            The best way I think to show that it is not related is
5    to talk about what happens if there isn't a release and if
6    there isn't an injunction and if that declaration hasn't come
7    forward.  Assume we sue and we win and we obtain $30 million
8    against the indentured trustee.  That doesn't affect Delta at
9    all.  Delta has no, and I haven't seen anything from anybody
10   that --
11           THE COURT:  How can you extract the releases from the
12   entire text of the settlement?
13           The settlement agreement on its face says that no
14   portion is severable, that it is an integrated document, and
15   it's fairly clear from the structure of the settlement that
16   that's true.
17           MR. SHORE:  I agree.
18           THE COURT:  KCAB is not going to enter into the
19   modification of its agreements without a release.
20           MR. SHORE:  That's right.
21           THE COURT:  How can you separate out the releases and
                            Page 21

752ndeln.txt

22  say, well, you can only look at the releases and ask whether

23  the releases are arising out of or related to the bankruptcy?

24      MR. SHORE:  The Fifth Circuit in Zale did exactly that

25  and said once you put an agreement in front of the judge, the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

752ndeln                    Argument                    24

1   bankruptcy court, that does not invoke the jurisdiction of the

2   court to do everything with respect to that agreement.

3       What happened here, as I understand what they said was

4   the deal is important to Delta and the releases are important

5   to the third parties.  Therefore, the bankruptcy Court can

6   grant the releases.

7       What that does is that establishes jurisdiction based

8   upon an agreement of the parties.  You can't do that.  If the

9   party said I'm sorry, I would love to do this deal, but I'm in

10  prison right, now the bankruptcy court can't write an order

11  allowing the prisoner out to do the deal.

12      THE COURT:  The bankruptcy court didn't accept

13  jurisdiction simply because the parties said we consent to

14  jurisdiction, we agree to jurisdiction.

15      The bankruptcy court looked at the structure of the

16  settlement and looked at the terms of the settlement and

17  concluded that they were integrated and arise out of and were

18  related to Delta's bankruptcy.  It was not as though there was

19  a provision of the settlement agreement that was not related to

20  Delta's bankruptcy.

21      MR. SHORE:  Looking at Zale closely, you have to look

22  at each integral piece.  This is an agreement to establish

23  jurisdiction.  In fairest terms what they said was if the

24  bankruptcy court doesn't exercise jurisdiction to grant these

Page 22

752ndeln.txt

25   releases, we are not doing this deal.  Leaving aside the issue

♀

                                                                    25
752ndeln                 Argument

1    of arising -- I'm sorry.

2            THE COURT:  No.  You have to ask yourself what is the

3    transaction?  When you say we won't do this deal, what is the

4    deal?

5            The deal includes, among other things, the elimination

6    of the lease and the restructuring of Delta's payments under

7    the prior lease.  It's hard to get something that is -- I'm

8    sure there are other examples, but it's hard to get something

9    that is not so integrally involved in Delta's bankruptcy.

10           MR. SHORE:  Respectfully, your Honor, if, for example,

11   they had put in the lease, the indentured trustee or the

12   airport had said, I want a gate I don't own, as a condition to

13   this deal, I will give you the lease, Delta, as long as the

14   bankruptcy court writes an order requiring a third-party to

15   deliver me a gate it doesn't own, that would be outside the

16   bankruptcy court's jurisdiction.

17           The mere fact that it's in a settlement agreement the

18   parties have put before the judge does not give the judge

19   jurisdiction over it.  Even if there were jurisdiction, there's

20   a question of power.

21           This is an important point that everybody has elided

22   over.  There is no statutory basis in Title 11 or 28 or

23   anything else that has been invoked by any party which would

24   say that the bankruptcy court had jurisdiction or had the power

25   to declare rights under this contract, to issue an injunction,

752ndeln.txt
(212) 805-0300

1    or to grant releases.

2            As the Court in Metromedia found, you are not free to

3    grant releases without a statutory provision to rely upon.

