752ndeln.txt

19    just not true.  In fact, the court's opinion expressly even

20    includes a quote from the trustee that they have their own

21    independent consultant that decided and concluded that there

22    was no one else to take this terminal.  His statement to you

23    that "the airport did nothing," I am sure KCAB will address,

24    but suffice it to say, your Honor, that there was a massive

25    amount of evidence in the record in the form of depositions

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

                                                                    48

752ndeln                    Argument

1    taken by White & Case, at which the airport talked about

2    contacting over 60 airlines on multiple occasions and working

3    with consultants and doing everything possible to try to see

4    what else they could do to get the proceeds and fill the space.

5          I just am astonished to hear counsel say that the

6    record says the airport did nothing.  That is completely at

7    variance with the hearing below, which I know Mr. Shore did not

8    attend.

9          Your Honor, on the question of what they should and

10   should not have opposed at trial, it is important to note that

11   this was not a rushed hearing.  There were 40 -- four zero --

12   days' notice of this hearing below.

13         We gave them all the discovery they wanted.  It began

14   on a rolling basis far before when he said it did.  They took

15   all the depositions they wanted.  Our proposed form of order

16   from day one said that the relief requested included a finding

17   that the settlement was fair and equitable, and they took a

18   huge amount of discovery about this.  They kept trying to get

19   the witnesses to admit that maybe there was a better deal out

20   there, and they got no traction, because it just is not the

21   truth.

Page 44

752ndeln.txt

22    As the evidence actually showed, the rent payment

23  equivalents that Delta is paying under the settlement

24  substantially exceed what other tenants are currently paying at

25  the airport, and in fact, but for Delta, there is no one to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

49

752ndeln                    Argument

1   take this terminal.

2        In fact, I actually joked at the hearing that if I had

3   known what the deponents would say we never would have cut a

4   deal this generous, knowing that we were really, truly

5   absolutely the only game in town.

6        Your Honor, as to the disclosure statement, quote,

7   saying nothing about this, that is completely untrue as well.

8        You will see from the record below and the argument

9   the disclosure statement had an entire section that described

10  exactly where we were with the settlement, a section that said

11  we will keep trying to settle, and another section that put

12  everyone on notice, and specifically if we settled municipal

13  bond indenture issues in time, the settlement was to be the

14  parties plan distribution.

15       As we argued below and proved below, people got notice

16  of the settlement and got their full package of hundreds of

17  pages of documents weeks, weeks before they had to vote on the

18  plan.

19       To be candid, your Honor, I spoke to Mr. Shore many

20  times yesterday and again this morning.  I never heard one

21  word, not one syllable about the boilerplate voting affidavit

22  being contested as evidence.  In fact, I've never heard

23  anything about that for weeks since it was filed in the middle

Page 45

752ndeln.txt
24    of April until I heard it for the first time on the phone
25    today.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

50

752ndeln                    Argument

1           Your Honor, that affidavit was admitted into evidence
2     at the confirmation hearing.  They agreed to the admission of
3     all of the evidence and the affidavits.  They agreed they did
4     not need to cross-examine anybody.  And it was entered into the
5     record.
6           This claim that this affidavit is somehow not
7     admissible is all the more remarkable because one of
8     Mr. Shore's partners e-mailed me and said he wanted to merge
9     the evidentiary record of the two hearings, and we were
10    concerned that that might not be entirely OK.
11          If you look at the record of the confirmation hearing,
12    you will see that.  So to allege now that a plain vanilla
13    voting affidavit that they've known about for weeks and they
14    willingly admitted into evidence and waived the right to
15    cross-examine at the confirmation hearing, where I might note
16    they were the only represented objector out of over 200,000
17    parties, is, I think, quite improper.
18          Your Honor, why do they draw you away from the four
19    factors and to what they want to talk about?
20          It's because the four factors show that extraordinary
21    relief is being sought here and that their burden is extremely
22    heavy and that, as the Court below found, they simply don't
23    meet the factors.  In fact, they probably meet none of them.
24    This Court has ruled in at least two published decisions that
25    failing to meet any of the four factors is fatal.

Page 46

752ndeln.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                              51
752ndeln                    Argument

 1          Even if there is a balancing, I think it's very clear
 2     that they do not satisfy the standard.
 3          Your Honor, your point that you raised in colloquy is
 4     critical.  Well over 90 percent of these bonds were bought
 5     after the world was on notice that the trustee was negotiating,
 6     actually executing and implementing interim compromises of
 7     payments when due.
 8          Delta paid over $30 million to the bondholders under
 9     these compromises.  No party objected.  No party alleged lack
10     of authority.  But, your Honor, the notices also said we are
11     negotiating towards a definitive deal.  No party objected.  The
12     notices said everyone is welcome to join the negotiating
13     committee.  Many of the notices said that.  These parties
14     refused.
15          To now plead to the Court that only two families of
16     bondholders representing only 60 percent of the bonds did the
17     deal when they rejected for over a year the invitation to be
18     part of the process is also I think quite improper.
19          Let me hit Mr. Shore's math, because the 41 percent
20     number that appears in his footnote is totally incorrect.  It
21     is true that 168 odd million dollars of bonds voted.  But what
22     Mr. Shore didn't calculate is that that's out of the $260
23     million that was the allowed claim; that the parties expressly
24     agreed at the disclosure statement hearing in connection with
25     the voting order, which their clients did not attend or object

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                              52
752ndeln                    Argument
                         Page 47

752ndeln.txt

1    to, they got a vote in the amount of their agreed claim.

2            So 168 of 260 properly voted, which is 65 percent of

3    the total number of bondholders' votes available.  Of that

4    amount, 97.35 voted in favor of the plan.

5            Your Honor, he's quite right, the plan -- and I

6    wouldn't quite use his terminology -- the plan vote absolutely,

7    positively was a referendum on the deal.  That was its

8    intention in part.  The order provided that the transaction was

9    incorporated into the plan.  To make sure that they could not

10   be robbed of plan protections, we even agreed the deal could

11   never go effective unless the plan went effective, which is why

12   you don't hear them pressing their sub rosa plan argument

13   anymore, because, of course, as the bankruptcy court expressly

14   found, exactly as requested from the parties in the opening

15   words of the approval motion way back in March, this is a

16   request to a settlement and have it be incorporated into

17   Delta's plan of reorganization.

18           So now let's look at the four factors.

19           Having seen a very full and fair day in court below,

20   which included all the depositions they asked for, extensive

21   interrogatories, over 10,000 pages of discovery, and they put

22   on video excerpts with sound for the bankruptcy court with

23   screens and multimedia, this was not any rushed hearing by any

24   stretch of the imagination.

25           Before I hit the four factors, your Honor, again, they

♀

53

752ndeln                        Argument

1    didn't even attach to their papers the bankruptcy court had a

2    stay hearing and heard argument and was an extremely robust

752ndeln.txt

3    awareness of the underlying facts.

4         THE COURT:  I have read the hearing on the stay, I

5    have read the Judge Hardin's decision on the stay.

6         MR. HUEBNER:  OK.

7         THE COURT:  As you all know, the argument that the

8    appellants didn't attach the stay hearing was made to me, and I

9    asked for the stay hearing even prior to the time of receiving

10   all of the papers in opposition.

11        I can't recall who actually provided it, but both

12   sides knew that it wasn't provided in the original papers and

13   it was provided promptly thereafter.  Whether it was a problem

14   in terms of getting it transcribed promptly or whatnot, there

15   is nothing not disclosed by not including the stay hearing

16   transcript because it's plain that I would eventually read the

17   stay hearing transcript.

