Hearing Date (if necessary): April 19, 2007 at 2:30 p.m. (prevailing Eastern Time)
Objection Deadline: April 12, 2007 at 4:00 p.m. (prevailing Eastern Time)

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Fax: (212) 450-6539
Marshall S. Huebner (MH 7800)
Sharon Katz (SK 4911)
James I. McClammy (JM 5592)

Attorneys for Debtors and
    Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                                  :

                                                        :    **Chapter 11 Case No.**
                                                        :
**DELTA AIR LINES, INC., et. al.,**                      :    **05-17923 (ASH)**
                                                        :
                                                        :    **(Jointly Administered)**
**Debtors.**                                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY RULE 9019 AND
BANKRUPTCY CODE SECTIONS 105, 363 AND 365 FOR ENTRY OF AN
ORDER (I) APPROVING SETTLEMENT AGREEMENT; (II) APPROVING THE
REJECTION OF CERTAIN AGREEMENTS; AND (III) AUTHORIZING THE
ENTRY INTO CERTAIN NEW AGREEMENTS**

Delta Air Lines, Inc. ("**Delta**") and those of its subsidiaries that are debtors and

debtors in possession in these proceedings (collectively, the "**Debtors**"),[1] respectfully

---

[1] The Debtors are the following entities:  ASA Holdings, Inc.; Comair Holdings, LLC; Comair, Inc.;
Comair Services, Inc.; Crown Rooms, Inc.; DAL Aircraft Trading, Inc.; DAL Global Services, LLC; DAL
Moscow, Inc.; Delta AirElite Business Jets, Inc.; Delta Air Lines, Inc.; Delta Benefits Management, Inc.;
Delta Connection Academy, Inc.; Delta Corporate Identity, Inc.; Delta Loyalty Management Services,

submit this motion ("**Motion**") seeking approval of a settlement agreement (the

"**Settlement Agreement**") pursuant to Federal Rule of Bankruptcy Procedure 9019 and

sections 105, 363 and 365 of title 11 of the United States Code (the "**Bankruptcy**

**Code**"), adopting the Settlement Agreement and incorporating the Settlement Agreement

into Delta's Plan of Reorganization (the "**Plan**"), and authorizing (i) the rejection and

assumption of certain agreements, as outlined more fully below, pursuant to section 365

of the Bankruptcy Code, 11 U.S.C. § 365;[2] and (ii) the entry by Delta into certain new

agreements as contemplated by the Settlement Agreement, pursuant to section 363 of the

Bankruptcy Code, 11 U.S.C. § 363.

### Procedural Background

       1.     On September 14, 2005 (the "**Petition Date**"), each Debtor commenced

with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors

are authorized to operate their business and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Court

has entered an order providing for joint administration of these chapter 11 cases.

### Jurisdiction

       2.     The Court has subject matter jurisdiction to consider this matter pursuant

to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and

---

LLC; Delta Technology, LLC; Delta Ventures III, LLC; Epsilon Trading, LLC.; Kappa Capital
Management, Inc.; and Song, LLC.

[2] Provided the Settlement Agreement is approved, Delta is no longer seeking to abandon any property as
was originally contemplated in the Rejection Motion.

may be determined by the Bankruptcy Court.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Factual Background**

3.      Delta and the Kenton County Airport Board ("**KCAB**") are parties to a Lease Agreement dated as of February 1, 1992 (the "**Facilities Agreement**"), pursuant to which Delta uses or occupies certain facilities (as defined in the Settlement Agreement, the "**Facilities**") at the Cincinnati/Northern Kentucky International Airport (the "**Airport**").[3]  Pursuant to the Facilities Agreement Delta made, *inter alia*, certain biannual payments equal to amounts due on certain special facilities revenue bonds – the $419,000,000 Kenton County Airport Special Facilities Revenue Bonds, 1992 Series A and the $19,000,000 Kenton County Airport Special Facilities Revenue Bonds, 1992 Series B (together, the "**1992 Bonds**", and holders of such 1992 Bonds, as defined in the Settlement Agreement, the "**1992 Bondholders**").

4.      The 1992 Bonds were issued under a Trust Indenture (the "**1992 Bond Indenture**") dated as of February 1, 1992 between KCAB and Star Bank, N.A., predecessor-in-interest to UMB Bank, N.A. as trustee (UMB Bank, N.A. being the "**Bond Trustee**"), pursuant to which KCAB assigned to the Bond Trustee certain of its rights under the Facilities Agreement, including the right to receive payment of certain rentals from Delta under the Facilities Agreement.

---

[3] Capitalized Terms, unless otherwise defined herein, have the meanings assigned to them in the Settlement Agreement.

5.    In addition to the Facilities Agreement, Delta and KCAB are parties to various other agreements governing Delta's use and occupancy of certain facilities and improvements at the Airport.  These include, but are not limited to:  (i) a Terminal Building Complex Ground Lease dated as of February 1, 1992; (ii) a Parking Lot Facility Ground Lease dated as of February 1, 1992; (iii) a Bulk Storage and Dispensing Ground Lease Agreement dated as of December 21, 1970; (iv) a Maintenance and Operations Services Agreement dated as of February 1, 1992; and (v) a Sublease Agreement for the Delta Employee Parking Lot dated as of November 1, 2002, in each case together with all amendments, supplements, other modifications and side letters thereto (all such agreements collectively, the "**Associated Agreements**").

