**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
**In re:**                                                  :     **Chapter 11 Case No.**
                                                            :
**DELTA AIR LINES, INC., et al.,**                          :     **05-17923 (ASH)**
                                                            :
            **Debtors.**                                    :     **(Jointly Administered)**
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>**DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF**</u>
<u>**REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**</u>

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Fax: (212) 450-6539
John Fouhey (JF 9006)
Marshall S. Huebner (MH 7800)
Benjamin S. Kaminetzky (BK 7741)
Timothy Graulich (TG 0046)
Damian S. Schaible (DS 7427)
Attorneys for Debtors
    and Debtors in Possession

Dated: February 7, 2007

the airports in Atlanta and Cincinnati and all inventory that is in transit to these airports as well as to the New York City area airports.

    o.   **Airports/Facilities Restructuring**

As of the Petition Date, the Debtors were party to hundreds of leases and other agreements governing the Debtors' use and occupancy rights at airport and other facilities throughout the United States. During the Chapter 11 Cases, the Debtors have undertaken various initiatives to restructure their operations and obligations at many of those facilities in order to reduce costs and to establish an airport footprint that serves the Debtors' future network plans. If the initiatives described below are successfully completed, they are projected to generate approximately $120 million per year in annual savings and eliminate approximately $1.2 billion in debt (approximately $600 million of which is currently classified as obligations under operating leases.)

    1.   Airport Revenue Bond Facilities

Delta leases a number of airport facilities financed, in whole or in part, by tax-exempt special facilities bonds issued on behalf of Delta. Pursuant to the Municipal Bond Agreements,[16] Delta is required, among other things, to fund amounts sufficient to cover interest payments, premiums (if any) and principal payable at maturity on such bonds. Under the terms of the Plan, the Debtors generally have four options of addressing the obligations related to Municipal Bond Agreements with respect to bond-related payment obligations that are set forth in a lease. The following is a general summary of these four options and the corresponding impact upon the Debtors and the respective holders of any special facilities bonds.

    (i)   ***Assumption of a Municipal Bond Agreement***. The Debtors may seek to assume such a Municipal Bond Agreement pursuant to sections 365 and/or 1123 of the Bankruptcy Code. Subject to the terms of the first paragraph of Section 10.3 of the Plan and Section 10.8 of the Plan, and unless otherwise provided in the relevant agreements, the Plan or an order of the Bankruptcy Court, each of the Assumed Municipal Bond Agreements shall be deemed assumed effective as of the Assumption Effective Date specified on Schedule 10.3(d) of the Plan, and the Proposed Cure specified in the notice mailed to each Assumption Party shall be the Cure and shall be deemed to satisfy fully any obligations the Debtors might have with respect to such Assumed Municipal Bond Agreement. The Debtors shall thereafter make the required payments in accordance with the terms and conditions of the Assumed Municipal Bond Agreement. To the extent provided in the relevant Municipal Bond Agreements, the Debtors will pay the reasonable fees and expenses (including reasonable counsel fees) of the Indenture Trustees associated with Assumed Municipal Bond Agreements. Any Municipal Bonds relating

---

[16] For the purposes of this Disclosure Statement and the Plan, the use of the words "Municipal Bond Agreement" is made with an express reservation of all parties' rights, claims, and defenses under all relevant agreements and applicable law on all issues including, but not limited to, whether any obligations under a "Municipal Bond Agreement" are true lease obligations or financing obligations.

to such Assumed Municipal Bond Agreement, the corresponding Municipal Bond Indenture and the associated Municipal Bond Documents shall remain in full force and effect, in accordance with their original terms and conditions and shall not otherwise be altered, amended, modified, surrendered or cancelled. Holders of Municipal Bonds associated with an Assumed Municipal Bond Agreement shall continue to receive payments in accordance with the terms and conditions of the underlying Municipal Bond Documents related to the Assumed Municipal Bond Agreement. Upon payment in full of the Cure, all Proofs of Claim on account of or in respect of any of the Assumed Municipal Bond Agreements shall be deemed disallowed and expunged with no further action required of any party or order of the Bankruptcy Court. To the extent any of the foregoing provisions conflict with the terms of a separate order of the Bankruptcy Court pursuant to which a Municipal Bond Agreement is assumed, that order shall govern.

