# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | ) |
| | ) Chapter 11 |
| | ) |
| DELTA AIR LINES, INC., <u>et al.,</u> | ) Case No. 05-17923 (ASH) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |
| | ) |
| KENTON COUNTY BONDHOLDERS | ) |
| COMMITTEE, | ) |
| | ) 07 Civ. 03968 (JGK) |
| Appellants. | ) |
| | ) |
| v. | ) |
| | ) |
| DELTA AIR LINES, INC., <u>et al.,</u> | ) |
| | ) |
| Appellees. | ) |
| | ) |

## <u>REPLY BRIEF OF APPELLANTS</u>

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
J. Christopher Shore (JCS-6031)

Wachovia Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone:  (305) 371-2700
Facsimile:  (305) 358-5744
Thomas E Lauria (*pro hac vice* application pending)
John K. Cunningham (JC 4661)

Attorneys for the Ad Hoc Committee
of Kenton County Bondholders

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ..........................................................................................................3

I.      APPELLEES CANNOT AVOID JUDICIAL REVIEW OF THEIR
ACTIONS BY CLOSING THE TRANSACTION IN THE FACE
OF CHALLENGES TO THEIR RELEASES AND THE INJUNCTION ...................3

      A.    This Appeal Is Not Constitutionally Moot........................................................3

      B.    This Appeal Is Not Equitably Moot....................................................................6

II.     APPELLEES HAVE OFFERED NO JUSTIFICATION FOR
ALLOWING THE RELEASES AND INJUNCTION TO STAND ...........................7

III.    THERE HAS NEVER BEEN A PROPER SETTLEMENT OR AN
ADJUDICATION OF BONDHOLDER CLAIMS ARISING IN
CONNECTION WITH THE SETTLEMENT...........................................................14

      A.    The Individual Bondholder Claims Have Never Been
Settled or Adjudicated........................................................................................14

      B.    Appellees Misinterpret the Indenture as Allowing
The Trustee to Compromise Principal and Interest .........................................15

      C.    The Issue of Relet Rights Is Critical to This Appeal .....................................20

CONCLUSION.....................................................................................................26

## TABLE OF AUTHORITIES

### CASES

Page

In re 183 Lorraine St. Assocs.,
    198 B.R. 16 (E.D.N.Y. 1996) ..........................................................................6

ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns
    Corp.), --- B.R. ----, No. 02-41729, No. 07 Civ. 1172, 2007 WL 1002127
    (S.D.N.Y. Apr. 2, 2007)..............................................................................5

A.I. Trade Fin., Inc. v. Petra Bank,
    989 F.2d 76 (2d Cir. 1993)..........................................................................13

Adams v. Resolution Trust Corp.,
    927 F.2d 348 (8th Cir. 1991) ......................................................................5

In re Adelphia Commc'ns Corp.,
    --- B.R. ----, No. 02-41729, 2007 WL 866643 (Bankr. S.D.N.Y. Jan. 3, 2007)........8, 9, 10

In re Adelphia Commc'ns Corp.,
    --- B.R. ----, No. 02-41729, 2007 WL 706884 (Bankr. S.D.N.Y. Mar. 6, 2007) .............11

Allstate Ins. Co. v. Hughes,
    174 B.R. 884 (S.D.N.Y. 1994)....................................................................6

Austin v. Healey,
    5 F.3d 598 (2d Cir. 1993) ...........................................................................13

In re Automationsolutions Int'l, LLC,
    274 B.R. 527 (Bankr. N.D. Cal. 2002) .......................................................18

Bateman v. Grover (In re Berg),
    45 B.R. 899 (B.A.P. 9th Cir. 1984)............................................................5

Bornholdt v. Brady,
    869 F.2d 57 (2d Cir. 1989).........................................................................13

Brooks v. Commonwealth,
    217 S.W.3d 219 (Ky. 2007) .......................................................................25

Carey v. Brown,
    92 U.S. 171 (1875).....................................................................................18

MIAMI 728994 (2K)

Carroll v. Rafael Galleries, Inc. (In re Altman),
   254 B.R. 509 (D. Conn. 2000) ........................................................................13

Cartalemi v. Karta Corp. (In re Karta Corp.),
   342 B.R. 45 (S.D.N.Y. 2006) ...........................................................................9

Church of Scientology of Cal. v. United States,
   506 U.S. 9 (1992) ........................................................................................3, 5

Codman v. Dumaine,
   144 N.E. 408 (Mass. 1924) .............................................................................15

Cohen v. United States,
   191 B.R. 482 (S.D. Fla. 1995) ........................................................................19

Colony Square Co. v. Prudential Ins. Co. (In re Colony Square Co.),
   819 F.2d 272 (11th Cir. 1987) ........................................................................18

In re Combustion Eng'g, Inc.,
   391 F.3d 190 (3d Cir. 2004) .............................................................................8

County of Suffolk v. Long Island Lighting Co.,
   907 F.2d 1295 (2d. Cir. 1990) ........................................................................20

Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re
   Metromedia Fiber Network, Inc.), 416 F.3d 136 (2d Cir. 2005) ................7, 8, 9

Epic Metals Corp. v. Condec, Inc. (In re Condec, Inc.),
   225 B.R. 800 (M.D. Fla. 1998) .........................................................................6

Evans v. Tucker,
   135 So. 305 (Fla. 1931) ...................................................................................15

Farnham v. City of Lincoln,
   106 N.W. 666 (Neb. 1906) ..............................................................................15

Feld v. Zale Corp. (In re Zale Corp.),
   62 F.3d 746 (5th Cir. 1995) ............................................................................10

Friedman v. Chesapeake & Ohio Ry. Co.,
   261 F. Supp. 728 (S.D.N.Y. 1966) ..................................................................15

Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.),
   10 F.3d 944 (2d Cir. 1993) ................................................................................6

Gulino v. N.Y. State Educ. Dep't,
   460 F.3d 361 (2d Cir. 2006) ...........................................................................13

ii

Herbert Constr. Co. v. Greater N.Y. Sav. Bank (In re 455 CPW Assocs.),
    225 F.3d 645, No. 99-5068, 2000 WL 1340569 (2d Cir. 2000) .........................................3

In re Pan Am Corp.,
    No. 98 Civ. 7838, 1999 U.S. Dist. LEXIS 14612
    (S.D.N.Y. Sept. 22, 1999) .......................................................................................6

Kassover v. Gibson,
    No. 02 Civ. 7978, 2003 U.S. Dist. LEXIS 8765 (S.D.N.Y. May 27, 2003) .......................6

Kelton Corp. v. County of Worcester,
    688 N.E.2d 941 (Mass. 1997) .............................................................................15

Kemper Inv. Life Ins. Co. v. Las Colinas Corp.,
    No. 88 C 9152 (N.D. Ill. 1989) ....................................................................16, 17, 19

Ky. Ins. Guar. Ass'n v. Natural Res. and Envtl. Prot. Cabinet,
    885 S.W.2d 315 (Ky. App. 1994) .......................................................................25

Lawrence v. Revere Copper & Brass Inc. (In re Revere Copper & Brass, Inc.),
    78 B.R. 17 (S.D.N.Y. 1987).................................................................................4

MBank Dallas, N.A. v. LaBarge, Inc.,
    No. 86 C 9583 (N.D. Ill. 1987) ....................................................................16, 17, 19

Masonic Hall & Asylum Fund v. Official Comm. of Unsecured Creditors (In re Refco
    Inc.), No. 05-60006, 2006 WL 3409088 (S.D.N.Y. Nov. 16, 2006) ................................17

Meckel v. Cont'l Res. Co.,
    758 F.2d 811 (2d Cir. 1985)................................................................................11

Palmer v. Bankers' Trust Co.,
    12 F.2d 747 (8th Cir. 1926) ................................................................................18

Peachtree Lane Assocs., Ltd. v. Granader (In re Peachtree Lane Assocs., Ltd.),
    188 B.R. 815 (N.D. Ill. 1995) ..............................................................................7

Phillips Petroleum Co. v. Shutts,
    472 U.S. 797 (1985)...........................................................................................20

Premier Bank v. Tierney,
    114 F. Supp. 2d 877 (W.D. Mo. 2000) .................................................................14

Princeton Cmty. Phone Book, Inc. v. Bate,
    582 F.2d 706 (3d Cir. 1978)..................................................................................4

MIAMI 728994 (2K)

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v Anderson,
     390 U.S. 414 (1968)........................................................................18

Quirke v. St. Louis-San Francisco Ry. Co.,
     277 F.2d 705 (8th Cir. 1960) ......................................................15

