**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

───────────────────────────────

In re DELTA AIR LINES, INC. et al.,

    Debtors.

───────────────────────────────

KENTON COUNTY BONDHOLDERS COMMITTEE,

    Appellants,

  - against -

DELTA AIR LINES, INC. et al.,

    Appellees.

───────────────────────────────

Chapter 11

05-B-17923 (ASH)

07 Civ. 3968 (JGK)

OPINION AND ORDER

**JOHN G. KOELTL, District Judge:**

   The appellants, a group of Bondholders who hold approximately $50 million in face amount of Bonds issued by the Kenton County Airport Board ("KCAB") pursuant to a 1992 Trust Indenture which covered the issuance of over $400 million in Bonds, appeal a Settlement Order entered by the United States Bankruptcy Court for this district approving a Settlement Agreement (the "Settlement") between Chapter 11 debtor Delta Air Lines ("Delta"), KCAB, and UMB Bank, N.A. ("UMB") as successor Trustee for the Bondholders under the 1992 Indenture.  See In re Delta Air Lines, Inc., No. 05 B 17923, 2007 WL 1805567 (Bankr. S.D.N.Y. Apr. 25, 2007).  There is jurisdiction to hear the appeal pursuant to 28 U.S.C. § 158(a)(1).

1

The Court has reviewed the Bankruptcy Court's thorough decision approving the Settlement and the arguments of the parties to this appeal.  The Settlement Order is **affirmed** for substantially the reasons stated by the Bankruptcy Court and for the additional reasons discussed below.

### I.

### A.

The following facts are undisputed unless otherwise noted.

The KCAB Bonds ("Bonds") at issue in this appeal relate to Delta's use of and improvements made to the Cincinnati/Northern Kentucky Airport, which is a hub for Delta's operations.  The KCAB Bonds were issued under a Trust Indenture (the "Indenture") dated February 1, 1992 between KCAB as issuer and Star Bank, N.A., the predecessor-in-interest to UMB, acting as Trustee. Concurrent with the issuance of the Bonds, Delta and KCAB entered into several interrelated agreements, including a Lease Agreement (the "Lease") between Delta and KCAB that called for rental payments over thirty years equal to the amounts due on the Bonds.  The Indenture indicates that the Bonds are non-recourse with respect to KCAB (Indenture ¶¶ 2.05, 7.01, Ex. A to App. to Appellants' Br.; see also Lease ¶ 6.15, Ex. D to Appellants' Br.), and it assigns to the Bond Trustee KCAB's right to receive rental payments from Delta pursuant to the

Lease, which the Indenture expressly references (Indenture preamble; see also Lease ¶¶ 4.03-4.04).  Under a separate Guaranty to the Bond Trustee, Delta agreed that it would make all of the payments due on the Bonds.  (Guaranty ¶ 1, Ex. B to Appellants' Br.)

On September 14, 2005, Delta (along with other debtors not parties to this appeal) filed a petition for bankruptcy protection under Chapter 11 of the Bankruptcy Code.  In late 2005, Delta informed KCAB and the Bond Trustee that it intended to reject certain of its contracts with KCAB, including the Lease, pursuant to section 365(a) of the Bankruptcy Code.  See 11 U.S.C. § 365(a).  On December 30, 2005, Delta, KCAB, and the Bond Trustee entered a Stipulation providing for a 60-day period to attempt to reach a consensual agreement, and in February 2006 the parties extended their negotiation period through May 1, 2006.  When no agreement had been reached by April 28, 2006, Delta filed in the Bankruptcy Court a motion seeking rejection of the Lease and certain other agreements.  Continued negotiations led the parties to enter a Forbearance Agreement on July 17, 2006 under which Delta made certain scheduled payments to the Bond Trustee and continued to use the airport facilities, and which provided that the parties would forbear from exercising any rights or remedies arising from Delta's failure to meet its full obligations under the Lease.  The Forbearance

3

Agreement was ultimately extended until the Settlement became effective.