4    There is nothing they rely upon, there is nothing in Section

5    363 of the Bankruptcy Code that says that you can't release us,

6    there's nothing in Section 365 of the Bankruptcy Code, the two

7    provisions they went under --

8            THE COURT:  what do you do with your colleague's

9    statement to the bankruptcy judge that he appeared to be

10   nodding along as the bankruptcy judge said:  There's no

11   question about jurisdiction here.  I have jurisdiction to enter

12   the settlement agreement, don't I?

13           Your colleague appeared to say no problem with respect

14   to jurisdiction.  Of course you have the jurisdiction, the

15   power to order the settlement agreement, and moved on.

16           If this is so clear to you, and there are a series of

17   factors that I have to go through on the issue of the stay and

18   this is a factor with respect to jurisdiction that logically

19   comes up under likelihood of success on the merits, likelihood

20   of success on the merits of jurisdiction, the appellant's

21   counsel didn't dispute jurisdiction before the bankruptcy

22   judge, thought it was so clear that it was not a matter of

23   dispute.

24           MR. SHORE:  I think in the context that you may be

25   reading it, or that may be reading a little out of context.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

752ndeln.txt

1   The brief very clearly said the court does not have
2   jurisdiction to do this.  It doesn't have the power to do it.
3          THE COURT:  OK.
4          MR. SHORE:  The point was not argued, and ultimately
5   the bankruptcy court did not think that the issue had been
6   waived or had been dropped because he made it a point to deal
7   with the issue of jurisdiction, saying the argument was
8   frivolous, but nonetheless he did not perceive the statements
9   made by counsel, which are probably the best evidence of what
10  happened, as being a waiver such that he did not need to deal
11  with it.
12         THE COURT:  I don't think you can waive jurisdiction.
13         MR. SHORE:  Right.
14         THE COURT:  So the bankruptcy judge couldn't really
15  have said there's waiver.
16         What I was asking was if the argument was so clear
17  that there was a lack of jurisdiction in the bankruptcy court
18  to do this, how could counsel so blithely go along with the
19  bankruptcy court's statement that of course there's
20  jurisdiction here.  It wasn't just sort of nodding.  I mean,
21  counsel said that of course the court had jurisdiction to enter
22  the settlement order.
23         MR. SHORE:  Right.  You know, I do not read the
24  transcript that way.
25         THE COURT:  OK.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                          28
752ndeln                    Argument

1          MR. SHORE:  I see it more as saying it is not
2   important to argue.  But that's where we are.

752ndeln.txt
```
 3              THE COURT:  OK.
 4              MR. SHORE:  Let me spend a few minutes on who we are
 5      and what we want.
 6              The rhetoric in the briefs was I think distractingly
 7      thick about us being extortionists, hostage takers, vast
 8      minority, and economic terrorists we were referred to below.
 9      The press referred to us, quoting somebody on the debtor's
10      side, as being a smudge.
11              I think the rhetoric probably speaks the other way.
12      You need the facts, your Honor.  We're six bondholders.  They
13      bought claims at various times in the bankruptcy case.
14      Substantially all of their bonds were bought before the
15      settlement was announced.  This gets to the issue of their
16      trying to say we are a holdout artist, and I'll come back in a
17      second --
18              THE COURT:  But the timing was substantially all of
19      the bonds were bought before December of 2005.  Right?
20              MR. SHORE:  No.  Substantially all of the bonds were
21      bought before February 2007, when the deal was announced.
22              MR. HUEBNER:  Your Honor, after December 2005 I think
23      is correct.
24              MR. SHORE:  Yes.
25              THE COURT:  Yes.
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>
(212) 805-0300

29

752ndeln                    Argument