18        Go ahead.

19        MR. HUEBNER:  Sure.  Your Honor, I guess then let me

20   turn to the merits, which is many of the findings about whether

21   or not the extraordinary relief of an 8005 stay is warranted

22   are, of course, factual findings.

23        Where is the harm?  Where is the public interest?

24        We think it is important that the Court that actually

25   heard the entire underlying matter and took in all the evidence

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

54

752ndeln                    Argument

1    made findings, factual findings, that were rather

2    overwhelmingly in our favor.

3         Let me hit the four factors very quickly.  On

4    irreparable harm, your Honor, I was going to read in a very

752ndeln.txt

5  long quote from that transcript where Mr. Lauria, the senior

6  partner on this matter, emphatically made it clear that his

7  view was that it was perfectly clear that no possible mootness

8  argument with respect to KCAB or UMB could lie.

9          THE COURT:  I read that, and I read the papers on

10  that.

11          MR. HUEBNER:  Understood, your Honor.

12          So let me move to the next paint.  It is a

13  mathematical point, your Honor.

14          Just so the record is clear, again, I think their math

15  may be a little off.  They own $51 million of bonds.  They are

16  going to get about $30 million under the settlement.  So when

17  they say their maximum harm is $30 million, I think they mean

18  $20 million, because I think they're getting 30.  There's 20

19  left.  Of course, they only paid about 35.

20          I just want the record to reflect that we don't agree

21  that if anything further happens on this, their measure of

22  damages may well not be capped.  It's a very small number of

23  dollars.

24          But as to irreparable harm, they have two large

25  creditworthy parties that they say they can still sue.  The

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

                                                                55

752ndeln                    Argument

1  mere fact that they might lose in their minds one of their

2  many, one of their three defendants we believe is not

3  irreparable harm.

4          Second, your Honor, and this point is made in the

5  papers, so I will really hit it only very quickly, irreparable

6  harm requires that you have a real thing that you are going to

7  lose forever.

752ndeln.txt

8          We believe that the record is clear that there is no
9    better option for them, that they did not challenge that this
10   was a fair and reasonable settlement, that the evidence taken
11   in by the bankruptcy court proved that, frankly, the downside
12   risk was much greater than upside risk, and I think that the
13   right to chase causes of action that are very likely without
14   merit is not the kind of thing that justifies the extraordinary
15   remedy of a stay under 8005.

16          I won't repeat the very extensive evidence I referred
17   to about there being no other possible tenants, and the rent
18   here being higher than what other people, rent equivalents were
19   paying, and this was deemed prepaid rent by everybody.  But
20   there was a lot of discovery and a lengthy hearing.  The
21   bankruptcy court expressly found, and this is in his written
22   decision as a factual matter, that the settlement agreement to
23   this -- I quote, "The settlement agreement appears to this
24   Court to be clearly in the best interests of both Delta and the
25   bondholders."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀                                                              56

752ndeln                    Argument

1          He also found the terms of the settlement agreement
2    also appear to be favorable to the bondholders and went on to
3    note that it is virtually certain the court would sustain
4    Delta's rejection motion.

5          So, your Honor, they are not going to be harmed
6    because a court has already found that this is a very good deal
7    for them and found it after they had an opportunity, which they
8    declined, despite having gone and made us produce huge amounts
9    of evidence to them to try to let them uncover facts that

Page 51

752ndeln.txt

10    suggested that it was a bad deal.

11          The bankruptcy Court found as factual matter -- or

12    just found maybe it is not a factual matter.  It bears

13    repeating that the objectors have not argued that the

14    settlement is not beneficial to the bondholders.

15          Prong two, your Honor, their burden to prove --

16    prove -- that the stay will not cause any harm to any other

17    party.

18          Your Honor, I would note that for prong one the

19    standard is irreparable harm.  They have to prove their own

20    harm is irreparable, whereas prong two is that our harm only

21    has to be substantial.  Of course, the bankruptcy Court found

22    that there is a, quote, tremendous potential for irreparable

23    injury to the other parties if the settlement cannot and does

24    not close on 10:00, May 3.

25          Your Honor, that harm comes from the fact that there

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

♀

                                                        57

752ndeln                    Argument

1     is about a quarter of a billion dollars of securities that

2     could well be volatile, that people may not get for two months.

3           If those securities go down, God forbid, you know, 20

4     percent, those bondholders, the 97.35 of the voters that wanted

5     this deal, will never be able to get back in that case $50

6     million of lost value.  That is irrevocably gone because the

7     stay that this court issued locked them out of getting it

8     tomorrow, which they so desperately negotiated for and was an

9     absolutely central part of the deal.

10          Secondly, your Honor, besides the harm in the

11    meantime, there is the harm of the deal dying.

12          Your Honor, I already walked through those provisions.

                            Page 52

752ndeln.txt

13  I won't belabor the point, but I think the document frankly is
14  clear on its face.  The closing date being no later than the
15  initial distribution date is a key term of the deal.  The order
16  being modified on appeal is an immediate walk-way right.
17          Your Honor, the next point, I would also note, your
18  Honor, there is law on this.  There is actually law on this
19  from this very court.
20          In two of the court's three published opinions in T.R.
21  Acquisition Corp., at page 637, and in Bogdanovich at *7 this
22  Court expressly found that a delay in consummating a
23  transaction and the possibility of losing a profitable
24  transaction was harm, and in the second case, that granting the
25  stay would "further delay . . . any possible recovery from the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

♀                                                        58
    752ndeln                    Argument

1   debtors."
2           So the Southern District feels pretty clearly that
3   delaying people's distributions and putting their deals at risk
4   is harm.  With all due respect, I don't think either of those
5   cases involved a quarter of a billion dollars of publicly
6   traded securities that were at the heart of the deal.
7           Then there's the third harm, your Honor, which is that
8   if a stay goes through and this deal ends up being terminated,
9   say, for example, the stock does plummet and the value that the
10  majority bondholders were expecting from the deal evaporates in
11  large part, they might very well rethink this and say, now the
12  consideration that we thought was $250 million is $170 million
13  and at 170 there's no deal because that's -- now we need to go
14  back to war and pursue all options.
                           Page 53

752ndeln.txt

15          THE COURT:  That depends on whether they have the

16    right to walk away from the deal simply because of the

17    existence of the stay.

18          MR. HUEBNER:  Agreed, your Honor, or the closing not

19    taking place when expressly required.  I agree, your Honor.

20    That's a question under the document.

21          But, your Honor, here's the real critical third harm,

22    which is if they get a stay and the deal doesn't consummate, we

23    lose our appellate rights.

24          The many, many parties that prevailed below at two

25    different hearings, the majority bondholders, the debtors, the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                           59
752ndeln                    Argument


 1    committee, the airport, the trustee, we lose our right to have

 2    the order affirmed on appeal, and we lose our bargain because

 3    the deal has gone away.

 4          With all due respect, if it is right that the one side

 5    or other needs to take those risks, I certainly don't think

 6    that it is appropriate for it to be our side.

 7          Prong three, your Honor, likelihood of success.

 8          Your Honor, I think your colloquy has addressed the

 9    jurisdiction point, so I will neither quote from the transcript

10    nor belabor the point at all.

11          We, of course, understand that jurisdiction can't be

12    waived, but we are here on an emergency motion where they have

13    to prove, in your court's ruling three times, a strong showing

14    of success on the merits and getting the thing reversed.

15          And the jurisdiction argument can't go from "we admit

16    it and the lower Court found it was frivolous" to "it was such

17    a gross error it justifies an emergency stay" in the course of
                            Page 54

752ndeln.txt

18    two weeks.

19         Your Honor, I'm very happy to discuss the Zale case

20    from the Fifth Circuit on the merits because I think it exactly

21    illustrates the fallacy of what's going wrong.