6.    In late 2005, Delta informed KCAB and the Bond Trustee that Delta expected to reject the Facilities Agreement and certain other executory agreements and unexpired leases related to Delta's use and occupancy of the Facilities.  To allow the parties time to negotiate issues associated with the Facilities and Delta's potential rejection, Delta, KCAB and the Bond Trustee agreed to a Stipulation on December 30, 2005 (the "**December 2005 Stipulation**"), that was entered by the Court on January 17, 2006 (Docket No. 1852).  Under the December 2005 Stipulation, the parties agreed to a sixty-day period (the "**Negotiation Period**") "for the parties to attempt to reach a consensual agreement on issues related to the Facilities Agreement and Delta's potential rejection thereof."  Dec. 2005 Stip. at 2-3.  The parties also agreed that any motion filed prior to the expiration of the Negotiation Period to approve the rejection of the Facilities Agreement and various other agreements would, if and when approved by the Court,

result in an effective rejection date of January 19, 2006. Id. On February 17, 2006, the parties agreed to extend the end of the Negotiation Period from March 1, 2006 to May 1, 2006 in order to provide the parties additional time to attempt to negotiate a consensual resolution.

7.      On April 28, 2006, having been unable, as of that time, to negotiate a consensual resolution with the parties as of that date, Delta filed a Motion (Docket No. 2477) (the "**Rejection Motion**") for Entry of an Order Approving the Rejection of the Facilities Agreement, the Associated Agreements and certain other agreements. A list of the agreements to be rejected, as now modified by the Settlement Agreement, is set forth as Exhibit A to the Settlement Agreement (collectively, the "**Rejected Agreements**").

8.      Notwithstanding the filing of the Rejection Motion, the parties continued to negotiate the terms of Delta's continued occupancy of certain facilities at the Airport, and consensually extended the time for KCAB and the Bond Trustee to file Objections to the Rejection Motion. On July 17, 2006, Delta, KCAB, and the Bond Trustee entered into a forbearance agreement (as amended, the "**Forbearance Agreement**"), pursuant to which the parties agreed, *inter alia*, that (i) Delta would make an initial payment to the Bond Trustee, on behalf of the 1992 Bondholders, on August 1, 2006 of $9,000,000 for Delta's use and occupancy of the 1992 Bond Facilities for the period between January 1, 2006 and August 31, 2006; (ii) for each month thereafter, Delta would make monthly payments equal to $1,125,000 for its use and occupancy of the 1992 Bond Facilities

during such month;[4] (iii) Delta's payments pursuant to the Forbearance Agreement would be credited against any obligation Delta may have to pay facilities rent for the 1992 Bond Facilities whether under the Facilities Agreement or otherwise; and (iv) each of the parties thereto would forbear from exercising any rights or remedies available to them with respect to any failure by Delta to make payments due under the Facilities Agreement. On November 26, 2006, the Forbearance Period was extended from July 17, 2006 to December 15, 2006. On December 29, 2006, the Forbearance Period was further extended to February 15, 2007. Under the Settlement Agreement, the Forbearance Period has been extended until the Issuance Date, as defined therein.

### Settlement and Release[5]

9.      On March 8, 2007, Delta, KCAB and the Bond Trustee (each a "**Party**" and collectively the "**Parties**") executed the Settlement Agreement attached as Exhibit A hereto.[6] The Settlement Agreement resolves all issues between the Parties and the 1992 Bondholders with respect to the 1992 Bond Agreements and 1992 Bond Facilities. As set forth below, the terms of the Settlement Agreement represent a fair and reasonable compromise that is not only in the best interest of Delta and its estate, but also is clearly in the best interest of the KCAB, the Bond Trustee and the 1992 Bondholders. In

---

[4] The parties also agreed in the Forbearance Agreement that, *inter alia*, such use and occupancy payments "in no way constitute an admission by Delta, KCAB, the Bond Trustee and/or the holders of the Bonds that such payments in any way represent an acceptable rate for the use and occupancy of the Facilities or in any way prejudice the ability of Delta, KCAB, the Bond Trustee or the holders of the bonds to later assert that Delta should pay some different rental amount for its use and occupancy of the Facilities."

[5] To the extent there are any inconsistencies between the Motion and the Settlement Agreement, the terms of the Settlement Agreement shall govern.

[6] Delta is currently seeking and believes it will obtain the consent of the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") to the Settlement Agreement.

resolving their differences, the parties have avoided protracted litigation and the significant risks and uncertainty associated therewith.