(ii)    *Rejection of a Municipal Bond Agreement.* The Debtors may seek to reject such a Municipal Bond Agreement pursuant to sections 365 and/or 1123 of the Bankruptcy Code. In the event of any such rejection, Claims arising from a Rejected Municipal Bond Agreement shall be treated in accordance with the terms of the Plan, and the obligations of the Debtors with respect to Municipal Bonds associated with such a Rejected Municipal Bond Agreement and in any way related thereto to shall be fully satisfied, released and discharged as set forth in more detail in Section 6.6 of the Plan; *provided, however,* that nothing contained herein or under the Plan shall affect the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to the Municipal Bond Documents relating to a Rejected Municipal Bond Agreement. Any Municipal Bond Documents associated with a Rejected Municipal Bond Agreement shall be cancelled only with respect to the Debtors' obligations thereunder as set forth in more detail in Section 6.6 of the Plan.

(iii)    *Settlement of Issues Arising Under a Municipal Bond Agreement.* The Debtors may elect to enter into and seek Bankruptcy Court approval of a settlement agreement resolving and/or restructuring its obligations related to such a Municipal Bond Agreement. If such a settlement is reached and approved by the Bankruptcy Court, the treatment of the parties to such settlement agreement and the holders of the Municipal Bonds subject to a settled Municipal Bond Agreement shall receive payments in accordance with the terms and conditions of such settlement agreement.

(iv)    *Recharacterization.* The Debtors also may request an order from the Bankruptcy Court seeking to recharacterize a Municipal Bond Agreement in the form of a lease as a financing. To the extent the Bankruptcy Court "recharacterizes" a Municipal Bond Agreement as a financing, such financing shall be a Secured Claim and/or General Unsecured Claim depending upon the facts and circumstances of the particular case. Any Indenture Trustee associated with a Municipal Bond Agreement with respect to which the Debtors file a notice reserving their rights to commence a recharacterization proceeding pursuant to Section 10.2(d) of the Plan shall have until the later of 30 calendar days after (A) the entry of a Final Order by the Bankruptcy Court determining the amount of any Secured Claim (if any) related to such Municipal Bond Agreement and (B) the date that the Debtors inform such Indenture Trustee of the distribution (if any) the Debtors intend to make on account of such Claim pursuant to Section 4.2(c) or 4.2(l) of the Plan, to make an election under section 1111(b) of the Bankruptcy Code;

55

*provided, however*, that no distributions under the Plan shall be made on account of any Claims relating to Municipal Bond Agreements for which the section 1111(b) election is so extended until (x) the election has been made or waived by the filing of a notice with the Bankruptcy Court or (y) the time for making such election has passed.

Delta has been able to substantially reduce its obligations with respect to various special facility bonds and bond-financed facilities and continues to pursue other potential opportunities.

***Boston/Logan.*** Delta has been working with the Massachusetts Port Authority ("**Massport**"), the Bank of New York as indenture trustee (the "**Massport Trustee**") for three series of revenue bonds in the aggregate principal amount of $497,585,000 (the $497,585,000 Massachusetts Port Authority Special Facilities Revenue Bonds (Delta Air Lines, Inc. Project), Series 2001A, 2001B and 2001C) issued by Massport and Ambac Assurance Corporation ("**Ambac**"), as insurer of the Massport Bonds, to restructure Delta's Terminal A Lease and related agreements and obligations at Logan.