Redmond v. Commerce Trust Co.,
     144 F.2d 140 (8th Cir. 1944) ......................................................18

Regions Bank v. Blount Parish & Co.,
     No. 01 C 0031, 2001 WL 72989 (N.D. Ill. June 27, 2001) ..............14

Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.),
     330 B.R. 394 (Bankr. S.D.N.Y. 2005)...............................................9

Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach Corp.),
     698 F.2d 571 (2d Cir. 1983)..........................................................17

Ross v. City of Fort Wayne,
     63 F. 466 (7th Cir. 1894) ............................................................18

Schallitz v. Starrett Corp.,
     82 N.Y.S.2d 89 (Sup. Ct. 1948) ..................................................15

SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham
     Lambert Group, Inc.), 960 F.2d 285 (2d Cir. 1992) ......................20

Shaw v. R.R. Co.,
     100 U.S. 605 (1879)....................................................................15

Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC),
     423 F.3d 166 (2d Cir. 2005)..........................................................15

In re Statistical Tabulating Corp.,
     60 F.3d 1286 (7th Cir. 1995) ........................................................7

Trust Corp. of Mont. v. Patterson (In re Copper King Inn, Inc.),
     918 F.2d 1404 (9th Cir. 1990) ......................................................13

United Bank of Ariz. v. Sun Mesa Corp.,
     119 F.R.D. 430 (D. Ariz. 1988) ..................................................15

United States v. 16.03 Acres of Land,
     26 F.3d 349 (2d Cir. 1994).........................................................13

United States v. W.T. Grant Co.,
     345 U.S. 629 (1953)....................................................................4

iv

Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.),
  326 B.R. 497 (S.D.N.Y. 2005) ....................................................................................4

U.S. Lines (S.A.), Inc. v. United States (In re McLean Indus.),
  30 F.3d 385 (2d Cir. 1994) ......................................................................................13

Vintero Corp. v. Corporacion Venezolana de Fomento,
  675 F.2d 513 (2d Cir. 1982) ....................................................................................13

Zimmerman v. Bell,
  800 F.2d 386 (4th Cir. 1986) ...................................................................................20

## STATUTES

15 U.S.C. § 77ppp(b) ...................................................................................................15

KY. REV. STAT. ANN. § 103.251 .................................................................................25

KY. REV. STAT. ANN. § 103.260 .................................................................................24

KY. REV. STAT. ANN. § 103.260(2) .............................................................................24

## MISCELLANEOUS

Advisory Committee's Note to Amendment to Federal Rule 23, 39 F.R.D. 69 (1966) ...............19

Bryant B. Edwards, et al., Mandatory Class Action Lawsuits as a Restructuring
  Technique, 19 PEPP. L. REV. 875 (1992) .................................................................18, 20

Ky. Op. Atty. Gen. 2-448, 1978-1979 Ky. Op. Atty. Gen. 2-448, Ky.
  OAG 79-459, 1979 WL 33371 (Ky. A.G.) ...............................................................25

Mark J. Roe, The Voting Prohibition in Bond Workouts,
  97 YALE L.J. 232 (Dec. 1987) .................................................................................19

## PRELIMINARY STATEMENT

What is currently before the Court, in the form of over 100 pages of argument from Appellees and a proposed *amicus curiae*, is a collection of attorney assertions largely lacking legal support in existing case law or factual support in the record.[1]  We implore the Court to look through the cool patina of normalcy laid out in Appellees' papers and examine closely the underlying legal and factual predicates for the arguments offered in support of affirmance.  A surprising number of these arguments fail even the most cursory legal analysis.  For example:

- Appellees nakedly contend that the Bankruptcy Court had the "power" to resolve the third-party issues before it through Releases[2] and Injunction, but none have cited any rule, regulation or statute from which that power derives;

- Appellees contend that the Releases are appropriate as they each had an "indemnification" right from Delta, yet none actually quote the language of the indemnity that explicitly excludes any indemnification for damages caused by the indemnitees' own "willful acts" such as the breach of the Indenture that is the very subject of this appeal;

- Appellees contend that the Relet Rights at issue are contained in a contract that does not benefit the Bondholders, but fail to cite the express third-party beneficiary provision in the Facilities Agreement (also referred to as the "Lease" in Appellants' Opening Brief and herein), which unambiguously grants third-party rights to the Bondholders' Trustee;

- Appellees attack Appellants as being "speculators," but cite no authority for the unsupportable proposition that an assignee of a claim is entitled to something less than the full panoply of rights that were afforded to the assignor;

- Appellees speculate that "rewarding" the minority here would cause chaos in future bankruptcies and might even affect prospective credit transactions, all the while ignoring the contractual arrangements between these parties in this Indenture, which make clear that the minority can veto any settlement that purports to impair payment of their principal and interest.  Further, none have yet explained the logic behind a veto right existing in the Indenture solely when there is no default and thus no settlement to veto;

---

[1]     Capitalized terms shall have the meanings ascribed to them in Appellants' Opening Brief unless otherwise stated herein.  Throughout, for convenience purposes, we refer collectively to "Appellees," recognizing of course that each has made distinct arguments and distinguish between them only when circumstances require.

[2]     The releases contained in Section 3.02(f) of the Settlement (see App. Ex. P § 3.02(f)) are referred to as the "Releases."

- Appellees contend that Appellants "did not contest" that the Settlement is in the best interests of Bondholders, when the record is directly to the contrary – indeed, Appellees selectively edit Judge Hardin's "did not make any argument" quote from the relevant transcript without including Appellants' answer to the Court's statement;

- Appellees now contend that the Releases were "critical" to the Plan, without citing or explaining the numerous instances in the record below where it was made clear that the Plan would be confirmed whether or not this dispute was resolved;

- Appellees contend this appeal is constitutionally moot because the *status quo ante* is now unattainable, but fail to cite U.S. Supreme Court authority that makes absolutely clear that an appeal is <u>not</u> moot even though the parties cannot be returned to the *status quo ante*;

- Appellees contend that the Trustee had the apparent authority to "settle" all of the Bondholder claims, without ever parsing between (i) claims against Delta and KCAB under the Guaranty and Lease that are at least arguably within the dominion of the Trustee and (ii) direct Bondholder claims against third parties that cannot be settled by the Trustee under any reading of the Indenture; and

- Appellees claim that Appellants "misrepresent" that the Bonds are not debt of KCAB, but never answer the question "who's debt is it, if not KCAB's?". Importantly, none contend that this Court is free to disregard the form of the transaction and deem the Bond debt that of Delta.

We do not dispute the importance of settlements in bankruptcy cases or the need for finality in them. We further understand the reluctance of a court to stand in the way of a transaction that has the support of substantial economic parties. But the issue on this appeal is one of <u>law</u>, based upon the contracts between the parties, existing statutes, rules and binding precedent. The Court should not permit Appellees to violate the contracts, abandon the law, and obtain, through an affirmance or mooting, an exoneration for their actions in the name of efficiency and what "appears" to be a "good deal." An illegal deal can never be a "good deal" and certainly cannot be sanctioned by a court of law.

MIAMI 728994 (2K)

ARGUMENT

I.     APPELLEES CANNOT AVOID JUDICIAL REVIEW OF THEIR
       ACTIONS BY CLOSING THE TRANSACTION IN THE FACE
       OF CHALLENGES TO THEIR RELEASES AND THE INJUNCTION

       Predictably, the Appellees start their assault on Appellants by contending that this appeal

should be dismissed because there has been a comprehensive change in circumstances since the

parties last appeared before this Court.  These contentions, however, fail to support a dismissal.