During the negotiations between Delta, KCAB, and the Bond Trustee, the Bond Trustee issued sixteen Notices to the Bondholders that notified them that the Trustee was negotiating a settlement and entering into interim agreements which compromised Delta's payment of interest on the Bonds and that invited the Bondholders to join an unofficial committee of Bondholders ("Bondholders' Committee") to participate in negotiations and strategy discussions.  (See Ex. 2 to Decl. of James I. McClammy, June 22, 2007.)  The Bondholders' Committee, consisting of Bondholders holding approximately sixty percent of the outstanding principal amount of the KCAB Bonds, gave a written Direction authorizing the Bond Trustee to agree to the Settlement on February 22, 2007.  (See Ex. O to Appellants' Br.) The parties then announced the principal terms of the Settlement to the Bankruptcy Court at a hearing on February 22, 2007, and the next day the Bond Trustee sent notice of the Settlement terms to all Bondholders.

In summary, the Settlement Agreement provides that the Lease, Guaranty, and certain other agreements would be terminated and that the 1992 Bond Indenture would have no force outside the terms of the Settlement.  Delta and KCAB would enter a new lease agreement and Delta would issue a new Note to the

Bond Trustee, on behalf of the Bondholders, with the original principal amount of $85 million less amounts paid during the interim negotiations and bearing a fixed eight percent interest rate.  The Bond Trustee, on behalf of the Bondholders, would have a $260 million allowed pre-petition, non-priority, unsecured claim against Delta.  Delta would reimburse the Bond Trustee up to $2 million for fees and expenses incurred during the bankruptcy negotiations.  Finally, Delta, KCAB, the Bond Trustee, and the Bondholders would release any claims or rights that each might have against the others with respect to the Bonds and the related agreements or the negotiated Settlement. The Settlement was expressly conditioned upon the Bankruptcy Court's entry of a Settlement Order approving the Settlement's terms and finding the terms fair and reasonable and in the best interest of Delta and its creditors, KCAB, the Bond Trustee, and the Bondholders.  The Settlement also provides that the terms of the Settlement are incorporated in Delta's Joint Plan of Reorganization and subject to creditor approval of the Plan. (See Settlement Agreement, Ex. P to Appellants' Br.)

On March 6, 2007, the appellants, an ad hoc group of Bondholders who object to the Settlement, sent a letter informing the Bond Trustee, Delta, and KCAB of their objections. On March 8, 2007, Delta submitted a motion pursuant to Bankruptcy Rule 9019 for the Bankruptcy Court to approve the

Settlement.  The appellants filed an objection to the Settlement
Motion, but after limited expedited discovery and extensive
argument, the Bankruptcy Court entered the Settlement Order on
April 24, 2007, with a written decision following on April 25,
2007.

While negotiations related to the Settlement were under
way, Delta's bankruptcy proceedings continued.  On February 7,
2007, the Bankruptcy Court entered an Order approving the
Disclosure Statement for the Plan of Reorganization, and Delta
and the other debtors distributed ballots to vote on their Joint
Plan of Reorganization in February of 2007.  The ballots were
issued before the Settlement was reached, but the Bondholders
and other creditors were fully informed of the terms of the
Settlement through a variety of means before the voting deadline
of April 9, 2007.  (See Exs. 2 & 3 to McClammy Decl.; Ex. R to
Appellants' Br.)  The Bondholders who voted on the Plan
overwhelmingly approved of it, with 97.35% in dollar amount and
89.19% in number voting to accept the Plan.[1]  After a hearing to
consider confirmation of the Joint Plan of Reorganization, the
Bankruptcy Court issued an Order confirming the Plan on April
25, 2007.  The Plan had an effective date of April 30, 2007,

---

[1]  The appellants contest this tabulation of votes cast by the Bondholders,
which the Bankruptcy Court cited, but they have provided no basis for finding
that anything other than an overwhelming majority of the voting Bondholders
approved the Plan, in keeping with the overwhelming approval from every class
of creditors who voted on the Plan.  (See Certif. of Jane Sullivan, Ex. 4 to
McClammy Decl.)

with initial distributions of shares of the reorganized Delta's stock to follow on May 3, 2007.  Under the Settlement's terms, its "Closing Date" was coordinated to coincide with the May 3, 2007 date of initial distributions under the Plan.

Immediately after the Bankruptcy Court had approved the Settlement, the appellants filed a notice of appeal and a motion requesting an expedited appeal in this Court.  On April 26, 2007, the appellants orally moved the Bankruptcy Court for a stay pending appeal, and the court denied that motion orally, with a formal order denying the motion following on April 27, 2007.  The appellants then immediately moved this Court for a stay pending appeal, and after extensive argument on May 2, 2007, this Court denied the motion, finding among other things that the appellants had failed to establish a likelihood of success on appeal.