```
 1              It was after Delta's bankruptcy with notice that the
 2      income stream for the bonds was imperiled by the bankruptcy,
 3      and they continued to hold the bonds while they knew that
 4      settlement was being discussed by the trustee.
 5              MR. SHORE:  Yes.
```

752ndeln.txt

6          THE COURT:  And didn't object that the trustee had no
7    power to negotiate away their rights.
8          MR. SHORE:  Well, that's a leap.  That's a leap that
9    the debtors have asked you to make.
10          THE COURT:  OK.
11          MR. SHORE:  The fact that the trustee is negotiating
12    is not news.  The trustee, we went through the provisions, has
13    the right at the direction of the majority to negotiate.  You
14    just can't cut some deals.  You can negotiate, and you better
15    be telling the party on the other side.  As you would expect in
16    any deal with one of these provisions, I can do a lot of
17    things.  If in fact you want to add more time to talk about
18    things that people do, you could strip all covenants --
19          THE COURT:  Could I just stop you.
20          MR. SHORE:  Sure.
21          THE COURT:  I don't want to sort of interfere with the
22    orderly presentation of what you were going to tell me about
23    the bondholders.
24          Let me just be clear with respect to when they bought
25    the bonds and what the significance was in your mind vis-a-vis

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
⚥
                                                              30
752ndeln                      Argument

1    what the appellees are telling me about them.
2          So most, substantially all of the bonds were bought
3    after December 2005, after Delta was in bankruptcy.  And what
4    was the other date that you wanted to tell me about
5    specifically?
6          MR. SHORE:  Substantially all before the settlement
7    was announced.

                              Page 27

752ndeln.txt

8          THE COURT:  OK.

9          MR. SHORE:  I don't think we need to spend any time

10    about the concept that we're capped at our purchase price or

11    the policy implications of that.  But I want to make one point

12    here on this and then move on.

13          It is plainly wrong and misleading for the other side

14    to say that they represent the overwhelming majority here.  It

15    is wrong.  This is why, among other reasons, I wanted to talk

16    about the exhibit which shouldn't be coming in.

17          But let me give you the quick rundown of facts.

18    February 9, the debtors put out their plan and disclosure

19    statement.  That said nothing about this settlement, provided

20    no information to bondholders as to what the settlement was,

21    what their alternative rights were or anything.

22          On February 27, again, after substantially all the

23    bonds were bought, two groups of funds, Oppenheimer and

24    Franklin -- this is in the Dean Exhibit O.  So two people --

25    one from Franklin, one from Oppenheimer -- on behalf of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

31

752ndeln                    Argument

1    funds gave a direction to the indentured trustee to enter into

2    the settlement which cancelled the lease, cancelled the

3    guarantee, and cancelled the indentures.

4          The trustee, rather than saying, I can't enter into a

5    deal which impairs the 316(b) rights of a minority until I get

6    full approval, nonetheless accepted that and entered into the

7    deal with a side indemnity in place from the directing

8    majority.  At that time they only spoke for 60 percent of the

9    bonds.  So when the indentured trustee accepted the letter, 40

10    percent of the outstands bonds did not deliver any consent to

752ndeln.txt

11    enter into this deal.  That is not an overwhelming majority

12    supporting this deal.

13              THE COURT:  OK.

14              MR. SHORE:  Then the bondholders voted.  Somehow it

15    has been transformed into the vote on the plan was a referendum

16    on the deal.  The evidence below was directly to the contrary,

17    that Delta never expected it to be a referendum on the deal.

18              But the votes came in.  According to debtor's counsel

19    in a statement made on the record at the hearing, which wasn't

20    evidence and which they are trying to bolster now with an

21    affidavit from a person I wanted to depose, $168 million of the

22    $413 million outstanding voted.

23              MR. HUEBNER:  That's totally incorrect, your Honor.

24              THE COURT:  OK.  Hold on.  I will avoid any references

25    to tennis, but I really prefer one side at a time and then a

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

♀                                                                    32

      752ndeln                      Argument

 1    response.

 2              So, Mr. Shore has the podium.

 3              Go ahead.

 4              MR. SHORE:  By my math that's 41 percent of the

 5    outstanding bonds voted in favor of the plan.  There is no

 6    explanation anywhere what happened to the 60 percent that gave

 7    the direction letter.

 8              If you want to say that the plan was a referendum on

 9    the deal, 59 percent of the outstanding bondholders have not