22         In Zale, your Honor, the underlying original document

23    had no possible -- let me not overstate it -- had no connection

24    to the debtors.  The debtors were not liable on it.  They

25    didn't have identification rights under it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                        60
752ndeln                    Argument

1         Pursuant to a brand-new settlement agreement reached

2    during Chapter 11, for the first time the settlement created

3    obligations of the debtor in connection with that document.

4         If those were our facts, your Honor, if the indenture

5    had no prior connection to Delta and if we were not previously

6    liable for any amounts due thereunder and if we were in the

7    Fifth Circuit, and if, like in Zale -- and it is on the first

8    page of the opinion -- someone who stuffed in the injunction in

9    the middle of the hearing, with no notice to anybody, I would

10   agree with them that they might be right.

11        But, your Honor, not one of those things is true.  In

12   fact, it's hard to even dream of a fact pattern more different

13   than Zale.

14        For 15 years Delta and only Delta has made every

15   single payment due under this indenture.  Tens and tens and

16   tens of millions of dollars.

17        Moreover, as the court expressly found and the

18   documents make screamingly clear, payments from Delta under the

19   lease or the guarantee are the only source of payments under

**Page 55**

752ndeln.txt
20  this indenture.  Delta has substantial indemnification

21  obligations.

22          So to say that this is on some unrelated document and

23  we're trying to bootstrap it into the Delta bankruptcy case, we

24  were very restrained.  We never used "sheer fantasy" or "aura

25  of unreality" in any of the our pleadings to your Honor, but it

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

♀
                                                              61
752ndeln                    Argument

 1  is difficult to avoid them on this individual point.

 2          THE COURT:  Try harder.

 3          MR. HUEBNER:  Sorry, your Honor.

 4          I will not repeat any of the documentary provisions in

 5  KCAB's or the indentured trustee or our pleadings that make it

 6  clear that Delta and in large part only Delta is liable, and

 7  therefore to claim that there is no, quote, conceivable effect

 8  on the Delta bankruptcy is without merit.

 9          THE COURT:  Better.

10          MR. HUEBNER:  Your Honor, at bottom, they keep trying

11  to tell the Court that debts of KCAB are being discharged in

12  someone else's bankruptcy.  In their brief they again tell you

13  that you we're improperly trying to "cancel 417 million dollars

14  of the airport's debt."

15          This is totally untrue.  As everyone I think in the

16  courtroom knows, this is a nonrecourse municipal instrument and

17  is not the debt of KCAB.  Mr. Lauria made that clear at the

18  stay hearing below at page 16.

19          THE COURT:  I understand.  I don't think that that is

20  disputed --

21          MR. HUEBNER:  OK.

22          THE COURT:  -- that it is not the debt of KCAB.
                            Page 56

752ndeln.txt

23          There may be relet obligations and the like, but the
24     other side has made it very clear that they're not arguing
25     that.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                                    62
       752ndeln                    Argument

 1          MR. HUEBNER:  OK.  Thank you, your Honor.
 2          Their second claim of gross error is the indenture.
 3          Your Honor, given the time available, I am not going
 4     to go into a long discourse on the indenture.  It was very
 5     extensively addressed below.
 6          I think that there is an awful lot of case law and a
 7     very large number of sections as well as logic that make it
 8     clear that Judge Hardin got it right, but I would note that one
 9     provision that he did not cite which on some level is a savings
10     clause for the entire issue.
11          THE COURT:  Ambiguity given to the trustee?
12          MR. HUEBNER:  Yes.  Under Section 1010.
13          THE COURT:  Yes.  I have that.
14          MR. HUEBNER:  Thank you, your Honor.
15          Your Honor, they're right.  He kept citing 316 all
16     throughout his entire argument to you after having admitted in
17     the first two minutes that it didn't apply.
18          But let's assume that the TIA did apply.  There's lots
19     of cases and even their own law review articles make it clear
20     that bankruptcies override because of the reality recognized by
21     Judge Hardin that it is not the trustee that took away
22     principal and interest, it not the settlement agreement that
23     compromised their right to payment; it's Delta's Chapter 11 and
24     Delta's rejection power.

                              Page 57

752ndeln.txt

25          So your Honor was quite right to ask Mr. Shore that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀
                                                          63
752ndeln                    Argument


 1   there is no indenture, there is no supplemental indenture,

 2   there is no amendment to the guarantee, there is no amendment

 3   to the indenture.

 4          That's right, your Honor.  The documents have been

 5   shattered by Chapter 11.  What the trustee did with extreme

 6   diligence was negotiate for the best possible recovery in light

 7   of the reality.

 8          This settlement agreement does not take away principal

 9   and interest.  Delta's insolvency and statutory rights as the

10   only economic obligor on this document did that on September

11   14, 2005.

12          Your Honor, before I forget, I want to hit this point,

13   they try to separate jurisdiction from, quote, power.

14          THE COURT:  You are just about out of time.

15          MR. HUEBNER:  I would note that Drexel and Manville

16   and this court's ruling in Bartel and Metromedia, they all say

17   that true third-party releases, not the kind we have here, are

18   in many circumstances A-OK.

19          So, since what we have here is a much more moderate

20   subset of third-party release, as set forth in our papers,

21   clearly the Second Circuit and this court believe that once

22   there is jurisdiction, there is, quote, power to enter into

23   arrangements of this nature because those courts and this court

24   all so found without pointing to a specific code provision.

25          Your Honor, the last thing that I think I would like

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

752ndeln.txt

752ndeln                    Argument

1    to hit is -- I will skip over the fourth factor which is the
2    public interest because I think that, frankly, the other
3    parties have a lot to say and are probably the more logical
4    spokesmen about aviation and the traveling public and the
5    governmental interest and all that.
6          Let me just go all the way to the bond, because while
7    we think that they have no entitlement to a stay and they meet
8    none of the four factors, let alone all four, the simple
9    reality is that the nature of a bond is to protect the other
10   side, to protect us from our potential losses.
11         In fact, the case that they quote to your Honor more
12   times than any other, the Adelphia decision, states clearly
13   that, "The court should set a bond at or near the full amount
14   of the potential harm to the nonmoving parties."
15         The fact that their harm is very small probably shows
16   that they certainly don't deserve a stay when one puts the two
17   sides on a scale.
18         THE COURT:  OK.  I have your argument on the bond.
19         MR. HUEBNER:  With that, your Honor, I will have
20   concluded.
21         THE COURT:  OK.  There are several other parties if
22   any of you would like to address me, briefly.
23         OK.
24         MR. BOTTER:  Good evening, your Honor.  David Botter
25   with Akin Gump Strauss Hauer & Feld on behalf of the Post

752ndeln                    Argument

752ndeln.txt

1    Effective Date Committee.

2         The Post Effective Date Committee is the successor to

3    the official committee of unsecured creditors in the Delta

4    Chapter 11 cases.  Your Honor, the committee during those cases

5    represented the holders of approximately $15 billion of

6    unsecured claims in Delta and its affiliates.

7         In reaction to some of the things Mr. Shore said

8    today, I can tell you that probably every single one --

9    actually, I can tell you certainly every single one of those

10   unsecured creditors would like to have received payment in

11   full.

12        Unfortunately, that is not happening in the Delta

13   case.  I can tell your Honor that there is a major subset of

14   those creditors that were counterparties to executory contracts

15   with the debtors, and I can tell you with certainly as well,

16   your Honor, that every single one of those counterparties to

17   those executory contracts, just like Mr. Shore said, wanted

18   their leases to be assumed.