10.    The Settlement Agreement sets forth the Parties' agreement that, *inter alia*, (i) the Rejected Agreements shall be deemed rejected as of the dates set forth in Exhibit A to the Settlement Agreement; (ii) the Rejected Agreements shall be terminated by agreement of the Parties as of the Closing Date, and the 1992 Bond Indenture shall be remain in effect solely as set forth in the Settlement Agreement and shall otherwise be of no force or effect; (iii) Delta and KCAB will enter into a new lease agreement substantially in the form of the draft attached as Exhibit F to the Settlement Agreement (the "**New Lease**") and such other agreements as Delta and KCAB shall deem necessary or appropriate in connection therewith, including a Maintenance and Operations Services Agreement in form and substance similar to the form attached as Exhibit G to the Settlement Agreement (the "**New M&O Agreement**") and a Bulk Storage Facilities Lease in form and substance similar to the form attached as Exhibit B to the Settlement Agreement; (iv) Delta shall issue a note (the "**Delta Note**")[7] to the Bond Trustee, on behalf of the 1992 Bondholders, the original principal amount of which shall be $85,000,000 less amounts paid by Delta under the Forbearance Agreement, as amended, and less amounts made as a prepayment of all or a portion of the Delta Note Value, and

---

[7] The Delta Note shall be and shall be deemed issued under Delta's Plan and, pursuant to 11 U.S.C. § 1145, shall qualify for exemption from any Federal or State law requiring registration for offer or sale of a security.

The Delta Note and the payments of amounts under Section 3.02(c)(iii) of the Settlement Agreement are provided in consideration of (i) the consent to certain relief sought in the Rejection Motion as modified by the terms of this Agreement, and (ii) the release of all claims with respect to the post-rejection occupancy of the 1992 Bond Facilities, including any purported rights to receive relet proceeds.

bearing a fixed interest rate of eight (8) percent per annum, as provided for in the Settlement Agreement; (v) the Bond Trustee, as trustee and on behalf of all 1992 Bondholders, shall have a $260,000,000 allowed pre-petition, non-priority, unsecured claim against Delta (the **"Bankruptcy Claim"**); (vi) Delta, KCAB, the Bond Trustee, and the 1992 Bondholders will forever release, discharge, waive and abandon any claims or rights that each may have against the others with respect to the 1992 Bonds, 1992 Bond Facilities and the 1992 Bond Agreements as set forth in the Settlement Agreement; (vii) Delta shall reimburse the Bond Trustee for the actual and reasonable fees and expenses of the Bond Trustee incurred in connection with the 1992 Bonds, the Settlement Agreement and Delta's bankruptcy case, with such reimbursement, in the aggregate, not to exceed $2,000,000; (viii) Delta will be deemed to have assumed at Closing the Airport Use Agreement, as amended, including prepetition and postpetition obligations pursuant thereto; and (ix) the Guaranty and Tax Certificate are pre-petition obligations of Delta that, as such, shall be fully discharged and terminated in connection with Delta's exit from bankruptcy, according to the terms set forth in the Settlement Agreement.

11.    The New Lease provides, *inter alia*, that (i) it shall have a term of approximately fifteen (15) years, beginning January 19, 2006 and expiring December 31, 2020; (ii) Delta shall initially lease certain airline leasable space located in Terminal 3, Hub A and Concourse B at the Airport; and (iii) effective on each of January 1, 2013, January 1, 2015 and January 1, 2017, Delta shall be entitled to reduce by certain percentages, as set forth in the New Lease, the space it occupies in such facilities at the Airport, with corresponding reductions in the Rental payable under the New Lease, as

such Rental is defined in the New Lease. Under the New Lease, Delta will not be charged rent for the facilities it shall use and/or occupy. Rather, the Bankruptcy Claim and the Delta Note (or the prepayment thereof) shall and shall be deemed to satisfy in full any facilities rental obligation Delta may otherwise have owed to the KCAB or the Bond Trustee, on behalf of the 1992 Bondholders.

12.    Except as otherwise set forth in the Settlement Agreement, the relevant Parties shall close on the New Lease, the New M&O Agreement, the New Indenture and such other agreements as are contemplated by or necessary for the implementation of, but that are not inconsistent with, the Settlement Agreement, as soon as reasonably practicable, but in no event later than the earlier of the day before the Initial Distribution Date, as defined in the Plan, or three (3) business days after the Effective Date, unless Delta, the Bond Trustee and KCAB otherwise agree.

13.    Subject to the terms of the Settlement Agreement, on the Issuance Date, Delta shall execute the Delta Note and deliver it to the Bond Trustee, on behalf of the 1992 Bondholders. The Settlement Agreement shall be, and shall be deemed, incorporated into the Plan and, subject only to the prepayment provisions of the Settlement Agreement, the Delta Note will be issued under and in accordance with the Plan, will have a term that ends on December 1, 2015, and will be governed by the New Indenture. To the maximum extent provided by sections 1145 and 1146 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of the Delta Note will be exempt from registration under the Securities Act and shall not be the subject of any stamp or similar tax.