Delta, Massport, the Massport Trustee and Ambac have entered into a settlement agreement, providing, among other things, for a reduction in Delta's leasehold premises to a level more appropriate for Delta's operations, the ability of Delta to return some additional space in 2007 and 2011, the reduction of Delta's lease term to 10 years and that Delta will have no liability for payments with respect to the Massport Bonds (including under the guaranty by Delta). The Massport Bonds, however, will continue to be insured under the policy issued by Ambac Assurance Corporation. The settlement agreement, assumption of the amended Terminal A Lease and restructuring of related agreements is subject to Bankruptcy Court approval. Pursuant to the settlement agreement, the Massport Trustee will have an Allowed General Unsecured Claim in the amount of $29,000,000. If the restructuring is approved by the Bankruptcy Court, the savings to Delta are expected to be substantial. The motion seeking an order approving the restructuring agreement is scheduled to be heard on February 22, 2007.

***Cincinnati.*** Delta has been working with the Kenton County Airport Board ("**KCAB**") and UMB Bank, N.A. as indenture trustee ("**KCAB Trustee**") for two series of revenue bonds in the aggregate original principal amount of $438,000,000 (the $419,000,000 Kenton County Airport Board Special Facilities Revenue Bonds 1992 Series A (Delta Air Lines, Inc. Project) and $19,000,000 Kenton County Airport Board Special Facilities Revenue Bonds 1992 Series B, (Delta Air Lines, Inc. Project)) issued by the KCAB (the "**KCAB Series 1992 Bonds**") to restructure Delta's obligations related to Terminal 3, Concourse B and certain other facilities and improvements constructed with the proceeds of such bonds. Currently, the amount outstanding under the KCAB Series 1992 Bonds is $413,570,000.

On April 28, 2006, Delta filed a motion (the "**Cincinnati Rejection Motion**") seeking approval of the rejection of certain executory contracts and unexpired leases relating to facilities at the Cincinnati/Northern Kentucky International Airport (the "**Cincinnati Airport**"), including a lease agreement pursuant to which Delta occupied certain facilities at the Cincinnati Airport and was required to, among other things, make payments equal to the debt service on the KCAB

Series 1992 Bonds. This motion was originally scheduled to be heard in June 2006, but was taken off the calendar while negotiations continued between the relevant parties.

In July 2006, Delta reached an agreement in principle with KCAB and the KCAB Trustee concerning the settlement of various matters related to the KCAB Series 1992 Bonds and Delta's continued use of most of the facilities constructed with the proceeds of such bonds after Delta rejects the related 1992 Facilities Agreement and certain other agreements. Recently, negotiations to finalize the settlement appear to have reached an impasse and there is no assurance that a settlement is still possible. In light of the impasse, Delta has re-noticed the Cincinnati Rejection Motion for hearing on February 22, 2007. If the Cincinnati Rejection Motion is approved by the Bankruptcy Court, Delta has expressed a willingness to enter into new agreements with KCAB that would allow Delta to occupy a reduced amount of space in certain facilities constructed with the proceeds of the KCAB Series 1992 Bonds. It is Delta's position that if the Cincinnati Rejection Motion is approved, the KCAB Trustee will be entitled to a Rejection Claim that is subject to the limitation on lease rejection damages provided in section 502(b)(6) of the Bankruptcy Code. It is the KCAB Trustee's position that the KCAB Trustee's Claims will not be so limited.

*Atlanta.* Delta has not made any of the semi-annual interest payments since the Petition Date on (i) the $29,900,000 Development Authority of Fulton County (Georgia) Special Facilities Revenue Bonds (Delta Air Lines, Inc. Project), Series 1992 or (ii) the $124,770,000 Development Authority of Fulton County (Georgia) Special Facilities Revenue Bonds (Delta Air Lines, Inc. Project), Series 1998 (collectively, the **"Fulton County Bonds"**). Because Delta considers its obligations with respect to the Fulton County Bonds to be pre-petition unsecured obligations, Delta intends to discharge the debt through the Plan.