       A.     This Appeal Is Not Constitutionally Moot

       Appellees attempt to create the appearance of constitutional mootness by complaining

that (i) any relief granted in favor of Appellants would have to result in a complete unwinding of

the Settlement and a disgorgement of all Bondholder recoveries, and (ii) reversal of any part of

the Settlement Order simply would be impossible.  These contentions are insufficient to meet

Appellees' heavy burden of establishing constitutional mootness.  See Princeton Cmty. Phone

Book, Inc. v. Bate, 582 F.2d 706, 710 (3d Cir. 1978) ("[A] party arguing that a case is moot must

bear a heavy burden of demonstrating the facts underlying that contention.") (citing United

States v. W.T. Grant Co., 345 U.S. 629 (1953)).  First, Appellees overstate the consequences of

reversing the Settlement Order.  In stark contrast to cases cited by Appellees,[3] Appellants are not

asking this Court to vacate a confirmation order or to order the return of billions of dollars in

creditor distributions.  Rather, this is an appeal involving a swing in Appellants' recoveries in the

tens of millions of dollars.  Whether or not Delta elects to seek disgorgement of hundreds of

---

[3]     Appellees cite a number of cases, including the Enron and Revere cases, the facts of which are
distinguishable from the present appeal.  See, e.g., Debtors' Brief at 16 (citing Upstream Energy Servs. v. Enron
Corp. (In re Enron Corp.), 326 B.R. 497, 502-03 (S.D.N.Y. 2005) (court found that to grant the appellant's requested
relief would unravel a plan under which distributions over $580 million had been made and a "myriad other
complicated and interrelated transactions have gone forward . . . .")); Debtors' Brief at 18 (citing Lawrence v.
Revere Copper & Brass Inc. (In re Revere Copper & Brass, Inc.), 78 B.R. 17 (S.D.N.Y. 1987) (court denied
appellant's request that a confirmation order be reversed on the basis of mootness where the debtors' plan providing
for approximately $300,000,000 in total claims had been substantially consummated).  Importantly, unlike the Enron
case, Appellants are not attempting to excise exculpation provisions that would require the entire plan to be
unraveled.  Enron, 326 B.R. at 503.

millions of dollars of Plan distributions from all Bondholders while litigating over a fraction of

that amount is a matter for Delta, not this Court.  We note, however, that because distributions to

Bondholders were made pursuant to the Plan and the Confirmation Order and <u>not</u> the Settlement

Order, Delta would need to vacate the Confirmation Order in order to obtain disgorgement.[4]

Plan § 4.2 (holders of allowed unsecured claims get a distribution on the Effective Date pursuant

to the Plan and the Settlement Agreement)[5]; App. Ex. P §§ 3.01, 4.04. This case is thus

significantly different than a case like <u>Adelphia</u>, where it was the <u>appellants</u> who actively sought

to vacate a confirmation order and have creditors disgorge in order to satisfy Appellants' claim.[6]

The Court should also dismiss out of hand Delta's implication that it would, if the Settlement

Order were vacated, vacate its Cincinnati hub while litigating this dispute.  Debtors' Brief at 18

n.14.

        Second, Appellees' preoccupation with the *status quo ante* simply misses the mark.  The

United States Supreme Court has held that an appeal must be dismissed as constitutionally moot

only when "an event occurs while a case is pending on appeal that makes it *impossible* for the

court to grant any effectual relief whatsoever to a prevailing party."  <u>Church of Scientology of</u>

<u>Cal. v. United States</u>, 506 U.S. 9, 12-13 (1992) (internal quotations omitted) (emphasis added).

---

[4]     Under the Settlement, the Bondholders were assigned the right to, in aggregate, a general unsecured claim of $260 million against the Debtors and a new $85 million note (to be issued under the Plan) purportedly in exchange for the cancellation of their Bonds and all of their rights under the Indenture.  App. Ex. P § 3.02.  Thus, the Bondholders did not receive any monetary distributions pursuant to the Settlement Order; but rather, they only received two new rights to payment (i.e., a claim and a note against Delta, instead of their Bonds owed by KCAB), pursuant to which they were entitled to receive distributions from the Debtors according to the treatment prescribed under the Plan.  Delta is simply imprecise when it says that "distributions pursuant to the Settlement Agreement were made through financial intermediaries …."  Debtors' Brief at 12.

[5]     Section 4.2 of the Debtors' Plan is attached hereto as Exhibit "A" to this Reply.

[6]     In <u>Adelphia</u>, appellants unsuccessfully argued that effective relief could be granted if the court reversed a settlement and allowed the settled litigation to proceed, claiming the court could, *ex post*, order disgorgement of plan distributions from creditors who had received in excess of the amount to which they were entitled pursuant to a judgment.  <u>ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)</u>, --- B.R. ---, No. 02-41729, No. 07 Civ. 1172, 2007 WL  1002127, at *5 (S.D.N.Y. Apr. 2, 2007).  Alternatively, the appellants in <u>Adelphia</u> sought disgorgement, *ex ante*, of hundreds of millions of dollars of plan distributions from creditors who had already received cash, stock and litigation interests in Adelphia.  <u>Id.</u>

Even if a reviewing court is unable "to return the parties to the *status quo ante*" upon reversal of an order, an appeal will not be considered constitutionally moot so long as "a court can fashion *some* form of meaningful relief in circumstances such as these." Id. at 12-13 (emphasis in original); Herbert Constr. Co. v. Greater N.Y. Sav. Bank (In re 455 CPW Assocs.), 225 F.3d 645, No. 99-5068, 2000 WL 1340569, at *2 (2d Cir. 2000)[7] ("A case becomes moot, then, only when it is 'impossible for the court to grant any effectual relief whatever.'") (quoting Church of Scientology, 506 U.S. at 12).

    Thus, even if a total rescission (with an unwinding of the new lease and a reinstatement of the old agreements) is not available here, the appeal is not constitutionally moot. Appellants can still recover in damages from Appellees. See Bateman v. Grover (In re Berg), 45 B.R. 899, 902 (B.A.P. 9th Cir. 1984) (appellant's failure to obtain a stay pending appeal may preclude a revesting of title to the property, but it does not preclude a later award of damages.). Likewise, the present case is not a situation in which an appellee no longer has assets to satisfy judgment, thus rendering any appeal meaningless. See, e.g., Adams v. Resolution Trust Corp., 927 F.2d 348, 355 (8th Cir. 1991) (holding that a subordinated noteholder's common law fraud claim was moot where defendant's assets were insufficient to satisfy even the claims of general creditors). Leaving aside the uncontested solvency of Trustee and KCAB, the Debtors are in possession of a substantial disputed claims reserve allotted to cover the approximately $2 billion in disputed prepetition claims still unresolved in their bankruptcy cases. The only issue affecting a damage recovery, then, is whether the Releases and the Injunction are effective. Unlike real constitutional mootness cases, the application of those "events" to Appellants' potential remedies

---

[7]        This decision was not selected for publication.

are not exogenous to, but rather are squarely within, the appellate jurisdiction of this Court, as set forth below.

> B.    This Appeal Is Not Equitably Moot

Unlike constitutional mootness, an appeal is equitably moot when effective relief could be fashioned but granting such relief would be "inequitable."[8] Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 950-54 (2d Cir. 1993) ("Chateaugay II") (holding appeal of confirmation order was not equitably moot after substantial consummation of the reorganization plan); see also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 890-91 (S.D.N.Y. 1994) (holding insurance company's appeal from unstayed injunction order was equitably moot after comprehensive change in circumstances).[9]

Here, appellate review is not inequitable for the simple reason that Appellees knowingly chose to consummate the Settlement in the face of challenges to the Releases and the Injunction. They simply cannot manipulate the appellate process by arguing that the Releases are non-severable aspects of the deal, based upon their private agreement on non-severability, and thereby create their own comprehensive change in circumstances supporting dismissal.[10]

---

[8]    As a general prudential principle, courts have found "that it is more desirable to decide cases on the merits." In re 183 Lorraine St. Assocs., 198 B.R. 16, 25 (E.D.N.Y. 1996) (rejecting mootness challenge and holding that its "duty to review a bankruptcy court's confirmation order . . . warrants consideration of these appeals"); Epic Metals Corp. v. Condec, Inc. (In re Condec, Inc.), 225 B.R. 800, 803-06 (M.D. Fla. 1998) (rejecting mootness and finding "competing interest" of the appellant's right "to seek review of a bankruptcy order adversely affecting him" outweighs the need for finality and dismissal).

[9]    Contrary to Appellee's assertion, Allstate does in fact distinguish between situations when (i) an unstayed order results in a "comprehensive change in circumstances" and (ii) a reorganization is substantially consummated, in applying equitable mootness. Allstate, 174 B.R. at 888 (citing In re Chateaugay Corp., 988 F.2d 322 (2d Cir. 1993)). Allstate explicitly states that a stricter standard is applied in the latter situation (i.e., "substantial consummation") compared to the "flexible comprehensive change in circumstances standard", and further describes the presumption of mootness only in terms of the "substantial consummation" standard. Id. at 889. Moreover, Appellees' authorities, Kassover v. Gibson, No. 02 Civ. 7978, 2003 U.S. Dist. LEXIS 8765 (S.D.N.Y. May 27, 2003), and In re Pan Am Corp., No. 98 Civ. 7838, 1999 U.S. Dist. LEXIS 14612 (S.D.N.Y. Sept. 22, 1999), are unhelpful to their proposition, as a presumption of equitable mootness was neither discussed nor applied.