The next day, May 3, 2007, the reorganized Delta issued Notes in the aggregate amount of $65,875,000 pursuant to the Settlement.  Delta also made an initial distribution of 5,848,221 shares of stock to the Bondholders in connection with their $260 million pre-petition claim under the Settlement. Delta also entered into a new Lease and other agreements with KCAB pursuant to the Settlement, and the settling parties have to date fully implemented the Settlement in accordance with its terms.  (See Aff. of Billy W. Williams ¶¶ 4.)  The new Notes and

the shares of reorganized Delta stock are freely tradeable, and Delta made the distributions through financial intermediaries without knowing the actual identities of the Bondholders. (<u>Id.</u> ¶¶ 5-6.)

### B.

Briefing on the current appeal proceeded according to a Court-ordered stipulated schedule governing both this appeal of the Settlement Order and the same appellants' related appeal of the Order Confirming the Joint Plan of Reorganziation (docketed as 07 Civ. 4148). (<u>See</u> Stipulation & Order Regarding Appeals, Docket No. 20.)  This appeal is opposed by Delta, UMB as the successor Bond Trustee, KCAB, and the Post Effective Date Committee (as successor to the Official Committee of Unsecured Creditors in the Delta bankruptcy).

Pursuant to the terms of the Stipulation and Order Regarding Appeals, the American Bankers Association ("ABA") moved for leave to file a brief as amicus curiae in support of the appellee UMB. (Docket No. 15.)  The motion is unopposed, and the Court **grants leave** for the ABA to file its brief as amicus curiae, which the Court has considered in connection with this appeal.

## II.

The Court reviews the Bankruptcy Court's conclusions of law de novo and its findings of fact for clear error.  Citibank, N.A. v. Vebeliunas, 332 F.3d 85, 90 (2d Cir. 2003); In re Johns-Manville Corp., 340 B.R. 49, 58 (S.D.N.Y. 2006); see also Fed. R. Bankr. P. 8013.  A bankruptcy court's finding pursuant to Bankruptcy Rule 9019 that a settlement is reasonable is reviewed for abuse of discretion.  In re Iridium Operating LLC, 478 F.3d 452, 461 n.13 (2d Cir. 2007); In re Purofied Down Prods. Corp., 150 B.R. 519, 522 (S.D.N.Y. 1993).  The bankruptcy court will have abused its discretion if "no reasonable man could agree with the decision" to approve a settlement.  In re Frost Bros., Inc., 91 Civ. 5244, 1992 WL 373488, at *4 (S.D.N.Y. Dec. 2, 1992) (internal quotation marks omitted).

## III.

As an initial matter, the appellees argue that the Court should dismiss the appeal as constitutionally or equitably moot.

An appeal must be dismissed as constitutionally moot when "an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party."  Church of Scientology v. United States, 506 U.S. 9, 12 (1992) (quoting Mills v. Green, 159 U.S. 651, 653 (1895)).  Even when a bankruptcy appeal is not

constitutionally moot, it should be dismissed as equitably moot
when, "even though effective relief could conceivably be
fashioned, implementation of that relief would be inequitable."
In re Metromedia Fiber Network, Inc., 416 F.3d 136, 143 (2d Cir.
2005) (quoting In re Chateaugay Corp., 988 F.2d 322, 325 (2d
Cir. 1993) ("Chateaugay I")).  The appellees focus on their
argument that the appeal is equitably moot.

The Court of Appeals has recognized that bankruptcy appeals
may be equitably moot in two situations:  when an unstayed order
has resulted in a "comprehensive change in circumstances," and
when a reorganization is "substantially consummated."  Allstate
Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) (quoting
Chateaugay I, 988 F.2d at 325, and In re Chateaugay Corp., 10
F.3d 944, 952 (2d Cir. 1993) ("Chateaugay II")).  When a
reorganization has been "substantially consummated," as that
term is defined in the Bankruptcy Code, see 11 U.S.C. § 1101(2),
there is a "strong presumption" that an appeal of an unstayed
order is moot.  Allstate, 174 B.R. at 889; see also In re Enron
Corp., 326 B.R. 497, 502 (S.D.N.Y. 2005).  This presumption may
only be overcome when five circumstances are present:

> (a) the court can still order some effective relief;
> (b) such relief will not affect the re-emergence of
> the debtor as a revitalized corporate entity; (c) such
> relief will not unravel intricate transactions so as
> to knock the props out from under the authorization
> for every transaction that has taken place and create
> an unmanageable, uncontrollable situation for the

> Bankruptcy Court; (d) the parties who would be
> adversely affected by the modification have notice of
> the appeal and an opportunity to participate in the
> proceedings; and (e) the appellant pursue[d] with
> diligence all available remedies to obtain a stay of
> execution of the objectionable order . . . if the
> failure to do so creates a situation rendering it
> inequitable to reverse the orders appealed from.