10    consented to this treatment.  So when they say majority, what

11    they mean is two bondholders gave a direction.  I think that's

12    the best way to look at it, because I don't see the plan as a

                                Page 29

752ndeln.txt

13  referendum.  40 percent of the bonds have not delivered

14  consents.  We happen to represent 10 percent, or one-quarter of

15  the nonconsenting bondholders, which is actually a pretty big

16  turnout when you talk about ad hoc committees.  25 percent of

17  the people who never delivered consent to this deal have hired

18  counsel and have fought this.

19          Importantly, the two who voted in favor were not our

20  fiduciaries.  This is what 316(b) protects.  I don't know what

21  their motivations were.  Assume they were short bonds, or they

22  had hedged, they had bought credit default insurance, they were

23  indifferent to a settlement at 70 cents.  I don't know.  But

24  under 316(b), that's irrelevant.  Because no matter what their

25  intent is, they cannot compromise my right to principal and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

752ndeln                    Argument

1  interest.

2          THE COURT:  I'm sure that Mr. Huebner can hear you and

3  I can, so --

4          MR. SHORE:  Sorry, your Honor.

5          We stayed above the rhetoric.  Again, terrorist is

6  maybe a bit much.

7          But look at the counterpart.  We are not holdup

8  artists.  A holdup artist is somebody who sees a legal

9  loophole, dives into it, and tries to extort a price.  For

10  example, the guys who used to register domain names:

11  "www.cocacola.com is mine.  I have no interest in using that

12  site.  Just pay me off."

13          Congress said, No, you can't do that.  These people

14  bought bonds before this deal was on the table with an

15  expectation that whenever the deal was going to be on the table

Page 30

752ndeln.txt

16    it was not going to be an impairment principal and interest.

17        The people who changed the legal landscape were those

18    who came up with this new procedure which required going to a

19    bankruptcy court for a determination that the 316(b) rights are

20    moot in a default setting.

21        This is not a holdup.  This is not guys who said, oh,

22    I see a scene here, the debtors have just announced that they

23    are going to reject this lease, and they haven't asked for my

24    consent, so I am going to buy one bond and say you don't have

25    consent.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

34

752ndeln                    Argument

1         These are people with substantial holdings that

2    existed before this deal closed, before this deal was

3    announced, who are trying to vindicate their rights and the

4    rights of all other bondholders.

5         Let me clear.  What we want here, everybody tries to

6    make much the of the fact that we didn't challenge the fairness

7    the settlement below.  That was a litigation necessity.  If our

8    point is the bankruptcy court doesn't have the power or the

9    jurisdiction to declare our rights under the indenture and to

10    say this is in our best interests, we can't submit evidence to

11    the court below to say, Your Honor find this is not in our best

12    interests.  We can't do that.  Let me make clear --

13        THE COURT:  No, sir, not right.  That's simply not

14    right, because it would certainly be in your power to argue in

15    the alternative to the bankruptcy court, after extensive

16    discovery, A, you have no jurisdiction, and, B, even if you had

17    jurisdiction, you should not approve the settlement, and here's

752ndeln.txt

18  why.  To say that you simply couldn't argue that is simply not

19  right.

20          MR. SHORE:  Your Honor, I would agree with you except

21  for one thing.  When you say extensive discovery, don't forget

22  this proceeding lasted from the beginning of March until the

23  end of April.  Discovery was propounded and not responded to

24  until I think April 3 with a response date on the brief of

25  April 11.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                  35

752ndeln                      Argument

1           To say that these bondholders were required over that

2   time on mount a challenge and to present to the bankruptcy

3   court, in a manner which again could be argued was against --

4   that is, retain experts, present it to the bankruptcy court,

5   and then still be at risk.  And I think there is a risk if you

6   submit it to the bankruptcy court, even with a reservation.

7   The argument is there.  Let's talk about what in fact we want.

8           THE COURT:  As I read what the bankruptcy court said,

9   and I don't think that you dispute this, the bankruptcy court

10  said that the appellants had raised only legal issues with

11  respect to the settlement, no factual issues, and had not

12  contested the fairness of the settlement either to Delta or to

13  the bondholders.

14          MR. SHORE:  That's not quite correct, your Honor.  If

15  you look at Dean Exhibit O at, I think at 19-20, it's very

16  clear that what was said is we do not believe this is a good

17  deal for bondholders.  It may be a good deal for Delta, and we