19        And unfortunately, your Honor -- or fortunately --

20   part of the fiduciary duty of the debtors in a chapter 11 case

21   as well as a creditor's committee is to examine those types of

22   executory contracts and to make a determination where it is

23   appropriate for a debtor to use the power authorized by

24   Congress under Section 365.

25        That is exactly what Delta and the committee did in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

⚲

                                                              66

752ndeln                    Argument


1    this case with respect to this particular contract.  They

2    reviewed the contract, and they reviewed the rates and they

3    said these rates are too high.  And Delta exercised its power

752ndeln.txt

4    under Section 365 as authorized by Congress and it sought

5    rejection of that contract.

6           As happens in every major Chapter 11 case that has

7    ever occurred, there was a settlement conversation that

8    followed the filing of that motion, and Delta entered into a

9    settlement conversation to adjust its rates to market rates

10   under the contract, to do exactly what Congress intended it to

11   do when it authored Section 365 of the Code.

12          That's what happened here.  They negotiated the better

13   deal by virtue of their rejection power under Section 365 of

14   the code.

15          Your Honor, the airline business is a very difficult

16   business.  I think we have all seen over the last bunch of

17   years many, many bankruptcies.  Obviously, it is even more

18   difficult to be a creditor of a major airline.  As a result of

19   incredibly easy access to information through the Internet,

20   airline pricing has become completely transparent.  It's a

21   commodity.  Airline tickets are commodities now.

22          What we've learned over the last couple of years is

23   that, for an airline to be successful in this type of

24   environment, that they have to cut costs.

25          Delta had a very successful Chapter 11.  They cut a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀
                                                              67

752ndeln                    Argument

1    lot of costs.  And my clients, who will be the new owners of

2    Delta Airlines tomorrow, will be the beneficiaries of the

3    successful cost cutting of Delta Airlines.

4           THE COURT:  The issue on the appeal and the likelihood

5    of success on the stay is whether there were errors made by the

Page 61

752ndeln.txt

6   bankruptcy judge which warrant reversal on appeal and there is

7   a sufficient likelihood of success on those claims to warrant a

8   stay.  I am really not being asked on the stay to examine the

9   entire economics of the airline industry and the complicated

10  difficulties that airlines and their creditors are facing today

11  and over the coming years.

12      MR. BOTTER:  Your Honor, I will cut to the chase that

13  was leading to the argument with respect to the one factor that

14  I want to talk about, which is substantial harm to the new

15  owners of reorganized Delta.  That is that substantial harm --

16  your Honor recognized the volatility of the stock question.  I

17  won't talk about that at all, although that is harm to my

18  creditor constituency as well.

19      The substantial harm that I would like to talk about

20  is uncertainty.  Despite the fact that people have talked about

21  a ten-week stay period for this appeal, there will be

22  uncertainty with respect to Delta's second largest hub.

23      That uncertainty will have an impact on the value of

24  the distribution made to my creditor body.  That is harm, your

25  Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                          68
752ndeln                      Argument


1       Additionally, your Honor, what I was trying to talk

2   about, when I talk about the commodity nature of the airline

3   business, when there is uncertainty the public is frightened.

4   What we have learned throughout all of this case is that the

5   public and travel agents when they are making their

6   reservations to fly on an airline will say there could be a

7   problem with Delta's occupancy.

8       THE COURT:  The only risk is if the bankruptcy court

752ndeln.txt

9    got it wrong.  If the bankruptcy court got it wrong, why

10   shouldn't there be that risk?  The alternative is to deny

11   rights to appeal from an incorrect decision.

12          So you ask that in the name of certainty we deny

13   appellate rights to a party that says the lower court was

14   wrong?;,  So cut off the rights to appeal and let the wrong

15   decision prevail in the name of certainty?

16          MR. BOTTER:  Your Honor, I think what we have heard

17   today is that with respect to the likelihood of success I think

18   that the much stronger argument is on the Delta side of the

19   table.

20          So, in terms of certainty, what we are looking at here

21   is the impact and the harm.  What I am just speaking to is the

22   harm to Delta in a situation where it appears as though the

23   bankruptcy court made the right decision.

24          If in fact you stay this decision, what I have a

25   problem with is not only do I lose value as a result of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

69

752ndeln                    Argument

1    volatility, but I also lose potential value because customers

2    may not be willing to book on Delta through Cincinnati.

3          That is potentially substantial lost revenue and a

4    substantial loss in the public eyes of Delta's franchise out of

5    Cincinnati.

6          Delta did exactly what it was supposed to do.  It

7    renegotiated rates to make market rates in Cincinnati, to

8    continue flying out of Cincinnati.  That's what the public

9    believes.

10          If your Honor finds, as I think we have all heard, as

752ndeln.txt

11    I said, that the likelihood of success is de minimus on the

12    bondholder' side, then the harm is not going to be de minimus

13    on our side.  It's substantial and real.

14         That's the only point I was make trying to make, your

15    Honor.  Thank you.

16         THE COURT:  Thank you.

17         MR. KANNEL:  Good evening, your Honor, William Kannel

18    for UMB bank.  I will be mercifully brief.  If I go up to ten

19    minutes, please shut me up.

20         Point number one, on likelihood of success on the

21    merits or substantial possibility of success on appeal,

22    whatever the standard du jour is, I am not going to take your

23    Honor through the trust indenture.  I am going to point out

24    this is a settlement done in bankruptcy, and what the

25    appellants are arguing, that in bankruptcy bonds cannot be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                         70

752ndeln              Argument

1    restructured with a hundred percent unanimous written consent,

2    we disagree with that.

3         In fact, if you look at the legislative history of the

4    Trust Indenture Act, which isn't applicable here, but which is

5    instructive because it's what is replicated in 9.06 of the

6    indenture, the point of that provision is to push restructures

7    like this toward judicial scrutiny.

8         That's exactly what happened here.  Your Honor, what

9    happened below is the trustee brought with Delta to the

10    bankruptcy court a settlement.  The trustee would not

11    consummate the settlement unless it got a finding from the

12    bankruptcy court that the settlement was fair and reasonable to

13    all bondholders.  We were more than happy to be told that we

752ndeln.txt

14    were wrong and get the judge to buy into a better recovery for

15    bondholders.  That would have been delightful.

16         THE COURT:  Do you agree on behalf of the trustee that

17    if I stayed the decision of the bankruptcy judge, any of the

18    parties to the settlement agreement have the right to walk

19    away?

20         MR. KANNEL:  I agree that Delta or committee could

21    make that argument.  Frankly, that scares the hell out of me

22    because I think this is a good deal for the bondholders.

23         THE COURT:  What's your position?

24         Mr. Huebner told me that all of the parties who

25    negotiated this are in the room and they would all say that the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀
                                                            71
752ndeln                    Argument

1     interpretation of this provision means that if there is a stay

2     anyone can walk away?

3          MR. KANNEL:  We agree with Mr. Huebner that the

4     definition of final order is as your Honor read it and as he

5     reads it.  That is, We were very concerned in negotiating the

6     settlement.  A large portion of the value to the bondholders

7     was the distribution of the stock when the tens of thousands of

8     other creditors got the stock, and that we didn't want to be

9     held up by a rogue appeal, especially after a finding that the

10    settlement was fair and reasonable.

11         THE COURT:  And that if there is a stay that

12    constitutes a modification on appeal so that it triggers the

13    ability of each of the parties to walk away?

14         MR. KANNEL:  I think that is an argument that Delta

15    could make and we could make if we chose to do so.

**Page 65**

752ndeln.txt
16          THE COURT:  Yes.  But I think Mr. Huebner said he was
17   quite confident that any of the parties could terminate, walk
18   away.  You say you are quite confident that any party could
19   make that argument, which is --
20          MR. KANNEL:  Your Honor, I think we can terminate.
21          THE COURT:  I'm sorry?
22          MR. KANNEL:  I think we can terminate.
23          THE COURT:  And they can terminate?
24          MR. KANNEL:  And they can terminate if the closing
25   date doesn't happen.