## The Legal Standard for Approval of Settlements

14.    Bankruptcy Rule 9019 permits a debtor in possession to enter into compromises and settlements, subject to approval by the Bankruptcy Court. Fed. R. Bankr. P. 9019(a). "[C]ompromises are favored in bankruptcy," 10 *Collier on Bankruptcy* P 9019.01. (15th ed., rev. 2005), and are "a normal part of the process of reorganization," *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)); *In re New York, N. H. & H. R. Co.*, 632 F.2d 955, 960 (2d Cir.), *cert. denied*, 449 U.S. 1062 (1980).

15.    In order to merit the approval of the bankruptcy court, a settlement must be "both fair and equitable and in the best interests of the estate." *In re Ashford Hotels, Ltd.*, 235 B.R. 734, 740 (S.D.N.Y. 1999); *see also In re Enron Corp.*, 2003 U.S. Dist LEXIS 1383, *4-5 (S.D.N.Y. Feb. 3, 2003). The bankruptcy court should form an informed and independent judgment as to whether a proposed compromise is in the best interests of the debtor's estate. *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 523 (S.D.N.Y. 1993). In reviewing the settlement, however, a court should not substitute its own judgment for that of the debtor. *See In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986).

16.    Courts of the Southern District of New York have described several factors that a bankruptcy court should consider in exercising its discretion under rule 9019(a):

> (1)    the probability of success in the litigation;

10

(2)    the difficulties associated with collection of any judgment that may be obtained;

(3)    the complexity of the litigation, and the attendant expense, inconvenience and delay; and

(4)    the paramount interests of the creditors.

*Anderson*, 390 U.S. at 424-25. Among the other factors to be considered are, *inter alia*, the competency and experience of counsel who support the settlement and the extent to which settlement is truly the product of "arm's length" bargaining, and not of fraud or collusion. *See In re Frost Bros., Inc.*, 1992 U.S. Dist. LEXIS 18301 at *16, No. 91 Civ. 5244 (PNL) (S.D.N.Y. December 2, 1992) (citing *In re Texaco Inc.*, 84 Bankr. 893, 902 (Bankr. S.D.N.Y.) (citations omitted), *appeal dismissed*, 92 Bankr. 38 (S.D.N.Y. 1988)).

17.    In determining whether a settlement should be approved under Rule 9019(a), the bankruptcy court need not conduct a "mini-trial" on the merits of the underlying litigation, but rather must "canvass the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'" *Frost Bros*, 1992 U.S. Dist. LEXIS 18301 at *16 (citations omitted). This standard "reflect[s] the considered judgment that little would be saved by the settlement process if bankruptcy courts could approve settlements only after an exhaustive investigation and determination of the underlying claims," *Purofied Down Prods. Corp.*, 150 B.R. at 522-23, and the fact that settlements are "favored and, in fact, encouraged" in bankruptcy. *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).

11

**The Settlement Agreement Should Be Approved**

18.    The settlement reflected in the Settlement Agreement and the other

agreements contemplated therein, including the rejection of the Facilities Agreement and

Associated Agreements and entry into new agreements, is both fair and equitable and in

the best interest of the Debtors and their estates, Delta's creditors, KCAB, the Bond

Trustee, and the 1992 Bondholders, and should be approved pursuant to the applicable

standards under Rule 9019 and sections 365[8] and 363[9] of the Bankruptcy Code.

Moreover, the relief requested in this motion is also appropriate under Section 105 of the

[8] Courts defer to a debtor's business judgment in assuming or rejecting an executory contract or unexpired lease, and, upon finding that a debtor has exercised its sound business judgment, approve the assumption or rejection under section 365(a) of the Bankruptcy Code. *See Orion Pictures*, 4 F.3d at 1099 (recognizing the "business judgment" standard used to approve assumption of executory contracts); *In re Minges*, 602 F.2d 38, 42-43 (2d Cir. 1979) (same); *In re G Survivor Corp.*, 171 B.R. 755, 758 (Bankr. S.D.N.Y. 1994) (approving rejection of license by debtor because such rejection satisfied the "business judgment" test); *In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (stating that a debtor may assume or reject an unexpired lease under § 365(a) in the exercise of its "business judgment"). Under this standard, courts should approve a debtor's decision to assume or reject where the latter demonstrates that assumption or rejection will benefit the debtor's estate or reorganization efforts.

[9] Section 363(b)(1) of the Bankruptcy Code empowers the Court to allow the debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Debtors' decisions to use, sell or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor. *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the evidence presented before him a good business reason to grant such application); *see also Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that standard for determining a section 363(b) motion is "good business reason"). The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Committee of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

Bankruptcy Code.[10]  The New Lease allows Delta, at a reduced cost relative to its obligations under the Facilities Agreement, to continue to use and occupy its facilities at the Airport, while also providing Delta flexibility to meet its future needs.  The Settlement Agreement provides the 1992 Bondholders with very substantial recoveries in the form of both a significant unsecured claim and the Delta Note – which are substantially more than Delta and KCAB believe that they would be entitled to if the issues were to be litigated.  KCAB benefits by Delta's continuing to operate at the Airport, thereby maximizing available service to the Airport.  In addition, the Settlement Agreement avoids complex, multi-party litigation with respect to the rejection of the Facilities Agreement, any claims arising as a result of such rejection, and the parties' financial obligations with respect to the 1992 Bonds and/or the 1992 Bondholders.  For the reasons more fully set forth in the Rejection Motion, the Debtors determined in the exercise of their sound business judgment that rejection of the Rejected Agreements is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