*Dallas.* Delta has not made any of the semi-annual interest payments due since the Petition Date on (i) the $116,500,000 Dallas-Fort Worth International Airport Facility Improvement Corporation, Delta Air Lines, Inc. Revenue Bonds, Series 1991 (of which $108,935,000 was outstanding on the Petition Date) or (ii) the $25,870,000 Dallas-Fort Worth International Airport Facility Improvement Corporation, Delta Air Lines, Inc. Revenue Refunding Bonds, Series 1993 (collectively, the **"DFW Bonds"**). Because Delta considers its obligations with respect to the DFW Bonds to be pre-petition unsecured obligations, Delta intends to discharge the debt through the Plan.

*Tampa.* In order to streamline Delta's maintenance operations, Delta closed its Tampa maintenance base and, pursuant to an order of the Bankruptcy Court, rejected the lease for this facility effective June 30, 2006. In connection with that rejection, a draw on a GE letter of credit paid off the $16,495,000 Hillsborough County Aviation Authority Special Purpose Revenue Refunding Bonds (Delta Air Lines, Inc. Project), Series 2000 secured by that letter of credit. Delta entered into a loan arrangement with GE to fund Delta's reimbursement obligation to GE in respect of the letter of credit, which loan is secured by the collateral described in Section 2.4(b)(2) above. The principal amount outstanding on the loan as of January 19, 2007 is $14.8 million. Additionally, Delta's view is that the $8,000,000 in Hillsborough County Aviation Authority Special Purpose Revenue Refunding Bonds (Delta Air Lines, Inc. Maintenance Base

Facility Project), Series 1993 (the "**Tampa Series 1993 Bonds**") not secured by the GE letter of credit is an unsecured obligation that gives rise to a Rejection Claim that is subject to the limitation on lease rejection damages provided in section 502(b)(6) of the Bankruptcy Code. It is the view of the Indenture Trustee associated with the Tampa Series 1993 Bonds that such Rejection Claim is not subject to section 502(b)(6) of the Bankruptcy Code.

*Portland*. Delta rejected three leases of surplus air freight, cabin service and ground equipment maintenance facilities at Portland International Airport effective April 1, 2006. The facilities lease that covered debt service on the $8,545,000 Port of Portland Special Obligation Revenue Bonds, Series 1992 (Delta Air Lines, Inc. Project) (the "**Portland Series 1992 Bonds**") was rejected together with the two associated ground leases. Delta's view is that this unsecured obligation gives rise to a Rejection Claim that is subject to the limitation on lease rejection damages provided in section 502(b)(6) of the Bankruptcy Code. It is the view of the Indenture Trustee associated with the Portland Series 1992 Bonds that such Rejection Claim is not subject to section 502(b)(6) of the Bankruptcy Code.

*Los Angeles*. Shortly after the inception of the Chapter 11 Cases, Delta initiated an adversary proceeding against the City of Los Angeles (the "**City**"), the relevant regional airport authority and the trustee for the $46,855,000 Regional Airports Improvement Corporation Facilities Sublease Refunding Revenue Bonds, Issue of 1996, Delta Air Lines, Inc. (Los Angeles International Airport) (the "**LAX Bonds**"), seeking a declaration that the "facilities sublease" executed in connection with the LAX Bonds was not a "true lease" within the meaning of section 365 of the Bankruptcy Code and that, as a consequence, Delta was not required during the Chapter 11 Cases to continue to make payments associated with the debt service on the LAX Bonds. The proceeds of the LAX Bonds were used to refinance the cost of portions of the construction of Delta's Terminal 5 facilities. The Bankruptcy Court stayed the litigation (commonly known as the "recharacterization litigation") pending a ruling in a similar litigation involving an agreement of United Airlines at Los Angeles International Airport ("LAX"). The United Airlines decision has since been issued, ruling that the United Airlines agreement constitutes a secured financing agreement. After the United Airlines decision was issued, the parties voluntarily continued the stay of the Delta recharacterization litigation. On February 1, 2007, Delta filed a notice of dismissal with respect to the adversary proceeding.