[10]    Nor is this case "closely on point" with Metromedia as Delta claims. Debtors' Brief at 15. In Metromedia, the Court took special notice that the appellants had failed to seek any stay of the transaction and had waited over a

<u>Peachtree Lane Assocs., Ltd. v. Granader (In re Peachtree Lane Assocs., Ltd.)</u>, 188 B.R. 815, 828 (N.D. Ill. 1995) ("Congress could not have intended for bankruptcy courts to be capable of avoiding appellate review . . . 'simply by disbursing the estate's assets and dismissing the case.'") (quoting <u>In re Statistical Tabulating Corp.</u>, 60 F.3d 1286, 1289 (7th Cir. 1995)).  The Court should be clear on this point – by structuring a deal the way they did with (i) releases, (ii) a non-severability provision, and (iii) a quick closing, Appellees in effect made the lack of Article III review an implied condition to the deal.  We have little doubt that had Appellees inserted into the Settlement Agreement a provision that explicitly allowed termination if any Article III court reviewed the Settlement Order, such a provision would never have been approved.

II.    APPELLEES HAVE OFFERED NO JUSTIFICATION FOR
       <u>ALLOWING THE RELEASES AND INJUNCTION TO STAND</u>

        Clearly, one of the two central foci of this appeal has become the Releases and the Injunction.  Perhaps the central deficiency in Appellees' briefs on this issue is the absence of any citation whatsoever to the legal basis on which the Releases and the Injunction were granted by the Bankruptcy Court.  Appellees do not dispute our contention that such relief is beyond the scope of section 365 of the Bankruptcy Code or Bankruptcy Rule 9019, the two express predicates for the Settlement Motion filed by the Debtors.  Nor do they cite (even if it were appropriate at this stage) any new statute or rule that would support the relief, in the end having to rely on the novel contention that, if one puts a request for judicial relief in a proposed order, the Court can grant that relief without regard to its jurisdictional mandate.  Debtors' Brief at 24 n.18, 31.  Without addressing the fundamental deficiency of power and jurisdiction head on, Appellees instead set forth a number of contentions purportedly justifying the legitimacy of these Releases and the Injunction.  None present a sufficient legal basis for supporting the relief.

---

year to raise the issue of releases.  <u>Deutsche Bank AG London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)</u>, 416 F.3d 136, 144-45 (2d Cir. 2005).

   *1.*  *Severability.* Appellees incorrectly assert that the Bankruptcy Court had authority to approve the Releases and the Injunction because those provisions are integral to the deal and not severable from the rest of the Settlement Agreement. <u>See</u> Trustee Brief at 21-22. As an initial matter, the Releases of, and the Injunction against, all third-party claims (including those that are unrelated actions to the Settlement) can be restricted by this Court without "imposing" a deal on Appellees. It simply has to vacate the Settlement Order. Whether Appellees then elect voluntarily to modify their agreement, terminate or sue each other for damages is up to them. In any event, Appellees cite nothing to support their syllogism that, if a bankruptcy court has the power to approve a debtor's entry into a settlement, and if third parties condition their settlement on the granting of relief beyond the court's powers, the court is therefore vested with new powers. A mere private agreement between the Debtors, KCAB, and the Trustee cannot expand the powers of the Bankruptcy Court or defeat this Court's ability to overturn an otherwise illegal grant of releases and improper issuance of an injunction. <u>Cf.</u> <u>In re Combustion Eng'g, Inc.</u>, 391 F.3d 190, 228 (3d Cir. 2004) ("[T]he boundaries of bankruptcy court jurisdiction cannot be extended simply to facilitate a particular plan of reorganization.").

   *2.*  *Scope.* Appellees' next argument that the Releases and the Injunction are narrowly tailored to the Settlement (<u>e.g.</u>, KCAB Brief at 17; Trustee Brief at 31-32; Debtors' Brief at 28-29) is patently incorrect. First, the Settlement's release and injunctive provisions apply to several <u>thousand</u> persons and entities, including the Debtors, KCAB, the Trustee, all of the Bondholders, and each of their "present and former parents, subsidiaries, affiliates, divisions, successors, transferees, partners, principals, officers, directors, employees, agents and assigns."[11] App. Ex. P § 3.02(f). Further, the provisions are unnecessarily made applicable to the entire

---

[11]  In quoting the release in its argument on narrowness, Delta uses ellipses to exclude the language expanding the Releases beyond just the Appellants. <u>See</u> Debtors' Brief at 28.

universe of potential claims between those parties to the extent they are "in any way related" to

the 1992 Bond Agreements.  Id.  For example, Bondholder claims related to purchases and sales

of securities are arguably released and enjoined by the Settlement Order, as are the rest of the

Bondholders' private, individual claims relating to the Settlement Agreement.  Under these

circumstances, the Releases are not sufficiently tailored.  See Metromedia, 416 F.3d at 142-43

(cautioning that non-debtor releases should only be approved in truly unusual circumstances);

Cartalemi v. Karta Corp. (In re Karta Corp.), 342 B.R. 45, 54 (S.D.N.Y. 2006) (quoting

Metromedia, 416 F.3d at 142); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.),

330 B.R. 394, 436 (Bankr. S.D.N.Y. 2005) (same).

      *3.*    *Alleged Consideration.*  Third, contrary to Appellees' contentions (see Debtors'

Brief at 29 n.22; Trustee Brief at 33-34; KCAB Brief at 17-18), KCAB and the Trustee did not

provide the Debtors with "substantial consideration" by releasing the Debtors' indemnity

obligations.  The Trustee goes so far as to state that, "[p]ursuant to Section 6.08 of the Facilities

Agreement, Delta agreed to indemnify both KCAB and the Bond Trustee *for any actions brought

against them by third parties*."  Trustee Brief at 33-34 (emphasis added).  This is a misstatement

of the record below.  See App. Ex. D § 6.08.  Delta is not required to indemnify the Trustee and

KCAB for actions brought by third parties if those actions relate to the Trustee's and KCAB's

own "negligence or willful misconduct."[12]  App. Ex. D § 6.08(a).  In reality, because the issue

here centers on the claimed willful breaches of the Indenture by the Trustee and KCAB, which

are not indemnifiable, the indemnities gave nothing to support a plan-type, third-party release.

See Adelphia, No. 02-41729, 2007 WL 866643, at *105 (Bankr. S.D.N.Y. Jan. 3, 2007)(noting

that the presence of the phrase "to the extent permitted by applicable law" narrowly prevented

---

[12]      Once again, Delta uses ellipses to end their quote of the indemnity before the reference to the exclusion for negligence or willful misconduct.  Debtors' Brief at 36 n.30.

certain third-party releases and exculpation provisions from rendering the Adelphia plan unconfirmable); Adelphia, 2007 WL 706884 (Bankr. S.D.N.Y. Mar. 6, 2007) (clarifying that the Metromedia standard applies even in the context of Bankruptcy Rule 9019 settlement agreements).  As Metromedia, Drexel, Zale and the cases cited therein make clear, third-parties do not get free passes in bankruptcy.  They have to give something "important" to the debtor's organization to get relief.  Feld v. Zale Corp. (In re Zale Corp.), 62 F.3d 746 (5th Cir. 1995).  See Metromedia, 416 B.R. at 141-43.  No such consideration passed from either the Trustee of KCAB to the Bondholders.

     *4.    "Consensuality" of Releases.*  In spite of Appellees' arguments, the Releases and the Injunction against the Bondholders' claims (as well as any of their other obligations under the Settlement) were not "consensual" as Appellees repeatedly contend.  The Trustee's authority to act on behalf of the Bondholders is explicitly limited by the provisions of the Indenture.  See Meckel v. Cont'l Res. Co., 758 F.2d 811, 816 (2d Cir. 1985) ("[A]n indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement.").  As the Indenture specifically states, the Trustee only has the authority to take actions on behalf of the Bondholders to protect their rights as owners of the Bonds.[13]  Nowhere in the Indenture does the Trustee undertake the power, on behalf of the

---

[13]    In addition to declaring acceleration upon an event of default (App. Ex. A § 9.01), the Indenture only permits the Trustee, on behalf of the Bondholders, to:

    (a)  by mandamus, or other suit, action or proceeding at law or in equity, enforce all rights of the Owners of the Bonds, and require the Issuer and the Company to carry out any agreements with or for the benefit of the Owners and to perform their duties under the Act, the Agreement and this Indenture;

    (b)  take all such actions as may be permitted under the Letter of Credit or other Credit Facility;

    (c)  bring suit upon the Agreement, the Bonds or any Credit Facility; or

    (d)  by action or suit in equity enjoin any acts or things which may be unlawful or in violation of the rights of the Owners of the Bonds.