Chateaugay II, 10 F.3d at 952-53 (alteration in original)

(internal quotation marks and citations omitted); see also

Allstate, 174 B.R. at 889.

While the Court of Appeals has not expressly formulated a

test for when a "comprehensive change of circumstances" renders

it inequitable to hear an appeal, courts have found the same

five equitable considerations listed above that can defeat a

claim of mootness in the context of "substantial consummation"

to be instructive as well in the context of a "comprehensive

change of circumstances."  See, e.g., Kassover v. Gibson, 02

Civ. 7978, 2003 WL 21222341, at *2 (S.D.N.Y. May 27, 2003),

aff'd, 98 Fed. Appx. 30 (2d Cir. 2004); Allstate, 174 B.R. at

889.

The Joint Plan of Reorganization has now been confirmed and

appears to be "substantially consummated."  However, because

this appeal relates only to the validity of the Settlement

Order, and not the full Plan, it is not clear that the

"substantially consummated" prong applies.  There has certainly

been a "comprehensive change in circumstances," and in any event

the distinction makes little difference because the same five factors guide the analysis.  The appellants do not contest that the parties have fully implemented the Settlement according to its terms, including entering into several new agreements relating to Delta's use of the Cincinnati/Northern Kentucky Airport, and that Delta has distributed millions of dollars in freely tradeable stock through financial intermediaries that cannot be reversed.  The Court then looks to the five factors listed above to determine whether the appellants can show that the Court should not find their appeal equitably moot.

The first Chateaugay II factor requires that some effective relief be available.  The appellants contend that it is not necessary to unwind the financial transactions that have transpired, but that the Court can fashion some relief by vacating the Settlement Order and leaving it to the appellees either to ratify the agreement without Bankruptcy Court approval of the releases or to reform the Settlement in a manner that addresses the appellants' objections.  In effect, this argument says that relief is possible even if the transactions cannot be unwound because a vacatur would nullify the releases and allow the appellants to assert claims for damages against KCAB or UMB as the Bond Trustee.  But to nullify the releases while leaving the remainder of the consummated Settlement intact would ignore the tradeoff that allowed the parties to settle in the first

instance and would treat a non-severable provision of the Settlement Agreement as dispensable.

The cases the appellants rely on do not support the idea that effective relief is available here.  In <u>LTV Corp. v. Aetna Cas. & Sur. Co.</u>, 167 B.R. 776 (S.D.N.Y. 1994) ("<u>Chateaugay III</u>"), the court declined to dismiss an appeal of a settlement order as moot, but there was no showing that the deal involved financial transactions that could not be unwound because it only involved a surety's payment to the debtor in return for a release of claims.  <u>Id.</u> at 778-79.  In <u>Feld v. Zale</u>, 62 F.3d 746 (5th Cir. 1995), the Court of Appeals for the Fifth Circuit found that a bankruptcy court did not have jurisdiction to enjoin certain third-party tort claims, which would not have affected the bankruptcy estate, as part of its approval of a settlement between the debtor and an insurer.  <u>Id.</u> at 755-57. However, because the court did not discuss equitable mootness at all, the case is inapposite.

The Bankruptcy Court found that the releases were a necessary part of the Settlement reached by the parties.  <u>See In re Delta</u>, 2007 WL 1805567 at *12-*13.  (<u>See</u> Settlement Agreement § 3.01 ("Except as the Parties may otherwise agree, all provisions of this Agreement are essential, non-severable terms . . . .").)  The distributions under the Settlement Agreement have already been made and the securities distributed

have likely been traded to parties who are not before the Court and those distributions cannot reasonably be undone and the appellants do not seek to do so.  While they do seek to undo the releases of claims against KCAB and the Trustee, those releases were an integral part of the entire Settlement and cannot equitably be undone in isolation from the distributions to the Bondholders which the appellants do not seek to reverse.  Cf. In re Metromedia, 416 F.3d at 145 (deeming appeal equitably moot where appellants sought to eliminate releases which were essential to the bargain struck); In re Enron Corp., 326 B.R. at 503 (finding appeal of exculpation provision moot where the bankruptcy court found the provision necessary for the negotiation of the reorganization plan); In re Texaco Inc., 92 B.R. 38, 45-50 (S.D.N.Y. 1988) (finding appeal seeking to sever and rescind releases moot because releases were part of an "integrated settlement" and their rescission would "undermine the entire reorganization").