18  are not contesting that this is not in the best interests of

19  Delta to enter into this transaction.  But we said very clearly

20  I think three or four times this is not a good deal for

752ndeln.txt

21   bondholders.

22        So when they say that we didn't contest it, that means

23   that we didn't put on evidence in the form of an expert to say

24   here are the five reasons why this is not a good deal, although

25   I think some of it is in the record below and can be argued

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                              36
752ndeln                    Argument

1    from.

2         Let me just turn to that for a minute.  I know I'm

3    using up time here.

4         THE COURT:  Yes.  You've got very little time left.

5         MR. SHORE:  First and foremost, we want Delta to

6    assume the lease.  I just think, these serious business people,

7    not holdup artists, do not believe that there is any

8    possibility that Delta is going to, and you can see it in their

9    papers about the importance of the hub, reject the lease, pick

10   up all of their stuff and vacate the leased premises, leaving

11   Comair there without a Delta hub in a separate terminal.

12        Second, if Delta rejects, there is an unsecured claim

13   on the lease.  That is settled pursuant to the agreement.

14   There is an unsecured claim on the guarantee.  Whether that's

15   capped or not is a legal issue, and we have views as to whether

16   they are going to win that and they have views as to whether

17   they are going to win that.  But the one thing the bankruptcy

18   court didn't do and he said it in his decision on Thursday, he

19   did not consider the relet rights.  He made no determinations

20   with respect to what the relet rights mean, but nonetheless

21   made a factual finding that our sole resource in a default

22   setting is due to Delta payments under the lease.  That's not

Page 33

752ndeln.txt

23    correct.

24          When the lease is breached, the airport has a

25    best-effort obligation to relet the premises.  The only

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

♀
                                                                37
      752ndeln                    Argument

1     evidence below was that the consultant who was hired by the

2     airport never marketed Delta's terminal to anyone.

3     Nonetheless, they're getting a release for having done that.

4           The problem with this, and why I focus on the relet

5     rights is it provides a windfall to the airport.  The indenture

6     is now cancelled.  Our sole recourse is against the $85 million

7     note and the $260 million claim.  If Delta files a bankruptcy

8     in two years and goes out of business -- does a TWA, you go in

9     three times and they you liquidate -- the airport will get our

10    $85 million note discharged in the bankruptcy.  The stock will

11    be whatever it's worth in the bankruptcy, and the airport in a

12    rejection scenario will be able to lease that to whoever they

13    want and won't have to pay us anything on the bonds.

14          So the concept that an airport, which has best-efforts

15    obligations to relet these proceeds did nothing and now is

16    obtaining an injunction and a release preventing us from

17    challenging upon that is a fundamental problem we have here.

18          Then as a last resort we'll go after the indentured

19    trustee and the issuer, but we don't want to do that.  This

20    issue should be dealt with in the context of the assumption or

21    rejection of this lease.

22          THE COURT:  That's different what you said in your

23    reply papers.

24          MR. SHORE:  How so, your Honor?

25          THE COURT:  Your reply papers said you wanted the
                            Page 34

752ndeln.txt

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

38

752ndeln                    Argument

1    opportunity to go after the trustee and KCAB.

2            MR. SHORE:  We do, your Honor.  There's no question.

3    I Said as a last resort -- no, I'm sorry.  We want all parties

4    in this.  We don't want anything to happen which is going to

5    interfere with our legal rights via an equitable mootness.

6            But this is not an instance in which we want to go

7    after an indentured trustee.  What we're trying to do is

8    improve recoveries for all bondholders here, but it will come

9    either through an assumption of the lease or an actual payment

10   in respect of relet rights which are gone.  That's what's

11   happening.

12           This is not anybody who is standing around saying we

13   are just standing in front of this deal.  We don't think this

14   deal is a good deal.

15           Now let me address very quickly, your Honor, the

16   question of harm or the harms they set forth.  I think you can

17   pretty clearly parse through their papers as to what is a real

18   harm caused by the stay and what is he a harm caused by

19   reversal.  If they are not entitled to it in ten weeks because

20   your Honor reverses, they're not entitled to claim a harm based

21   upon that now, that is, the risks that are raised by various

22   people, Delta might not get the hub.  Well, if Delta wasn't