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
♀                                                              72
     752ndeln                    Argument

1           THE COURT:  OK.
2           MR. KANNEL:  Your Honor, back to likelihood of success
3    on the merits, in bankruptcy it can't be that a single
4    bondholder can derail a settlement which has received judicial
5    scrutiny and been upheld as fair and reasonable.
6           Let me talk very briefly about harm to them.  What
7    they want, if you take them at their word, is an opportunity to
8    relitigate the issues that have been settled, in other words,
9    to come in after a year of negotiation of which they were on
10   notice and basically say that trustee got it wrong and the
11   court got it wrong.
12          I think that their ability to do better on the
13   settlement is remote or speculative at best and not the sort of
14   harm that should result in a granting of the stay.
15          On the other hand, and I will talk about this briefly
16   because I think your Honor clearly understands it, it was given
17   the definition of closing date and given what we've just talked
18   about in colloquy, a very important part of the consideration
                          Page 66

752ndeln.txt

19    that this plan, consideration which is the bulk of the

20    settlement, the $260 million claim be paid when other creditors

21    get it.

22            Frankly, your Honor, that is all I have.

23            One other point, your Honor.  I will confirm for you

24    that at least from UMB's perspective the releases are a

25    critical and integral part of the settlement, and the repeated

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

                                                                    73
752ndeln                    Argument

 1    threats, whatever the motivation is, in the last round of

 2    briefing makes that only more clear.

 3            Thank you, your Honor.

 4            THE COURT:  OK.  Thank you.

 5            MS. MELNICK:  Thank you, your Honor.  Very, very

 6    briefly Selinda Melnick of Edwards Angell Palmer & Dodge for

 7    the Kenton County Airport.

 8            THE COURT:  Before you begin, I should mention I did

 9    mention on the phone call and I should have mentioned at the

10    beginning that I know people in all of your firms.  I don't

11    believe I know any of the lawyers who have appeared here.  I

12    know people in all or almost all of your firms, and nothing

13    about that affects anything that I do in the case.

14            But go ahead, Ms. Melnick.

15            MS. MELNICK:  Thank you.

16            I'm sure the firm will be happy to know that they have

17    been heard of.

18            Your Honor, to go directly to your question about the

19    effect of the stay, I believe that the stay does give any of

20    the parties the right to walk away for the simple reason that

Page 67

752ndeln.txt

21   granting the stay undoes the settlement.  There is no

22   settlement with a stay for all of the reasons that have been

23   mentioned and more.

24        The reality is that's what the 10 percent bondholder

25   committee wants.  They want a stay here because, once they have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

74

752ndeln                    Argument

1    a stay, there is no settlement agreement.  In effect, a stay

2    breaches the settlement agreement.  It eviscerates it, it

3    obviates it on so many different levels.

4         Particularly in addition to the obvious effect of May

5    3, with respect to the releases, clearly bargained for,

6    considerable consideration given for them, perfectly legal,

7    perfectly appropriate, perfect jurisdiction and power to grant

8    them in this instance, and without the release there no

9    settlement agreement.

10        So to stay the effect of the release, i.e., to permit

11   suit to be brought against any of the parties potentially other

12   than Delta obviously effectively dissolves the settlement.

13        There wouldn't be releases anymore.  They would be

14   stayed.  The purpose of the release would go away.  In fact,

15   your Honor, on the issue of the releases, yes, they are

16   absolutely crucial, but they also bring to mind another point

17   that was made by appellants here that I think deserves a little

18   bit of consideration, and that is their argument on the

19   jurisdiction and power side effectively that there is no tie of

20   the releases and the nondebtor parties to Delta.  It is totally

21   independent and, therefore, there is no jurisdiction.

22        Well, if they felt that there was no tie, the airport

23   and of the indentured trustee to Delta, it raises the question

Page 68

752ndeln.txt

24    about why when they knew about the settlement being reached

25    even before the motion for approval.  The 9019 motion was filed

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

75

752ndeln                    Argument

1    by Delta, why they didn't go out to a court and seek to enjoin

2    the airport or the indentured trustee from entering into that

3    settlement agreement, from putting pen to paper.  Because if

4    it's not tied to Delta and it's not related to Delta's

5    bankruptcy, they weren't stayed from doing that.

6           By not doing that, if they truly believe that that's

7    the case, rather than using it as an interesting argument here,

8    potentially they've waived the right to sue those parties.

9           That's just one major point, your Honor.

10          THE COURT:  There would be an argument of laches

11   perhaps.

12          MS. MELNICK:  Yes, exactly.  That's the exact point,

13   is laches.

14          The last thing, your Honor, very briefly is -- the

15   other parties have touched on it.  The prepaid rent, the $85

16   million note is definitely consideration that KCAB is giving

17   and allowing to occur with no payments to it.  It is in the

18   nature of prepaid rent.  It is a settlement.

19          Again, what we're dealing with here is a settlement of

20   the issue of whether or not there were relet obligations and to

21   what extent there are relet obligations.  The parties differ on

22   that issue.  This is a settlement of it.

23          Indeed, as Delta and the others have shown, that

24   settlement amount far exceeds the rent that would otherwise be

25   attainable if any rent would be obtainable on a relet there.

**Page 69**

752ndeln.txt

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

76

752ndeln                    Argument

1          The underlying record is clear.  The argument before

2      the Court below is clear, that there was not a possibility for

3      relet and definitely not a possibility for relet to any other

4      party at an amount that in any way bore any relationship to

5      what is left owing on the bonds, even if the airport, which it

6      does not, and the property of the airport, which it does not,

7      had any obligation with respect to those bonds.

8          Thank you, your Honor.

9          THE COURT:  OK.  Thank you.

10         Very brief reply.

11         MR. SHORE:  Thank you, your Honor.

12         Let me first deal with the issue on the settlement

13     agreement and the walk rights, because I don't think anybody

14     was answering your Honor's question.

15         THE COURT:  On the contrary.  Each of them did.

16         MR. SHORE:  But then they put qualifications in the

17     end.

18         THE COURT:  No.  Each one took away the qualification.

19         In fact, it was only Mr. Kannel who I think started

20     with some qualifications, and after further questioning and

21     considering his position became quite unqualified.

22         Each of the parties to the settlement agreement takes

23     the unqualified position that if the stay is entered under the

24     agreement, they all have the right to walk away.

25         MR. SHORE:  OK.  I heard the answer to that question

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

77

Page 70

752ndeln.txt
752ndeln                        Argument

1   came in, if the closing date does not occur.  OK.

2         THE COURT:  OK.

3         MR. SHORE:  But under the terms of the agreement, the

4   terms of the agreement, the closing date doesn't occur if the

5   order is not final.

6         THE COURT:  They were all unequivocal really, that if

7   there is a stay such that there is no closing tomorrow, May 3,

8   if there is a stay such that the securities to which the

9   bondholders would otherwise be entitled tomorrow is not made,

10  each of them takes the position they can walk away.

11        That's understandable.  It may be parties may have

12  some different interests, but at the very least the bondholders

13  and the trustee for the bondholders may see the value of the

14  deal crater, as they say, and not to take the position that

15  they have no recourse except to wait for the Court to get

16  around to deciding this appeal, that they are just stuck with

17  consideration that may not be the consideration that they

18  agreed to, not to take the position that they could walk away

19  would be in its own way remarkable.

20        Isn't that right?

21        MR. SHORE:  That doesn't make the agreement support

22  their claim.