19.    Had the parties not agreed to the Settlement Agreement, there would have been protracted and costly litigation on numerous issues.  For example, the Bond Trustee opposed the relief sought in the Rejection Motion and, absent consensual resolution, would have (a) advocated for separate, independent bankruptcy claims under both the Facilities Agreement and the Guaranty (as, in the view of the Bond Trustee, expressly provided for under the terms of the Guaranty and related documents), (b) argued that

---

[10] Section 105 of the Bankruptcy Code grants broad authority to this Court to issue "any order, process or judgment that is necessary or appropriate" to carry our the provisions of the Bankruptcy Code.  11 U.S.C. § 105.

such claims would not be capped by section 502(b)(6) of the Bankruptcy Code, (c) argued that the lease was not in fact a true lease, but a financing, and (d) argued that the Guaranty is an independent and unconditional guaranty of the 1992 Bonds and not of the Facilities Agreement.

20.     In response, the Debtors would have argued, *inter alia*, that the Bond Trustee would be entitled to only one claim that is capped under the provisions of section 502(b)(6) of the Bankruptcy Code.  As a matter of law and equity, the Debtors would argue that the Bankruptcy Code does not allow for "double recovery" on the same injury. *See, e.g., Diversified Graphics, Ltd. v. Groves*, 868 F.2d 293, 295 (8th Cir. 1989) ("In instances where a party's claims are simply alternative theories seeking relief for the same injury, that party is not entitled to a separate compensatory damage award under each legal theory.  On the contrary, he is entitled only to one compensatory damage award if liability is found on any or all of the theories involved.") (internal quotations omitted); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882 (Bankr. S.D.N.Y. 1993) (Conrad, J.) (finding that the pension trustee's claim for missed pension funding payments, and a claim by the PBGC to recover for net underfunding of the pension plan, each sought compensation for the same loss and that dual claims to recover a single loss could not be allowed).  Moreover, Delta would have argued that the Guaranty was a guaranty to make rental payments under the Facilities Agreement and not a guaranty to pay debt service on the bonds.  In addition, as Delta's only obligation with respect to the Bonds was pursuant to the Facilities Agreement, and the Guaranty was of amounts due under the Facilities Agreement, the Debtors believe

14

they would also have prevailed on the argument that there is but a single capped claim. The Debtors would argue that courts have almost universally held that the Bankruptcy Code's cap on damages resulting from rejection of a lease applies to guarantors who are themselves debtors – even in cases where the guaranty was in fact a guaranty of bond payments, not lease obligations. *See In re Ace Electrical Acquisition, LLC*, 342 B.R. 831 (Bankr. M.D. Fla. 2005); *see also Oldden v. Tonto Realty Corp.*, 143 F.2d 916 (2d Cir. 1944) (finding that the statutory cap on damages applies to a guarantor); *In re Episode USA, Inc.*, 202 B.R. 691 (Bankr. S.D.N.Y. 1996) (same). However, in lieu of a single capped claim under section 502(b)(6), the Debtors have agreed to provide the Bond Trustee a $260 million claim and an $85 million note to avoid uncertain and protracted litigation.[11]

       21.    Because of the complexity, expense and risks associated with litigating these and other issues with respect to the Rejection Motion, the Settlement Agreement is clearly in the best interests of the Debtors and their estates as well as in the best interests of KCAB, the Bond Trustee and the 1992 Bondholders.

<u>**Notice**</u>

       22.    No trustee or examiner has been appointed in these chapter 11 cases. Consistent with the procedures described in the Court's Order Approving Notice, Case Management and Administrative Procedures entered October 6, 2005 (the "**Case Management Order**"), the Debtors have served notice of this Motion on (i) the Core

---

[11] The positions of the respective parties set forth in Paragraphs 19 and 20 hereof are intended to be a summary of certain arguments only and should not be construed as a comprehensive statement of the issues and arguments the parties would raise were the Settlement Agreement not approved.

Parties (as that term is defined in the Case Management Order); (ii) KCAB; and (iii) the Bond Trustee. In addition, notice of this Motion shall be provided in accordance with Section 6.01 of the Settlement Agreement, attached hereto as Exhibit A. The relief requested herein may be granted without hearing if no objection is timely filed and served in accordance with the Case Management Order.

23.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request the Court grant the

Debtors the relief requested herein and such other and further relief as is just and proper.