Recently, the City passed a resolution indicating its intention, subject to appropriate court rulings, including an order lifting the automatic stay of section 362 of the Bankruptcy Code, to terminate Delta's Terminal 5 lease by defeasing the LAX Bonds. On February 2, 2007, the City filed a motion with the Bankruptcy Court seeking an order (1) that the automatic stay is not applicable to the City's actions to terminate Delta's Terminal 5 lease or granting relief from the automatic stay to permit the City to proceed with such actions and to file a declaratory relief action or other appropriate proceeding to resolve any dispute with Delta regarding the City's use of Section 5(a) of the Terminal 5 lease to cause early termination and (2) compelling Delta to assume or reject its Terminal 5 lease by March 22, 2007. Delta intends to contest vigorously the City's motion and its attempt to terminate Delta's Terminal 5 lease. Unless Delta's Terminal 5 lease has been terminated as of the Confirmation Date, Delta's current intention is to assume the Terminal 5 lease prior to the Confirmation Date pursuant to Article 10 of the Plan.

If Delta assumes its Terminal 5 lease, then pursuant to Article 10 of the Plan, Delta intends to assume the Municipal Bond Agreement associated with LAX (the "**LAX Assumed Municipal Bond Agreement**"). Upon the Assumption Effective Date and upon payment in full of the Cure, all Proofs of Claim in respect of the LAX Assumed Municipal Bond Agreement shall be deemed withdrawn automatically without any further notice to any party or action by the Bankruptcy Court. If the City of Los Angeles has defeased the LAX Bonds prior to the Confirmation Date, then such defeasance will have the effect of eliminating Claims in respect of the LAX Bonds as liabilities of Delta, and all Proofs of Claim filed in respect of the LAX Bonds shall be deemed withdrawn automatically without any further notice to any party or action by the Bankruptcy Court.

*Chicago*. The Special Facility Use Agreement between the City of Chicago and Delta dated as of August 1, 1982, as the same may have been amended, supplemented or otherwise modified, shall receive the treatment set forth in Section 10.3(d) of the Plan.

*New York/LaGuardia*. The Agreement of Lease between the Port Authority of New York and New Jersey and Delta dated as of December 10, 1980, as the same may have been amended, supplemented or otherwise modified, shall receive the treatment set forth in Section 10.3(d) of the Plan.

        2.    Other Facilities

In addition, the Debtors obtained authorization from the Bankruptcy Court to reject numerous other airport and other related agreements, including various airport agreements at Dallas-Fort Worth International Airport, the Atlanta Airport, Pittsburgh International Airport and Orlando International Airport. In connection with several of these rejections, the Debtors successfully negotiated replacement airport agreements that are consistent with the Debtors' future network plans.

*Orlando*. The Debtors reached an agreement with the Greater Orlando Airport Authority to reject an unexpired lease covering 24 gates and associated space and to enter into a new lease for fewer gates better suited to the Debtors' current operations in Orlando. The agreement took effect as of January 20, 2006 and substantially reduced the Debtors' annual rental costs in Orlando.

        p.    **Other Debt Restructuring**

        1.    Letter of Credit Facility Related to VISA/MasterCard Credit Card Processing Agreement

On January 26, 2006, Delta entered into a letter of credit facility with Merrill Lynch (the "**Letter of Credit Reimbursement Agreement**") with the authorization of the Bankruptcy Court. Under the Letter of Credit Reimbursement Agreement, Merrill Lynch issued a $300 million irrevocable standby letter of credit (the "**Merrill Lynch Letter of Credit**") for the benefit of Delta's VISA/MasterCard credit card processor (the "**Processor**"). As contemplated in Delta's VISA/MasterCard credit card processing agreement (the "**Processing Agreement**"),