App. Ex. A § 9.02.

Bondholders, to litigate or take any action – let alone settle and release – claims independent of the Bonds or, as explained below, individual Bondholders' rights to principal and interest. Appellees' argument that the Bankruptcy Court's approval of the Releases and the Injunction was proper because the Bondholders' agent consented should be rejected as simply circular.

     5.    *"Importance" to the Plan.*  As presaged in our Opening Brief, Appellees now attempt to rely on plan release cases to argue that the Releases and the Injunction were properly approved as important to the Debtors' Plan.  Notably, in their Disclosure Statement, the Debtors made clear that the negotiations between the Debtors, KCAB, and the Trustee regarding the Bonds had reached an impasse and that, consequently, the Debtors had re-noticed their motion to reject the Facilities Agreement and related leases and contracts.  See App. Ex. M at 56-57. According to the Disclosure Statement, prior to voting on and confirmation of the Plan, the Debtors enumerated several alternatives to a settlement.  See id. at 54.[14]  Clearly, the Debtors had no intention of foregoing their reorganization absent the approval of the Releases and the Injunction, which eventually made their way into the Settlement.

     6.    *Deficiencies in the Injunction.*  Finally, with respect to the Injunction, Appellees adopt a "no harm, no foul" approach contending that either (i) Appellants failed to preserve their right to object to the lack of an adversary proceeding pursuant to Bankruptcy Rule 7001 or, in the alternative, (ii) the Settlement Hearing provided Appellants with due process sufficient to justify the entry of injunctive relief.  E.g., Debtors' Brief at 38-39.

     On the waiver point, the Second Circuit has noted in multiple cases, "[a]rguments made on appeal need not be identical to those made below if they involve only questions of law and additional findings of fact are not required."  A.I. Trade Fin., Inc. v. Petra Bank, 989 F.2d 76, 80

---

[14]    The four options disclosed to voters on the Plan included: (1) assumption of the municipal bond agreement; (2) rejection of the municipal bond agreement; (3) the settlement of issues arising under the municipal bond agreement; and (4) recharacterization of the municipal bond agreement in the form of a lease as a financing.  Id.

(2d Cir. 1993) (citing <u>Vintero Corp. v. Corporacion Venezolana de Fomento</u>, 675 F.2d 513, 515

(2d Cir. 1982); <u>see also</u> <u>U.S. Lines (S.A.), Inc. v. United States (In re McLean Indus.)</u>, 30 F.3d

385, 387 (2d Cir. 1994).  Thus, an appellate court has considerable discretion to review purely

legal questions not formally raised in the lower court.  <u>McLean Indus.</u>, 30 F.3d at 387; <u>see also</u>

<u>Austin v. Healey</u>, 5 F.3d 598, 601 (2d Cir. 1993), <u>cert. denied</u>, 510 U.S. 1165 (1994); <u>United</u>

<u>States v. 16.03 Acres of Land</u>, 26 F.3d 349, 353-54 (2d Cir. 1994) (same); <u>Bornholdt v. Brady</u>,

869 F.2d 57, 68 (2d Cir. 1989).[15]

On the more substantive issue – that any failure to follow the relevant procedures was

allegedly harmless – Appellees miss the point.  The issue is not one of form *per se*, but the

failure of the Bankruptcy Court to apply *any* of the traditional, requisite procedures and

standards applicable to the entry of an injunction.  <u>See</u> Opening Brief at 19-22.  Whether that

application was conducted in an adversary proceeding or contested matter is less an issue than

the fact that it was not done at all.  Indeed, Appellees have not cited to a single decision that

would give a federal court the ability to issue a permanent anti-suit injunction under the

circumstances in this case.[16]

III.    THERE HAS NEVER BEEN A PROPER SETTLEMENT
        OR AN ADJUDICATION OF BONDHOLDER CLAIMS
        <u>MISSING IN CONNECTION WITH THE SETTLEMENT</u>

Perhaps recognizing the fragility of the release provisions and the Injunction, Appellees

maintain, in effect, that even if the Releases and the Injunction are vacated, Appellants' claims

have already been either settled or judicially resolved as a result of the Bankruptcy Court's

---

[15]    The only case cited by the Appellees to suggest that waiver is appropriate, <u>Gulino v. N.Y. State Educ.</u>
<u>Dept.</u>, 460 F.3d 361, 380 n.22 (2d Cir. 2006), involved an appeal of a Title VII decision in which the defendants on
appeal attempted to <u>reverse</u> their arguments made below and assert that Title VII did not apply.

[16]    Instead, Appellees cite two inapposite cases – <u>Trust Corp. of Mont. v. Patterson (In re Copper King Inn,</u>
<u>Inc.)</u>, 918 F.2d 1404 (9th Cir. 1990), and <u>Carroll v. Rafael Galleries, Inc. (In re Altman)</u>, 254 B.R. 509 (D. Conn.
2000).  While each notes that non-adherence to Bankruptcy Rule 7001 is not *per se* fatal, neither supports the
proposition that a bankruptcy court may ignore the requirements for issuing an injunction.

findings made, and legal conclusions reached, in connection with the approval of the Settlement. Thus, Appellees' argument appears to be that, even if this Court granted the relief sought by Appellants, Appellants are chasing a phantom remedy.  That is not the case.

      A.     The Individual Bondholder Claims Have Never
              Been Settled Or Adjudicated

Appellants do not contend that the Bankruptcy Court in fact, adjudicated any of Appellants' private claims against the Trustee, KCAB, the Debtors and others relating to entry into the Settlement.  Debtors' Brief at 28-29 (emphasizing that the Releases were intended to prevent adjudication of these claims).  In trying to explain away the constitutional problem of a court releasing claims that have not been adjudicated, Appellees simply state that all of the Individual Bondholder Claims were properly settled by the Trustee in its capacity as the Bondholders' authorized agent.  See, e.g., Debtors' Brief at 20-23.  That argument lacks any rigor.

As noted in Section II. 4., supra, the powers of the Trustee are derived entirely from the Indenture.  The Indenture does not give the Trustee authority to bring suit on or settle private claims on behalf of the Bondholders, such as claims against the Trustee for breach of the Indenture.  See App. Ex. A §§ 9.01; 9.02; see also Regions Bank v. Blount Parish & Co., No. 01 C 0031, 2001 WL 72989, *3 (N.D. Ill. June 27, 2001) (stating that an indenture trustee may only pursue a private action on behalf of bondholders when such claim has been assigned to the indenture trustee under the terms of the indenture); Premier Bank v. Tierney, 114 F. Supp. 2d. 877, 882 (W.D. Mo. 2000) ("There is no pre-existing right for the [indenture trustee] to bring . . . tort claims on behalf of the bondholders.  Such a right must be given by the bondholders, for it is they who are provided it by law."); United Bank of Ariz. v. Sun Mesa Corp., 119 F.R.D. 430, 431 (D. Ariz. 1988) (indenture trustee did not have standing to pursue fraud claims on behalf of

13

bondholders where the "agreements did not support an inference that the individual bondholders had surrendered their right to independently sue . . . .").[17]  None of the authorities cited by Appellees permits an indenture trustee either to hold to itself the private claims of bondholders or to act inconsistently with the document that creates, and more importantly governs, the trust.[18]

B.    Appellees Misinterpret The Indenture As Allowing<br>The Trustee to Compromise Principal And Interest

With respect to claims arising under the Indenture for principal and interest on the Bonds, we will not repeat our textual arguments as to why the Indenture before this Court does not allow the Trustee to settle principal and interest without Appellants' consent.  Nor are we going to dwell on Appellees' contentions that Appellants did not contest the fairness of the Settlement below.[19]  We simply note that Appellees (and the Court below) (i) create an implied right for the Trustee to settle any action on any terms, (ii) eviscerate the minority protections in the Indenture and (iii) in turn, offer no explanation whatsoever as to why the minority has consent rights which can only be used in the absence of any default.[20]  Instead, we focus on Appellees' intimations

---

[17]    See note 10 supra.