As for the other Chateaugay II factors, The appellees assert that the absence of the vast majority of KCAB Bondholders from this proceeding would render it inequitable to undo the Settlement to benefit a small number of dissenting Bondholders. Courts have found that the effect on creditors who are not party to an appeal in analogous circumstances weighs in favor of finding an appeal moot.  See In re Revere Copper & Brass, Inc.,

14

78 B.R. 17, 18, 22 (S.D.N.Y. 1987).  Similarly, while the
Settlement comprises only a small part of Delta's Joint Plan of
Reorganization, its undoing would complicate Delta's rights to
an important hub of its operations and therefore risks having
some negative effect on Delta's vitality as a reorganized
entity.  These considerations are not alone determinative, but
they contribute to a finding of equitable mootness.

Because of the irreversible financial transactions that
have occurred, and because Delta has entered into a whole new
set of agreements relating to its use of the Cincinnati/Northern
Kentucky Airport as a hub of its operations, the appellants
cannot show that a vacatur of the Settlement Order, even if it
were possible, would not "knock the props out from under the
authorization for every transaction that has taken place and
create an unmanageable, uncontrollable situation for the
Bankruptcy Court."  Metromedia, 416 F.3d at 144 (quoting
Chateaugay II, 10 F.3d at 953).

Finally, as to the fifth Chateaugay II factor, the
appellants did avail themselves of their opportunity to seek a
stay of the Settlement Order, both before the Bankruptcy Court
and before this Court.[2]  But the appellants' diligence alone is

_____

[2]  While the appellants did not seek a stay from the Court of Appeals after
this Court denied a stay on the eve of the Settlement's Closing and the date
of initial distributions under the Settlement and the full Joint Plan of
Reorganization, the parties agree in light of the time constraints that this
fact is not grounds for mootness.

insufficient to avoid equitable mootness in light of the unavailability of effective relief and the other considerations discussed above.  See In re UNR Indus., 20 F.3d 766, 769-70 (7th Cir. 1994) ("[A] stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization."); cf. In re Gucci, 126 F.3d 380, 383, 387-89 (2d Cir. 1997) (appeal of sale pursuant to bankruptcy court auction was moot despite two unsuccessful attempts to obtain a stay).

In their reply, the appellants argue that the appellees manipulated the process to render any appeal moot by structuring the Settlement with releases of claims and a rapid Closing. However, the appellees have shown there was a good reason to time the Settlement Closing to coincide with initial distributions under the Joint Plan or Reorganization so that the KCAB Bondholders could have the benefit of freely trading the distributed stock at the same time as other creditors to avoid market risk.  Furthermore, the timing of the Settlement did not foreclose the appellants from making strenuous objections before the Bankruptcy Court and indeed seeking a stay before this Court.  The timing and structure of the Settlement therefore provides no basis for entertaining an appeal that cannot result in equitable or effective relief.

For all of these reasons, the Court concludes that it would be inequitable to hear this appeal and finds it equitably moot. Nonetheless, the Court considers the merits of the appeal below "so that there is no doubt as to the finality of the Bankruptcy Court's Order." Allstate, 174 B.R. at 891.

## IV.

On the merits of their appeal, the appellants repeat a variety of arguments that the Bankruptcy Court considered and rejected, although they have reformulated several of these arguments. The core of the appellants' position is (i) that the Bankruptcy Court had no jurisdiction or power to impose a Settlement that released claims against KCAB, Delta, the Trustee, and other Bondholders, and (ii) that the Trustee had no authority in the first instance to bind dissenting Bondholders to a Settlement reducing the principal and interest that would be repaid under the KCAB Bonds. The appellants also devote much attention to alleged rights they have against KCAB to require it to "re-let" Delta's airport space and to pay the proceeds to the Bondholders. These issues are addressed in turn.