23   entitled to the hub, then it can't claim that that is a harm.

24           I think the only harms that are tied to the ten-week

25   stay that we've asked for are that they aren't going to get

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Page 35

752ndeln.txt

752ndeln                    Argument

1    their stock and that people will walk.

2            If we could spend a moment just in the settlement

3    agreement, which is Exhibit L in our papers, it starts in

4    Section 4.05.  The pages aren't numbered.

5            4.05 says, if the bankruptcy court shall (i) deny the

6    settlement motion, and then (ii) if the settlement order fails

7    to become final by July 15, then any of the parties may

8    terminate this agreement.  Those are the termination rights.

9    Nobody has a right to walk unless the order doesn't become

10   final before July 15.  "Final" is defined in the, I think the

11   fourth page, the fourth page, which is that an appeal at the

12   end has been withdrawn or dismissed.

13           If this closing is stayed and the order can't go

14   final, nobody has a right to walk.  I point out that in their

15   papers everybody says there's a risk of someone walking, but

16   not one of the parties who has a claimed right to walk under

17   this agreement has said I will walk.  But by its terms they

18   don't have a right to walk.

19           Importantly, also, moving back to 4.01, which is

20   contingency, except with respect to Sections 3.02(b), which are

21   the forbearance payments, and 4.03, which is that the parties

22   have to work to support the settlement, the effectiveness of

23   this agreement shall be conditioned upon entry by the

24   bankruptcy court having jurisdiction over the bankruptcy cases

25   of the settlement order and the settlement order becoming

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

752ndeln                    Argument

1    final.

752ndeln.txt

2          In order to close this transaction now with an appeal

3    pending, they are going to have to waive the condition.  How

4    can they say that we need to post a $330 million bond, which

5    they know we are not going to post, because the transaction

6    won't close when the reason the transaction would close is the

7    parties took an affirmative step waiving conditions in 4.01.

8          The parties, expecting an appeal, bargained for a

9    period of time in which we could resolve this issue without

10   jamming the court.

11         THE COURT:  That was not successful.

12         MR. SHORE:  Yes.  For example, the stock volatility,

13   again, no evidence anywhere there's people speculating as to

14   what might happen or might not happen with respect to the stock

15   or their desire to get it on the date that everybody else gets

16   it.

17         That's a risk that they allocated to each other in the

18   agreement.  Nobody has a walk right if the stock goes up or

19   goes down before July 15.  If there is an appeal pending,

20   nobody has a right to walk from this deal if the order is

21   dismissed or withdrawn or the appeal is dismissed or withdrawn.

22   I don't understand.  Those are the only harms they have even

23   set forth.  I think they are speculative, but they are not

24   harms that are compensable.

25         Unless your Honor has further questions, I think I've

♀

                                                              41

752ndeln                    Argument

1    used up my time.

2          THE COURT:  OK.  Thank you, Mr. Shore.

3          MR. HUEBNER:  Your Honor, this is Marshall Huebner

752ndeln.txt

4   with Davis Polk.  Can I be heard by everybody?

5           THE COURT:  Yes.

6           MR. HUEBNER:  Your Honor, let me first begin on a

7   personal note, with profound apologies.  It is very rare to

8   appear telephonically in a very important hearing, but as your

9   Honor knows from the papers, this was the long prescheduled

10  closing date for the entire plan's distributional scheme, and I

11  am at Delta headquarters in Atlanta.

12          Your Honor, I need to hit all four factors, but I

13  think Mr. Shore -- and I understand why -- frankly did his best

14  to draw you away from the four independent factors that they

15  must satisfy.

16          Frankly, he has said so many things that are totally

17  untrue that I think that I have to correct some of those

18  misimpressions first.

19          The first, your Honor, he completely misunderstands

20  the definition of "final order."  The last five minutes of what

21  he said is completely incorrect.

22          The definition of "final order" actually says that if

23  there is an appeal, the order is still final if either there is

24  not a stay or the appeal has ultimately been resolved in favor

25  of approving the order.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

♀
                                                              42
    752ndeln                    Argument


1           If I can quote it directly, your Honor, and here we

2   go --

3           THE COURT:  Hold on.

4           MR. HUEBNER:  -- in the event any appeal has been

5   taken, or any petition for certiorari has or may have been

6   filed with respect to such order --
                         Page 38

752ndeln.txt