23        THE COURT:  OK.

24        MR. SHORE:  If the agreement says that for a closing

25  date to occur -- let's go back to what counsel for the debtor

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                        78
752ndeln                        Argument

1   said.

                          Page 71

752ndeln.txt

2          He said, well, we have an obligation to deliver the
3     stock on the closing date.
4          4.01 says the opposite.  It says your executory
5     obligation, other than 3.02 and 4.03, doesn't become effective
6     until the settlement order becomes final.  So that these
7     parties would stand up and say to your Honor, doom and gloom, I
8     have the right to walk, not one of them saying I will walk, but
9     saying I have the right to walk --
10          THE COURT:  I explored with them the definition of
11     finality.  In fact, it was an issue when I read the agreement
12     that appeared to support exactly what they said.  Strange as
13     this definition of finality may be, their definition of
14     finality in this agreement provides for finality based upon the
15     filing of an appeal and the failure to have a stay.
16          MR. SHORE:  Right.
17          The debate we got into was a question of, back and
18     forth in our respective arguments was a question of whether
19     right now, without a stay being issued, there is a final order.
20          I agree with you.  This provision -- the debtor is
21     going to have to come to its own conclusions because it has an
22     order that says that you can do this.  As to whether or not it
23     is final, that's their own burden to take up, but the issue
24     there is whether it's final now.
25          If it is not final now, we can stop talking about a

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              79
     752ndeln                    Argument

1     stay or anything else.  They can't close unless they all agree
2     to waive the condition.
3          The issue now, though, is, if a stay is issued, there
4     is no reading of finality that says that the order is final.
                            Page 72

752ndeln.txt

5          I think your Honor just said it.  If a stay is issued,
6    there is no final order.  If there's no final order, nobody has
7    an obligation to deliver on the closing date, and if you turn
8    to the termination provisions, nobody has a right to walk until
9    July 15.
10          So they took your Honor's invitation to get into a
11   question with respect to is it final now with just the appeal
12   pending and have tried to turn that into, if a stay is entered,
13   the order still becomes final.
14          That's wrong.  If the stay is issued, the order isn't
15   final.  Nobody has to do anything, and nobody can walk until
16   July 15.  That they would come up here and tell you, oh, I can
17   claim the right and I have the right to walk if it's contrary
18   to the agreement, that's not the responsibility of the
19   bondholder.
20          If they want to violate their own agreement and all
21   agree that that we can change the terms of the agreement to
22   close this deal or all agree to walk away, that doesn't become
23   the responsibility of the party who obtained the stay of the
24   order approving this deal.
25          THE COURT:  OK.  Briefly.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                            80
752ndeln                    Argument

1          MR. SHORE:  The next issue with respect to relet
2    rights, just so your Honor knows, it is in the facility
3    agreement.  It is 8.07 of the facility agreement if your Honor
4    wants to look at it.
5          The problem we have with a couple of things -- again,
6    it is an issue coming up on appeal.  The testimony was very

                            Page 73

752ndeln.txt
7    clear from the CEO of KCAB, when the question was asked:

8         "Now I understand what you have all done, so let me

9    ask it this way.  In approaching these other airlines about

10   using the facilities here in Cincinnati, have you done so in

11   the context of Delta leaving and presenting them with the

12   possibility of having the complete use of terminal B as a hub

13   or the gates of terminal B that were paid for with the proceeds

14   of the bonds?

15        "No."

16        So the concept that what ended up happening here was

17   this is the best deal we can get is disputed.  I don't want to

18   sit down here today with your Honor thinking that what they did

19   with respect to the relet proceeds or what Judge Hardin did, he

20   said very clearly in his opinion, or in his discussion of the

21   stay really, he said, I didn't look at the relet issue.  That

22   is not an issue.  I was not here to make a determination with

23   respect to relet rights, because that's not part of the 9019.

24        So when somebody stands up and says this was an issue

25   for Delta, for the judge to resolve, that is not correct.  When

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

81

752ndeln                    Argument

1    counsel for the debtor says, our only right, the reason this is

2    so important, and the reason why this is a bankruptcy, which

3    allows us to do this is because really everybody knows your

4    only right here is to get a lease payment from Delta, that's

5    not right.  The right here is to get rental proceeds from

6    whoever is renting that.

7         If Delta went out of business five years ago and there

8    was someone in here renting the terminal we would be getting

9    those proceeds.  It wouldn't be related to the fact that Delta
Page 74

752ndeln.txt

10    was the original party to the lease.  The mere fact that they

11    are a party to the lease now doesn't turn the issuer into a

12    debtor.

13          There are times when you prepack a bond issuer because

14    you can't get unanimous consent.  You all agree and you go in

15    and you use the provisions of 1129 to cram it down.

16          THE COURT:  OK.  There's no question this isn't that.

17          So go ahead.  Finish up.

18          MR. SHORE:  To say that it is nonrecourse and

19    therefore Delta is the issuer, is to -- which is essentially

20    what's going on here.  There is a way to do that, your Honor.

21    It was done in the United Airlines bankruptcy in a case that

22    was cited to you.  It's called a lease recharacterization.  You

23    say really, the rental stream I was paying you was just

24    servicing rent.  I, Delta am the issuer of these bonds.

25          MS. MELNICK:  Objection, your Honor.  We're dealing

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀
                                                                    82
752ndeln                    Argument

1    with the settlement.  This is not an appeal of a decision yea

2    or nay on relet rights.  It is a settlement.

3          THE COURT:  All right.  Finish up.

4          MR. SHORE:  My point being that there is no precedent

5    for because a debt is nonrecourse and is only at this time

6    against the assets of the debtor, that makes it a matter for

7    the bankruptcy court to deal with.

8          The way you get a bankruptcy court to deal with an

9    issuer is the issuer files.  That's how you deal with it.  So I

10    come to the end, and I will just say it because I haven't heard

11    it, nobody has said to your Honor, they didn't say below, they

Page 75

752ndeln.txt

12    haven't said in their papers, they can't say today what

13    statutory provision was the bankruptcy court operating under

14    when he made a declaration that everything here is perfectly

15    OK, that an injunction can issue, and that we can be coerced

16    into giving releases to our indentured trustee and issuer.

17    They didn't cite anything.

18              THE COURT:  OK.

19              Thank you.

20              I appreciate the arguments.  I'm going to take five

21    minutes.

22              Then I will be back.

23              (Recess)

24              (Continued on next page)

25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                83
♀
       752ndeln                    Decision


 1

 2              THE COURT:  Good afternoon, all.

 3              All right.  I am prepared to decide.

 4              I appreciated the briefing and the arguments.

 5              The appellants, a group of Bondholders who hold

 6    approximately $50 million in face amount of bonds issued by the

 7    Kenton County Airport Board ("KCAB") pursuant to a 1992 Trust

 8    Indenture, bring this motion for a stay pending appeal of a

 9    settlement order entered by the United States Bankruptcy Court

10    for this district approving a settlement among Chapter 11

11    debtor, Delta Airlines, KCAB, and UMB Bank, N.A. as trustee for

12    the Bondholders under the 1992 Indenture.  The appellants

13    objected to the proposed bankruptcy court order approving the

14    settlement, but after limited expedited discovery and extensive

752ndeln.txt

15    argument, the Bankruptcy Court entered the settlement order at

16    issue here on April 24, 2007, with a written decision following

17    on April 25, 2007.  The appellants immediately filed a notice

18    of appeal and a motion requesting an expedited appeal.