Dated:   March 8, 2007
         New York, New York

By:   /s/ Marshall Huebner
      _____
      Marshall S. Huebner (MH 7800)
      Sharon Katz (SK 4911)
      James I. McClammy (JM 5592)

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 450-6539

17

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                               :
**In re:**                                     :
                                               :
                                               :    **Chapter 11 Case No.**
                                               :
**DELTA AIR LINES, INC., et. al.,**            :    **05-17923 (ASH)**
                                               :
                                               :    **(Jointly Administered)**
**Debtors.**                                   :
                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER GRANTING DEBTORS' MOTION FOR ENTRY OF AN ORDER (I)
APPROVING SETTLEMENT AGREEMENT PURSUANT TO FEDERAL RULE
OF BANKRUPTCY PROCEDURE 9019, (II) APPROVING THE REJECTION OF
CERTAIN AGREEMENTS UNDER SECTION 365 AND (III) AUTHORIZING
THE ENTRY INTO CERTAIN NEW AGREEMENTS UNDER SECTION 363**

Upon the motion dated March 8, 2007 (the "**Motion**")[1] of Delta Air Lines, Inc.

("**Delta**") and those of its subsidiaries that are debtors and debtors in possession in these

proceedings (collectively, the "**Debtors**"),[2] for entry of an order approving the Settlement

Agreement among Delta, the Kenton County Airport Board ("**KCAB**") and UMB Bank,

N.A., as trustee, (the "**Bond Trustee**") with respect to Delta's occupancy of certain

facilities at the Cincinnati/Northern Kentucky International Airport (the "**Airport**")

pursuant to Federal Rule of Bankruptcy Procedure 9019 and sections 105, 363 and 365 of

title 11 of the United States Code (the "**Bankruptcy Code**"), and authorizing (i) the

---

[1] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to it in the
Settlement Agreement.

[2] The Debtors are the following entities:  ASA Holdings, Inc.; Comair Holdings, LLC; Comair, Inc.;
Comair Services, Inc.; Crown Rooms, Inc.; DAL Aircraft Trading, Inc.; DAL Global Services, LLC; DAL
Moscow, Inc.; Delta AirElite Business Jets, Inc.; Delta Air Lines, Inc.; Delta Benefits Management, Inc.;
Delta Connection Academy, Inc.; Delta Corporate Identity, Inc.; Delta Loyalty Management Services,
LLC; Delta Technology, LLC; Delta Ventures III, LLC; Epsilon Trading, LLC; Kappa Capital
Management, Inc.; and Song, LLC.

1

rejection of certain agreements, as outlined more fully below, pursuant to section 365 of the Bankruptcy Code, 11 U.S.C. § 365; and (ii) the entry by Delta into certain new agreements as contemplated by settlement agreement, pursuant to section 363 of the Bankruptcy Code, 11 U.S.C. § 363, as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding the Bankruptcy Court can determine pursuant to 28 U.S.C. § 157(b)(2); and the Settlement Agreement and the terms and conditions thereof being incorporated into the Plan; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been given; and the relief requested in the Motion being in the best interests of the Debtors and their estates and creditors and otherwise supported by the Bankruptcy Code; the Court hereby ORDERS, ADJUDGES and DECREES as follows:

1.    The Motion is granted in its entirety.  The execution and delivery of the Settlement Agreement by the Parties and the settlement, compromises, and releases set forth in the Settlement Agreement are hereby approved.

2.    The terms of the Settlement Agreement, attached as Exhibit A to the Motion (the "**Settlement Agreement**"), are incorporated into the Plan and herein by reference.  To the extent there is any conflict between the terms of the Settlement Agreement and this Settlement Order, the terms of this Settlement Order shall govern.

3.    The manner in which notice of the Motion and Settlement Order was provided to all parties entitled to notice, including the 1992 Bondholders, is adequate, appropriate, reasonable, and sufficient for all purposes and is hereby approved.

2

4.    Debtors' Motion for Entry of an Order Approving the Rejection of Certain Executory Contracts and Unexpired Leases and Authorizing the Abandonment of Certain Personal Property (Docket No. 2477) (the **"Rejection Motion"**), and the relief sought therein, in every respect as modified, qualified or amended by the terms of the Settlement Agreement, is granted pursuant to section 365 of the Bankruptcy Code, and, as of the Closing Date the Rejected Agreements in each case as defined in the Settlement Agreement, are deemed rejected as of the Rejection Dates.

5.    The Rejected Agreements are hereby deemed terminated and cancelled as of the Closing Date, with the exception of the 1992 Bond Indenture, the terms of which shall remain in effect solely as and for the purposes set forth in the Settlement Agreement.

6.    On the Closing Date, Delta and KCAB shall enter into the New Lease and the other Implementing Agreements to which they are to be a party.

7.    Delta is authorized and directed to enter into the New Lease, and each of the other Implementing Agreements to which it is a party and/or to make such payments as are contemplated by the Settlement Agreement, in accordance with section 363 of the Bankruptcy Code.

8.    Delta is authorized to issue the Delta Note under the Plan. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of the Delta Note will be exempt from registration under the Securities Act. Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of the Delta Notes shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real

3

estate transfer tax, mortgage recording tax, FAA filing or recording fee or other similar tax or governmental assessment in the United States.

9. Prior to the Issuance Date, Delta is authorized to continue to make monthly payments in accordance with Section 3.02 of the Settlement Agreement.