[18]    In neither Shaw v. Railroad Co., 100 U.S. 605 (1879), nor Schallitz v. Starrett Corp., 82 N.Y.S.2d 89 (Sup. Ct. 1948), was the court called upon to consider whether the action taken by the trustee was in direct violation to the express terms of an indenture or other governing document.  Friedman v. Chesapeake & Ohio Railway. Co., 261 F. Supp. 728 (S.D.N.Y. 1966), and Quirke v. St. Louis-San Francisco Railway Co., 277 F.2d 705 (8th Cir. 1960), merely stand for the enforceability of no-action clauses, and thus, are irrelevant.  These cases do not support Appellees' contention that a trustee may enter into a settlement that contravenes beneficiaries' rights under an indenture or other trust instrument.  Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs, 423 F.3d 166 (2d Cir. 2005) (reversing bankruptcy court order conferring derivative standing on creditor to settle causes of action over objection of debtor in possession), Kelton Corp. v. County of Worcester, 688 N.E.2d 941 (Mass. 1997) (finding county's inherent power to sue to include implied power to settle), Evans v. Tucker, 135 So. 305 (Fla. 1931) (finding power of estate administrator to sue to include implied power to settle), Codman v. Dumaine, 144 N.E. 408 (Mass. 1924) (finding that power of corporation to sue or be sued carried with it power to settle), and Farnham v. City of Lincoln, 106 N.W. 666 (Neb. 1906) (finding that city charter's authorization to sue included authorization for city officials to settle), are all distinguishable from the instant case in that they did not involve trusts or other similar relationships governed by agreement.  Accordingly, unlike here, the courts in those cases were not called upon to consider whether the actions of the settling parties contravened an express limitation on the settling parties' powers.

[19]    When asked, Appellants stated that the Settlement was not a "good deal."  Debtors' Brief, Ex. 7 at 20-21.

[20]    We will not repeat our analysis of those cases – cited by Appellees and the American Bankers Association – which stand for the uncontested proposition that, if an issuer is in bankruptcy, it does not need to obtain the

14

that the impairment of minority rights by trustees is somehow commonplace.  In that regard,

notwithstanding that sixty-plus years have elapsed since the enactment of Trust Indenture Act of

1939,[21] and even with the assistance of an *amicus curiae* which seeks to speak for the indenture

trustee industry, Appellees can point to only two lawyer-drafted, non-precedential orders that

suggest an indenture trustee can ever impair minority rights to principal and interest through a

settlement without unanimous consent.[22]  See  Kemper Inv. Life Ins. Co. v. Las Colinas Corp.,

No. 88 C 9152 (N.D. Ill. filed June 29, 1989) (district court granted an *uncontested* motion

brought by a bondholder, both individually and in its capacity as class representative of a class of

bondholders, for approval of a class action settlement in a declaratory judgment action brought

by the class representative); MBank Dallas v. LaBarge, Inc., Case No. 86 C 9583 (N.D. Ill. filed

Jan. 2, 1987) (district court certified a class of bondholders and approved a class action

settlement of a declaratory judgment action brought by the indenture trustee and the class

---

consent of all bondholders in order to modify the bondholders' rights to principal and interest.  As set forth repeatedly, the issuer here (KCAB) is not a debtor entitled to use the Bankruptcy Code to override its contractual commitments.  In that regard, none of Appellees contend that this Court may disregard the form of the transaction on this record.

[21]     The language in Section 9.06 of the Indenture closely mirrors Section 316(b) of the Trust Indenture Act of 1939, entitled "Prohibition of impairment of holder's right to payment," which states:

> Notwithstanding any other provision of the Indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder.

15 U.S.C. § 77ppp(b).

[22]     At this point, the record is entirely unclear as to just how a majority the "majority" is here. While the Debtors openly tout that "hundreds of Bondholders, the vast majority of whom (97.3% in amount) endorsed the Settlement," the actual vote based on the Balloting Affidavit, which Debtors seek to introduce, but was not admitted into evidence below, reflects that less than half of the Bondholders voted in terms of amount.  Only $168,520,535.67 of the over $400,000,000 of the Bonds cast votes that were counted. [Balloting Affidavit--Exhibit E].  At argument at the stay hearing, counsel for the Debtors claimed that the tabulation reduced the amount held by the Bondholders to reflect that the Settlement provided them with an allowed $260 million claim.  However, the Balloting Affidavit does not indicate that Bondholders' votes were adjusted in such manner.  Indeed, the Balloting Affidavit supports a contrary result, because the amounts listed match the amounts held by Appellants.  For example, the Balloting Affidavit avers that Moses Marx, one of the Appellants, voted $325,000 of the Bonds, specifically CUSIP 491026JF8, to reject the Plan.  As noted in the Second Supplemental Statement of White & Case LLP Pursuant to Bankruptcy Rule 2019 filed March 27, 2007, Moses Marx only held $325,000 of that specific CUSIP.  These facts seems to indicate no adjustment.

15

representative).  Both of these decisions are inapposite in all material respects and actually cut against Appellees.

First, both <u>Kemper</u> and <u>MBank</u> were class actions certified under Rule 23 of the Federal Rules of Civil Procedure.  Pursuant to subsection (e) of that rule, the Courts were specifically required to conduct a best interests of bondholders determination.  Here, the Bankruptcy Court had <u>no</u> obligation to determine whether the Settlement was in the best interests of the individual Bondholders that are, at most, creditors of a creditor of the Debtors.  On the contrary, the Bankruptcy Court was charged with finding the obverse – <u>i.e.</u>, that the settlement was in the best interest of the Bondholders' <u>adversaries</u> in the negotiation.[23]  <u>See</u> <u>Masonic Hall & Asylum Fund v. Official Comm. of Unsecured Creditors (In re Refco, Inc.)</u>, No. 05-60006, 2006 WL 3409088, at *6 (S.D.N.Y. Nov. 16, 2006) ("The Bankruptcy Court properly declined to consider Appellants' objections because creditors of a debtor, not a 'creditor of a debtor's creditor,' could properly raise objections to the Settlement."); <u>see also</u> <u>Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach Corp.)</u>, 698 F.2d 571, 573 (2d Cir. 1983); <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v Anderson</u>, 390 U.S. 414, 425 (1968).  Perhaps more important, the fact of class certification under Rule 23 allowed the Courts to circumvent the 316(b) rights of non-consenting bondholders by adopting the fiction that, by virtue of the class representative's delivery of consent to the settlement, the other bondholders were deemed to have consented.  <u>Kemper</u>. No 88 C 9152, at 14, 22 ("The Proposed Settlement . . . has been accepted by Kemper, individually, and as Class Representative. . . .  Accordingly, all Class Members, including Kemper, . . . are bound by this order and declaratory judgment."); <u>MBank</u>, No. 86 C 9583, at 13, 23 ("This lawsuit is a suit, brought by the Trustee and by CNA on behalf

---

[23]     Had the Debtors been acting altruistically to the Bondholders in the negotiations that fact alone would have arguably supported a basis for denying the motion.

of Debentureholders, . . .  Accordingly, . . . the Class Members, . . . are bound by this order and

declaratory judgment.").  In other words, in neither case did the <u>trustee</u> settle with the issuer,

rather each <u>bondholder</u> did through its deemed class representative.

Second, unlike <u>Kemper</u> and <u>MBank</u>, the Bankruptcy Court did not find in its written,

published decision that the Settlement was, in fact, fair and reasonable and in the best interests of

the Bondholders.  <u>E.g.</u>, Debtors' Brief at 24.  The Settlement Opinion here only suggests, and

stops short of concluding, that the Settlement was in the Bondholders' best interests when it

states, "[t]he terms of the Settlement Agreement also *appear* to be favorable for the

Bondholders."  App. Ex. AA at 10 (emphasis added).  By contrast, the Settlement Order provides

that, "[t]he Settlement Agreement is fair and reasonable to, and is in the best interest of, Delta

and its creditors, KCAB, the Bond Trustee, and the 1992 Bondholders . . . ."  App. Ex. C ¶ 11.

The language of the Settlement Order was drafted by Appellees prior to the hearing on the

Settlement Motion, not after the hearing itself, and should not be used to contradict the written

decision.[24]  <u>See, e.g.</u>, <u>Colony Square Co. v. Prudential Ins. Co. (In re Colony Square Co.)</u>, 819

F.2d 272, 275-76 (11th Cir. 1987) (discussing the "overwhelming" temptation of a party to

overreach and exaggerate in a proposed order); <u>In re Automationsolutions Int'l, LLC</u>, 274 B.R.