## A.

The appellants' argument that the Bankruptcy Court lacked subject matter jurisdiction to order the Settlement lacks merit

17

for the reasons the Court discussed in its denial of the motion
for a stay.  The Bankruptcy Court plainly had jurisdiction under
28 U.S.C. §§ 1334(b) to approve this Settlement binding non-
debtors because the litigation that was settled had more than a
"conceivable effect" on the bankrupt estate; it in fact had a
very clear effect on Delta's obligations.  In re Cuyahoga Equip.
Corp., 980 F.2d 110, 114 (2d Cir. 1992) (citing Pacor, Inc. v.
Higgins, 743 F.2d 984, 994 (3d Cir. 1984)); see also In re
Worldcom Inc. Secs. Litig., 293 B.R. 308, 318 (S.D.N.Y. 2003).
The Bankruptcy Court correctly found that the Indenture and the
associated Lease and Guaranty are "inextricably related to each
other" and that the court could not resolve the creditor claims
of KCAB and the Bondholders against Delta without a
corresponding resolution of the relationship between KCAB and
the Bondholders.  In re Delta, 2007 WL 1805567 at *11.

     The appellants also argue more specifically that the
Bankruptcy Court lacked jurisdiction or power to approve the
releases of claims against the non-debtors, which are contained
in section 3.02(f) of the Settlement Agreement.  As the Court
found previously in denying the stay, this argument has no
merit.  A Bankruptcy Court may approve the release of claims
against third parties where those releases played an "important
part" in a debtor's reorganization plan.  In re Drexel Burnham
Lambert Group, Inc., 960 F.2d 285, 293 (2d Cir. 1992); see also

Bartel v. Bar Harbor Airways, Inc., 196 B.R. 268, 274 (S.D.N.Y. 1996).  The In re Metromedia decision relied on by the appellants does not bar the releases in this case.  The Bankruptcy Court found that the releases of claims against KCAB, Delta, the Bond Trustee, and the Bondholders at issue here are narrowly drawn and are necessary to prevent relitigation of precisely the claims that were negotiated and resolved by the Settlement Agreement.[3]  See In re Delta, 2007 WL 1805567 at *12-*13.  It is furthermore clear that they comprised valuable consideration for KCAB and the Bond Trustee in return for their agreement to give up indemnification rights against Delta under section 6.08 of the Lease, and therefore the releases are of the kind In re Metromedia expressly lists as acceptable.  416 F.3d at 142.

The appellants raise several new arguments that essentially repackage their assertion that the Bankruptcy Court lacked jurisdiction and power to approve this Settlement.  First, the appellants assert that the Bankruptcy Court's actions denied them their constitutional right to due process because the Settlement Order's release of claims eliminates their ability to bring claims as individual Bondholders against the Bond Trustee, KCAB, or other Bondholders and they were thus never afforded an

---

[3]  The Bond Trustee points out the irony that the appellants' actions in this very case show why parties would rarely agree to settle without being released from claims relating to the settlement itself.

opportunity to adjudicate those claims.  In particular, the
appellants point to their alleged right to sue the Bond Trustee
for failing to act prudently in accordance with section 10.18 of
the Indenture and to their right to hold KCAB accountable for
"re-let proceeds" they allege that KCAB must pursue under
section 8.07(c) of the Lease, both rights which are expunged
under the Settlement.

     This due process argument was not made to the Bankruptcy
Court below.  Because the argument was raised for the first time
on appeal, the Court can decline to hear it.  See, e.g.,
Adelphia Bus. Solutions, Inc. v. Abnos, 482 F.3d 602, 607 (2d
Cir. 2007); Gulino v. N.Y. State Educ. Dep't, 460 F.3d 361, 380
n.22 (2d Cir. 2006).  In any event, the argument has no merit
because the Bankruptcy Court gave the appellants notice and an
opportunity for both expedited discovery and a hearing on their
objections to the proposed Settlement, and obviously the
appellants availed themselves of this opportunity.  It is no
answer to say that the Bankruptcy Court proceedings did not
adjudicate the alleged claims of individual Bondholders because
the matter before the Bankruptcy Court was a motion pursuant to
Bankruptcy Rule 9019 to approve a Settlement, not an
adjudication on the merits of individual tort or contract
claims, and the Bankruptcy Court concluded that the Bond Trustee
was authorized to enter into the Settlement on behalf of all

Bondholders.   See In re Purofied Down Prods. Corp., 150 B.R. at 522-23 ("[L]ittle would be saved by the settlement process if bankruptcy courts could approve settlements only after an exhaustive investigation and determination of the underlying claims.").