```
 7              THE COURT:  Stop.
 8              MR. HUEBNER:  -- and there has not been a stay of such
 9    order, or such appeal or petition for certiorari has been
10    withdrawn or dismissed or resolved --
11              THE COURT:  Mr. Huebner.
12              MR. HUEBNER:  -- what the parties actually drafted,
13    your Honor, there is a mere appeal.  It is a final order.  We
14    are obligated to close tomorrow.
15              Secondly, your Honor, when he read you Section 405 of
16    the settlement agreement, he left some words out, which I find
17    amazing --
18              THE COURT:  Is there someone from Davis Polk in the
19    courtroom?
20              MR. HUEBNER:  Yes, your Honor.
21              THE COURT:  Hold on, Mr. Huebner.
22              MR. HUEBNER:  Yes, sir.
23              THE COURT:  Every now and then could you take a
24    breath.  I have been shouting for you to please stop.
25              MR. HUEBNER:  I apologize, your Honor.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

43

752ndeln                   Argument

```
 1              THE COURT:  Because of the way in which the phone
 2    system works, apparently there is a pause that's required
 3    before you can hear someone else talk.  So, so long as you're
 4    talking, you won't hear the fact that there is someone trying
 5    to listen, but I can't listen if I can't participate also.
 6              MR. HUEBNER:  I apologize, your Honor.  I will stop
 7    frequently.
 8              THE COURT:  So can you hear me?
```

Page 39

752ndeln.txt

```
 9          MR. HUEBNER:  Yes, your Honor.  Perfectly.

10          THE COURT:  OK.  Let's go back to "final."

11          I have two questions, because I have also read the

12   settlement agreement and the definition of "final," and I would

13   like to hear what your position is with respect to whether, if

14   there were a stay, the parties to the settlement agreement

15   could walk away and whether they could walk away -- hold on.

16   Keep breathing.  OK?

17          If they could walk away tomorrow, and why that's true.

18          I should tell you, I have read the definition of

19   "final," and it does seem as though it's a less than clear

20   definition of final under all of the circumstances just in

21   terms of the use of "or" at various places.

22          There is a reading of it that appears to say the order

23   becomes final if there is an appeal pending but no stay has

24   been issued.  So, the very fact, and the parties can advise me

25   about this, the very fact that there is an appeal and no stay
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

♀

752ndeln                    Argument

```
 1   makes the order final.  So you can describe for me "final," and

 2   then you can take me through the provision of the agreement

 3   that allows termination and give me your argument that if a

 4   stay was entered the parties could walk away from this

 5   agreement tomorrow.  OK.

 6          MR. HUEBNER:  Sure, your Honor.  I will try very hard

 7   to breathe in between making each of those points.