19            On April 26, 2007, the appellants orally moved the

20    Bankruptcy Court for a stay pending appeal, and the Court

21    denied that motion orally with a formal order denying the

22    motion following on April 27, 2007.  The appellants now move

23    this Court by way of an Order to Show Cause why a stay pending

24    appeal pursuant to Federal Rule of Bankruptcy Procedure 8005

25    should not be issued.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

84

752ndeln                    Decision

1            In considering a stay pending appeal of a bankruptcy

2    order, the Court applies a four factor test involving: (1)

3    whether the movant will suffer irreparable injury if the stay

4    is denied (2) whether the nonmoving parties will suffer

5    substantial harm if the stay is granted, (3) whether there is a

6    strong likelihood, or alternatively, a substantial possibility

7    of success on the merits of the appeal, and (4) whether a stay

8    is in the public interest.  See In Re Adelphia Communications

9    Corp., No. 02-41729 M47, 2007 WL 186796, at *4 (S.D.N.Y.

10   January 24, 2007) (citing Hirschfeld v. Board of Elections, 984

11   F.2d 35, 39, (2d Cir. 1993)); In Re Bogdanovich, 00 Civ. 2266

12   2000, WL 1708163, at *3 (S.D.N.Y. November 14, 2000).  These

13   factors are considered in turn, giving each its due weight in

14   determining whether the Court's equitable power to issue a stay

15   is warranted.

16           First, the appellants have failed to show a sufficient

Page 77

752ndeln.txt

17    likelihood of irreparable harm, though there may be the

18    possibility of some harm if the stay is denied.  The appellants

19    argue primarily that a denial of a stay may render their appeal

20    subject to dismissal as equitably moot because Delta could

21    begin making distributions under the terms of the settlement

22    agreement as early as May 3, 2007, and after those

23    distributions the Court would be unable to fashion a remedy

24    should the appeal succeed.  However, the appellant stated to

25    the Bankruptcy Court and have repeated in these proceedings

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

85

752ndeln                    Decision

1     that they do not believe their claims against KCAB, the

2     trustee, and any other nondebtors are likely to be dismissed as

3     equitably moot.  (See April 26, 2007, Bankruptcy Court Stay

4     Hearing Transcript at 6, attached as Exhibit A to declaration

5     of Andrew Dean, May 1, 2007).  Their equitable mootness

6     argument therefore appears to pertain only to their claims

7     against the debtor Delta.  However, the appellants have not

8     pressed arguments on the merits, at least in their papers,

9     against Delta on this appeal because they assert in their reply

10    that they "are now not seeking to recover principal and

11    interest on the bonds from the Airport or Delta . . ., but

12    rather to sue for a breach of Sections 9 and 12 of the

13    Indenture by the Airport and the Trustee."  (Appellants Reply

14    Memo of Law at 7).   Indeed, the appellants suggest as possible

15    relief that this court enter an order staying the provisions of

16    the settlement order that delivers a release to the Airport and

17    the Trustee.  (Appellants' Brief at 4.)  Moreover, it is worth

18    noting that if the appellants succeeded in their argument that

19    the Bankruptcy Court lacked jurisdiction to enter the

Page 78

752ndeln.txt

20  settlement order, it is unlikely that their appeal would be

21  moot.  Therefore, the argument that the appellants would be

22  irreparably harmed if the stay is denied because their appeal

23  would be rendered equitably moot is a weak one.

24       The appellants' argument for irreparable harm is also

25  speculative.  See In Re Bogdanovich, 2000 WL 1708163 at *6 ("To

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86

752ndeln                Decision

1  establish irreparable harm, a party must demonstrate 'an injury

2  that is neither remote nor speculative, but actual and

3  imminent'" (quoting Tucker Anthony Realty Corp. v. Schlesinger,

4  808 F.2d 969, 975 (2d Cir. 1989)).  To the extent that the

5  plaintiffs are attempting to argue that the value of their

6  investments has been diminished or harmed in some way or will

7  be harmed during the pendency of the appeal, there is no such

8  showing.  If the appellants' appeal succeeded, it would lead to

9  further litigation, but the appellants have not established

10  that this strategy would likely result in a more favorable

11  settlement for them.  In fact, the Trustee and the majority of

12  Bondholders who supported the settlement have argued without

13  substantial contradiction that the settlement provides fair and

14  reasonable consideration.  The appellants have therefore failed

15  to establish that a denial of the stay would make them worse

16  off economically.  In any event, they have made no showing that

17  any loss of economic benefit would be "irreparable."

18       Second, the parties resisting this motion have made a

19  persuasive showing that they would suffer substantial harm if a

20  stay pending appeal were granted.  A stay would deprive the

21  Bondholders of a substantial benefit of the settlement that

Page 79

752ndeln.txt
22  would allow them to receive a substantial distribution of
23  securities from Delta on May 3, 2007, the same date that other
24  creditors would receive distributions under Delta's approved
25  reorganization plan.  And therefore, to avoid future market

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

87

752ndeln                Decision

1   risk, Delta and the other parties opposing this motion have
2   argued compellingly that the value of these securities could
3   decrease after the bulk of the distributions to other creditors
4   take place and, therefore, that the Bondholders could lose a
5   substantial portion of their bargained for value under the
6   settlement agreement.  In any event, the Bondholders bargained
7   for the right to have their securities and to be able to decide
8   whether to keep them or sell them.  Any stay would deprive them
9   of that consideration by holding up the distribution of their
10  securities.
11          Furthermore, each of the parties to the settlement
12  agreement, who all oppose the stay, maintain that under the
13  settlement agreement each of those parties can terminate the
14  settlement agreement if there is a stay.  That is at least a
15  plausible argument under the settlement agreement, and the
16  enormity of that consequence would be irreparable injury.
17          While the severity of the risk that the settlement
18  could be imperiled by a stay is unclear at this stage, any risk
19  that the settlement could dissolve presents the possibility of
20  a substantial harm because the settling parties agree that the
21  negotiated settlement is in the best interests of both Delta
22  and the Bondholders.
23          The substantial harm to the Bondholders that would
24  result from their inability to monetize their stake of the

Page 80

752ndeln.txt

25     distribution immediately and thereby avoid market risk together

♀

88

752ndeln                Decision

1     with a possibility that the settlement itself could fall apart

2     weighs against the grant of a stay.

3          The appellants raise the possibility of granting less

4     onerous relief by staying only the portion of the order

5     delivering releases of claims against KCAB and the trustee, or

6     by specifically putting KCAB and the trustee "on notice" that

7     their releases are subject to vacatur on appeal regardless of

8     whether the settlement has closed.  The first alternative would

9     result in the alteration of a material term of the settlement

10    and would contravene Section 3.01 of the Settlement Agreement,

11    which provides that all provisions of the settlement agreement

12    are essential and nonseverable.  Staying only some terms would

13    likely require staying the entire agreement and indeed imperil

14    the carrying out of the Settlement Agreement.  The second

15    alternative would amount to an advisory opinion and is plainly

16    inappropriate at this stage.  All parties are free to research

17    the law and assess their legal positions.  Neither alternative

18    can prevent the risk of substantial harm to the Bondholders and

19    the other settling parties.

20         Third, having reviewed the Bankruptcy Court's thorough

21    decision approving the settlement agreement, the Court finds

22    that the appellants have failed to establish a likelihood of

23    success on appeal.  The appellants' argument that the

24    Bankruptcy Court lacks subject matter jurisdiction to enter the

25    settlement order is undercut by their concession in the

752ndeln.txt
(212) 805-0300

1    Bankruptcy Court's April 19, 2007, hearing on the motion to

2    grant the Settlement Order that the Court had subject matter

3    jurisdiction under 28 U.S.C. Sections 1334(b) and 157 to rule

4    on the motion.  The Bankruptcy Court plainly had jurisdiction

5    under Section 1334(b) to approve the settlement binding

6    nondebtors because the settlement had more than a "conceivable

7    effect" on the bankruptcy estate, as required in this circuit;

8    it in fact had a very clear effect on Delta's obligations.  In

9    Re Cuyahoga Equipment Corp. 980 F.2d 110, 114 (2d Cir. 1992)

10   (citing Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir.