10. The Settlement Agreement is fair and reasonable to, and is in the best interest of, Delta and its creditors, KCAB, the Bond Trustee, and the 1992 Bondholders, and, in entering into the Settlement Agreement, Delta, KCAB, the Bond Trustee, and those 1992 Bondholders irrevocably directing the Bond Trustee to enter into the Settlement Agreement have exercised their rights and powers, and used the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances.

11. The mutual releases contained in the Settlement Agreement shall be effective as of the Closing.

12. Upon the Closing, each of the Releasing Parties shall be deemed to have released and shall be permanently enjoined from asserting, pursuing or prosecuting, in any manner and in any forum, any and all Released Claims against any of the Releasing Parties, including, but not limited to, claims arising from the negotiation and entry into the Settlement Agreement and/or the Implementing Agreements.

13. The Guaranty and Tax Certificate are pre-petition obligations of Delta that, as such, upon the Closing and as part of the Settlement Agreement shall be fully discharged and terminated in connection with, and upon the effectiveness of, Delta's exit from bankruptcy. Neither KCAB, the Bond Trustee nor the 1992 Bondholders shall be

4

allowed any claim in the Bankruptcy Cases, other than the Bankruptcy Claim, with respect to the Guaranty or the Tax Certificate.

14. Upon Closing, but effective as of the Effective Date, the Bond Trustee, as trustee and on behalf of all of the 1992 Bondholders, shall have an allowed pre-petition, non-priority, unsecured claim against Delta in its Bankruptcy Case in the amount of $260,000,000 not subject to offset, recoupment, deduction, counterclaim or objection, of any kind or nature, by any party (the "**Bankruptcy Claim**"), which allowed Bankruptcy Claim shall be treated at least as favorably as any unsecured claim in Delta Class 4 under the Plan. Except as set forth in the immediately preceding sentence and except with respect to the Delta Note and the Bond Trustee's rights set forth in the Settlement Agreement and the Implementing Agreements to which the Bond Trustee is a party, the Bond Trustee, as trustee, and the 1992 Bondholders, shall not have any other claim in the Bankruptcy Cases with regard to the 1992 Bond Agreements whatsoever, including without limitation any bankruptcy or other claim of any type or amount with respect to the 1992 Bond Agreements or under any other agreement or law with respect to the 1992 Bonds or 1992 Bond Facilities. Notwithstanding anything to the contrary in the Plan, the appropriate initial distribution under the Plan with respect to the Bankruptcy Claim shall be made to the Bond Trustee, after or at Closing, on the Initial Distribution Date, as defined in the Plan, provided that the Closing has occurred.

15. As of the Closing Date, Delta will be deemed to have assumed the Airport Use Agreement, as amended, including prepetition and postpetition obligations pursuant thereto, and Delta is hereby authorized and directed to make a cure payment in the

amount of $52,321.12 in satisfaction prepetition amounts owed to KCAB under such agreement.

16. Delta is authorized to reimburse to the Bond Trustee those amounts set forth in and in accordance with Section 3.02(j) of the Settlement Agreement.

17. This Settlement Order and the Settlement Agreement incorporated herein is and shall be binding on Delta, KCAB, the Bond Trustee, and the 1992 Bondholders, and each of their predecessors or successors.

18. This Settlement Order shall be binding on the Bond Trustee solely in its capacity as a trustee with respect to the 1992 Bonds, and not in any other capacity, including, but not limited to, its capacity as a holder of any claim against Delta and/or its affiliates (unrelated to the 1992 Bond Agreements) or as the trustee with respect to any other bonds related to Delta and/or its affiliates.

19. This Settlement Order shall be binding on each 1992 Bondholder solely in such bondholder's capacity as a 1992 Bondholder, and not in any other capacity, including, but not limited to, its capacity as the holder of any other claim against Delta and/or its affiliates (unrelated to the 1992 Bond Agreements) or as the holder of any bond other than the 1992 Bonds related to Delta or its affiliates.

20. The Bond Trustee shall be entitled in its sole discretion to establish one or more record dates for the 1992 Bondholders for the purpose of distributions on the 1992 Bonds including distributions on the Bankruptcy Claim.

21. This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Settlement Order and the Settlement Agreement.

22. With the exception of Sections 3.02(b) and 4.02, which were immediately effective, the effectiveness of the Settlement Agreement is conditioned upon the confirmation of the Plan and the occurrence of its Effective Date.

23. Notwithstanding the possible applicability of Bankruptcy Rule 6004(g), 7062, 9014 or any other provision, the terms and conditions of this Settlement Order shall be immediately effective and enforceable upon its entry.