---

[24]    Nor should the Settlement Order be used against Bondholders in any subsequent proceeding.  Neither <u>Carey v. Brown</u>, 92 U.S. 171 (1875), nor <u>Ross v. City of Fort Wayne</u>, 63 F. 466 (7th Cir. 1894), cited by Appellees, stand for the proposition that because a settlement agreement is fair and reasonable and a trustee acted prudently, a settlement will be binding on all holders.  In <u>Carey</u>, a trustee held notes with the power to settle, and no other conditions were imposed but that the trustee should account for the proceeds.  The issue was whether the beneficiaries of the trust needed to be made parties when the trustee brought suit to recover the trust-property. Similarly, <u>Ross</u>, having nothing to do with a settlement agreement, merely stands for the proposition that, generally, in suits respecting trust property, the beneficiaries, as well as the trustees, are necessary parties. Appellees cite <u>Redmond v. Commerce Trust Co.</u>, 144 F.2d 140, 155 (8th Cir. 1944), to support their argument that when a compromise is made conditioned on proper court approval, the trustee may bind the beneficiaries. Unfortunately for Appellees, in <u>Redmond</u>, that power only exists when it is conferred by the indenture.  As the case states, "a valid compromise . . . may be made by the parties [to the indenture], subject to their capacity to contract the subject matter."  <u>Id.</u> at 154.  Lastly, in <u>Palmer v. Bankers' Trust Co.</u>, 12 F.2d 747, 754 (8th Cir. 1926), a trustee brought a foreclosure suit, and a bondholder intervened demanding payment in full and claiming the trustee could not represent him due to a conflict of interest.  Importantly, the authority of the trustee to enter into the foreclosure suit was never challenged; rather, the power to bring the foreclosure suit was expressly within the trustee's powers.

MIAMI 728994 (2K)

527, 528-29 (Bankr. N.D. Cal. 2002) (finding that proposed order that contained findings of fact and conclusions of law that the court had not addressed at the hearing or in its oral ruling would not be given effect where, first, minimum standards of procedural due process have not been met and, second, the findings and provisions of the order were not necessary to the relief sought); see also Cohen v. United States, 191 B.R. 482, 484 (S.D. Fla. 1995) ("When the factual findings were not the product of personal analysis and determination by the trial judge, an appellate court may feel more confident in concluding that important evidence was overlooked or inadequately considered.").

Third, the existence of both Kemper and MBank can be explained by a critical factor that is not present here – i.e., a "limited fund" problem created by a dwindling asset with imperiled future prospects of recovery.  See Kemper, No. 88 C 9152, at 15 ("Individual lawsuits by Noteholders at this time could . . . lead to a race to judgment and quite possible, to a reduced recovery to all Noteholders"); MBank, No. 86 C 9583, at 9, 13 ("[I]f LaBarge were [sic] liquidated today . . . the Debentureholders would receive nothing in liquidation value to apply to the $20,000,000 in Debentures. . . .  Individual lawsuits by Debentureholders at this time . . . would lead to a race to judgment and quite possibly, to a reduced recovery for all Debentureholders.").  "'The paradigm [non-opt-out class under Rule 23(b)(1)(B)] is one in which there are multiple claimants to a limited fund . . . .  There is a risk, if litigants are allowed to proceed on an individual basis, that those who sue first will deplete the fund and leave nothing for the latecomers.'"  Byrant B. Edwards, et al., Mandatory Class Action Lawsuits as a Restructuring Technique, 19 PEPP. L. REV. 875, 901 (1992), quoting Arthur R. Miller, A Overview of Federal Class Actions: Past, Present, and Future, 4 JUST. SYS. J. 197, 211 (1978).  In fact, such concerns prompted Congress to permit courts to use the mandatory non-opt-out

provisions of Rule 23.  See Advisory Committee's Note to Amendment to FED. R. CIV. P. 23, 39 F.R.D. 69, 101 (1966) (noting, however, that "the subdivision [permitting non opt-out classes] does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages").  Here, the Bankruptcy Court could never certify a class of Bondholders without an opt-out provision for the simple fact that, if the Trustee prevailed in its dispute with Delta and the Lease were assumed, all Bondholders could and would recover in full.  Further, regardless of how Delta decided to treat its obligations under the Lease, the Bondholders would have retained claims against the Trustee and KCAB.  See County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1303 (2d Cir. 1990) (recognizing that certification of a non-opt-out class under Rule 23(b)(1)(B) was designed for the "limited fund" context); Zimmerman v. Bell, 800 F.2d 386, 389 (4th Cir. 1986) (where the fund was not limited, certification of a non-opt-out class under Rule 23(b)(1)(B) was not warranted).  Given the foregoing, by entering the Settlement Order and binding all Bondholders to the terms of the Settlement without opt out rights,[25] the Bankruptcy Court deprived Appellants of the right to due process which the non-opt-out cases strive to protect.  See  Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811-12 (1985) (due process at a minimum requires that a plaintiff may opt out of a class action seeking predominantly money damages).[26]

Ultimately, when one strips away Kemper and MBank, the Court is left only with Appellees' bare claims of "commonality" and "routine practice" stacked up against a long history of bondholders' minority rights, well documented in academic and legal circles.  See Opening Brief at 35-36; see also Mark J. Roe, The Voting Prohibition in Bond Workouts, 97 YALE L.J. 232, 250-51 (Dec. 1987) (discussing the legislative history behind non-impairment

---

[25]        Counsel for Appellants specifically requested below to have opt out rights.  Debtors' Brief, Ex. 7, at 5.

[26]        But see SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 292 (distinguishing Shutts when plaintiffs have already submitted to court's jurisdiction).

clauses and the inability to effectuate change without unanimous consent); Bryant B. Edwards, et al., Mandatory Class Action Lawsuits as a Restructuring Technique, 19 PEPP. L. REV. at 885 (noting that non-impairment clauses are a "plague" for restructuring debt).  There was nothing routine at all about the course of events below.

        C.      <u>The Issue Of Relet Rights Is Critical To This Appeal</u>

The issue of Bondholders' rights to rental proceeds from any reletting of the Terminal (<u>i.e.</u>, Relet Rights), which dominates KCAB's opposition brief, is critical to this appeal in two respects.  First, the fact that any rights of Bondholders to future receipts from the Terminal are cut off in the Settlement Order undermines any "finding" with respect to the prudency of the Trustee in agreeing to the deal at all (and correspondingly explains the legitimacy of the Appellants' desire to retain substantive claims against the Trustee).  In fact, nowhere in any of Appellees' submissions do they explain why the Trustee, in settling with Delta, gives any material economic concessions to <u>KCAB</u>.  Nor have Appellees disputed that Delta was, by definition, indifferent in its negotiations to the disposition of rental proceeds from the Terminal after it was no longer a tenant.  Second, the existence of Relet Rights running to the Trustee completely undermines the Bankruptcy Court's finding that Delta is the "sole source of funding for the Bonds."  App. Ex. AA at 4.  That finding, in turn, is essential both to the jurisdiction of this Court and to Appellees' arguments that the Trustee did not so much settle with Delta as it suffered the "real world, fundamental facts of life" that Delta was in bankruptcy.  <u>Id.</u>  The fact is that, with or without Delta, the Bondholders could have had their Bonds paid in full.

Despite the strident protests of KCAB (the one party which clearly benefits economically from the stripping of Relet Rights) and Delta (the tenant under the New Lease), the argument that Relet Rights never ran to the Bondholders is not supported by the record.

1.     *The Settlement Order.*  Although as discussed above, the Bankruptcy Court entered an order which states that the Trustee acted prudently in entering into the settlement and further found that Delta is the "sole source" of payment for the Bonds, Judge Hardin later clarified that he never made a legal determination as to the existence of such rights and did not "express any views" on the Relet Rights issue.  App. Ex. Z at 44.

2.     *The Lease*.  Both KCAB and Delta go to lengths to assert that the Relet Rights, which arise under the Lease, do not run to the Bondholders because the Bondholders are not intended third-party beneficiaries of that Lease as a matter of Kentucky law.  <u>E.g.</u>, KCAB Brief at 4-6; Debtors' Brief at 36-38.  Neither, however, actually quotes for the Court Section 10.02 of the Lease, entitled "<u>Parties in Interest</u>," which states, "This Agreement shall inure to the benefit of and shall be binding upon the Issuer, the Company and their respective successors and assigns, and no other person, firm or corporation, *other than the trustee*, shall have any right, remedy or claim under or by reasons of this Agreement") (emphasis added).  App. Ex. D § 10.02. In light of this provision, the Trustee and the Bondholders, as the sole beneficiaries of the Trust Estate administered by the Trustee are indisputably intended third-party beneficiaries of the Lease.