Second, the appellants argue that the Bankruptcy Court failed to abide by certain procedural rules in effectively adjudicating their claims as individual Bondholders without an adversary proceeding.  This argument also was not raised below and is therefore waived, see Gulino, 460 F.3d at 380 n.22, and moreover the argument lacks merit because the appellants had ample notice and opportunity to voice their views on the Settlement generally and on the release of claims specifically.

For all of these reasons, and for the reasons stated by the Bankruptcy Court, the appellants' arguments that the Bankruptcy Court lacked either jurisdiction or power to approve the Settlement, and in particular to approve the releases, are without merit.

### B.

The appellants also continue to argue, as they did before the Bankruptcy Court and before this Court on the stay, that the terms of the Indenture did not authorize the Bond Trustee to settle for less than the full value of the Bonds over the

objection of some Bondholders.[4]   The appellants contend that so-
called "non-impairment" provisions in sections 9.06, 12.03(a),
12.06, and 12.07 of the Indenture protect minority rights by
prohibiting the impairment of a Bondholder's right to receive
payment of the principal and interest on a Bond or to institute
suit for the enforcement of any past-due payment without the
consent of that Bondholder.

Considering all of the relevant provisions of the
Indenture, the Bankruptcy Court correctly found that the
Indenture did not bar it from approving the Settlement,
particularly in view of the agreement by the Bond Trustee at the
direction of a majority in principal amount of the Bondholders
to enter into the Settlement, the Bankruptcy Court's independent
finding that the Settlement was fair and reasonable and in the
interest of all Bondholders, and the approval of the Joint Plan
of Reorganization, which incorporates the Settlement, by a large
majority of the Bondholders.   See In re Delta, 2007 WL 1805567
at *7-*10.   The Bankruptcy Court was also correct in finding
that any impairment of the Bondholder's ability to collect was
due to Delta's default due to bankruptcy and its protection
under the bankruptcy laws, not to any act of the Issuer or Bond
Trustee.

---

[4]   It should be noted that if the Bond Trustee was so authorized, this is
an additional reason that the appellants' other arguments are without merit
because the appellants would be parties to a Settlement agreed to by their
authorized agent.

In reaching this conclusion, the Bankruptcy Court carefully reviewed the Indenture, including all of Article IX relating to "Defaults and Remedies," and found that "[t]hese provisions, individually and collectively, make absolutely clear that, when there is a default by the issuer, the Bond Trustee alone has the power and authority to commence remedial procedures on behalf of all Bondholders, constrained only by the direction of a majority in amount of the Bondholders." Id. at *10. Furthermore, the power to negotiate and agree upon settlements inheres within this power to commence remedial procedures. See, e.g., In re Smart World Tech., LLC, 423 F.3d 166, 174-75 (2d Cir. 2005); In re Adelphia Commc'ns Corp., 361 B.R. 337, 355 (S.D.N.Y. 2007). Moreover, non-impairment clauses of the type upon which the appellants rely become moot in the context of a default because of bankruptcy. In re Delta, 2007 WL 1805567 at *10 (collecting cases).

The brief of the amicus curiae ABA further convincingly shows that section 9.06 of the Indenture borrows language from the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. §§ 77aaa et seq., which was included in indentures to prevent insiders from renegotiating an issuer's obligations to the detriment of non-insider investors and was never intended to preclude a trustee from procuring a satisfactory compromise, subject to judicial scrutiny and approved by a majority of the bondholders, from a

bankrupt issuer.  (Br. of Amicus Curiae American Bankers
Association 7 (citing Hearing on H.R. 10292 Before the Subcomm.
of the Comm. on Interstate and Foreign Commerce, 75th Cong. 3
(1938) (statement of William O. Douglas, SEC Chairman)).)
Moreover, the appellants concede that the case law suggests the
language of section 9.06 would not prevent a trustee from
impairing rights to principal and interest if the issuer were
the bankrupt.

　　While KCAB, rather than Delta, is the issuer of the Bonds
here, the Bankruptcy Court correctly found that the bonds are
non-recourse with respect to KCAB and that Delta provides the
only guaranteed source of payments under the Bonds.  The
appellants have provided no authority holding that a non-
impairment provision like section 9.06 requires unanimous
Bondholder consent to enter a settlement in the circumstances
present here.  Delta's bankruptcy, which compromised the
Guaranty and the Lease which are "inextricably related" to the
Indenture, also compromised the rights to payment under the
Bonds and therefore overrides the protection of section 9.06.
In any event, section 10.10 of the Indenture provides that the
Bond Trustee may resolve any ambiguities or inconsistencies in
the Indenture in good faith, and there is no question that the
Bond Trustee's interpretation that section 9.04 takes precedence

over section 9.06 in the circumstances present here is a good
faith interpretation.