 8          Your Honor, the read of "final" that I think the Court

 9   just expressed, all three parties who signed this document are

10   in the courtroom.  They all know and distinctly intended what

11   it means, which is exactly what you said.  The "or" is very
```
Page 40

752ndeln.txt

12    intentional.

13            If there is a mere appeal, which as of right now is

14    our situation, that does not -- repeat, does not -- prevent the

15    order from being final.  In fact, if this court does not issue

16    a stay, the parties are obligated to close tomorrow because the

17    definition of "final" has been satisfied.  What

18            the latter part of the definition says is that if

19    there is an appeal the two ways to have the order still be

20    deemed final are either there is no stay or the appeal has been

21    finally resolved in upholding the order.

22            The second provision, your Honor -- and given that we

23    wrote it and we are all in the courtroom I think it's pretty

24    clear that we know what it means.

25            The second provision, your Honor, and, again, he just

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
♀
                                                              45
       752ndeln                        Argument

1     read you from Section 4.05, but he left out a bunch of words

2     that govern today.  In Section 405, (ii) says:  Or if the

3     settlement order fails to become final by July 15, 2007, or is

4     reversed or modified on appeal, then any of the parties may

5     terminate.

6             That second qualifier, that if it's modified on

7     appeal, I think it's a very real position, if not much more

8     than that, that a stay freezing the order's effectiveness would

9     be deemed a modification.  That gives anybody an immediate

10    walk-away right.

11            The third point, your Honor, is that multiple

12    provisions of the document, including 3.02(c), require the

13    delivery of the consideration on the closing date.

                            Page 41

752ndeln.txt

14          If your Honor turns to the definition of "closing

15   date," it can never, ever be after May 3, 2007, which is

16   tomorrow, because the definition expressly says the closing

17   date can in no event be later than one of two dates, which now

18   both work out to tomorrow.

19          As your Honor knows, because you've obviously read the

20   stuff with extraordinary care, the bankruptcy court ruled on

21   two different occasions after extensive evidence that the

22   receipt by the bondholders of their distributions on the plan's

23   initial distribution date was a critical, central component of

24   this agreement.  That's why it's structured this way.  Because

25   it was, unless we are stayed by a higher court from closing, we

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              46
     752ndeln                    Argument

1    must give them their value tomorrow because that was a

2    critical, critical piece of the consideration.

3           Your Honor, to hear Mr. Shore, of all people in the

4    world, argue to you that volatility in distributions and not

5    getting their equity for a couple of months doesn't constitute

6    harm is simply remarkable.

7           Mr. Shore filed a pleading on January 12, 2007, in the

8    Adelphia bankruptcy, your Honor, where he was on my side of the

9    table, a small group of dissenting bondholders, 11 in that case

10   as opposed to the 6 here, in a class that had overwhelmingly,

11   or among a group that had overwhelmingly voted in favor of a

12   plan, 97.5 percent to our 97.35 sought a stay.  Here is what

13   Mr. Shore represented to the court as the massive harm from his

14   client's not getting their distributions on and when scheduled.

15   May I read the quote, your Honor?

16          THE COURT:  NO.
                            Page 42

752ndeln.txt

17            I don't find that very helpful.  It is not an area of

18    the law where I really require lawyers to represent only one

19    side, so long as in any individual litigation they only

20    represent one side.

21            So I understand the argument that if a distribution of

22    securities is held up, at the very least those who are to

23    receive the securities are prevented from getting their right

24    to make their own market choices as to whether to keep the

25    securities or sell the securities and that as a result of that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                    47

752ndeln                    Argument

1    they are denied a right that they would otherwise have.

2            MR. HUEBNER:  Thank you, your Honor.

3            THE COURT:  There's no way to calculate that right.  I

4    really don't need what Mr. Shore said in another litigation.

5            MR. HUEBNER:  Understood.

6            Again, given that I think it is very straightforward

7    that not receiving securities for months while everyone else

8    can trade and they are very volatile in a post-emergent

9    scenario -- I will leave it at that.

10            What I would like to do, your Honor, is hit a couple

11    of more specific things he said, and then turn back to what I

12    was hoping to tell the court today.

13            First of all, your Honor, Delta will never assume this

14    lease.  We have been very clear about that all along.

15            THE COURT:  You have just until about 5 after 6:00.

16            MR. HUEBNER:  Thank you, your Honor.

17            The second thing, your Honor, Mr. Shore told you that

18    the bankruptcy court never considered relet rights.  That is

Page 43