11   1994)); See Also In Re WorldCom Inc. Securities Litigation, 293

12   B.R. 308, 319 (S.D.N.Y. 2003).  The appellants attempt to

13   ignore the centrality of Delta to the indenture because KCAB is

14   named as the issuer, but the Bankruptcy Court found that the

15   indenture along with the associated Lease Agreement and

16   Guaranty clearly show that the bonds are nonrecourse with

17   respect to KCAB and that Delta's rent obligations provide the

18   only source of payment.  (See, e.g., Indenture, Sections 2.05,

19   7.01, attached as Exhibit G to Dean Declaration; Lease

20   Agreement, Section 4.03, attached as Exhibit H to Dean

21   Declaration.)

22           As the Bankruptcy Court explained, both KCAB and the

23   Bond Trustee are direct creditors of Delta, KCAB based on the

24   lease and the trustee based on Delta's guarantee of the lease,

25   which is the only source of funding for the bonds.  All three

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

752ndeln.txt

1    of the agreements are inextricably related to each other, and
2    the settlement resolves the claims among the parties arising
3    from Delta's effort to reject the lease in the bankruptcy case.
4            The appellants argue particularly that the Bankruptcy
5    Court lacked jurisdiction to approve the releases of claims
6    against the nondebtors which are contained in Section 3.02(f)
7    of the settlement agreement.  The appellants have failed to
8    establish that this claim is likely to succeed on appeal.  The
9    appellants fail to address cases such as In Re Drexel Burnham
10   Lambert Group, Inc., 960 F.2d 285, 293, (2d Cir. 1992), which
11   have allowed releases of claims against third parties where
12   those releases played an important part in a debtor's
13   reorganization plan.  See Bartel v. Bar Harbor Airways, Inc.,
14   196 B.R. 268, 274 (S.D.N.Y. 1996).  The appellants' reliance on
15   In Re Metromedia Fiber Network Inc., 416 F.3d 136 (2d Cir.
16   2005) is misplaced.  Unlike the releases in Metromedia, the
17   releases of claims against KCAB, Delta, and the Trustee at
18   issue here are narrowly drawn and are necessary to prevent
19   relitigation of precisely the claims that were negotiated and
20   resolved by the Settlement Agreement.  It is furthermore clear
21   that the releases at issue comprise valuable consideration for
22   KCAB and the Trustee in return for their agreement to give up
23   indemnification rights against Delta and therefore the
24   releases.  Therefore, the releases are of the kind that
25   Metromedia would consider as acceptable.  Moreover, the

♀

752ndeln                Decision

1    releases are part of the Settlement Agreement that was entered
2    into by the Trustee on behalf of the Bondholders.  The Trustee

752ndeln.txt

3    was authorized to settle claims by the majority of the

4    Bondholders pursuant to the terms of the Indenture.  Therefore,

5    the releases were consensual releases which were recognized as

6    authorized in Metromedia.  See Metromedia, 416 F.3d at 142.

7         To the extent that the appellants argue that the

8    so-called nonimpairment provision of the Indenture barred the

9    Bankruptcy Court's actions, its position is unlikely to succeed

10   on appeal.  Taking a full view of the Indenture's provisions,

11   it appears likely that the Bankruptcy Court correctly found

12   that the indenture did not bar it from approving the

13   settlement, particularly in view of the agreement by the

14   Trustee at the direction of a majority and principal amount of

15   the Bondholders to enter into the settlement, and the approval

16   of the reorganization plan, which incorporates the settlement

17   agreement by a large majority of the Bondholders.

18        The Bankruptcy Court was also likely correct in

19   finding that any impairment of the Bondholders' ability to

20   receive payment within the meaning of Section 9.06 of the

21   Indenture was due to Delta's default and protection under the

22   bankruptcy laws, not any act of the Issuer or Trustee.

23        The Bankruptcy Court was also likely correct that the

24   trustee had the right under Section 9.04 of the Indenture

25   following Delta's default to accept directions from the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

92

752ndeln                Decision

1    majority of the Bondholders and that it was authorized to do so

2    on behalf of all Bondholders.

3         Finally, the pubic interest factor weighs heavily in

4    favor of denying the stay.  It is undisputed that the public

5    interest favors the expedient administration of bankruptcy

Page 84

752ndeln.txt

6    proceedings.  In Re Savage and Associates, P.C., 05 Civ. 2072

7    2005 WL 488643 at *2 (S.D.N.Y. February 28, 2005.)  See Also In

8    Re Metiom Inc., 318 B.R. 263, 272 (S.D.N.Y. 2004).  The

9    overwhelming number of Bondholders have approved the

10   settlement.  There is no dispute that the settlement is in the

11   best interests of Delta.  The appellees also argue persuasively

12   that the settlement is in the best economic interests of the

13   Bondholders, and the appellants have avoided making any

14   substantial argument that the settlement is not in the best

15   economic interests of the Bondholders.  The appellants stand

16   only on their asserted legal rights to object to the

17   settlement, which rights are unlikely to be recognized.

18   Moreover, the appellants have not provided any compelling

19   support for their argument that this settlement would result in

20   any instability in the financial markets.  Rather, the

21   substantial approval of the settlement and the plan reflect the

22   fact that other participants in the process do not share their

23   evaluation of the settlement.

24           Furthermore, the equities tip decidedly against the

25   appellants in view of the fact, apparent from their April 25,

                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

♀
                                                              93
     752ndeln                    Decision

1    statement pursuant to Bankruptcy Rule 2019, that the

2    overwhelming number of the appellants' bonds were bought after

3    Delta entered into bankruptcy proceedings.  Thus the appellants

4    bought the bonds while they knew the income stream to pay the

5    bonds was imperiled, and they continued to hold the bonds

6    without objection while they were aware that the Trustee was

7    engaged in settlement discussions.

                              Page 85

752ndeln.txt

8          A consideration of all of the factors discussed above,

9    none of which provides considerable support for the appellants'

10   position, leads to the conclusion that a stay pending appeal is

11   unwarranted.

12          The appellant's motion for a stay pending appeal is,

13   therefore, denied.

14          So ordered.

15          To the extent that findings of fact and conclusions of

16   law are required on denying a stay pending appeal, the

17   foregoing constitutes the Court's findings of fact and

18   conclusions of law.

19          So ordered.

20          There are two minor things.

21          I attempted to deal with this as expeditiously as

22   possible so that all of you would have the opportunity to seek

23   other review.  I am sure that you can get the transcript from

24   the court reporter.  What I would do, I will issue tonight just

25   a brief order that says for the reasons stated on the record

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

♀                                                                  94

752ndeln                    Decision

1    the motion for the stay is denied.

2          Rather than to put you all now through the discussion

3    of the timing of the appeal, I am perfectly prepared to listen

4    to an expedited appeal, and you all had agreed without

5    prejudice to timing of the appeal.  Rather than discuss that

6    with you now, would you all simply provide me a stipulation

7    setting out what the timing of the appeal is, and after I get

8    the stipulation I'll set down an appropriate argument date.

9          OK?

10

                            Page 86

752ndeln.txt

11          COUNSEL:  Thank you, your Honor.

12          THE COURT:  OK.  Good afternoon, all.  Thank you again

13    for the argument and your briefs.

14          (Adjourned)

15

16

17

18

19

20

21

22

23

24

25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
  ♀