Dated: _____, 2007
         New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

# PS◇SHIP

# 798625503733

## Shipment Receipt

**Ship Date:** 03/09/2007

**Recipient:** Standard & Poor's Securities
55 Water Street
45th Floor
New York NY 10041
2124384595

**From:** Ian Hammel
Mintz Levin

**Billing:** 33539-002
UMB BANK AS TRUSTEE FOR DELTA
BONDHOLDERS-LAGUARDIA

**Operator:** JBLuti

**Billing Note:**

**Vendor:** FedEx

**Airway Bill:** 798625503733

**Courtesy Quote:** $8.41

## Legal Terms and Conditions

Tendering packages by using this system constitutes your agreement to the service conditions for the transportation of your shipments as found in the applicable FedEx Service Guide, available upon request. FedEx will not be responsible for any claim in excess of the applicable declared value, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the applicable FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see applicable FedEx Service Guide. FedEx will not be liable for loss or damage to prohibited items in any event or for your acts or omissions, including, without limitation, improper or insufficient packaging, securing, marking or addressing, or the acts or omissions of the recipient or anyone else with an interest in the package. See the applicable FedEx Service Guide for complete terms and conditions. To obtain information regarding how to file a claim or to obtain a Service Guide, please call 1-800-GO-FEDEX (1-800-463-3339).


**790198595893**

## Shipment Receipt

| | | | |
|---|---|---|---|
| **Ship Date:** | 03/09/2007 | **Vendor:** | FedEx |
| | | **Airway Bill:** | 790198595893 |
| **Recipient:** | DPC Data Inc. | **Courtesy Quote:** | $8.41 |
| | One Executive Drive | | |
| | Fort Lee NJ 07024 | | |
| | 2013460701 | | |
| **From:** | Ian Hammel | | |
| | Mintz Levin | | |
| **Billing:** | 33539-002 | | |
| | UMB BANK AS TRUSTEE FOR DELTA | | |
| | BONDHOLDERS-LAGUARDIA | | |
| **Operator:** | JBLuti | | |
| **Billing Note:** | | | |

## Legal Terms and Conditions

Tendering packages by using this system constitutes your agreement to the service conditions for the transportation of your shipments as found in the applicable FedEx Service Guide, available upon request. FedEx will not be responsible for any claim in excess of the applicable declared value, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the applicable FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see applicable FedEx Service Guide. FedEx will not be liable for loss or damage to prohibited items in any event or for your acts or omissions, including, without limitation, improper or insufficient packaging, securing, marking or addressing, or the acts or omissions of the recipient or anyone else with an interest in the package. See the applicable FedEx Service Guide for complete terms and conditions. To obtain information regarding how to file a claim or to obtain a Service Guide, please call 1-800-GO-FEDEX (1-800-463-3339).



# PS SHIP

# 798625520817

## Shipment Receipt

| | | | |
|---|---|---|---|
| **Ship Date:** | 03/09/2007 | **Vendor:** | FedEx |
| | | **Airway Bill:** | 798625520817 |
| **Recipient:** | NRSMIR | **Courtesy Quote:** | $8.41 |
| | FT INTERACTIVE DATA | | |
| | 100 Williams Street | | |
| | 15th Floor | | |
| | New York NY 10038 | | |
| | 2127716999 | | |
| **From:** | Ian Hammel | | |
| | Mintz Levin | | |
| **Billing:** | 33539-001 | | |
| | UMB BANK AS TRUSTEE FOR DELTA | | |
| | BONDHOLDERS-UMB BANK/DELTA | | |
| **Operator:** | JBLuti | | |

**Billing Note:**

## Legal Terms and Conditions

Tendering packages by using this system constitutes your agreement to the service conditions for the transportation of your shipments as found in the applicable FedEx Service Guide, available upon request. FedEx will not be responsible for any claim in excess of the applicable declared value, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the applicable FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see applicable FedEx Service Guide. FedEx will not be liable for loss or damage to prohibited items in any event or for your acts or omissions, including, without limitation, improper or insufficient packaging, securing, marking or addressing, or the acts or omissions of the recipient or anyone else with an interest in the package. See the applicable FedEx Service Guide for complete terms and conditions. To obtain information regarding how to file a claim or to obtain a Service Guide, please call 1-800-GO-FEDEX (1-800-463-3339).

 **PS◇SHIP**  **790198571430**

## Shipment Receipt

| | | | |
|---|---|---|---|
| **Ship Date:** | 03/09/2007 | **Vendor:** | FedEx |
| | | **Airway Bill:** | 790198571430 |
| **Recipient:** | Bloomberg Municipal Repository 100 Business Park Drive Skillman NJ 08558 6092793225 | **Courtesy Quote:** | $8.41 |
| **From:** | Ian Hammel Mintz Levin | | |
| **Billing:** | 33539-001 UMB BANK AS TRUSTEE FOR DELTA BONDHOLDERS-UMB BANK/DELTA | | |
| **Operator:** | JBLuti | | |
| **Billing Note:** | | | |

## Legal Terms and Conditions

Tendering packages by using this system constitutes your agreement to the service conditions for the transportation of your shipments as found in the applicable FedEx Service Guide, available upon request. FedEx will not be responsible for any claim in excess of the applicable declared value, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the applicable FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see applicable FedEx Service Guide. FedEx will not be liable for loss or damage to prohibited items in any event or for your acts or omissions, including, without limitation, improper or insufficient packaging, securing, marking or addressing, or the acts or omissions of the recipient or anyone else with an interest in the package. See the applicable FedEx Service Guide for complete terms and conditions. To obtain information regarding how to file a claim or to obtain a Service Guide, please call 1-800-GO-FEDEX (1-800-463-3339).