3.     *The Indenture*.  As Section 10.02 of the Lease makes clear, rights under the Lease also run to KCAB's "assigns."  Both Delta and KCAB correctly argue that the right to evict Delta and relet the Terminal or any portion thereof to a new tenant pursuant to Section 8.07 of the Lease is an "Unassigned Right" under the Indenture.  The same is not true, however, with respect to <u>rental</u> <u>proceeds</u> generated by a new tenant.  The definition of "Unassigned Rights" in Section 1.01 of the Indenture explicitly carves out such <u>proceeds</u> from a section 8.07 reletting:

> "Unassigned Rights" shall mean all . . . rights and remedies of the
> Issuer under the Agreement with respect to Section[ ] . . . 8.07 (except

> with respect to all rights, duties and obligations regarding the
> application of moneys derived thereunder to the redemption, purchase
> or defeasance of Bonds as provided in Section 8.07, which rights,
> duties and obligations are expressed assigned to the Trustee)[.]

App. Ex. A § 1.01.  It makes commercial sense that KCAB, as the owner and operator of the

Airport, did not want the Trustee to control the identity of its tenant.  However, the Indenture

clearly specifies that once a new tenant is selected the "application of moneys derived thereunder

are expressly assigned to the Trustee."  App. Ex. A. § 1.01.  KCAB's follow-on arguments with

respect to the waiver of a statutory mortgage lien are a red herring.  KCAB Brief at 10.  The

Trustee did not need a mortgage lien on the Terminal to protect Relet Rights because the rights

under the Lease were already expressly assigned in the Indenture.

        4.    *Common Sense*.  Throughout its submission, KCAB refers to the alleged

"absurdity" of Appellants' position that it would be entitled to look to Terminal rents for

repayment, but never responds head on to one fundamental question – if Delta had liquidated its

assets in 1993 and KCAB had relet the Terminal to some other airline, would the Bondholders

have no recourse to recover the more than $400 million they had just given to KCAB?  Perhaps

recognizing that such a contention would make absolutely no commercial sense, both KCAB and

Delta attempt to explain that the Terminal simply is not worth more than the value of Delta's

payment stream under the New Lease.  In so doing, they cite the testimony of Robert Holscher,

CEO of KCAB, to the effect that no other airline was interested in reletting the Terminal.  <u>See</u>

Debtors' Brief at 36 n.32; KCAB Brief at 6.  Beyond merely begging the question "if the rights

are not valuable, why is KCAB fighting so had to keep them?," the full record on appeal does not

support their point.  In his examination which is in the record at App. Ex. II, Mr. Holscher

explained that he marketed the <u>unused portions</u> of the Airport to 60 airlines, but had never

MIAMI 728994 (2K)

marketed Delta's Terminal to any airline.[27]  App. Ex. II at 206:9-16 (when asked whether he

marketed the Terminal to other airlines, Mr. Holscher responded "No").  Further, there is

absolutely no record evidence below (credible, competent or otherwise) to support a contention

that there is no residual value of the Terminal at the end of the New Lease.  KCAB Brief at 5-6.

　　　　5.　　*KCAB's and the Trustee's Prior Admissions*.  In marketing the Bond issuance to

the public in 1992, KCAB unequivocally touted in its offering memorandum that the Relet

Rights, which it now claims are non-existent, would in fact serve as a source of repayment for

the Bonds.  "[T]he monies derived from the exercise of such remedies, including any proceeds

derived from the re-letting of the Project Facilities, have been assigned to the trustee as security

for the Bonds."  App. Ex. NN at 12-13.  The Trustee, for its part, has during the pendency of

Delta's cases openly acknowledged the legitimacy of Appellants' present arguments.  In a prior

submission to the Bankruptcy Court, its counsel asserted that in any dispute over such rights it

would argue, <u>inter alia</u>,

> (i)　　　Section 8.07(c) of the Facilities Agreement provides that
> KCAB is obligated to use its best effort to re-let any vacated
> portion or portions of the Facilities and to credit all rentals derived
> from any such re-letting to the amounts owed under the Facilities
> Agreement.  Thus, KCAB would be required to pay over the Re-
> Let Proceeds to the Indenture Trustee to reduce the amounts owed
> under the Facilities Agreement.  This right is expressly preserved
> for the benefit of the Indenture Trustee under the terms of the
> Indenture Trustee.  *See Trust Indenture* at § 1.01 (Definition of
> "Unassigned Rights" which definition carves-out the right to
> receive Re-Let Proceeds for the benefit of the Indenture Trustee);
>
> (ii)　　　The Indenture Trustee would also refer to various
> provisions of the Official Statement which make clear that the Re-
> Let Proceeds have been assigned to the Indenture Trustee.  *See
> Official Statement* at pp. 12-13 ("[T]he monies derived from the
> exercise of such remedies, including any proceeds derived from the

---

[27]　　　Again, Section 8.07(c) makes clear that KCAB was obligated to use its "best efforts" to relet the Facilities
and to apply proceeds from the Relet Rights to the Bonds.

re-letting of the Project Facilities, have been assigned to the trustee as security for the Bonds.");

(iii)    The Indenture Trustee would also argue that it is the clear and intended beneficiary under Kentucky law of the Re-Let Proceeds; and

(iv)    Finally, the Indenture Trustee would again assert that the amount of the Re-Let Proceeds would be fixed based upon the provisions of the Kentucky Statute.

App. Ex. HH at 39-40.

6.    *Kentucky Law.*  Having no legitimate explanation under the relevant project documents for the alleged non-existence of Relet Rights running in favor of the Bondholders, KCAB then provides the Court with an exegesis on KY. REV. STAT. ANN. § 103.260(2), essentially arguing that the statute does not impose on KCAB any statutory obligation to use future rentals to defease the Bonds.  As an initial matter, the Court need not resolve whether a statutory obligation exists in order to find enforceable rights running to the Bondholders under the Lease and Indenture; they do under the agreements.  In any event, KCAB's interpretation of KY. REV. STAT. ANN. § 103.260 fails in two critical respects.

First, it violates basic principles of statutory construction.  The basic interpretational dispute here is whether the phrase "at or before issuance of the bonds" in subsection (a) of the statute should be read into subsection (b).  If it is, KCAB argues, it only needs to ensure when the bond issue is sold that rentals fixed and revised from time to time are "sufficient to provide for payment of interest upon all bonds and to create a sinking fund to pay the principal thereof when due, and to provide for the operation and maintenance of the building and an adequate depreciation account."  Yet, the legislature did not put the phrase "at or before issuance of the bonds" into subsection (b).  Further, implying the phrase into subsection (b) would render meaningless the phrase "revised from time to time" which is explicitly contained in subsection

(b).  Courts in Kentucky observe the canon that where there is an apparent conflict between statutes or sections thereof, courts must endeavor to harmonize its interpretation so as to give effect to both.  <u>Ky. Ins. Guar. Ass'n v. Natural Res. and Envtl. Prot. Cabinet</u>, 885 S.W.2d 315, 317 (Ky. App. 1994); <u>see also</u> <u>Brooks v. Commonwealth</u>, 217 S.W. 3d 219, 223 (Ky. 2007) (rules of statutory construction require interpretation that harmonizes the statutes and prevents a part of a statute from becoming meaningless or ineffectual).

Second, and particularly in relation to KCAB's insinuation that Appellants are seeking to require KCAB to set an unreasonable future rent, there is nothing in the statute which permits KCAB to retain for itself proceeds of rentals on a facility when the bonds supporting the construction of that facility have not been paid in full.  In other words, while the statute may not impose upon KCAB the obligation to obtain rental proceeds that are not commercially obtainable, there is nothing in that statute that gives KCAB license to enter into an agreement that defeases the Bonds, cancels remaining principal and interest, and retains for itself the right to all future rentals.  On the contrary, the Kentucky project finance statutes at issue were constructed so as to provide investors confidence that municipal issuers would take reasonable steps to see that all principal and interest on their bonds would be paid in full.  <u>See</u> KY. OP. ATTY. GEN. 2-448, 1978-1979, Ky. OAG 79-439, 1979 WL 33371 (Ky. A.G.) (regarding additional security for bondholders, the Attorney General opined that KY. REV. STAT. ANN. § 103.251, which provides for a mortgage deed of trust, is merely a "logical remedial refinement of the industrial revenue bond law, which is calculated to give the bondholders additional security, and thus promotes a lower rate of interest as to the bonds.").

MIAMI 728994 (2K)

CONCLUSION

For the foregoing reasons, Appellants respectfully request entry of an order (i) vacating

the Settlement Order, and (ii) granting such other further relief as is just.

Dated: June 29, 2007
       New York, New York

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York  10036-2787
(212) 819-8200
By: /s/J. Christopher Shore
J. Christopher Shore (JCS-6031)

Wachovia Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
(305) 371-2700
Thomas E Lauria (*pro hac vice* application pending)
John K. Cunningham (JC 4661)

ATTORNEYS FOR THE AD HOC COMMITTEE OF
KENTON COUNTY BONDHOLDER