In summary, the Court concurs with the Bankruptcy Court's
conclusion that the Indenture authorized the Bond Trustee to
conduct remedial proceedings at the behest of a majority of the
Bondholders, and that the Bond Trustee's remedial powers
included the right to enter the Settlement that was ultimately
approved by the Bankruptcy Court.

### C.

The appellants' arguments concerning KCAB's alleged
liability to the Bondholders for "re-let proceeds" under the
Lease and Indenture provide no basis for reversal.  First, as
the Bankruptcy Court found, the issue of re-let proceeds was
both a legal and factual question that confronted the parties to
the Settlement and that was resolved by the Settlement, which
the Court has already concluded the Bond Trustee was authorized
to enter on behalf of the Bondholders and which the Bankruptcy
Court had the power to approve.  See In re Delta, 2007 WL
1805567 at *5.  As such, further inquiry into the question
whether the Lease and Indenture assigned rights to the re-let
proceeds to the Bondholders is wholly unnecessary.

Second, even if the Court were to look behind the
Settlement and decide whether the governing documents assigned

to the Bondholders any claims based on re-let rights, it would
conclude that they do not.  Delta's payments under the Lease
(and guaranteed in the Guaranty to be paid to the Bond Trustee
on behalf of the Bondholders) constituted the only payment
stream to which the Bondholders were entitled.  See In re Delta,
2007 WL 1805567 at *2, *11.  The provision the appellants
contend establishes their right to re-let proceeds, section
8.07(c) of the Lease, provides that KCAB owes a duty to use its
"best efforts" to re-let any vacated portion of its leased
facilities "and to credit all rentals derived from any such
reletting to the rentals payable by [Delta] under this
Agreement."  The Lease is an agreement between KCAB and Delta,
and thus the duty expressed in section 8.07(c) is a duty owed by
KCAB to Delta.  The Lease required KCAB to assign to the Bond
Trustee certain rights of KCAB under the Lease as security for
the payment of the Bonds, including KCAB's right to receive
payments from Delta, but it explicitly did not assign
"Unassigned Rights."  (Lease § 4.04.)  The Indenture
specifically included KCAB's duty to re-let under section 8.07
of the Lease as one of the "Unassigned Rights" and hence it was
a right not assigned to the Bond Trustee.  (See Indenture § 1.01
("Unassigned Rights").)  A carve-out to the Unassigned Rights
language does appear to provide that money produced through re-
letting the facilities should be applied toward payment of the

Bonds (see id.), but to say that KCAB should forward any proceeds it receives from re-letting the facilities to the Bond Trustee for the benefit of the Bondholders is not the same as imposing upon KCAB a duty to the Bondholders to re-let the facilities.  The re-let provision provides an obligation on KCAB to mitigate its damages in the face of a default by Delta under the Lease and to apply the proceeds toward payment of the Bonds.  But the re-let obligation was never a duty owed to the Bond Trustee or the Bondholders.  Hence, the re-let provision of the Lease provides no basis for the Trustee, much less individual Bondholders, to enforce any right to require KCAB to re-let vacated facilities.

Finally, the evidence before the Bankruptcy Court relating to the availability of alternative tenants for the facilities at issue showed that no tenant other than Delta would want to make the airport a hub and that some efforts had been made to find other potential tenants.  (See Dep. of Robert F. Holscher 62-63, 73, 198-99, 206-07, Ex. 11 to McClammy Decl.)  It is thus unrealistic in the extreme to assert that the Bond Trustee could have sought greater recovery for the Bondholders than they received under the Settlement by attempting to enforce any rights to the re-let provisions.

For all of these reasons, the appellants have failed to show that the Settlement improperly impaired any rights to re-let proceeds.

### CONCLUSION

The Court has considered the appellants' remaining arguments and found them to be either moot or without merit. The Settlement Order entered by the Bankruptcy Court is therefore **affirmed**.

SO ORDERED.

Dated:      New York, New York
            August 2 7, 2007

                                    _____
                                         John G. Koeltl
                                  United States District Judge